Amanda R. Washton (SB# 227541)
  *a.washton@conklelaw.com*
CONKLE, KREMER & ENGEL
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California  90403-2351
Phone: (310) 998-9100 • Fax: (310) 998-9109

Peter A. Gergely (Admitted Pro Hac Vice)
  *PGergely@merchantgould.com*
Ryan James Fletcher, Ph.D. (*Admitted Pro Hac Vice*)
  *RFletcher@merchantgould.com*
Andrew T Pouzeshi (*Admitted Pro Hac Vice*)
  *apouzeshi@merchantgould.com*
MERCHANT & GOULD, P.C.
1801 California St., Suite 3300
Denver, CO 80202

*Attorneys for Defendants*
*True Wearables, Inc. and Marcelo Lamego*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware Corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation,, <br><br> Plaintiff, <br><br> v. <br><br> TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual, <br><br> Defendant. | CASE No. Case No. 8:18-cv-2001-JVS-JDE <br><br> **DEFENDANTS TRUE WEARABLES, INC.'S AND MARCELO LAMEGO'S OPENING CLAIM CONSTRUCTION BRIEF** <br><br> Hon. James V. Selna <br> Presiding Judge <br> Hon. John D. Early <br> Magistrate Judge <br><br> Complaint Filed:    November 8, 2018 <br> Trial Date:          August 18. 2010 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION. ..................................................................................... 7

II.    LEGAL STANDARD FOR CLAIM CONSTRUCTION. .......................... 7

III.   DEFENDANTS' PROPOSED CONSTRUCTIONS ARE
       CONSISTENT WITH THE CLAIM LANGUAGE,
       SPECIFICATIONS AND PROSECUTION HISTORIES. ........................... 7

       A.   7,186,966: Amount-Of-Use Tracking Device And Method For
            Medical Product. ............................................................................ 8

            1.    The preamble of claim 1 is limiting ........................................ 8

            2.    "caregiver" is a third-party care provider. ............................. 8

            "medical product" ..................................................................... 3

            "amount of use" ........................................................................ 4

            "patient monitor" ...................................................................... 6

       B.   7,295,866: Low-Power Pulse Oximeter ..................................... 13

            "first duty cycle" ..................................................................... 7

            "first power consumption" ...................................................... 7

            "second duty cycle" ................................................................ 7

            "second power consumption" .................................................. 7

            "duty cycle"……………………………………………………7

       C.   8,886,271 and 10,194,848: Non-invasive Physiological Sensor
            Cover .......................................................................................... 15

            "an opaque portion attachable to the sensor and configured to
            block readings by the sensor" ................................................. 9

            "an opaque portion attachable to the sensor and configured to
            block optical readings by the sensor" .................................... 9

            "the sensor cover blocking readings by the sensor" ............. 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"the sensor cover is configured to prevent the detector from receiving light when the sensor is active" ........................................... 12

"blocking, with the sensor cover, the light from one or more emitters from being received by the detector of the sensor" .............. 12

"the opaque portion is configured to block ambient light from a surrounding area" ................................................................................ 12

"blocks at least a portion of ambient light from a surrounding area from being received by the detector" ........................................... 12

"opaque portion is configured to prevent the detector from receiving light during sensor activation" ........................................... 14

"the sensor cover is configured to block the light from the one or more emitters from being received by the detector" ........................... 14

"protrudes from the sensor" .................................................................. 14

"protrudes from the pulse oximeter sensor" ....................................... 14

"a protruding portion that protrudes from the pulse oximeter sensor" ................................................................................................ 14

"blocks at least a portion of light from the one or more emitters from being received by the detector" .................................................. 15

"blocks at least a portion of light from the one or more emitters of the pulse oximeter sensor from being received by a detector of the pulse oximeter sensor" .................................................................. 15

"blocking, with the sensor cover, at least a portion of the light from the one or more emitters from being received by the detector" ...... ....... 16

"the sensor cover reduces false readings by the pulse oximeter until the pulse oximeter sensor is in use ............................................. 16

"false readings" ...................................................................................... 16

"at least partially opaque" ..................................................................... 17

"partially or fully opaque" ..................................................................... 17

DEFENDANTS TRUE WEARABLES, INC.'S AND MARCELO LAMEGO'S
OPENING CLAIM CONSTRUCTION BRIEF

D.    8,983,564 and 10,194,847: Perfusion Index Smoother ........................23

    "indication of perfusion index"..............................................................18

    "indication of amplitude"......................................................................18

    "selecting a lowest indication of amplitude from the first
    and second indications"   …………………………………………18

    1.    The "indication of perfusion index" and "indication of
          amplitude" must be numerical values.........................................24

    2.    The "indication of perfusion index" is the perfusion index. ......25

    3.    The "first and second indications of amplitude" are each a
          calculated value of amplitude. ...................................................25

    "calculation technique(s)".....................................................................21

    "pleth" ...................................................................................................22

    "perfusion" ............................................................................................23

    "statistically analysis"..........................................................................24

IV.    CONCLUSION. ............................................................................................30

DEFENDANTS TRUE WEARABLES, INC.'S AND MARCELO LAMEGO'S
OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

. *Acqis LLC v. Alcatel-Lucent USA Inc.*
No. 6:13-CV-638, 2015 U.S. Dist. LEXIS 48339, at *10-11 (E.D. Tex.
Apr. 13, 2015)................................................................................................23

*Audionics Sys., Inc. v. AAMP of Florida, Inc.*
No. CV 12-10763 MMM (JEMx), 2013 U.S. Dist. LEXIS 188664, at
*36-51 (C.D. Cal. Sept. 12, 2013)................................................................23

*Biogen Idec v. GlaxoSmithKline*
713 F.3d 1090 (Fed. Cir. 2013)......................................................................7

*Catalina Mktg. Int'l v. Coolsavings.com*
289 F.3d 801 (Fed. Cir. 2002).......................................................................8

*Emtel v. Medaire*
No. H-11-3007, 2016 U.S. Dist. LEXIS 48783, at 13 (S.D. Tex. Apr.
12, 2016).........................................................................................................9

