Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
stephen.jensen@knobbe.com
Irfan A. Lateef (Bar No. 204004)
irfan.lateef@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
**KNOBBE, MARTENS, OLSON
 & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949)-760-0404
Facsimile: (949)-760-9502

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories, Inc.

Amanda R. Washton (Bar No. 227541)
a.washton@conklelaw.com
Sherron Wiggins (Bar No. 321819)
s.wiggins@conklelaw.com
**CONKLE, KREMER & ENGEL
Professional Law Corporation**
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100
Facsimile: (310) 998-9109

Peter A. Gergely (*Pro Hac Vice*)
PGergely@merchantgould.com
Ryan J. Fletcher, (*Pro Hac Vice*)
RFletcher@merchantgould.com
Zachary D. Kachmer (*Pro Hac Vice*)
ZKachmer@merchantgould.com
Paige S. Stradley, (*Pro Hac Vice*)
PStradley@merchantgould.com
**MERCHANT & GOULD, P.C.**
1801 California St., Suite 3300
Denver, CO 80202
Telephone: (303) 357-1651
Facsimile: (612) 332-9081

Attorneys for Defendants,
True Wearables, Inc. and
Marcelo Lamego

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual, <br><br> Defendants. | Case No. 8:18-CV-02001-JVS-JDE <br><br> **JOINT STIPULATION ACCOMPANYING TRUE WEARABLES, INC.'S AND MARCELO LAMEGO'S MOTION TO OVERRULE PLAINTIFFS' OBJECTION TO DISCLOSURE OF INFORMATION TO DR. INAN** <br><br> [Discovery Document: Referred to Magistrate Judge John D. Early] <br><br> Hearing: April 15, 2021 <br> Time: 10:00am <br> Ctrim: 6A, Sixth Floor <br><br> Discovery Cutoff: May 21, 2021 <br> Pre-Trial Conf.: Dec. 13, 2021 <br> Trial: Jan 11, 2022 |

Pursuant to Federal Rule of Civil Procedure 26 and Local Rule 37-2, Defendants True Wearables, Inc. and Marcelo Lamego (collectively "Defendants"), as movants, and Plaintiffs Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs"), as respondents, respectfully submit the following Joint Stipulation regarding Defendants' Motion for an order overruling Plaintiffs' objections to Defendants' expert, Dr. Omer Inan.

## I.  INTRODUCTORY STATEMENTS

## A.      Defendants' Introductory Statement

Dr. Omer Inan is an academic researcher who runs a research laboratory at Georgia Tech. His research relates to physiological monitoring, but is not focused on pulse oximetry or on the noninvasive estimation of any other blood constituent. He has agreed to be bound by the Protective Order in this case, which prohibits him from using or disclosing any party's information for any purpose other than for his service as an expert in this action.

For over a month, Plaintiffs have objected to Dr. Inan's accessing any of Plaintiffs' confidential information, but the basis for the objection has shifted along the way. The objection was initially based on Plaintiffs' purported concerns about Dr. Inan's role as a consultant to certain companies. But when Defendants clarified that Dr. Inan no longer works for three of those companies and that his work for the remaining company is limited to spending approximately one hour per week on investor relations, Plaintiffs still did not withdraw their objection. Instead, they shifted their focus from Dr. Inan's limited consulting work to his work as an academic researcher and as an academic advisor to graduate students. Plaintiffs spent weeks combing through the publications of the students in Dr. Inan's research lab, picking and choosing isolated sentences from lengthy publications and asserting that these publications were a "cause of concern" for Plaintiffs without ever identifying specific and concrete harm that Plaintiffs would

likely suffer by disclosure of materials to Dr. Inan.

Defendants have pointed out that none of the identified publications focus on the technology at issue in this case, have explained that Dr. Inan's work as an academic advisor poses no risk of competitive harm to Plaintiffs, and have noted that to the extent there is any risk of competitive harm, that risk would be mitigated by Dr. Inan's commitment to be bound by the Protective Order. Defendants have asked Plaintiffs to specifically define the technology they believe to be at issue in the case, to identify a single case in which an academic advisor was found to pose a risk of competitive harm, and to explain why the existing provisions of the Protective Order are insufficient to address their purported concerns. Plaintiffs have done none of these things, yet they still maintain their objection.

In an effort to resolve Plaintiffs' objections, Defendants have offered to consider reasonable proposals of additional restrictions that might alleviate Plaintiffs' alleged concerns. After refusing to provide a specific proposal for at least ten days, Plaintiffs finally offered a proposal. But the proposed restrictions were not reasonable. The scope and duration of the proposed restrictions were not remotely proportional to any realistic assessment of the risk posed by Dr. Inan's work and amounted to a noncompetition agreement that would be more restrictive than California law would allow even if Dr. Inan were an employee of Plaintiffs. In effect, the proposed restrictions were designed to give him a choice between being an expert in this case and continuing to work as an academic researcher at Georgia Tech. Dr. Inan cannot agree to such unreasonable restrictions.

Because the parties have agreed to a protective order, Plaintiffs bear the burden of showing why the current provisions of the Protective Order are insufficient to protect Plaintiffs and why the risk of disclosure of its confidential information outweighs the risk of harm to Defendants' ability to prosecute its case. But Plaintiffs cannot satisfy their burden because Plaintiffs (i) overstate the

breadth of the case and the information to which Dr. Inan is likely to be exposed in this case, (ii) overstate the risk that Dr. Inan's academic research would result in inadvertent disclosure, (iii) understate the extent to which the existing Protective Order eliminates the risks of any disclosure, and (iv) fail to consider the harm to Defendants if Dr. Inan is not permitted access and the fact that their position would essentially preclude Defendants from retaining any qualified expert. Moreover, Plaintiffs' objection is plainly at odds with positions Plaintiffs took earlier in the case.

As the close of discovery approaches, Defendants are in need of an expert with Dr. Inan's expertise. For the reasons explained below, allowing Dr. Inan to access Plaintiffs' information poses no risk of competitive harm to Plaintiffs. Plaintiffs' objection is inconsistent with prior positions that Plaintiffs have taken in this case and is based on a vague assertion of risk that is disconnected from reality. The Court should overrule Plaintiffs' objection and allow the parties to proceed with the case.

**B.** **Plaintiffs' Introductory Statement**

Dr. Inan researches and develops physiological monitoring technologies based on the photoplethysmogram ("PPG") signal.  Many of his articles and patents describe how to process the PPG to remove noise.  ████████████ ███████████████████████████████████████████████████ ██████████████████████████  Dr. Inan also co-founded and advises a start-up company that is developing, for commercial sale, a wearable that processes a PPG to determine oxygen saturation.  In view of his current activities, Dr. Inan could not avoid being influenced by what he learns about processing the PPG from Plaintiffs' highly confidential information.

Plaintiffs explained their concerns to Defendants.  Rather than address those concerns, Defendants argue that the case does not involve PPG processing, but only pulse oximetry.  But this ignores that pulse oximetry rests on PPG

-3-

processing.  Defendants cannot maintain that PPG processing and pulse oximetry are separate fields.