*Fenner Investments v. Cellco P'ship*
778 F.3d 1320 (Fed. Cir. 2015)....................................................................12

*Hyperphrase Techs., LLC v. Google, Inc.*
260 F. App'x 274 (Fed. Cir. 2007)...............................................................25

*Karlin Tech. v. Surgical Dynamics*
177 F.3d 968 (Fed. Cir. 1999)......................................................................18

*Markman v. Westview Instruments*
517 U.S. 370 (1996).......................................................................................7

*McHugh v. Hillerich & Bradsby Co.*
No. C 07-03677 JSW, 2010 U.S. Dist. LEXIS 16164, at *14-15 (N.D.
Cal. Feb. 24, 2010).......................................................................................17

*Mount Hamilton Partners, LLC v. Groupon, Inc.*
No. C 12-1700 SI, 2014 U.S. Dist. LEXIS 34556, at *20 (N.D. Cal.
Mar. 14, 2014)..............................................................................................16

*Nautilus, Inc. v. Biosig Instruments, Inc.*
572 U.S. 898 (2014).....................................................................................29

*Novo Indus., L.P. v. Micro Molds Corp.*
350 F.3d 1348 (Fed. Cir. 2003)....................................................................29

*Ormco Corp. v. Align Tech., Inc.*
498 F.3d 1307 (Fed. Cir. 2007)....................................................................11

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................ 7

*Power Mosfet Techs., L.L.C. v. Siemens AG*
    378 F.3d 1396 (Fed. Cir. 2004) ..................................................................... 25

*Verizon Services Corp. v. Vonage Holdings Corp.*
    503 F.3d 1295 (Fed. Cir. 2007) .................................................................... 11

## FEDERAL STATUTES

35 U.S.C. § 102 ........................................................................................................... 11

DEFENDANTS TRUE WEARABLES, INC.'S AND MARCELO LAMEGO'S
OPENING CLAIM CONSTRUCTION BRIEF

I.   **INTRODUCTION.**

Defendants True Wearables, Inc. and Marcelo Lamego's (collectively "True Wearables") proposed constructions should be adopted because they are consistent with the intrinsic evidence of the patents-in-suit.

II.   **LEGAL STANDARD FOR CLAIM CONSTRUCTION.**

Claim construction is a matter of law for the Court. *Markman v. Westview Instruments*, 517 U.S. 370, 391 (1996). The claims define the scope of the invention and are "generally given their ordinary and customary meaning," as understood by a person of ordinary skill in the art ("POSA"). *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

The claim language, specification, and prosecution history are the best source for understanding a patent term with the specification "[u]sually [being] dispositive" and serving as "the single best guide to the meaning of a disputed term." *Id.* at 1315. The prosecution history can "demonstrat[e] how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.* at 1317. Narrowing of claims may be done through amendment or argument, which need not be explicit statements of disavowal, but need only be made with reasonable clarity and deliberateness. *Id.* at 1317; *Biogen Idec v. GlaxoSmithKline*, 713 F.3d 1090, 1096 (Fed. Cir. 2013).

A court may also consider "extrinsic evidence," which includes dictionaries. *Markman*, 52 F.3d at 980. Dictionaries can be useful as they are generally viewed as unbiased and "endeavor to collect the accepted meanings of terms. . . ." *Phillips*, 415 F.3d at 1318, 1322 (further noting dictionaries "are often useful in understanding the commonly understood meaning of words").

III.   **DEFENDANTS' PROPOSED CONSTRUCTIONS ARE CONSISTENT WITH THE CLAIM LANGUAGE, SPECIFICATIONS AND PROSECUTION HISTORIES.**

A.     **7,186,966: Amount-Of-Use Tracking Device And Method For Medical Product.**

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "caregiver" (claim 1) | Preamble limiting; A third-party care provider | Preamble not limiting; Plain and ordinary meaning or "a person, including oneself, who provides care" |

The term "caregiver", in the preamble of claim 1 of the '966 patent,[1] gives life and meaning to the claim, and is thus limiting. *Catalina Mktg. Int'l v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002). It should be construed as "a third-party care provider."

### 1.     The preamble of claim 1 is limiting.

The '966 patent is directed to methods for ensuring that a pulse oximeter sensor is replaced before the sensor becomes soiled, contaminated, damaged, or otherwise affected by overuse. (Joint Appendix ("JA") at MASM0000227 (1:59-2:5).[2]) However, an expired sensor cannot replace itself. Thus, the invention informs the caregiver when the sensor needs replacement. (JA at MASM0000227 (2:12-16).)

Claim 1 recites "activating one or more indications" when a sensor expires; however, merely "activating" an "indication," is insufficient to achieve the stated goal of the patent because the indication could be "activated" while not being readily visible or apparent to the party responsible for replacing the expired component. Thus, to give the intended life and meaning to claim 1, it is necessary to consider the preamble, which recites "tracking . . . *to alert a* caregiver."

### 2.     "caregiver" is a third-party care provider.

_____

[1] Ex. A, attached hereto, provides all claims containing the disputed terms with all disputed terms bolded and underlined.

[2] This citing convention refers to the patent column followed by the line number in that particular column.

1  The court should construe "caregiver" as meaning "a third-party care provider."

2  The specification explains that pulse oximetry is used to monitor medical patients at

3  risk of receiving insufficient oxygen supply, such as those in critical care or in surgery.

4  (JA at MASM0000227 (1:36-38).) Accordingly, claim 1 recites alerting a "caregiver"

5  because such patients are not in a position to (a) receive or comprehend an alert of

6  component expiration and (b) replace an expired component. Merriam-Webster defines

7  "caregiver" as "a person who provides direct care, as for children, the disabled, or the

8  chronically ill." (JA at TRUE00548); *Emtel v. Medaire*, No. H-11-3007, 2016 U.S.

9  Dist. LEXIS 48783, at 13 (S.D. Tex. Apr. 12, 2016) ("care giver" means "a person who

10 routinely provides assistance in the rendering of medical care *to another individual*").