Defendants also ignore that Dr. Inan would be their fourth retained technical expert.  Defendants' complaint that disqualifying Inan would preclude them from retaining ***any*** qualified expert rings hollow.

Therefore, Plaintiffs request the Court sustain their objection to Dr. Inan.

## II.  RELEVANT PROTECTIVE ORDER PROVISIONS

The Protective Order provides a process by which a party may notify another party of its intent to retain an outside consultant or expert for the purpose of this litigation. The Protective Order states that experts may be given access to a party's confidential materials, provided that

> . . . before access is given, the consultant or expert has completed the Undertaking attached as Exhibit A ("Agreement to be Bound by Protective Order") hereto and the same is served upon the producing Party with (i) a current curriculum vitae of the consultant or expert, (ii) a listing of each person or entity from whom the expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years, and (iii) a listing (by name and number of the case, filing date, and location of court) of any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years, at least seven (7) days before access to the DESIGNATED MATERIAL is to be given to that

consultant or expert. The producing party may object to and notify the receiving Party in writing that it objects to disclosure of DESIGNATED MATERIAL to the consultant or expert. The Parties agree to promptly confer and use good faith to resolve any such objection. If the Parties are unable to resolve any objection, the objecting Party may file a motion with the Court within such other time as the Parties may agree, seeking a protective order with respect to the proposed disclosure. The objecting Party shall have the burden of proving the need for a protective order.

(Dkt. 100 at 5-6.)

The Protective Order also contains a "patent prosecution bar," which prohibits certain individuals from certain types of participation in patent prosecution for patent applications in certain fields. Here, the provisions that the parties agreed to restrict prosecution activities "in the field of pulse oximetry":

After the adoption of this provision by the parties, Outside Counsel representing a Party and any person associated with a Party who receive a producing Party's Protected Material designated "CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" under this Protective Order who accesses or otherwise learns of, in whole or in part, said Protected Material designated "CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" under this Protective Order shall not prepare, prosecute, supervise, advise, counsel, or assist in the

> preparation or prosecution of any patent application seeking a patent on behalf of the receiving Party or its acquirer, successor, or predecessor in the field of pulse oximetry during the pendency of this Action and for two years after final termination of this action. . . .

(Dkt. 100 at 18-19).

## III.  DEFENDANTS' POSITION

### A.  History of Dispute

On February 12, 2021, Defendants identified Dr. Omer Inan as an expert. *See* Kachmer Decl., ¶ 2, Ex. A at 25. With that identification, Defendants provided Plaintiffs with (i) a signed Agreement to be Bound by the Protective Order, (ii) Dr. Inan's curriculum vitae, (iii) a listing of all companies to whom Dr. Inan has provided professional services in the past five years. *Id.*, ¶ 3, Ex. B. Plaintiffs responded that they objected to the disclosure of materials to Dr. Inan until the parties are able to resolve certain issues. *Id.* Plaintiffs specifically raised three issues: (1) Dr. Inan's consulting relationship with ███████ (2) Dr. Inan's consulting relationship with ███████ and (3) Dr. Inan's pending patent applications. *Id.* Defendants promptly provided the requested information. *Id.* at 23-24.

When Defendants expressed a desire to meet and confer regarding the identified concerns, Plaintiffs indicated that they would not be available to meet and confer for several days because they were "evaluating proposed restrictions" for Dr. Inan and would need additional time before being able to "meaningfully discuss a proposed compromise on Dr. Inan." *Id.* at 20-21. To expedite resolution of Plaintiffs' objection, Defendants provided additional information about Dr. Inan's limited consulting work and requested that Plaintiffs provide (a) a listing of patent applications that were causing Plaintiffs concern and (b) a specific identification of the "proposed restrictions" that Plaintiffs believed to be warranted

and which, if agreed to, would resolve Plaintiffs' concerns. *Id.* at 15-21.

One week after Defendants made these requests, Plaintiffs provided, on March 9, a list of "references to specific publications and patent applications that cause Plaintiffs concern." *Id*. at 16-17. Even though Defendants had provided, on February 12, 2021, Dr. Inan's CV, which lists all of Dr. Inan's academic publications, Plaintiffs' March 9 email was the first time that Plaintiffs had identified any of Dr. Inan's academic publications as a purported source of Plaintiffs' concern. *Id.*

In the week between March 9 and March 16, Plaintiffs' focus gradually shifted from Dr. Inan's consulting work to the content of Dr. Inan's academic publications. *Id.* at 3-17. Plaintiffs identified several journal articles, making vague allegations of "concern" about these publications. For some publications, Plaintiffs' alleged concern stemmed from the fact that the publications discussed "technologies that Plaintiffs have developed and could be within the scope of materials Dr. Inan is exposed to." *Id.* at 10-12. For others, Plaintiffs' alleged concern stemmed from the fact that Dr. Inan's work involved processing of photoplethysmogram (PPG) signals, which Plaintiffs argue are the same signals used by pulse oximetry devices. *Id.* at 10-17.

For each of the publications identified by Plaintiffs, Defendants' response has been the same. *Id.* at 4-7, 10, 13. First, the technologies identified in Dr. Inan's academic publications are simply not technologies that are currently at issue in this case or that are likely to be put at issue. *Id.* Second, it is Plaintiffs' burden to establish why the current provisions of the Protective Order are not sufficient to protect Plaintiffs and to identify the specific harm they will suffer if Dr. Inan accesses information designated under the Protective Order. *Id.* They have not done so. Relatedly, Plaintiffs also bear the burden of proposing reasonable restrictions that they believe would adequately address their concerns.

Defendants have consistently maintained that Dr. Inan's Agreement to be

-7-

Bound by the Protective Order is sufficient to protect against any risk of competitive harm to Plaintiffs that would be posed by Dr. Inan's accessing their confidential information. *Id.* However, to avoid bringing the issue to the Court and in an effort to compromise, Defendants have also offered to consider any reasonable proposal from Plaintiffs of additional restrictions that would alleviate their alleged concerns about Dr. Inan. Plaintiffs provided a proposal on March 16, 2021, over one month after Defendants first disclosed their intention of retaining Dr. Inan. *Id.* at 1-2. But the specific proposal of additional restrictions offered by Plaintiffs was, for lack of a better work, unconscionable.

After spending weeks learning about the details of Dr. Inan's academic work, Plaintiffs proposed a group of restrictions seemingly aimed at requiring Dr. Inan to cease his activities as a research advisor at Georgia Tech for up to 10 years following the duration of the litigation. Not only was the length of the restrictions unjustifiable, but the scope of restrictions far exceeded anything that would be reasonable based on the scope of the confidential information to which Dr. Inan is likely to be exposed in this case. There is serious reason to doubt that the proposed restrictions would even be enforceable under California law, which rejects the theory that an individual will inevitably disclose confidential information and disallows non-competition agreements that restrict an individual's ability to pursue work. *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1463, 125 Cal. Rptr. 2d 277 (2002) ("Lest there be any doubt about our holding, our rejection of the inevitable disclosure doctrine is complete."); *Freeman Expositions, Inc. v. Glob. Experience Specialists, Inc.*, No. SACV 17-00364-CJC(JDEx), 2017 U.S. Dist. LEXIS 62087, at *13 (C.D. Cal. Apr. 24, 2017) ("California[ has a] strong public policy against noncompete agreements. *See* Cal. Bus. & Prof. Code § 16600.").