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "medical product" (claim 15) | Medical device intended for use in the diagnosis of disease or other conditions | Plain and ordinary meaning or "physiological product" |

16 The term "medical product" is a term with a specific, accepted meaning in the

17 field of pulse oximetry—a "medical device intended for use in the diagnosis of disease

18 or other conditions." The '966 patent field of art is medical care and treatment. (JA at

19 MASM0000227 (1:35-44).) Thus, the court's construction of "medical product" should

20 reflect how a POSA in the medical care and treatment field would understand the term.

21 *Phillips*, 415 F.3d at 1313 (claim construction "requires examination of terms that have

22 a particular meaning in a field of art.").

23 In the relevant field, the U.S. Food and Drug Administration (FDA) regulates

24 medical products, including "human and animal drugs, biologics, and medical devices."

25 (JA at TRUE005051.) The difference between a non-medical and a medical product lies

26 in its intended use. The definition for "medical devices" requires that the device be

27 "intended for use in the diagnosis of disease or other conditions, or in the cure,

28 mitigation, treatment, or prevention of disease . . ." (JA at TRUE005056.)

The specification states that pulse oximeters are devices developed by "the medical industry" for use "in critical care and surgical operations," fitting squarely within the FDA's definition of medical device. (JA at MASM0000227 (1:35-44).) A POSA would understand that "medical product" means a "medical device intended for use in the diagnosis of disease or other conditions."

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "amount of use" (claims 1 & 15) | Amount of time of use | Plain and ordinary meaning |

Claims 1 and 15 of the '966 patent include the term "amount of use" in reference to an oximeter. "Amount of use" is an amount of time of use.

The invention prevents caregivers from using pulse oximetry components for too long of an amount of time. Claim 1 is directed to a method for determining when sensor components have "expired" or reached the end of their "useful and safe life," (JA at MASM0000227 (2:20-23; 2:60-64)), which is when the cumulative amount of use exceeds a predetermined amount of use. In the specification, each method for tracking an amount of use either directly or indirectly tracks the duration of the sensor's use— i.e., the amount of time of use.

For example, the specification provides that the amount of use is tracked by monitoring the oximeter's drive signals. (JA at MASM0000229 (5:60-67).) The number of drive signals alone, however, is not an "amount of use." Rather, the number of drive signals is merely an indirect indication of the amount of time of use. Specifically, the system will know that the oximeter outputs drive signals at a constant frequency. (JA at MASM0000229 (5:63-64).) Frequency is the number of cycles per constant unit time. The system uses this information to calculate an amount of time of use. (JA at MASM0000229 (5:64-67) ("The counter comprises a divide-by-1000 counter that advantageously produces, for example, an output only after one thousand cycles of the drive signal, or every one second.").) Thus, the counter is tracking an amount of time of

1   use, and upon reaching that amount of time, the sensor expires. (JA at MASM0000229
2   (6:44-47) ("[T]he useful life of the sensor expires after the sensor has received drive
3   pulses for a combined total of the foregoing time.").)

4         The prosecution history of related family member patents also provides
5   supporting intrinsic evidence. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314
6   (Fed. Cir. 2007). In the prosecution of a parent application (now U.S. Patent No.
7   6,515,273), the pending claims recited "a timer . . . and a sensor life indicator connected
8   to the timer such that the sensor life indicator is configured to indicate the expiration of
9   the useful or safe life of a pulse oximetry sensor." (Ex. B at TRUE005085.) The claim
10  was rejected as indefinite. (*Id.* at TRUE005073.) The applicant responded by stating:
11  "*The present invention* provides a system and method for allowing the manufacturer *to*
12  *specify a time, after which, the sensor is deemed to be worn out,* or in other words, the
13  sensor's useful and safe life has expired." (*Id.* at TRUE005080 (emphasis added));
14  *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir.
15  2007) ("When a patent thus describes the features of the 'present invention' as a whole,
16  this description limits the scope of the invention."). Later, the applicant referred to
17  similar claim language reciting a "predetermined number of pulses" and stated: "When
18  a predetermined *time of use* has elapsed, the indicator activates." (Ex. C at
19  TRUE005095.) Accordingly, the "predetermined amount of use" in similar claim 1 of
20  the '966 patent would be a predetermined *time* after which the sensor is deemed to be
21  worn out.

22        Moreover, to the extent these methods of tracking involve anything other than
23  directly measuring time of use, these other measures are merely proxies for an amount
24  of time of use. Indeed, the applicant adopted this very view in prosecution of a parent
25  patent, U.S. Patent No. 6,861,639. Similar to the '966 patent, the pending application
26  recited "monitoring with an electronic device *an amount of use* of a pulse oximetry
27  sensor." (JA at MASM0002309.) This claim had been rejected under 35 U.S.C. § 102
28  as anticipated by Dahlke, which taught counting the number of usage cycles by a

3855.002\9990                                    -11-

sensor. (JA at MASM0002379-MASM0002381.) The patent applicant distinguished Dahlke by arguing that it "clearly [did] not teach or suggest **durational use-based measurements**." (JA at MASM002266.) The applicant characterized Dahlke as tracking "events" rather than tracking "actual use." (*Id*.) According to the applicant, an "event count is potentially radically different than *the actual amount or duration of use* of each product." (JA at MASM0002367 (emphasis added).) This confirms that "amount of use" means "duration of use" i.e. an "amount of time of use." *Fenner Investments v. Cellco P'ship*, 778 F.3d 1320, 1325 (Fed. Cir. 2015).

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "patient monitor" (claim 4) | An oximeter | Plain and ordinary meaning |

The term "patient monitor" appears in claim 4 of the '966 patent, where the claim recites activating an alarm "on a patient monitor." According to the plain language of the claims, claim 4 provides methods for alerting a caregiver when oximeter components have been used for too long, e.g., by activating an audio and/or video alarm on a patient monitor.