Plaintiffs' objection rests on an overly broad assessment of the information to which Dr. Inan is likely to be exposed. If Plaintiffs' objection is not overruled,

it would essentially preclude Defendants from obtaining any expert with the background and qualifications necessary to effectively serve as an expert in this case. Plaintiffs have not and cannot show that the protections provided for in the Protective Order are insufficient. Accordingly, Defendants now bring this motion for an order overruling Plaintiffs' objections.

## B.   Plaintiffs Cannot Meet their Burden of Establishing that Dr. Inan Should not have Access to their Confidential Materials.

Pursuant to the agreed-upon provisions of the Protective order, Plaintiffs bear the burden of proving the need to preclude Dr. Inan from accessing confidential materials. (Dkt. 100 at 6(c)). Because Defendants are attempting to exclude Dr. Inan from access to confidential information, they must establish an unacceptable risk of or opportunity for the inadvertent disclosure of confidential information. *See ODS Techs., L.P. v. Magna Entm't Corp.*, 583 F. Supp. 2d 1141, 1144 (C.D. Cal. 2008).[1] That risk must lead to specific prejudice or harm to Plaintiffs. *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 554 (C.D. Cal. 2007) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1130 (9th Cir. 2003)).

If the parties have agreed to, and the court has entered, a protective order the party opposing disclosure of their confidential information "bear the burden of showing why the risk of disclosure of its confidential information outweighs the risk of harm to [the opposing party's] ability to prosecute its case." *Isis Pharm.,*

---

[1] Dr. Inan has already signed the Agreement to be Bound, which includes an agreement that he "will not to disclose to anyone not qualified under the Protective Order, and will use only for purposes of this action any information designated as 'CONFIDENTIAL,' 'CONFIDENTIAL – ATTORNEYS' EYES ONLY' or 'RESTRICTED CONFIDENTIAL SOURCE CODE' that is disclosed to me." (Dkt. 100 at Agreement to Be Bound.) Accordingly, there is no risk of purposeful disclosure, and the only potential risk at issue with respect to Plaintiffs' objection is inadvertent disclosure by Dr. Inan.

*Inc. v. Santaris Pharma A/S Corp.*, No. 11cv2214-GPC (KSC), 2013 U.S. Dist. LEXIS 94263, at *9 (S.D. Cal. July 5, 2013). In balancing these risks, the court "must examine factually all of the risks and safeguards surrounding inadvertent disclosure." *Id.* A "crucial factor" in evaluating the risk of inadvertent disclosure is whether the person seeking access is involved in "competitive decision-making; that is, advising on decisions about pricing or design made in light of similar or corresponding information about a competitor." *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992).

Plaintiffs have not met and cannot meet this burden.

1.     **Plaintiffs' Objection Contradicts their Prior Arguments about their own Expert, Dr. McNames**

The meritless nature of Plaintiffs' objection is borne out by their own actions and statements. In February, Defendants objected to the disclosure of their confidential information to Plaintiffs' identified expert, Dr. James McNames. (Dkt. 69-1). Defendants expressed concerns about Dr. McNames based on his work as "Chief Algorithm Architect" for ADPM, a company that sells signal-processing algorithms to customers. (*Id.* at 10-11). Defendants specifically identified a patent owned by ADPM naming Dr. McNames as an inventor that disclosed an algorithm for performing cardiovascular signal analysis, modeling, and monitoring, and repeatedly stated that the invention could be used in pulse oximetry. (*Id.*) Defendants argued that Plaintiffs "should find another expert who does not commercialize and profit from algorithms, such as an academic or other expert consultant." (*Id.* at 12).

Plaintiffs responded: "Dr. McNames' work with APDM *is not related to the technology at issue in this lawsuit*. . . . *they do not develop pulse oximetry devices*." (*Id.* at 8-10). Plaintiffs also pointed out that Dr. McNames had signed an Agreement to Be Bound by the Protective Order, arguing that Agreement "requires him to maintain the confidentiality of any designated materials he

-10-

accesses in the case, and severely limits his ability to copy or print Defendants' highly confidential source code. (*Id.*)

Plaintiffs' arguments apply with equal force to Dr. Inan, who does not develop pulse oximetry devices and who has already agreed to be bound by the protective order. Declaration of Omer Inan ("Inan Decl."), ¶ 21. On this basis alone, the Court should overrule Plaintiffs' objection.

### 2.   Plaintiffs have Failed to Show an Unacceptably High Risk of Inadvertent Disclosure

Even ignoring that Plaintiffs' plainly inconsistent positions, Plaintiffs' objection should be overruled because Plaintiffs cannot meet their burden of establishing that a protective order is necessary. Dr. Inan has already agreed to be bound by the provisions of the Protective Order, which expressly prohibit use or disclosure of Plaintiffs' confidential information. *Id*. Therefore, Dr. Inan's access to Plaintiffs' information should only be restricted if his work poses an unacceptably high risk of inadvertent disclosure.

While Plaintiffs have raised "concerns" regarding Dr. Inan, Plaintiffs have never specifically identified or described why there is an unacceptably high risk of inadvertent disclosure. But, to the extent Plaintiffs claim that such a risk exists, Plaintiffs cannot satisfy their burden to show that the risk of disclosure outweighs the risk of harm to Defendants' ability to prosecute its case. There are four primary sources of error in Plaintiffs' assessment and balancing of these risks. First, Plaintiffs overstate the breadth of information to which Dr. Inan is likely to be exposed in this case. Second, Plaintiffs overstate the risk that Dr. Inan's academic research would result in inadvertent disclosure. Third, Plaintiffs understate the extent to which the existing Protective Order eliminates the risks of any disclosure. Finally, Plaintiffs have failed to consider the harm to Defendants if Dr. Inan is not permitted access and the fact that their position would essentially preclude Defendants from retaining any qualified expert.

### a.     This Case is Fundamentally about Pulse Oximetry Technology, which Dr. Inan does not Develop

As Plaintiffs' recognized in their argument regarding Dr. McNames, this case is fundamentally about pulse oximetry devices and pulse oximetry technology. (Dkt. 69-1 at 8-10). The briefing regarding Dr. McNames is not the only time that Plaintiffs have acknowledged that this is the technological focus of the case. Earlier in the case, the parties negotiated the inclusion of a patent prosecution bar in the Protective Order. That prosecution bar prohibits certain individuals from engaging in certain patent prosecution activities if they have accessed a party's confidential information during this litigation. (Dkt. 100). However, when the parties negotiated these provisions, they agreed that the scope of the prosecution bar should only apply to prosecution activities "in the field of pulse oximetry." (*Id.*). The fact that Plaintiffs were comfortable with a patent prosecution bar that only applies to technologies "in the field of pulse oximetry" strongly supports that Plaintiffs have understood, since the beginning of this case, that the case is fundamentally about pulse oximetry technology.