The specification makes clear that the visual and audio indications are made on the oximeter device itself, thus making the oximeter the "patient monitor" of claim 4. In every figure that includes a speaker or a video display, the speaker and the video display are an integral part of the oximeter. (JA at MASM0000219-0000226 (Figs. 1, 4-5, and 7-8).) The written description accompanying these figures confirms this conclusion. It describes an "oximetry system," which includes an "oximeter" and a "sensor." The "oximeter" includes a microprocessor, a speaker, and a display. (JA at MASM0000228 (4:18-23).) In describing how the system notifies a caregiver of expiration, the specification states: "*[T]he oximeter* may issue the expiration indication by employing an audio alarm through the speaker, a visual alarm through the display, or a power-down function where the oximeter is inoperable until the sensor is

replaced." (JA at MASM0000230 (7:65-8:3).) The speaker and visual alarm are integral to the oximeter. When claim 4 recites an audio and a visual alarm "on a 'patient monitor,'" it is referring to an audio visual alarm "on 'an oximeter'."

### B.    7,295,866: Low-Power Pulse Oximeter

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "first duty cycle"; "first power consumption" (Claims 10, 11) | "first percentage of time of operation"; "first level of power used that is greater than zero" | Plain and ordinary meaning or "power used" |
| "second duty cycle"; "second power consumption" (Claims 10, 12) | "second percentage of time of operation"; "second level of power used that is greater than zero" | Plain and ordinary meaning or "power used" |
| "duty cycle" (Claim 10) | "percentage of time of operation" | "the on time relative to the off time" |

Pulse oximeters use sensors that utilize LEDs. The sensor is attached to, e.g., a finger and the LEDs project light through the fingernail and into the blood vessels and capillaries underneath. (JA at MASM0000248 (1:22-31).) The '866 patent sought to save energy by managing the power consumption by varying the oximeter's power consumption. (*Id.* at claim 10.)

The intrinsic record supports True Wearables' proposed constructions.[3]  The proposed construction of "first duty cycle" is consistent with use of the term in the patent which confirms that the duty cycle is expressed as a percentage. (*E.g.*, JA at MASM0000248 (2:48-49).) Further, the specification confirms that a duty cycle is a "percentage of time of operation." Indeed, Figure 5 is a "graph of emitter drive current versus time illustrating variable duty cycle processing." (JA at MASM0000249 (4:52-

---

[3] True Wearables will only address the term "first duty cycle"; "first power consumption" because the logic and evidence supporting True Wearables' construction of this term applies equally to the remaining disputed terms.

53).) The patent further explains that in the high duty cycle state, the sensor emitters are turned on for a relatively long period of time, "such as 25% on time," and, while in a low duty cycle state, the sensor emitters are turned on for a relatively short period of time, "such as 3.125% of the time." (JA at MASM0000251 (8:22-30).) The specification thus makes clear that the duty cycle represents the percentage of time the sensor emitter is operational. True Wearables' proposed construction is also consistent with the extrinsic evidence. (JA at TRUE005545 (defining "duty cycle" as, *inter alia*, the "[r]atio of working time to total time for intermittently operated devices.").)

True Wearable's proposed construction for "first power consumption" is also consistent with intrinsic evidence and should be construed as "first level of power used that is greater than zero." The claim language itself states that power is being consumed, i.e., the consumption is greater than zero. And, although dependent claim 11 claims a first power consumption that corresponds to a lower power consumption, it and none of the other claims contemplate a power consumption that is zero because then there would be no power consumption. (*Id.* at claim 11.) Similarly, the specification confirms that the power consumption is not zero and its discussions of varying power consumption are always within the context of reducing the duty cycle to reduce or minimize the power consumption. For example, the abstract states that the "pulse oximeter can lower power consumption without sacrificing performance . . . ." (JA at MASM0000235.) And in discussing regulating power consumption, the specification explains that the control engine regulates power to do one of three things: "satisfy a predetermined power target, [] minimize power consumption, or [] simply reduce power consumption . . . ." (JA at MASM0000250 (6:24-28); *see also*, *e.g.*, MASM0000251 (7:6-13).) The figures too show that power consumption is greater than zero. (JA at MASM0000244, MASM0000246 (Figs. 8, 10).) Indeed, even in the data off state, Figure 8 discloses a minimum power consumption of 300 mv. (JA at MASM0000244, MASM0000251 (Fig. 8, 8:39-52); *see also id.* (9:8-11).) This makes sense because the patent contrasts the claimed invention with prior art pulse oximeters

with sleep modes during which the oximeter is not functioning. (JA at MASM0000248 (2:16-24).) The patented invention, while varying power consumption, does not drop that power consumption to zero, i.e., off like the prior sleep modes.

### C.     8,886,271 and 10,194,848: Non-invasive Physiological Sensor Cover[4]

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "an opaque portion attachable to the sensor and configured to block readings by the sensor" (claim 1 of the '271 patent) | "a light-blocking portion attachable to the sensor and designed to block readings by the monitored sensor" | "A portion attachable to the sensor that blocks a range of wavelengths of light sufficient to prevent measurements" |
| "an opaque portion attachable to the sensor and configured to block optical readings by the sensor" (claim 10 of the '271 patent) | "a light-blocking portion attachable to the sensor and designed to block optical readings by the monitored sensor" | "Portion attachable to the sensor that blocks a certain range of wavelengths from at least one emitter from reaching the detector" |

The '271 and '848 patents are directed to a sensor cover to reduce or eliminate false readings from a pulse oximetry sensor that is constantly powered and always active (i.e., reading). The claimed cover does this "by blocking a light detecting component of a pulse oximeter sensor when the pulse oximeter sensor is active but not in use." (JA at MASM0000257.) This sensor is connected to a monitor which monitors measurements indicative of the patient's health. (JA at MASM0000272 (1:25-27, 2:8-15).) In order to reduce setup time to begin monitoring a patient, the sensor remains connected to the monitor and active. (JA at MASM0000272 (2:12-15).) However, these monitors "can generate false readings by detecting ambient light even though the sensor

---

[4] Citations to the '271 patent specification apply equally to the '848 patent.

is not in use" and "emit alarms or otherwise make noise due to false readings [from the sensor], which can be distracting to medical personnel." (JA at MASM0000257, MASM0000272 (Abstract; 2:8-19).) Accordingly, the claimed cover not only prevents these false readings but also aims to prevent distracting alarms from a constantly monitored oximeter. (JA at MASM0000257, MASM0000272 (Abstract; 2:8-19).)