Now that Plaintiffs' own technical expert has been approved, though, Plaintiffs conveniently state that the technology at issue in the case is broader than pulse oximetry. When the parties met and conferred regarding Plaintiffs' objection, Defendants' counsel noted this apparent change in Plaintiffs' view of the case. Plaintiffs' counsel responded that the issues in the case had changed since the parties' briefing regarding Dr. McNames but could not and did not specify precisely how or why. Plaintiffs' counsel stated that the scope of confidential information was now "broader" than only pulse oximetry but, again, could not and did not articulate a specific definition of what Plaintiffs believe the scope to be. In an effort to compromise, Defendants offered a broader definition of the scope of the case that would include not only pulse oximetry but also noninvasive monitoring of *other* blood constituents. However, Plaintiffs disagreed

that even this broader definition would suitably define the scope of confidential information to which Plaintiffs believed that Dr. Inan would likely be exposed as an expert witness.

Plaintiffs still have not articulated a clear definition of what they now believe to be the relevant scope of technologies at issue. Instead, Plaintiffs have merely resorted to identifying items on Dr. Inan's CV that "cause Plaintiffs concern." Kachmer Decl., Ex. A at 16. Looking at these publications and the reasons for Plaintiffs' purported concern, it seems that Plaintiffs now believe the scope of relevant confidential information to be _much_ broader than pulse oximetry or even noninvasive monitoring of other blood constituents. For instance, Plaintiffs identified publications relating to respiration rate, ECG, pulse transit time, and pulse arrival time as "technologies that Plaintiffs have developed and could be within the scope of materials Dr. Inan is exposed to." _Id._ at 11-12. Plaintiffs also identified publications relating to "hemodynamic parameters" and expressed concern because Masimo "has a business unit that sells products that calculate hemodynamic parameters." _Id._ Based on these statements, it seems that Plaintiffs believe that the scope of confidential information to which Dr. Inan would be exposed is not limited to pulse oximetry or even to noninvasive monitoring of blood constituents, but rather includes any technology that Plaintiffs "have developed" or for which Masimo "has a business unit."

This vastly overstates the scope of the case and the confidential information at issue in this case and, as a result, overstates the risks of Dr. Inan's accessing that confidential information. Plaintiffs are attempting to broaden the inquiry to look not only at the technologies actually at issue in this case but also any technologies that are remotely related to pulse oximetry or that fall under Plaintiffs' large corporate umbrella, which expands far beyond the technology of this case. For instance, Plaintiffs requested that Defendants ask Dr. Inan whether he does any work involving signal processing of light signals. Similarly, Plaintiffs

have expressed "concerns" about Dr. Inan's work involving analysis of a photoplethysmogram (PPG) signal. While it is true that pulse oximetry involves signal processing of light signals and involves processing a PPG signal, these categories encompass far more than pulse oximetry or monitoring of blood constituents. To allow Plaintiffs to expand the inquiry in this manner would effectively preclude Defendants from retaining a qualified expert. If parties in patent and trade secret litigation were not permitted to retain experts who work in any field *related* to the technology at issue in the case, essentially all qualified experts would be eliminated because the only remaining experts would not have the necessary technical expertise.

Moreover, the Protective Order unequivocally places the burden on Plaintiffs to establish the need to restrict Dr. Inan's access. To the extent Plaintiffs believe that the scope of confidential information expands beyond what they have already stated before this Court, Plaintiffs must substantiate this claim and must offer a clear definition of what they believe to be the appropriate definition. Plaintiffs have done neither.

The Court should reject Plaintiffs' attempt to expand the inquiry to include any technology that Plaintiffs have ever developed or sold and, instead, acknowledge, as Plaintiffs' themselves did in discussing their expert Dr. McNames (when it suited Plaintiffs' needs), that the scope of confidential information includes pulse oximetry or, at most, noninvasive monitoring of blood constituents. Adopting this more realistic view of the scope of confidential information, it becomes clear that Plaintiffs purported concerns are overstated and do not support precluding access by Dr. Inan. Dr. Inan's work involves processing measured signals (e.g., cardiogenic vibration signals, kinematics measurements, sound signals, vagus nerve stimulation, etc.) to determine useful clinical indications. Inan Decl., ¶ 4. This knowledge is precisely what makes him qualified to serve as an expert in this case. But while Dr. Inan's work makes him a qualified

-14-

expert, his work does not create a risk of inadvertent disclosure because it does not focus on the specific technology to which he is likely to be exposed in this case in this case (i.e., technology for noninvasively estimating SpO2 or other blood constituents). *Id.*, ¶ 10, 12-14. Because Plaintiffs' objection rests on an overstated view of the scope of the case and the confidential information at issue in this case, the Court should overrule Plaintiffs' objections.

### b.  <u>Dr. Inan's Work is Academic, Not Commercial</u>

Plaintiffs not only overstate the scope of the case and the confidential information to which Dr. Inan is likely to be exposed, but they also overstate the opportunities and motivation for Dr. Inan to inadvertently disclose their information. Even if the Court were to accept Plaintiffs' exceptionally broad definition of the scope of confidential information to which Dr. Inan will be exposed, the Court should still overrule Plaintiffs objection because Dr. Inan's work poses very little risk of inadvertent disclosure.

Dr. Inan is primarily an academic. He has engaged in minimal consulting work outside of academia, but this work has been limited both in terms of the time that he commits to it and the scope of his responsibilities. *See* Inan Decl., ¶ 11. (identifying his most extensive consulting role as involving one hour of work per week seeking out and meeting with potential investors and not involving technology development, which is left to the company's full-time team of engineers).[2] Thus, the vast majority of Dr. Inan's time and attention is dedicated to the work he does as an Associate Professor at Georgia Tech University. *Id.*, ¶ 4-7.

More specifically, Dr. Inan spends the vast majority of his time working at the Inan Research Lab, where he is the Principal Investigator. *Id.* The Inan

---

[2] After Defendants provided additional detail about the limited nature of Dr. Inan's consulting, Plaintiffs shifted their focus to his academic publications, implicitly acknowledging that Dr. Inan's limited consulting does not pose a risk of competitive harm.