True Wearables' constructions for both of these terms, and similar terms below, clarify that the sensor is "monitored." This comports with the purpose of the invention and is supported by the intrinsic evidence. The specification explains that a pulse oximetry system "generally includes a patient monitor, a communications medium such as a cable, and a physiological sensor having light emitters and a detector, such as one or more LEDs and a photodetector … the detector outputs a detector signal to the monitor over the communication medium, which processes the signal to provide a numerical readout of physiological parameters…." (JA at MASM0000272 (1:33-45); *see also*, *e.g.*, MASM0000261, MASM0000273 (Fig. 1 and 3:31-33) (showing a sensor cover attached to a physiological measurement system with monitor and sensor).) It further notes that the sensor can cause these monitors to emit alarms and make noise; thus, false readings can cause false and unwanted alarms to be emitted which distracts medical staff. (JA at MASM0000272 (2:8-19).) Unless monitored, there would be no need for a cover because the false readings would not be perceptible to medical staff, and there would be no reason to block those false readings. They would simply go unnoticed. The cover, therefore, must be designed to block readings by the monitored sensor in order to fulfill the purpose of the sensor and invention. *E.g.*, *Phillips*, 415 F.3d at 1315 (specification "is the single best guide to the meaning of a disputed term'"); *Mount Hamilton Partners, LLC v. Groupon, Inc.*, No. C 12 1700 SI, 2014 U.S. Dist. LEXIS 34556, at *20 (N.D. Cal. Mar. 14, 2014) (construing 'configured to' to mean 'designed to'); *McHugh v. Hillerich & Bradsby Co.*, No. C 07-

03677 JSW, 2010 U.S. Dist. LEXIS 16164, at *14-15 (N.D. Cal. Feb. 24, 2010) (same).[5]

True Wearables' constructions also clarify that "opaque" should be construed to mean "light-blocking." Again, this is consistent with the plain language of the claims and specification. Claim 10 itself defines opaque as "light-blocking": "wherein the opaque portion is configured **to prevent the detector from receiving light** during sensor activation." (Claim 10 (emphasis added); *see also* JA at MASM0000273 (3:44-49).)  The specification too supports a construction of "light-blocking", explaining "[t]he opaque cover 140 can prevent or reduce false readings caused by the emitters or the ambient light, even if the sensor is active, **by preventing the sensor from receiving light**." (JA at MASM0000273 (3:51-54) (emphasis added).)

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "the sensor cover blocking readings by the sensor" (claim 1 of the '271 patent) | "the sensor cover blocking readings by the monitored sensor" | Plain and ordinary meaning (does not permit a range of wavelengths of light used by the sensor) |
| "the sensor cover is configured to prevent the detector from receiving light when the sensor is active" (claim 1 of the '271 patent) | "the sensor cover is designed to prevent the detector from receiving light when the monitored sensor is active" | Plain and ordinary meaning (does not permit a range of wavelengths of light used by the detector when the sensor is on) |
| "blocking, with the sensor cover, the light from one or more emitters from being received by the detector of the sensor" (claim 6 | "blocking, with the sensor cover, the light from one or more emitters from being received by the detector of the monitored sensor" | Plain and ordinary meaning |

---

[5] The term "configured" appears in multiple terms. These cited cases apply equally to use of the term "configured" throughout the '271 and '848 patents.

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| of the '271 patent) | | |

As described above, the purpose of a sensor cover that blocks light is to prevent false readings and alarms in a monitored sensor, and the intrinsic evidence supports that the sensor is monitored. (*See*, *supra*, pp. 10-12.)

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "the opaque portion is configured to block ambient light from a surrounding area" (claims 8 and 17 of the '271 patent) | "the light blocking portion is designed to block detectable light originating from the sources other than the emitter" | "A portion that blocks a certain range of wavelengths of light other than from the emitter to prevent measurements" |
| "blocks at least a portion of ambient light from a surrounding area from being received by the detector" (claims 5, 14, 23 of the '848 patent) | "blocks at least a portion of light originating from sources other than the emitter from being received by the monitored detector" | "Prevents a certain range of wavelengths from the one or more emitters from being received by the detector" |

The parties agree that for claims 8 and 17 of the '271 patent, the phrase "ambient light from surrounding areas" refers to light originating from sources other than the emitter. True Wearables construes this phrase consistently in both the '271 and '848 patents. Masimo, however, does not, despite the fact that the two patents share a common specification. True Wearable's consistent construction of "ambient light from surrounding areas" should prevail. A comparison of dependent claims 5, 14, and 23 of the '848 patent to their respective independent claims shows that cover is "**further** block[ing] . . .  ambient light from a surrounding area," meaning it is blocking ambient light from surrounding areas in addition to blocking light from the emitter as claimed in the independent claims. *Karlin Tech. v. Surgical Dynamics*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). The specification further confirms that ambient light is light originating from the sources other than the emitter: "The opaque cover 140 can prevent or reduce

false readings **caused by the emitters *or* the ambient light**." (JA at MASM0000273 (3:51-53) (emphasis added).)

The remaining dispute centers on the terms "opaque" for claims 8 and 17 of the '271 patent which is discussed above at p. 12; whether the ambient light must be "detectable" and the detector monitored; and Masimo's inclusion of the phrase "to prevent measurements" (to be addressed in True Wearables' responsive brief).

True Wearables' proposed construction clarifies that the ambient light must be "detectable" and the detector monitored. This comports with the purpose of the invention and the specification. If the ambient light was not detectable, the sensor would not generate false readings, and there would be no need for a sensor cover. (JA at MASM0000272 (2:14-16) ("[T]he sensor can generate false readings by detecting ambient light even though the sensor is not in use."); *see also* (1:37-45).) Likewise, the detector is part of the sensor (JA at MASM0000272 (1:33-36)) which, as explained above, must be monitored so that the information gathered is useful and for the cover to serve its purpose.

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "opaque portion is configured to prevent the detector from receiving light during sensor activation" (claim 10 of the '271 patent) | "light-blocking portion is designed to prevent the detector from receiving light during monitored sensor activation" | "Blocks a certain range of wavelengths from at least one emitter from reaching the detector when the sensor is turned on" |

True Wearables' construction of opaque and its construction of "sensor" as being a "monitored sensor" should be adopted. (*See, supra*, pp. 10-12.)