-15-

Research Lab does not develop or sell any products. *Id.*, ¶ 6. The Inan Research Lab is not a for-profit enterprise. *Id.* Rather, the Inan Research Lab receives its funding primarily from grants, which allow the Lab to conduct cutting-edge research and to present the findings of that research in academic journals and at academic conferences. *Id.*

As the Principal Investigator, Dr. Inan's role is supervisory and managerial. Although Dr. Inan oversees the research conducted by the students in the Lab, he spends most of his time making giving students the resources they need to conduct research. *Id.*, ¶ 6. This includes seeking and obtaining funding to support the research, hiring students and team members, and setting a vision for the lab in terms of strategy for the research. *Id.* It also involves, for the individual students, ensuring that they understand the state of the art and literature, evaluating the methodologies they intend to employ in their research, assisting in the preparation of scientific manuscripts and presentations for dissemination, and providing mentoring and guidance to students throughout their graduate studies. *Id.* It is the students and the trainees in the lab—*not* Dr. Inan—who are responsible for algorithm development, device design and fabrication, hardware verification and testing, human subjects research and data collection, data analysis and statistical analysis, and other day-to-day technical activities. *Id.*

This type of high-level advisory role in an academic setting is not the type of role that creates a risk of inadvertent disclosure. *See, e.g., Labyrinth Optical Techs. LLC v. Ciena Communs., Inc.*, No. SACV12-02217-AG (DFMx), 2013 U.S. Dist. LEXIS 188655, at *30-31 (C.D. Cal. Dec. 18, 2013) (entering protective order specifically stating that restrictions on expert witness "shall not preclude such Expert(s) from any academic work"); *Apple Inc. v. Samsung Elecs. Co.*, Civil Action No. 11-CV-01846-LHK, 2012 U.S. Dist. LEXIS 49201, at *33-34 (N.D. Cal. Jan. 30, 2012) (same). The risk posed by high-level academic work is particularly low where, as here, the type of confidential information likely to be

-16-

at issue is technical information like the source code or technical specifications of Plaintiffs' pulse oximetry products. Because Dr. Inan is not responsible for the technical aspects (e.g., algorithm development, device design, etc.) of the research in the Inan Research Lab, there is minimal opportunity for Dr. Inan to inadvertently disclose Plaintiffs' technical information. If Plaintiffs were claiming trade secret information in "techniques for obtaining funding for academic research," it would be a different question. But that is not the case here.

Even if Dr. Inan were more involved in the technical aspects of the Lab's research, Plaintiffs' risk assessment would still be overstated because they ignore that the purpose of the Inan Research Lab is not technology development and commercialization. Inan Decl., ¶ 4-7, 12-14. The Inan Research Lab does not develop and sell products that would compete with Plaintiffs' products. *Id.* Rather, the focus of the Research Lab is conducting research and publishing the results of that research. *Id.* Plaintiffs have identified a number of research papers published by the Inan Research Lab as allegedly causing Plaintiffs "concern" about Dr. Inan's serving as an expert. But Plaintiffs have not articulated why Dr. Inan's work supervising academic research and publication would be a cause of concern. Or, put differently, Plaintiffs have not explained how or why an academic research publication creates a risk of inadvertent disclosure their confidential information.

The purpose of academic publications and presentations is the presentation new or interesting research results. This presentation of research results often includes discussion of the methodologies of the study and explanations of how and why certain measurements were taken for data collection. But to the extent these papers/publications ever discuss specific technology, the discussion presents the technology at a high level. For instance, Plaintiffs have identified the following excerpts from publications as an alleged source of concern:



Kachmer Decl., Ex. A at 8-9. These publications do not discuss pulse oximetry or noninvasive monitoring of blood constituents and, therefore, do not relate to any technology that is at issue in this case. Inan Decl., ¶ 12-14. However, even if these (or other) academic papers did describe technology relevant to the case, the discussion is limited to high-level block diagrams that merely identify, for example, "PPG reduction" and "feature extraction" as techniques used in the research. There is no explanation of any specific techniques that were used as part of "PPG redaction" or "feature extraction." This lack of technical detail is perfectly consistent with the purpose of academic research: the author's goal is not to explain the hardware and software of each and every technology used to collect data but, rather, to present the *results* of the research.

Defendants expressly asked Plaintiffs if they were aware of any cases in which a Court found that there was a risk of inadvertent disclosure by an

individual whose primary role was as an academic researcher. Plaintiffs failed to identify any such cases. This is not surprising because cases addressing the risk of inadvertent disclosure by experts often focus on experts who are involved in technology development and/or the commercialization thereof for direct competitors of the disclosing party. Indeed, there is an entire line of cases providing factors to determine whether an expert should be given access to one party's confidential information when that expert is a current or former employee or consultant for the *opposing party in the case*. *See, e.g.*, *Pac. Marine Propellers, Inc. v. Wartsila Def., Inc.*, No. 17cv555 BEN (NLS), 2018 U.S. Dist. LEXIS 75268, at *10 (S.D. Cal. May 3, 2018) (collecting cases). That stands in stark contrast to the situation here.

Here, Plaintiffs cannot allege a risk of competitive harm based on product development or commercialization because Dr. Inan is an academic research. So, Plaintiffs are left to object based on his work as an advisor to Ph.D. students and as the manager of an academic research laboratory. But Dr. Inan's academic work poses no risk of inadvertent disclosure, at least because his students are responsible for the technical aspects of their research and because the purpose of the research conducted by the Inan Research Lab is to present interesting research findings and not to develop and commercialize new technologies. Inan Decl., ¶ 4-7, 12-14. Indeed, because Dr. Inan's work is so heavily focused on non-commercial research, it is difficult to imagine a qualified expert with *less* of an opportunity or motive to cause Plaintiffs competitive harm via inadvertent disclosure. Because Plaintiffs' objection rests on an overstated view of the opportunity for disclosure in Dr. Inan's academic work, the Court should overrule Plaintiffs' objection.

### 3. The Protective Order Provides Adequate Protection

The risk that Dr. Inan will inadvertently disclose Plaintiffs' information is low because he does not work in the technologies at issue in this case and because

his work provides minimal opportunity for inadvertent disclosure. To the extent Dr. Inan's work creates any risk of competitive harm to Plaintiffs, that risk is adequately addressed by Dr. Inan's agreeing to be bound by the protective order. *Id.*, ¶ 21. By agreeing to be bound, Dr. Inan is agreeing that he will not use or disclose the information to which he is exposed in this case for *any purpose* other than serving as Defendants' expert. This is more than sufficient. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 08cv335 IEG (NLS), 2008 U.S. Dist. LEXIS 93873, at *10 (S.D. Cal. Nov. 18, 2008) ("ATC's need to reasonably protect its confidential information is already addressed by both experts executing agreements to be bound by the Protective Order."); *Santella v. Grizzly Indus.*, No. 3:12-mc-00131-SI, 2012 U.S. Dist. LEXIS 158349, at *13 (D. Or. Nov. 5, 2012) ("SawStop has failed to offer any persuasive evidence that Mr. Domeny will violate the protective order by intentionally disclosing its confidential information" and, further, rejecting arguments that an expert posed a risk of inadvertent disclosure, in part because the theories of possible disclosures would all require a "violation of the express provisions of the terms of the Court's protective order").