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "the sensor cover is configured to block the light from the one or | "the sensor cover is designed to block the light from the one or | Plain and ordinary meaning |

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| more emitters from being received by the detector" (claim 15 of the '271 patent) | more emitters from being received by the monitored detector" | |

True Wearables' proposed construction clarifies that the detector is monitored and should be adopted. (*See, supra*, pp. 10-12, 14.)

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "protrudes from the sensor" (claims 1 and 10 of the '271 patent) | "extends from a point originating proximate to the detector or emitter to a point past the sensor" | Plain and ordinary meaning (extends beyond the sensor) |
| "protrudes from the pulse oximeter sensor" (claims 1 and 19 of the '848 patent) | "extends from a point originating proximate to the pulse oximeter emitter or detector to past the pulse oximeter sensor" | Plain and ordinary meaning (extends beyond the pulse oximeter sensor) |
| "a protruding portion that protrudes from the pulse oximeter sensor" (claim 9 of the '848 patent) | "a portion extending from a point originating proximate to the pulse oximeter emitter or detector to a point past the pulse oximeter sensor" | Plain and ordinary meaning (a portion that extends beyond the pulse oximeter sensor) |

True Wearables' proposed construction provides context necessary to understand the term "protrudes." That term is relative and has little meaning unless it is clear where the protruding portion begins and ends. True Wearables' construction does that, identifying the beginning of the protrusion as proximate to the detector or emitter and the end point as past the sensor.

-20-

The claim language itself as well the specification support this construction. For example, Figure 2A (left) shows the sensor cover 140 with protruding portion 220, the detector 210, and the emitter 230 and illustrates that the origin of protruding portion 220 is proximate to the emitter or detector. (JA at MASM0000261, MASM0000274 (Fig. 2A, 5:1-8) (color added).) Masimo does not appear to contest that True Wearables' end point is correct; rather, Masimo fails to provide the beginning point necessary to understand where the protrusion originates. True Wearables' construction should be adopted.



FIG. 2A

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "blocks at least a portion of light from the one or more emitters from being received by the detector" (claims 1 and 8 of the '848 patent) | "block some wavelengths of light generated by the one or more emitters and capable of being detected by the monitored detector" | "Prevents a certain range of wavelengths from the one or more emitters from being received by the detector" |
| "blocks at least a portion of light from the one or more emitters of the pulse oximeter sensor from being received by a detector of the pulse oximeter sensor" (claim 9 of the '848 patent) | "blocks some wavelengths of light generated by the one or more emitters and detectable by a detector of the monitored pulse oximeter sensor" | "Prevents a certain range of wavelengths from the one or more emitters from being received by the detector" |
| "blocking, with the sensor cover, at least a portion of the light from the one or more emitters from being received by the detector" (claim 26 of the '848 patent) | "blocking, with the sensor cover, some wavelengths of light generated by the one or more emitters and capable of being detected by the monitored detector" | "Prevents a certain range of wavelengths from the one or more emitters from being received by the detector" |

The dispute in these claim terms is whether the light generated by the emitters must be "**detectable** by a detector of the **monitored** pulse oximeter sensor" (claims 1, 8, 9) or "**capable of being detected** by the **monitored** detector" (claim 26). The answer is yes to both. (*See*, *supra*, pp. 10-12, 14.)

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "the sensor cover reduces false readings by the pulse oximeter until the pulse oximeter sensor is in use" (claims 6, 16, and 27 of the '848 patent) | "the sensor cover reduces false readings by the monitored pulse oximeter until the monitored pulse oximeter is in use" | "Sensor cover reduces unintended readings (or inaccurate readings) before use" |
| "false readings" (claims 6, 16, and 27 of the '848 patent) | "false monitored readings" | "Unintended readings or inaccurate readings" |

Here, the dispute centers on (1) whether the pulse oximeter is monitored and (2) construction of the term "false reading." First, this claim should be construed to reflect that the pulse oximeter and false readings are monitored. (*See*, *supra*, pp. 10-12.) Second, besides clarifying that the readings are monitored, there is no reason to further construe the term "false reading." That is a common term that is well known to a POSA as well as jurors, and the patent provides ample context that will confirm to the jurors that their ordinary understanding of the term is correct. (JA at MASM0000252, MASM0000272, MASM0000273 (Abstract, 2:14-19, 3:19-21, 3:46-54, 4:19-22).)

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "at least partially opaque" (claim 1 of the '848 patent) | "at least partially light-blocking" | "Blocks a certain range of wavelengths of light" |
| "partially or fully opaque" (claims 17, 28 of the '848 patent) | "partially or fully light-blocking" | "Partially or fully blocking a certain range of wavelengths of light" |

True Wearables' construction does not seek to construe "partially" or "fully" as those terms are readily understood. *Acqis LLC v. Alcatel-Lucent USA Inc.*, No. 6:13-CV-638, 2015 U.S. Dist. LEXIS 48339, at *10-11 (E.D. Tex. Apr. 13, 2015) (construing "fully independent" to have its plain meaning); *Audionics Sys., Inc. v. AAMP of Florida, Inc.*, No. CV 12-10763 MMM (JEMx), 2013 U.S. Dist. LEXIS 188664, at *36-51 (C.D. Cal. Sept. 12, 2013) (terms used in their ordinary senses need not be construed). Rather, True Wearables only seeks to construe the term "opaque." Its proposed construction is consistent with its proposed construction for that term in other claims and should be adopted. (*See*, *supra*, p. 12.)

### D.   8,983,564 and 10,194,847: Perfusion Index Smoother[6]

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| Selecting the lowest "indication of perfusion index" (claims 1, 3 of the '564 patent; claim 3 of the '847 patent) | "perfusion index number" | Plain and ordinary meaning |
| "indication of amplitude" (claim 4 of the '847 patent) | "numerical value of amplitude data" | Plain and ordinary meaning |
| "selecting a lowest indication of amplitude from the first and second indications" (claim 4 of the '847 patent) | "selecting a lowest calculated value of amplitude from the first and second calculated values" | Plain and ordinary meaning |

Both the "indication of perfusion index" and the "indication of amplitude," one of which appears in all claims of the '564 and '847 patents, must be numerical values. More specifically, "indication of perfusion index" must be the perfusion index number and "indication of amplitude" must be a calculated, numerical value of amplitude. Any

---

[6] All citations to the '564 patent specification apply equally to the '847 patent.