Plaintiffs fail to consider the protection provided by the Protective Order when they formulate the bases for their objections. They profess to be "concerned" about the fact that Dr. Inan supervises research in certain areas. But their concerns appear to assume that Dr. Inan will blindly ignore the restrictions of the Protective Order. For instance, Plaintiffs have asserted that Dr. Inan "could include information he learned from Plaintiffs either in patent applications, or in publications that would include his students as authors" and that they "cannot allow Dr. Inan to access their information and later use it to compete against them" Kachmer Decl., Ex. A at 6, 9. But for Dr. Inan to do either of these things would clearly be inconsistent with Dr. Inan's commitment that he will *only* use Plaintiffs' confidential information in connection with *this litigation*. Inan Decl., ¶

21. Moreover, none of the patent applications that Plaintiffs have identified relate to the technology at issue in this case. Inan Decl. ¶ 15-20. Accordingly, it seems that Plaintiffs are severely discounting the extent to which Plaintiffs' concerns are already addressed by Dr. Inan's agreement to be bound by the protective order. Because Plaintiffs' objection rests on an understatement of the extent to which the Protective Order addresses their concerns, the Court should overrule Plaintiffs' objection.

### 4.    Defendants Cannot Proceed without a Qualified Expert

This Court has seen Plaintiffs' identification of trade secrets in connection with previously filed motions. Thus, the Court is aware that Plaintiffs' alleged trade secrets are highly technical. It is imperative that Defendants be able to seek the expertise of Dr. Inan, whose experience with signal processing in the context of blood pressure, ECG, etc. gives him insight into the technology behind Plaintiffs' other alleged trade secrets.

The universe of individuals with this type of signal processing experience is limited. Plaintiffs' expert Dr. McNames and Dr. Inan each have a Ph.D. in electrical engineering, which gives them unique insight into the principles of signal processing that are the basis of the alleged trade secrets that Plaintiffs are asserting in this case. To exclude Dr. Inan (or to effectively exclude him by requiring that he sign an additional agreement containing unnecessary and overly burdensome restrictions) would leave Defendants without his valuable expertise, which will be indispensable in Defendants' efforts to defend against Plaintiffs' claims.

If the Court adopts Plaintiffs' view of what (a) the scope of the case and the confidential information at issue in this case and (b) the risk of disclosure that comes from a role as an academic researcher, it would disqualify not only Dr. Inan but also essentially any other expert qualified to opine on the technical issues related to Plaintiffs' trade secrets. This would be prejudicial to Defendants,

especially because Plaintiffs' own technical expert—who would likely be excluded under the same rationale that Plaintiffs' advance here—has already been retained and has already gained access to Defendants' confidential materials. Because Plaintiffs' objection does not take into consideration the prejudice to Defendants that would result from sustaining their objection, the Court should overrule Plaintiffs' objection.

## IV.  PLAINTIFFS' POSITION

The parties agree that the Court must weigh the risk of disclosure of Plaintiffs' confidential information against the potential harm to Defendants' ability to prosecute its case.  Defendants argue that Dr. Inan presents no risk of disclosure because he works in a different field than pulse oximetry.  But Dr. Inan researches and develops physiological monitoring technologies based on the photoplethysmogram ("PPG") signal.  ███████████████████ ███████████████████████████ Plaintiffs' patents and ████████████████████████████████████████ Defendants cannot maintain that PPG processing and pulse oximetry are separate fields.

Defendants ignored that the company Dr. Inan co-founded and advises is developing, for commercial sale, a wearable that processes a PPG to determine oxygen saturation.  Dr. Inan admits that he is performing "cutting edge research" to develop signal processing of the PPG. Inan Decl., ¶ 6.  Dr. Inan also filed for patents and published articles about that work.  These activities present a very high risk of disclosure of Plaintiffs' market-leading technology.

Defendants cannot show any potential harm.  Dr. Inan would be their *fourth* technical expert.  Defendants therefore have no basis for arguing that the objection "would essentially preclude Defendants from retaining *any* qualified expert."

-22-

**A.      Background to Dispute**

**1.      Defendants Omit Material Facts**

Defendants provide an incomplete factual background beginning in February 2021.  The relevant facts start a year earlier. Defendants disclosed a first technical expert, Nikolaus Baer, on February 20, 2020. Claassen Decl. Ex. 13. Mr. Baer's CV stated that he had been a testifying expert witness for intellectual property litigations including patent and trade secrets. Claassen Decl. Ex. 17. Mr. Baer also listed seven pages of expert engagements. *Id.*  Plaintiffs did not object.

On February 24, 2020, Defendants disclosed a second technical expert, Dr. Robert Stone.  Claassen Decl. Ex. 14.  Dr. Stone's CV stated that he had been an expert in approximately one dozen intellectual property matters, including three previous engagements adverse to Masimo. Claassen Decl. Ex. 18. ████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

On August 27, 2020, Defendants disclosed a third technical expert, Dr. Thomas Goldstein.  Claassen Decl. Ex. 15.  Dr. Goldstein's CV spanned 19 pages and included numerous signal processing talks, patents, publication, and research. Claassen Decl. Ex. 19.  Again, Plaintiffs did not object.

**2.      Plaintiffs' Promptly Evaluated Defendants' Disclosure of Dr. Inan**

On Friday, February 12, 2021, Defendants disclosed their fourth technical

expert, Dr. Inan.   Kachmer Decl. Ex. A at 25.   Plaintiffs promptly evaluated Defendants' disclosure of Dr. Inan.

Dr. Inan's CV listed hundreds of publications, patents and patent applications. Claassen Decl. Ex. 7. On February 17, Plaintiffs asked for more information because Dr. Inan's CV listed only the titles of his patent applications. Kachmer Decl. Ex. A at 24-25. Also, his professional services merely listed the names of 14 different companies without indicating the services Dr. Inan provided to them. *Id.* The companies included multiple life science and medical device companies. Plaintiffs independently learned that Dr. Inan served as a spokesman for one company and currently serves a scientific advisor for another. *See* Kachmer Decl. Ex. A at 25; Claassen Decl. Ex. 10.

Masimo and Cercacor were concerned about allowing Dr. Inan access without learning more about Dr. Inan.   Plaintiffs' counsel obtained the publications and asked for more information about Dr. Inan's professional services. Kachmer Decl. Ex. A. Plaintiffs reviewed that information and identified several examples of work that overlapped with the confidential information that Plaintiffs had produced over the course of discovery. Kachmer Decl. Ex. A at 3-4, 5-6, 8-10, 16-17, 21-22. ██████████████████████████████ ███████████████████████████████████████████████ *See, e.g.,* Claassen Decl. Exs. 4-6; Diab Decl. ¶¶ 15, 18.   Plaintiffs identified those examples to Defendants, including signal processing of detected light signals for noninvasive monitoring.

As part of a series of discussions between the parties, Defendants represented that Dr. Inan's consulting work did not involve oxygen saturation estimation.   Kachmer Decl. Ex. A at 13, 18.   But Defendants said nothing about any other signal processing, physiological parameters, or noninvasive monitoring. Thus, Defendants' representation about oxygen saturation estimation failed to respond to Plaintiffs concerns.