1   other interpretations would render the claims indefinite and would contradict both the

2   specification and statements made during prosecution.

3       1.   **The "indication of perfusion index" and "indication of**

4            **amplitude" must be numerical values.**

5       The '564 and '847 patents are directed to reducing noise in a reading of perfusion

6   index. The plain language of the claims requires that these indications be numerical

7   values. In each claim in which these terms are recited, the claim also recites selecting,

8   either directly or indirectly, the "*lowest*" of these "indications." This is no accident. As

9   noted throughout the specification, "motion noise tends to increase PI." (JA at

10  MASM0000291 (6:9-10).) Thus, by selecting the lowest of the possible indications, the

11  smoother improves accuracy. (*Id.*)

12      Based on the plain language of the claims, both "indication" terms must be

13  numerical values simply because there is no way to select a "lowest" of non-numerical

14  terms. Indeed, in the prosecution of the '564 patent, Masimo accepted this basic

15  principle. In response to a prior art rejection, Masimo distinguished the pending claims

16  from the prior art by stating that the prior art reference "does not teach specifically

17  selecting *the lowest PI number*." (JA at MASM0000979.) This argument, made with

18  the express intention of distinguishing the pending claims from the cited prior art

19  reference, was clearly premised on the applicant's belief that "indication of perfusion

20  index" was a number. The court should adopt the patentee's own interpretation of the

21  claims. *Fenner*, 778 F.3d at 1325 (Fed. Cir. 2015).

22      For related reasons, these statements made during prosecution should apply to

23  the court's construction of "indication of amplitude" in the '847 patent. Although the

24  '847 recites "indication of amplitude" instead of "indication of perfusion index," the

25  surrounding claim language is similar in many respects and indicates that the

26  "indication of amplitude" plays a similar role to the "indication of perfusion index" in

27  method claim 4. Moreover, the statements made during prosecution of the '564 patent

28  are relevant to claim construction of the '847 patent. *Ormco Corp.*, 498 F.3d at 1314.

2.     **The "indication of perfusion index" is the perfusion index.**

Generally, there is a preference for giving meaning to all terms in a claim. This preference, however, is "not inflexible," and interpretations that render some portion of the claim language superfluous may be appropriate "where neither the plain meaning nor the patent itself commands a difference in scope." *Power Mosfet Techs., L.L.C. v. Siemens AG,* 378 F.3d 1396, 1410 (Fed. Cir. 2004). Here, there is strong intrinsic evidence that "indication of perfusion index" is the same as the perfusion index. The specification does not distinguish between an "indication" of perfusion index and the perfusion index itself. In the claims, an "indication" of perfusion index is calculated using calculation techniques. (*See*, *e.g.*, claim 1.) Throughout the specification, though, a perfusion index is also calculated using calculation techniques. (*See*, *e.g.*, JA at MASM0000290 (3:22) ("*PI* is calculated using at least two different calculation techniques"), MASM0000289 (1:66)). The terms are thus used interchangeably to refer to the same thing. Because the specification does not inform a person of ordinary skill in the art what the difference is between an "indication of perfusion index" and a "perfusion index," the court should interpret them as referring to the same numerical value. *Hyperphrase Techs., LLC v. Google, Inc.*, 260 F. App'x 274, 278-79 (Fed. Cir. 2007) (interchangeable use of two terms is akin to definition equating them).

3.     **The "first and second indications of amplitude" are each a calculated value of amplitude.**

In addition to both being numerical values, the "first and second indications of amplitude" are calculated values of amplitude. This interpretation is supported by the claim language and the specification.

Claim 4 of the '847 patent recites "determining one or more indications of pulse information from data responsive to intensity signals acquired from a detector capable of detecting light attenuated by body tissue." From there, this pulse information is used to determine "indication[s] of amplitude data." When read in light of the specification,

though, it becomes clear that "determining" requires calculating and that, as a result, the indications of amplitude data are calculated values.

The specification of the '847 patent does not describe how to "determine" indications of amplitude data based on indications of pulse information. In fact, the only mention of amplitude data comes in a recitation of claim 4 in the specification. (JA at MASM0000290 (4:29-41).) Elsewhere in the specification, however, is a general discussion of oximeter systems. Here, the specification notes that an oximeter "does not directly measure" plethysmograph data but that a plethysmograph waveform "can be derived" from a detected intensity signal. (JA at MASM0000289 (1:38-43).) Thus, in claim 4, "determining . . . pulse information [i.e., pleth data] from data responsive to intensity signals" requires at least some level of calculation. Because each indication of amplitude is determined from this pulse information, the "indication of amplitude" must also be a calculated numerical value. The court should construe the term as such by adopting True Wearables' proposed construction.

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "calculation technique(s)" (claims 1-3 of the '564 patent; 1-3 of the '847 patent) | "calculation technique": calculation procedure | Plain and ordinary meaning |

The phrase "calculation technique(s)" is used in almost every claim of the '564 and '847 patents. The patents are directed to selecting the lowest perfusion index values in order to reduce noise in the output. (JA at MASM0000291 (6:7-10).) Before making this selection, though, the system must compute multiple indications of perfusion of index from which it will choose the lowest. An oximeter "does not directly measure" plethysmograph data. (JA at MASM0000289 (1:38-40).) Likewise, an oximeter does not *directly* measure an indication of perfusion index. (JA at MASM0000289 (1:52-65).) Rather, as both the specification and the claims make clear, it must be "calculated." More specifically, it must be calculated "using . . . calculation

techniques." (*See*, *e.g.*, claim 1 of '564 patent.) Thus, in the context of these patents, "calculation techniques" transform an input of pleth data into an output of perfusion index.

The claim language offers further support for True Wearables' construction. Specifically, claim 1 recites "using *at least two different* calculation techniques" and requires that these two different calculation techniques generate "at least two indications of perfusion index." In other words, for a single input (i.e., pleth data), there are two different outputs (i.e., indications of perfusion index). Accordingly, the two calculation techniques must be two different calculation procedures.