On February 25, 2021, Plaintiffs offered to further discuss the issue. Kachmer Decl. Ex. A at 23. Plaintiffs identified additional publications and pending patent applications related to Plaintiffs' confidential information designated under the Protective Order. *Id.* at 16–17. Plaintiffs also offered to discuss possible restrictions that would reduce Plaintiffs' concerns of an inadvertent disclosure. *Id.* Defendants responded that Dr. Inan's work was not related to pulse oximetry, but did involve signal processing of light signals for noninvasive monitoring. *Id.* at 14–15.

Despite continued discussions, the parties were unable to resolve Plaintiffs' objection to Dr. Inan.

**B.** **Defendants Incorrectly Minimize the Risk of Inadvertent Disclosure**

Defendants raise three points to trivialize the risk that Dr. Inan would inadvertently disclose Plaintiffs' confidential information. Defendants argue: (1) the scope of the technology in the case is limited to pulse oximetry, (2) Dr. Inan's academic advising on research poses little risk, and (3) the Protective Order "eliminates" the risk of disclosure. All three arguments lack merit.

**1.** **The Case Concerns Technology That Rests Upon Processing The PPG**

Defendants allege Dr. Inan's PPG signal processing differs from the technology at issue in this case. Specifically, Defendants contend that Dr. Inan's PPG signal processing does not result in the estimation of oxygen saturation. But Defendants concede "that pulse oximetry involves signal processing of light signals and involves ***processing a PPG signal***." *Supra*, Section III.B.2.a (emphasis added). That processing is at issue in this case.

The technology in the case is not limited to "estimation of oxygen saturation" as Defendants imply. "Pleth" is shorthand for photo***pleth***ysmogram and is recited in both Claim 1 of U.S. Patent No. 8,983,564 and Claim 1 of U.S. Patent No. 10,194,847. *See* Dkt. 42 (First Amended Complaint) at ¶¶ 122, 173

-25-

(alleging Defendants use pleth data to determine perfusion index with respect to Claim 1 of '564 Patent and Claim 1 of '847 Patent).   In its claim-construction briefing, Plaintiffs described the PPG or pleth as follows:

> A typical signal by the sensor for a given wavelength of light is illustrated below, and is known in the field as a plethysmograph or plethysmographic waveform:



Dkt. 51 at 3 (citing '564 Patent at Fig. 1).  Defendants identified "pleth" as a term requiring construction.  Dkt. 50 at 7, 10.  For example, Claim 1 of '564 Patent and Claim 1 of '847 Patent are not limited to merely estimating oxygen saturation or any other blood constituent.   Instead, they concern calculating perfusion index from the PPG.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████   Masimo SET stands for Signal Extraction Technology and refers to, among other things, the ability to extract a meaningful PPG signal during difficult measurement conditions.  *See* Dkt. 42 (First Amended Complaint) at ¶ 11. Those difficult measurement conditions include patient movement and low signal strength.   Masimo's signal processing for those PPG signals is recognized as world-leading technology.  *Id.* at ¶ 17.

██████████████████████████████████████████████████████████

█████████████████████████   Diab Decl. ¶¶ 15-18; Chen Decl. Ex. 1; Claassen Decl. Ex. 5.   Plaintiffs have also produced source code and Matlab files demonstrating how to implement that technology.  *See* Diab Decl. ¶¶ 15-18; Chen

Decl. Ex. 1; Claassen Decl. Ex. 5.  Plaintiffs' interrogatory responses would also focus Dr. Inan on the significant information from the production discussing the PPG.   The discovery produced shows this case concerns technology that rests upon processing the PPG.

## 2. Dr. Inan's Academic Research Poses A Significant Risk of Inadvertent Disclosure

Defendants dismiss Dr. Inan's research publications as irrelevant because they do not discuss pulse oximetry.  But it is undisputed that Dr. Inan's recent publications describe PPG signal processing.  For example, in an April 1, 2020 article, Dr. Inan explains that commercially available PPG sensors "***do not yield high quality measurements***."  Claassen Decl. Ex. 2 at 3851.  Dr. Inan therefore designed his own PPG sensors and signal processing for "extracting clean PPG waveforms" as shown in various figures in the publication.  *Id.* at 3852 (annotated).  For example, Dr. Inan developed "a digital FIR bandpass filter" that "removes out-of-band noise."  *Id.*  Dr. Inan describes techniques for selecting the "optimal PPG" in that publication.  *Id.* at 3854.

Other Dr. Inan publications similarly disclose PPG signal processing.  For example, Dr. Inan discloses the use of linear filtering and wavelet processing to reduce noise and motion artifacts.  *See* Diab Decl. at ¶ 10; Claassen Decl. Ex. 1.  He also discloses obtaining ensemble-averaged PPGs.  *Id*. at ¶ 12; Claassen Decl. Ex. 3.   Another Dr. Inan publication discloses processing PPG signals using "finite impulse response (FIR) band-pass filters."  *See* Claassen Ex. 20 at 3, 5.

These details go beyond mere "high-level block diagrams" as Defendants argue.  *Supra*, Section III.B.2.B.  Dr. Inan is immersed in the details and his research focuses on specific processing techniques for extracting a clean PPG signal.   Dr. Inan continues to publish on how to address low quality signal conditions with PPG signal processing. ███████████████████████

███████████████████████████████  Because Dr. Inan frequently

publishes papers on PPG processing, Plaintiffs cannot bear the risk that he may inadvertently reveal aspects of their PPG processing algorithms.   Whether Dr. Inan publishes for academic reasons or otherwise is irrelevant.

### 3.      The Protective Order Does Not Address Plaintiffs' Objections

Defendants assert that the Protective Order is "more than sufficient" to protect Plaintiffs' trade secrets. *Supra,* Section III.B.3. Defendants rely on Dr. Inan's agreeing to not use or disclose the Plaintiffs' confidential information for an improper purpose.   But that agreement could not prevent any ***inadvertent*** disclosure.

The Protective Order recognizes the possibility of inadvertent disclosures. It provides for parties to object when they suspect risks of an inadvertent disclosure. Dkt. 100, ¶ 6(c).  The harm of an inadvertent disclosure is heightened when one discloses trade secrets.  Any violation of the Protective Order would be unintentional and not prevented by it.

Defendants also argue that Dr. Inan's role as an academic researcher, as opposed to a commercial competitor, poses no risk of inadvertent disclosure. *Supra,* Section III.B.2.b. But courts draw no such distinction. Academic researchers pose a serious risk because they are much more likely to publish their findings and research for anyone to read, including competitors.   Whether academic or commercial, "the court must balance the risk of inadvertent disclosure of trade secrets to competitors against the risk to the other party that protection of these trade secrets will prejudice its ability to prosecute or defend the present action." *Layne Christensen Co. v. Purolite Co.*, 271 F.R.D. 240, 249 (D. Kan. 2010) (preventing access to "Attorneys' Eyes Only" documents by engineering professor and inventor who was not a competitor or competitive decision-maker).