This very interpretation is illustrated by Figure 7. In Figure 7, multiple "PI Calculators" receive the same pleth data. (JA at MASM0000287 (Fig. 7)) Working with *the same input*, these PI Calculators use different calculation procedures to output two different PI indications. (*Id.*) The PI selector chooses the lowest of these PI indications because "the lower PI value should be the more accurate value . . . because motion induced noise tends to raise PI values." (JA at MASM0000291 (6:64-67).) This depiction confirms that the PI Calculators are using different calculation procedures to arrive at different PI outputs. Any construction of "calculation techniques" that did not require two different calculation procedures would be inconsistent with Figure 7 and would therefore contradict the rule that courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification." *Verizon Servs.*, 503 F.3d at 1305.

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "pleth" (claim 1 of the '564 patent; claim 1 of the '847 patent) | An abbreviation for plethysmograph | An abbreviation for plethysmograph: a signal representing the change in volume of arterial blood with each pulse beat |

The parties agree that "pleth" is an abbreviation for plethysmograph but disagree regarding what a plethysmograph is.

A plethysmograph is an *instrument* for measuring variations in volume in different parts of the body. (Ex. D at TRUE005151.) According to the intrinsic evidence of the specification, a plethysmograph may generate a "plethysmograph *signal*" or a "plethysmograph *waveform*." (JA at MASM0000289 (1:37-40).) The signal or the waveform may represent the change in volume of arterial blood in a part of the body with each pulse beat. (Ex. D at TRUE005151.) The plethysmograph, however, is not itself that signal, but rather the device responsible for collecting the data necessary to generate that signal. (*Id*.) Masimo's proposed construction confuses a plethysmograph with the data it generates. The Court should clarify that "pleth" is not a signal and does not represent a change in volume in arterial blood.

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "perfusion" | Plain and ordinary meaning: "the passage of blood through an organ or tissue" | The volume of blood per unit volume of tissue |

Each claim at issue includes the term "perfusion index." As used in the patents at issue, perfusion is a dynamic measure.

The specification of the patents at issue states that perfusion index is "an indication of blood flow." (JA at MASM0000289 (1:54-56).) If perfusion index is essentially a blood flow index, then perfusion must be the flow (i.e., the passage) of blood in the body. Indeed, this interpretation is supported by the dictionary definition of perfusion: "the pumping of fluid through a tissue or organ by way of an artery." (JA at TRUE005037.) In other words, the "pumping" is the flow or passage of fluid, a dynamic measure.

Masimo cites the Abstract of WO 2004/034898 as allegedly supporting its proposed construction. Upon closer examination, though, this evidence actually supports True Wearables' proposed construction. Specifically, the cited Abstract

defines perfusion as "the arterial *filling* with blood." (JA at MASM0001085.)The use of the gerund "filling" suggests that perfusion is the movement of blood into (and out of) the arteries rather than a static measure of the amount of blood in the arteries at a given moment.

| Claim Term/Phrase | True Wearables' Proposed Construction | Masimo's Proposed Construction |
|---|---|---|
| "statistically analysis" (claim 1 of the '847 patent) | Indefinite | Statistical analysis |

Masimo proposes that the term "statistically analysis" be construed as "statistical analysis," seemingly indicating that the issued claims contain a typographical error. However, that term is indefinite when read in light of the specification, and a court should not rewrite issued patent claims to correct an alleged error unless (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification, and (2) the prosecution history does not suggest a different interpretation of the claims. *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

Here, because of the lack of description in the specification with respect to either statistical or statistically analysis, the correction does not meet these criteria. The entire patent application is directed to more accurately calculating perfusion index. The portions of the claims specifying precisely which methods to use in calculating a more accurate perfusion index relate to the very heart of the invention for which the USPTO issued Masimo a patent. To rewrite this critical portion of the claim after the patent has been issued and in the middle of litigation would undermine sections 254 and 255 of the Patent Act by "effectively writing the nonretroactivity provisions out of [the statute]." *Id*. at 1357.

The claims, read in light of the specification, fail to inform, with reasonable certainty those skilled in the art about how to calculate a more accurate perfusion index, as required by *Nautilus, Inc. v. Biosig Instruments, Inc.*. 572 U.S. 898, 901 (2014). To the extent this failure is the result of a typographical error, it is not appropriate to use

1 claim construction to correct this error because the correction would change the
2 meaning of the claims in a way that is subject to reasonable debate. Claim 1 of the '847
3 patent is invalid for indefiniteness.

4 **IV.**    **CONCLUSION.**

5      For the reasons described above, the Court should adopt True Wearables'
6 proposed constructions.

7

8

9 Dated:  November 26, 2019          Amanda R. Washton, member of
                                     CONKLE, KREMER & ENGEL
10                                   Professional Law Corporation

11

12

13                          By:  /s/*Amanda R. Washton*
                                 Amanda R. Washton
14                               Attorneys for Defendants
                                 True Wearables, Inc. and Marcelo Lamego
15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS TRUE WEARABLES, INC.'S AND MARCELO LAMEGO'S
OPENING CLAIM CONSTRUCTION BRIEF

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California.  My business address is 3130 Wilshire Boulevard, Suite 500, Santa Monica, California  90403-2351.

On November 26, 2019, I served true copies of the following document(s) described as **DEFENDANTS TRUE WEARABLES, INC.'S AND MARCELO LAMEGO'S OPENING CLAIM CONSTRUCTION BRIEF** on the interested parties in this action as follows:

Joseph R. Re
Stephen C. Jensen
Irfan A. Lateef
Brian C. Claassen
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
joseph.re@knobbe.com
stephen.jensen@knobbe.com
irfan.lateef@knobbe.com
brian.claassen@knobbe.com
Telephone: (949)-760-0404
Facsimile: (949)-760-9502

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I caused said document(s) to be served by means of this Court's electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, to the parties and/or counsel who are registered CM/ECF Users set forth in the service list obtained from this Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on November 26, 2019, at Santa Monica, California.

/s/*Amanda R. Washton*
Amanda R. Washton