While Dr. Inan may not intentionally disclose Plaintiffs' confidential information, he may do so inadvertently.   *Trustees of Bos. Univ. v. Everlight Elecs. Co.*, No. 12-CV-11935-PBS (D. Mass. July 8, 2014), Dkt. 636, at 7–8

-28-

("Although the Court does not question Dr. Moustakas' intentions, it 'nonetheless question[s] his human ability during future years of research to separate the applications he has extrapolated from [Defendants'] documents from those he develops from his own ideas.'" (quoting *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*, 682 F. Supp. 20, 22 (D. Del. 1988))).

Defendants cite two cases for the proposition that "an academic setting is not the type of role that creates a risk of inadvertent disclosure." *Supra*, Section III.B.2.b (citing *Labyrinth Optical Techs. LLC v. Ciena Communs., Inc.*, No. SACV12-02217-AG (DFMx), 2013 U.S. Dist. LEXIS 188655, at *30-31 (C.D. Cal. Dec. 18, 2013) and *Apple Inc. v. Samsung Elecs. Co.*, Civil Action No. 11-CV-01846-LHK, 2012 U.S. Dist. LEXIS 49201, at *33-34 (N.D. Cal. Jan. 30, 2012)).  But in both cases, the parties agreed upon the protective orders entered and the court did not categorize the type of expert at issue.

Accordingly, Dr. Inan presents a significant risk of inadvertent disclosure despite Defendants' attempt to trivialize his work in PPG processing and its relation to Plaintiffs' confidential information.

**C.   Dr. Inan Is A Co-founder And Scientific Advisor To Cardiosense Whose Sole Product Includes Pulse Oximetry**

Defendants argue that "Dr. Inan is primarily an academic." *Supra*, Section III.2.b.  Defendants contend that "He has engaged in minimal consulting work outside of academia, but this work has been limited both in terms of the time that he commits to it and the scope of his responsibilities." *Id*.  But Defendants fail to address Dr. Inan's co-founding of Cardiosense and its oxygen saturation measurement.  Kachmer Decl. Ex. A at 25; Claassen Decl. Ex. 10 at 3.

Dr. Inan admits he "co-founded Cardiosense with Dr. Andrew Carek, who received his Ph.D. from Georgia Tech under his direction."  Inan Decl. at ¶ 11(a).  Dr. Inan still serves as a Scientific Advisor to Cardiosense. *Id*.

Cadiosense describes its wearable device on its website.  Cardiosense touts

-29-

its wearable device as "the first non-invasive monitoring platform to give an early warning of declining heart function."  Claassen Decl. Ex. 10 at 1.  Cardiosense's wearable processes a PPG to determine oxygen saturation as shown in the screenshot below:



*Id.* at 3.  That wearable device would compete with Masimo's Radius PPG, a wearable pulse oximeter.

Dr. Inan represents that he does not develop algorithms "to estimate blood oxygen saturation or any other blood constituent."  Inan Decl. at ¶ 13.  However, Dr. Inan is a Scientific Advisor for Cardiosense (Inan Decl. at ¶ 11(a)) and his work contributed to a device that includes a pulse oximeter (Claassen Decl. Ex. 10 at 3).  Plaintiffs' concern is justified under these circumstances.  Dr. Inan's work presents a high risk of both inadvertent disclosure and competitive harm to Plaintiffs.

**D.      That Defendants Already Have Three Other Technical Experts Refutes Any Claim Of Prejudice**

Defendants argue they "cannot proceed without a qualified technical expert." *See supra*, Section III.B.4.  But Defendants ignore that Dr. Inan would be their fourth retained technical expert.  Defendants' complaint that disqualifying

Dr. Inan would preclude them from retaining **any** qualified expert rings hollow.

Defendants also argue that Dr. Inan has "a Ph.D. in electrical engineering, which gives [him] unique insight into the principles of signal processing that are the basis of the alleged trade secrets that Plaintiffs are asserting in this case." *Id.* But there are thousands of Ph.D.s granted in electrical engineering in the United States each year. *See* Claassen Decl. Ex. 21. And one of Defendants' other experts, Dr. Goldstein, was a "Postdoctoral Fellow in the Department of Electrical Engineering at Stanford University and then a Postdoctoral Fellow in the Department of Electrical and Computer Engineering at Rice University." Dkt. 171-1 at ¶ 8. Defendants never explain why they need a fourth technical expert. The chance of inadvertent disclosure increases with each additional expert.

**E.**      **Defendants Incorrectly Argue That Plaintiffs Contradicted Themselves When Discussing Dr. McNames**

Defendants argue that Plaintiffs' objection to Dr. Inan somehow contradicts Plaintiffs' argument that their expert, Dr. McNames, does not present a risk of inadvertent disclosure. This argument fails for several reasons.

First, Defendants point to Plaintiffs' representation that Dr. McNames' work is not related to pulse oximetry. *Supra*, Section III.B.1. Defendants rely on a cropped quote from the joint stipulation on Dr. McNames. *Id.* (citing Dkt. 69-1). But Defendants omit that Plaintiffs' representations to the Court went further. Dr. McNames specifically represented that his research does not "use any optical sensors." Dkt. 69-10 at ¶ 6. In stark contrast, Defendants have confirmed that Dr. Inan specifically works with light signals, and with processing the PPG, the core of Plaintiffs' light-based technologies. Kachmer Decl. Ex. A at 14.

Second, Defendants argue that Plaintiffs downplayed a McNames patent that mentioned pulse oximetry. But that patent issued in 2011 and there was no evidence that McNames was pursuing new patents related to pulse oximetry. Here, however, Dr. Inan is currently working on PPG signal processing. Dr. Inan

published articles in the last year on PPG signal processing.  *See* Diab Decl. ¶¶ 9,

11; Claassen Decl. Ex. 2.  He is also currently prosecuting a patent application

concerning the PPG and its use for noninvasive monitoring.  *See* Diab Decl. ¶ 10;

Claassen Decl. Ex. 1.

Defendants conclude by stating "Plaintiffs' arguments apply with equal

force to Dr. Inan."  Not so.  Each of the parties produced different information.

Plaintiffs produced extensive information regarding processing of PPGs and

pointed out that Dr. Inan is working on processing PPGs.  Defendants never

identified any of their confidential information that Dr. McNames could use or

disclose in the ordinary course of his work.


Respectfully submitted,

**KNOBBE, MARTENS, OLSON & BEAR, LLP**

Dated: __March 25, 2021__      By: */s/ Brian C. Claassen*
                                          Brian C. Claassen

                               Attorneys for Plaintiffs, Masimo Corporation
                               and Cercacor Laboratories, Inc.


**MERCHANT & GOULD, P.C.**

Dated: __March 25, 2021__      By: */s/ Paige S. Stradley*
                                          Paige S. Stradley

                               Attorneys for Defendants.
                               True Wearables, Inc. and Marcelo Lamego


**<u>FILER'S ATTESTATION</u>**

Pursuant to Local Rule 5-4.3.4 regarding signatures, I hereby attest that

concurrence in the filing of this document has been obtained from all signatories

above.

Dated: __March 25, 2021__        By: __*/s/ Paige S. Stradley*__

32797900

-32-