UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)


| | | |
|---|---|---|
| MASIMO CORPORATION, ET AL, | ) | CASE NO: 8:18-CV-02001-JVS-JDE |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Santa Ana, California |
| | ) | |
| TRUE WEARABLES, INC, ET AL, | ) | Friday, May 14, 2021 |
| | ) | |
| Defendants. | ) | |


TELEPHONIC HEARING RE DEFENDANTS' MOTION [DKT.NO.263]
AND EX PARTE APPLICATION [DKT.NO.264]


BEFORE THE HONORABLE JOHN D. EARLY,
UNITED STATES MAGISTRATE JUDGE


**APPEARANCES**:              SEE PAGE 2


Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Maria Barr

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>**APPEARANCES**</u>:


For Plaintiffs:                   IRFAN A. LATEEF, ESQ.
                                  JOSEPH R. RE, ESQ.
                                  BRIAN C. CLAASSEN, ESQ.
                                  Knobbe Martens Olson & Bear, LLP
                                  2040 Main Street
                                  14th Floor
                                  Irvine, CA 92614

                                  MARK D. KACHNER, ESQ.
                                  Knobbe Martens Olson & Bear, LLP
                                  1925 Century Park East
                                  Suite 600
                                  Los Angeles, CA 90067


For Defendants:                   PAIGE S. STRADLEY, ESQ.
                                  Merchant & Gould, PC
                                  80 South 8th Street
                                  3200 IDS Center
                                  Minneapolis, MN 55402

                                  RYAN J. FLETCHER, ESQ.
                                  ZACH KACHMER, ESQ.
                                  Merchant & Gould, PC
                                  1801 California Street
                                  Suite 3300
                                  Denver, CO 80202

                                  AMANDA R. WASHTON, ESQ.
                                  Conkle Kremer & Engel, PLC
                                  3130 Wilshire Blvd.
                                  Suite 500
                                  Santa Monica, CA 90403

1          **Santa Ana, California; Friday, May 14, 2021**

2                     **(Telephonic Hearing)**

3                       **(Call to Order)**

4          **THE COURT:**  All right.  Good morning.  United States

5     District Court for the Central District of California is now in

6     session.  This is Magistrate Judge Early and we are calling

7     Case Number 8:18-cv-2001-JVS, *Masimo Corporation, et al. v.*

8     *True Wearables, et al.*  We are proceeding telephonically and I

9     am going to state who I understand is here on the line and then

10    if I could just have just one person for each side confirm that

11    that's correct.

12          On behalf of Plaintiffs, we have Brian Claassen,

13    Irfan Lateef, Joseph Re, and Mark Kachner.  Is that correct?

14          **MR. CLAASSEN:**  Yes, Your Honor, that is correct.

15    This is Brian Claassen.

16          **THE COURT:**  All right.  And Mr. Claassen, who will be

17    speaking for Plaintiffs, so that you don't have to identify

18    yourself each time?

19          **MR. CLAASSEN:**  I will be speaking on behalf of

20    Plaintiffs, Your Honor.

21          **THE COURT:**  Okay.  On behalf of the Defendants, we

22    have Amanda Washton, Ryan Fletcher, Zach Kachmer, and Paige

23    Stradley.  Is that correct on behalf of Defendants?

24          **MR. FLETCHER:**  This is Ryan Fletcher from Merchant

25    and Gould, Your Honor, and that is correct on behalf of

4

```
1   Defendants.  I will also be the one speaking for Defendants
2   today.
3            THE COURT:  All right.  And we're not going to
4   preclude others from speaking if there's a reason for it, but
5   at that point we'll need to identify our speaker and I'd just
6   ask you to ask permission before jumping in.
7            All right, we are here on Defendant Marcelo Lamego's
8   Ex Parte Application for an Expedited Determination of a Motion
9   for a Protective Order to allow a remote deposition of
10  Mr. Lamego.  The Ex Parte Application and the Motion were filed
11  yesterday, May 13th, and the Ex Parte Application is Docket
12  Number 264 and related filings, and the Motion and Joint
13  Stipulation is Docket Number 263 and related filings.
14           I'm going to give you some thoughts and then I'm
15  going to kind of open things up.  I don't know whether we're
16  going to reach a determination on the substantive issue of the
17  Motion.  We must just reach the expedited briefing and
18  determination request and have more follow-up and possibly some
19  live testimony.
20           But I'm going to start by saying I don't particularly
21  care to get in the business of making determinations about
22  people's risk and health and concerns in an ever-changing
23  environment.  This relates to concerns Mr. Lamego has expressed
24  about an in-person deposition.  And nothing was filed under
25  seal in connection with the Motion and Joint Stipulation, so
```

1    this hearing is not going to be sealed in any fashion.  So,

2    there is health related information that's been provided, but

3    I'm going to discuss it openly because it was openly provided.

4    Mr. Lamego indicates he has not received a vaccination for the

5    COVID virus and doesn't intend to in the immediate future and

6    has -- does not feel comfortable, I think is the word,

7    proceeding in an in-person deposition.

8           That said, you know, I don't want to get into too

9    much but if I have to, I have to.  I'll also tell you I don't

10   really want to get into a situation where we have private

11   investigators following litigants around shopping for Mother's

12   Day and going to the Pier with their families on a weekend.  If

13   we've reached that stage, I'm saddened that we've reached that

14   stage where that's going to be part of cases going forward.

15   But if it is, it is, and if we have to have a hearing and we

16   have to have information about what someone's true level of

17   comfort or discomfort with being out in the world and attending

18   to a deposition in a case where that person was sued, that

19   person is not suing, that person was sued, then that's what

20   we'll do.

21          But my hope is that maybe we can work it out because

22   what often happens is people get to their corners, everything

23   becomes a binary issue of yes we will, no we won't, when

24   there's lots of middle grounds that maybe can be worked out.

25   So, I'd like to talk about some of the possibilities for that

1    middle ground.

2         It's Mr. Lamego's motion, so I'll start with you,

3    Mr. Fletcher.  But I have a question for you before we -- why

4    don't we start with answering a few questions.

5         **MR. FLETCHER:**  Absolutely, Your Honor.

6         **THE COURT:**  Is Mr. Lamego going to attend trial in

7    person in January of 2022?

8         **MR. FLETCHER:**  I would certainly expect he would

9    attend trial in person in January 2022, should the Court be

10   having in-person trials and should the Local Rules and

11   everything mandate that he do so because it's safe.

12        **THE COURT:**  When you say "mandate," the Local Rules

13   don't mandate any party in a civil case to attend trial unless

14   they're served with a subpoena.  I'm asking is he going to --

15   you said he certainly intends to attend trial.  Obviously, we

16   see how things go.  If there's one thing this COVID situation

17   has taught us all is humility.  Anyone who says that they know

18   how things are going to look in six months can't say that.  So,

19   I'm not asking for a definitive word, but sitting here today

20   you've answered my question, that he certainly intends to

21   attend the trial in person, assuming that conditions permit it.

22   I appreciate that.

23        I'll tell you before I'd even looked at Mr. I think

24   it's Prince (phonetic) is the private investigator's

25   Declaration, looking at Mr. Lamego's Declaration it was -- how

1    do I put this, I'll use the technical term -- it was squishy.

2    It left open a lot of possibilities about his concerns here.

3    And again, I don't really want to get into the business of

4    getting into someone's head about how concerned they are or

5    their medical situation, but he's provided information on both,

6    so I have to get into it a little bit.  But, you know, the

7    ultimate conclusion that I don't feel comfortable attending an

8    in-person deposition, which that's taken from his Declaration

9    at Paragraph 5, there's lots of things in life we're not

10   comfortable with.  I'm not really comfortable with -- well, I'm

11   going to leave my in-laws out of it.  But there's lots of

12   things in life we're not comfortable with but we proceed with.

13          We are concerned with risks and no one wants to

14   create an unnecessary or excessive risk to someone's health or

15   well-being in the context of a litigation, but there's always

16   risks.  People can get into car accidents on their way to

17   depositions.  People can catch the flu at a deposition.  I had

18   a case where a deponent was arrested by the FBI in the middle

19   of a deposition.  All sorts of things can happen at a

20   deposition, so we're not trying to eliminate all potential

21   risks.  We're trying to carefully weigh and balance, looking at

22   all the information about what the right thing to do is.

23          Now, my understanding is that all but one deposition

24   in this case has been proceed -- has been conducted by video

25   conference, and that one deposition was kind of a different

1    situation.  So, I'm considering that.  It sounds like none of

2    Plaintiffs' representatives, other than that one deposition,

3    were required to appear in person.  And I'll hear from

4    Plaintiff and I'll hear from you, Mr. Fletcher, on that.  So,

5    that's something that I'm certainly considering, why one

6    particular person is to be in-person.  But the situation has

7    changed in terms of the risks associated with the spread of the

8    virus in Orange County in mid to late May 2021, as opposed to

9    November or December of 2020.

10        And obviously Mr. Lamego is a very important witness

11   and there's an issue regarding the handling and use of source

12   code information which was, if I recall correctly, stipulated

13   to by the parties.  That particular issue anyway.  And that

14   stipulation, I looked at it when this Motion came in, I think

15   the stipulation was in April of 2020.  So, at a time when the

16   virus was in force, when courts were shutting down, but perhaps

17   maybe people didn't know how long it was going to last or what

18   the impacts were going to be.  But certainly Defendants knew

19   that Mr. Lamego would have his deposition taken at the time

20   they agreed to the procedures for using source code information

21   which could be complicated, I don't know whether that's the

22   case or not, but could be complicated by a remote deposition.

23        So, if there's anything further, Mr. Fletcher, that

24   I've just talked to you about or that's not already in the

25   papers that are before me, let me know.

```
 1              MR. FLETCHER:  Yes, Your Honor.  Just a couple points
 2   to follow up on and clarify.
 3              One, that (indisc.) referring to which is Document
 4   Number 140, contemplates in-person depositions, but it clearly
 5   contemplates those in an environment where it is safely
 6   possible.  So, I just want to bring that to the Court's
 7   attention.
 8              Regarding my client, I haven't even seen my client in
 9   person since the beginning of the pandemic.  My client's
10   maintained a very low exposure and profile.  He does go to his
11   office, True Wearables, but it's a family-run company.  The
12   only person at his office when he's there is his wife
13   sometimes.  So --
14              THE COURT:  I'm going to --
15              MR. FLETCHER:  -- to the extent we --
16              THE COURT:  I'm going to --
17              MR. FLETCHER:  -- would discuss --
18              THE COURT:  I'm going to pepper you with a few --
19              MR. FLETCHER:  Sir?
20              THE COURT:  I'm going to pepper you with a few
21   questions as they hit me.  Because you raised the issue again,
22   I wouldn't normally ask this, but since you said you haven't
23   personally met with Mr. Lamego since the virus, has any of his
24   counsel in this case personally met with him since the virus
25   hit?
```

1          **MR. FLETCHER:**  No, sir.  Not a single counsel in this

2   case.

3          **THE COURT:**  All right.

4          **MR. FLETCHER:**  His primary counsel is all located out

5   of state.  I'm in Colorado.  One of my colleagues is in

6   New York.  One of my colleagues is in Minnesota.  And none of

7   us has been to -- have been to California to see our client.

8   And our local client, Amanda, has not seen him either.

9          **THE COURT:**  And is it your -- and again I'm only

10  asking because you raised the issue, is it your intention that

11  preparation for his deposition will be done remotely?

12         **MR. FLETCHER:**  Absolutely.  It would be -- in my

13  opinion it would be inconsistent to prep someone in person then

14  say he can't attend an in-person deposition.

15         **THE COURT:**  All right.  Please continue.

16         **MR. FLETCHER:**  Yes, absolutely.  And then I just want

17  to follow up on a couple things.

18         You know, we still are in the middle of a global

19  pandemic and I think Your Honor was spot on earlier when you

20  said to say you know what's going to happen six months from now

21  is, for lack of better words, hard or ludicrous.  And I might,

22  I would point -- I would only have to point you as far as

23  Exhibit 3 to the Declaration of Mark Kachner, Page 9, where the

24  CDC recognizes that we're still learning a lot about the

25  effectiveness of certain vaccines, we're still trying to

1    understand how the virus spreads.  So, there is still a fair

2    amount of information that's unknown and therefore a fair

3    amount of risk associated to people.

4        **THE COURT:**  And I didn't see it, and I wouldn't have

5    expected to have seen it in the Joint Stipulation, because that

6    would have been circulated seven or more days ago, I'm not sure

7    I saw it in the request for an expedited hearing or in your

8    supplemental memorandum, but the CDC guidance that came out

9    yesterday regarding vaccinated persons, does that have a

10   bearing on anything we're talking about?

11       **MR. FLETCHER:**  I do not believe so, Your Honor.  I

12   think, you know, the CDC does sometimes offer guidance.  Last

13   time I checked though they weren't a rule making body.  And I

14   still think, and you certainly or opposing counsel would

15   certainly know better than I, but last time I checked

16   Orange County was still under a pretty significant threat

17   level, or however it's referred to there.  So, no, I don't

18   think it affects the determination here.

19       **THE COURT:**  I think by the time of the deposition, or

20   at least maybe by the second day of the deposition, the

21   Orange County level, they do it colors, will be at yellow and

22   then that means many more things will be open to the public and

23   to full 100 percent capacity, as opposed to limited capacity.

24       But be that as it may, these are all things that if

25   we have to get to an evidentiary hearing on, there will

12

1    probably be things I'll need more briefing and more evidence

2    on.  But I appreciate you letting me know.  Is there anything

3    else that you want to follow up on?

4              And by the way, I mentioned Mr. Lamego's initial

5    Declaration, which I described as squishy.  I would say his

6    Declaration in the Supplemental Memorandum is less squishy, but

7    that's I assume largely because he's responding to the

8    Declaration by Mr. Prince about him being in public.

9              So let me ask you, Mr. Fletcher, it looked like in

10   the meet and confer correspondence, it wasn't really fleshed

11   out, there was a proposal or an offer made by Plaintiffs to

12   conduct the deposition outdoors, and maybe at the time you

13   didn't know exactly what Mr. Lamego's comfort level with being

14   outdoors is, but his Declaration in the Supplemental Memorandum

15   suggests to me that he has a fair comfort level at being

16   outdoors, and even being indoors while masked for limited

17   periods of time.  What does that do in terms of the offer to

18   have the deposition conducted out of doors?

19             **MR. FLETCHER:**  Sure, a couple of responses.  First, I

20   think there's a fine distinction between being masked indoors

21   for a limited amount of time, i.e., 30 minutes, 45 minutes,

22   maybe an hour, and being masked indoors for up to eight, nine,

23   ten hours a day for two straight days.  So, I mean that's a

24   pretty significant distinction.

25             As far as Plaintiffs' offer to conduct the deposition

1    outdoors, it's certainly something we considered.  It's

2    certainly something we discussed with them, you know, in a good

3    faith effort to kind of reach some sort of agreement.  But we

4    ultimately concluded we're just not sure of the effectiveness

5    of trying to conduct a deposition outdoors for two straight

6    days, which we imagine, although the record time would only be

7    14 hours, but the actual deposition time would be significantly

8    longer with lunch breaks and such.  I mean how do you deal with

9    weather, how do you deal with noise, how do you deal with a

10   whole assortment of things?

11            And so ultimately, and this goes to the last point I

12   wanted to make, Your Honor, for the time being, is that Zoom is

13   actually an incredibly effective way to take a deposition.  I

14   just concluded a nearly six-week trial, and it was a hundred

15   percent remote.  Jurors were remote, judge was remote, we were

16   all remote.  And it's become an incredibly effective way to

17   take a deposition, much more effective, frankly, than trying to

18   take a deposition with someone wearing a mask or trying to take

19   a deposition outdoors.  And I would say --

20            **THE COURT:**  Doesn't that cut against them?  Isn't the

21   downside then to the Plaintiffs?  If they want to have a less

22   effective deposition out of doors, isn't that their problem to

23   worry about, not yours?

24            **MR. FLETCHER:**  Well, I'd still have to be able to

25   make sure the communication and the record and everything's

14

1   clear if we were sitting outdoors, just to make sure that

2   that's all happening appropriately.  And then I don't --

3   frankly, I'm not sure how it occurs outdoors.  I mean how close

4   are we sitting together, just so that we can effectively see

5   each other?  You know?  I mean if we're sitting next to each

6   other outdoors so we can effectively see each other and the

7   court reporter can effectively hear us, I'm not really sure

8   we've accomplished much, because we're still breathing down

9   each other's, each other's throats.

10           So, I don't think it's a feasible alternative and

11  it's certainly something we considered at great length.  But I

12  would say Plaintiffs are very --

13           **THE COURT:**  Well, let -- can I --

14           **MR. FLETCHER:**  -- are very aware --

15           **THE COURT:**  Can I ask, you said you considered it at

16  great length.

17           **MR. FLETCHER:**  Right.

18           **THE COURT:**  From the correspondence it looked like it

19  was I'll say summarily rejected a day after it was proposed,

20  but maybe I'm missing something.  What great length?  I mean

21  did you get into a question about, well, what's the outdoor

22  space look like, how can we control --

23           **MR. FLETCHER:**  Right.

24           **THE COURT:**  -- for sound, how --

25           **MR. FLETCHER:**  Right.

15

1        THE COURT:  -- have you confirmed that a court

2   reporter can fairly and accurately report out of doors?  Are

3   those all the sorts of questions that you went over and

4   considered possible locations?

5        MR. FLETCHER:  Yeah, so we didn't -- well, we

6   actually did consider some possible locations.  But we

7   considered effectiveness of sound, we considered distance, we

8   considered weather, we considered wind, we considered, you

9   know --

10        THE COURT:  What are the locations --

11        MR. FLETCHER:  -- whether a court reporter --

12        THE COURT:  What are the locations --

13        MR. FLETCHER:  Sir?

14        THE COURT:  What are the locations that you talked

15   about with Plaintiffs?

16        MR. FLETCHER:  Well, we didn't talk about them with

17   Plaintiffs.  We considered them internally.

18        THE COURT:  Do you think --

19        MR. FLETCHER:  We never had any --

20        THE COURT:  Do you think it would --

21        MR. FLETCHER:  -- long correspondence with Plaintiffs

22   on the issue.

23        THE COURT:  Do you think it would be helpful to talk

24   to them about what their space looks like, what their options

25   are, whether there are controls for sound, et cetera?

16

1          **MR. FLETCHER:**  We can certainly discuss it with them.

2     I mean I obviously wouldn't reject it out of hand, that's for

3     sure.

4          But I think where I was going with this is Plaintiffs

5     are -- well, two points.  Plaintiffs are well aware of the

6     effectiveness of a Zoom deposition.  They've used -- in

7     depositions that I've been involved in they've used an

8     independent, I believe an independent party to sit in what's

9     called a hot seat, and essentially what happens is a document

10    is shown to the witness and the person running the hot seat can

11    immediately bring the witness's attention to any place in the

12    document that's necessary, which makes it simply quite

13    effective because you're not trying to direct the witness to,

14    you know, a certain paragraph on a certain page in a 35-page

15    document.  The Plaintiff has the ability -- or the person

16    taking the deposition has the ability to immediately go where

17    they need to and highlight that portion.  So, it actually is a

18    very effective means of taking depositions.

19         The other thing I think that Plaintiffs have raised

20    is the issue of discussing source code and looking at source

21    code during the deposition if it were to happen by Zoom.  And

22    this is something we've given thought to and the first point

23    there is this, is that to the extent they want to discuss my

24    client's source code, obviously he has access to his own source

25    code.  And he can have access on his computers and have access

1    in any number of ways, including in paper format if we needed

2    to do that.  But I also discussed with my client, and he's

3    willing to allow them to take the source code printout they've

4    requested and we've provided in paper format, and under the

5    protective order they're only allowed to be in paper format,

6    he's agreed to allow them to make an additional copy of that,

7    so that would be -- it would be provided, you know, on a screen

8    during the deposition so any concern they had about directing

9    him to a specific portion of the source code would be

10   alleviated by the fact that it can be shown to him directly on

11   the screen during the deposition.

12            THE COURT:  What about their source code?

13            MR. FLETCHER:  Well, their source code they have the

14   ability to do whatever they please.  And so, if they want to

15   make a digital version of their source code to use during the

16   deposition, they certainly can do that.

17            THE COURT:  Isn't just the whole point though that

18   they probably don't want to be emailing or sending out digital

19   versions of their highly confidential source code in case they

20   are going to request Mr. Lamego to do a line-by-line comparison

21   of his source code versus their source code?  Isn't that really

22   the issue we're talking about?

23            MR. FLETCHER:  Well, I --

24            THE COURT:  If it's not the issue, let me know.

25            MR. FLETCHER:  Well, no, I don't think that's the

1   issue because a couple things.  We also have paper versions of

2   their source code that obviously our client can't see.  But to

3   the extent they, you know, want our client to see something we

4   certainly have paper versions we can show him.

5            The other thing, and this is a really important --

6            **THE COURT:**  How would you --

7            **MR. FLETCHER:**  -- and really unique aspect of --

8            **THE COURT:**  Logistically --

9            **MR. FLETCHER:**  Sir?

10           **THE COURT:**  -- how would you do that if he's

11  appearing remotely?

12           **MR. FLETCHER:**  This is a -- that's a fair question.

13  And this goes to my second point and this is one of the really

14  beneficial aspects of Zoom and it's actually something that

15  came up in a deposition yesterday.  You have the ability in a

16  Zoom deposition to show documentation on the screen that

17  doesn't necessarily get marked as an exhibit.  Meaning it

18  doesn't get given to a court reporter and it doesn't get

19  uploaded to a system.  Essentially all that's happening is the

20  person taking the deposition shows the documents and pages

21  through the documents to show a witness on the screen itself.

22  So, there is no disclosure of, you know, i.e., a digital

23  version of the source code to anyone else other than the person

24  who's looking at it and obviously then there's no actual paper

25  copy or digital copy that's provided to anyone.

19

1          **THE COURT:**  How --

2          **MR. FLETCHER:**  And that's --

3          **THE COURT:**  How confident --

4          **MR. FLETCHER:**  Sir?

5          **THE COURT:**  How confident are you --

6          **MR. FLETCHER:**  Sir?

7          **THE COURT:**  How confident are you in Zoom, what you

8    just said, which is no other person can have access to it, how

9    confident are you that there is not some, and I'm going to

10   express lack of knowledge about how the information is

11   transmitted, but of how something so sensitive, that is at

12   least according to Masimo, if they do need this to happen, that

13   the protective order won't even allow copies to be made that it

14   can be sent over the Internet or over some other facility that

15   it's not going to be available for some third party to be able

16   to have access to or for some third party to be looking over

17   someone's shoulder while it's being shown?  How comfortable are

18   you in making an assessment of that?

19         **MR. FLETCHER:**  I'm extremely comfortable because

20   nothing is actually transmitting.  For instance, if I were

21   taking your deposition I would, on my screen only I would open

22   a document and then what happens is I share my screen.  I don't

23   ever share the underlying document.  I share my screen and you

24   can see my screen.  But there is actually no transmission of an

25   underlying document to anyone.  And so, I feel very confident.

20

1    I mean it was very effective throughout a nearly six-week trial

2    that we just finished.

3              **THE COURT:**  Well, trial is different --

4          **MR. FLETCHER:**  And --

5              **THE COURT:**  Trial is different and here we have a

6    protective order, so this would potentially be a modification

7    of how documents are handled in the protective order when only

8    hard copies are permitted to be kept or shown.  But since it's

9    Masimo's own copy, that may be something that they could

10   certainly waive if they wanted to, but I can see why they may

11   have concerns about that.

12             But let me get a little bit more specific then about

13   Mr. Lamego, and you can tell me you don't know, you can tell me

14   you decline to answer it on his behalf if you do know and you

15   don't want to, or you can tell me.  What else can you tell me

16   about what he's been doing in terms of his interaction with

17   others?

18             Again, I'm not real pleased, and maybe pleased is the

19   wrong term, but I don't -- I hope we don't get to a situation

20   where we're sending out private investigators to determine

21   people's comfort and actions.  But I can't walk away from the

22   fact that Mr. Lamego, it looks like, and the dates might be

23   wrong, at least it says it was executed on May 12, discussed

24   how he attempts to limit the number of people with whom he

25   comes into close contact, and according to Plaintiffs'

1    investigator, Mr. Prince, it was five days earlier that he went

2    out to the Habit Burger Grill, and again Mr. Lamego says he ate

3    outside but obviously he went inside and ordered food, and also

4    went to the Irvine Spectrum shopping area in Irvine and was

5    observed walking in a crowded, and I will confirm that it's an

6    outdoor mall, but also entering a sporting goods store, a shoe

7    store, and a bakery, and then the following day observed at the

8    Balboa Pier in Newport Beach, and then Mr. Lamego provided his

9    greater detail on those excursions.  But it certainly is

10   somewhat jarring that immediately or a few days before telling

11   me that he, quote, "is attempting to limit the number of people

12   with whom I come into close contact," that he was out and

13   about, mostly outside but to some extent inside, doing things

14   that he certainly didn't have to do.

15          What else can you tell me about his excursions

16   outside and other excursions?

17          **MR. FLETCHER:**  Sure.  I think I would start, Your

18   Honor, with just -- and I think this is in his supplemental

19   Declaration, but I think it bears mentioning again.  And that

20   is, I mean he didn't even attend one daughter's wedding, and so

21   I think that pretty much can sum up his efforts to avoid

22   extended contact with other people.  I think Dr. Lamego's

23   supplemental Declaration addresses that the extent the

24   excursion (indisc.) he was always masked up and it was for a

25   very limited amount of time, and my understanding is it's an

22

1   outside mall to begin with.  I think his Declaration also

2   addresses that he chose to eat outside and he chose to go at

3   off hours.  My further -- to the lunch, that is.  And my

4   further understanding is that he has limited his exposure to

5   his family members.  And I think that's significant, and I

6   think one of the critical points here is really timing of

7   exposure.

8           We certainly have all lived a much more restrictive

9   life in the last year, but there are certain things we need to

10  do and when we do need to do those things we wear a mask and we

11  limit the exposure, i.e., 45 minutes or a half hour, and we try

12  to have it be outside.  And the difference between those type

13  of situations and a deposition is the deposition isn't a

14  limited amount of time.  It's a 10- or 11-hour day.  And it's

15  going to be back-to-back days.  And so, there's significant

16  exposure and that significantly increases the risk of

17  contacting COVID.

18          **THE COURT:**  All right.  I want to clarify some

19  things.  Again, this gets back to my word squishy.  I read

20  declarations very closely and you said that -- you mentioned

21  it, so I'm going to inquire further about it.  Mr. Lamego's

22  daughter's wedding in --

23          **MR. FLETCHER:**  Right.

24          **THE COURT:**  -- she's a medical student in Ireland and

25  I congratulate him and her and her new spouse.  What the

23

1 Declaration actually says though is that he didn't attend this

2 important once in a lifetime event, quote, "due in part to

3 concerns about COVID-19."  What were the other reasons he

4 didn't attend?

5    **MR. FLETCHER:**  I do not have an answer to that,

6 unfortunately, Your Honor.  I'm sorry.

7    **THE COURT:**  All right.  Well, that's important.

8 Right?

9    **MR. FLETCHER:**  My understanding was it was driven

10 primarily by his concerns for COVID.  That is my understanding.

11 But --

12    **THE COURT:**  Well, when someone throws that --

13    **MR. FLETCHER:**  -- I don't know --

14    **THE COURT:**  -- when someone throws that in there in a

15 supplemental Declaration, to somebody who reads things very

16 carefully that throws a lot of alarm bells off.  It sounds --

17 in my prior life one of the things I was taught was something

18 called statement analysis and words like in part or other, you

19 know, words in his original Declaration like things like using

20 the word attempting to limit the number of people, that's the

21 truth coming through that someone maybe attempting but it

22 doesn't mean that they're not out and about.  So, this is not a

23 crystal-clear Declaration or Declarations that are telling me

24 that he is avoiding, except in necessary situations, contacts

25 with third parties.

24

1          And in terms of the depositions, we can spread this

2   deposition out longer.  I know you've run it up to the last day

3   of the discovery cutoff date, and Judge Selna's Standing Order

4   is that the discovery cutoff is the date that discovery must be

5   completed.  But the same Order discusses how and when discovery

6   motions are to be brought and obviously implicit in that is my

7   ability as the discovery Judge to continue in the face of

8   objections or other difficulties the discovery process after

9   the discovery cutoff, if a motion is timely filed.  And I'm

10  telling you that I'm thinking about that.

11          I've got a lot of ideas in my head.  I'm here to help

12  you folks, although you might not believe it.  I've got a lot

13  of ideas.

14      **(Laughter)**

15          And so but let me tell you that I don't want to get

16  into a situation where I have to put Mr. Lamego under oath at a

17  hearing to determine how serious his discomfort level is with

18  COVID.  I want to, really want to avoid that.  So, I really

19  hope that you and he will work with me and work with Plaintiffs

20  to try to come up with some reasonable accommodation here.

21          And your concern about depositions being nine or ten

22  hours in close contact with people, first of all there's ways

23  to break it up.  There's plenty of things that can be done to

24  minimize risks.  We'll never eliminate risks, but to minimize

25  risks.  And I really want to see if we can work something out.

25

1              But I'm going to turn it -- because I have questions

2    for Plaintiffs as well.  But Mr. Fletcher, I want to give you a

3    final word before I turn it over to Plaintiffs, if there's

4    anything else you want me to think about or questions I don't

5    know.

6              **MR. FLETCHER:**  Yeah, I think at the end of the day

7    it's still not clear to me what's prejudicial, what the need is

8    for an in-person deposition, given that we're still in the

9    global pandemic, when Plaintiffs have demonstrated repeatedly

10   the ability to be very effective at taking depositions by Zoom.

11   That's really at the end of the day I think where the rubber

12   meets the road.

13             **THE COURT:**  All right.  I'm going to now turn it over

14   to Mr. Claassen and why don't we start there.  You've been

15   doing depositions by Zoom all case long and probably in all

16   your cases for the last year.  Other than what's in your Joint

17   Stipulation, what's wrong with continuing the course of conduct

18   that's been established in this case and other cases over the

19   last 12 months?

20             **MR. CLAASSEN:**  Well, Your Honor, as we included in

21   our Joint Stipulation, so I'll keep the points short, the

22   source code issue is unique here in terms of being able to

23   effectively show the witness and his attorneys who are located

24   remotely from him paper copies of the source code.

25             **THE COURT:**  When you say --

26

1          **MR. CLAASSEN:**  Now, there was an offer to make

2    digital copies available --

3          **THE COURT:**  When you say --

4          **MR. CLAASSEN:**  -- I do not share opposing

5    counsel's --

6          **THE COURT:**  Let me interrupt so that we're talking

7    about the same thing.  Because the phrase "the source code" --

8          **MR. CLAASSEN:**  Yes.

9          **THE COURT:**  -- whose source code do you mean when you

10   say "the source code"?

11         **MR. CLAASSEN:**  Both parties, Your Honor, both

12   Plaintiffs and Defendants.

13         **THE COURT:**  And I may have misunderstood.  I got the

14   sense that Mr. Fletcher was representing that he would

15   authorize that Mr. Lamego's source code could be shown to him

16   electronically via Zoom.  So, assuming you have that approval,

17   that removes that concern.  Is that correct?

18         **MR. CLAASSEN:**  It would reduce that concern, Your

19   Honor.  I will add that we have been videotaping these

20   depositions, so it's not entirely correct that there would be

21   no record or copy of his source code if we were to share it on

22   the screen via Zoom.  So, the recording would include whatever

23   is shown on the screen, which would include his source code.

24          So, I think there needs to be a little more thought

25   given to that process before --

27

1          **THE COURT:**  Well, assuming --

2          **MR. CLAASSEN:**  -- we weigh in on it.  I also in no

3    way have authority from my client to show their source code in

4    that.

5          **THE COURT:**  Okay.  Assuming -- Mr. Fletcher, we can

6    come to one that authorizes that and obviously it would subject

7    to the protective order and it would ordered to remain

8    confidential, only to be shown to folks authorized under the

9    protective order.

10         Let's focus on -- is it your intention or your

11   expectation that you will be showing your client's source code

12   to Mr. Lamego?

13         **MR. CLAASSEN:**  Yes, it is, Your Honor.

14         **THE COURT:**  All right.  And tell me what -- what

15   Mr. Fletcher told me is that you should have no concern because

16   there's no record being made.  You told me that it would be

17   videotaped.  Perhaps you can agree to remove the videographer

18   for that portion of the deposition.  Do you have any other

19   concerns about sharing your client's source code via Zoom?

20         **MR. CLAASSEN:**  Your Honor, I believe the issue would

21   still be coordinating everybody's view of my source code.  Are

22   you using an electronic version of my client's source code or

23   do you mean a paper version?

24         **THE COURT:**  Yeah, here's what I'm getting at and I'll

25   be blunt.  When -- if you folks may or may not recall, for the

1    first six months of the pandemic, the United States courts did

2    not use Zoom and there was a particular reason for that.  It

3    involved security.  I don't know whether -- and, in fact, the

4    only Zoom that is authorized to be used by the Central District

5    is the Zoom.gov which is not the public Zoom.

6            Is there security concerns that you or your client

7    have about using Zoom and publishing even in the manner

8    discussed by Mr. Fletcher who indicated he has zero concerns?

9    Do you have concerns about the security of that process?

10           **MR. CLAASSEN:**  My client does have extreme concerns

11    about the security of a source code overall.  I don't have a

12    great understanding of how safe Zoom might be but there are

13    reports every day about cyberattacks on lots of different types

14    of issues including -- there was just the pipeline issue on the

15    East coast.

16           **THE COURT:**  Well, that's a different issue.  I'm

17    focused --

18           **MR. CLAASSEN:**  I agree that it's different but I

19    don't know that I can represent on behalf of my client that

20    they're comfortable with the security of Zoom.

21           **THE COURT:**  Well, we're back to the squishiness of

22    comfortable but what I was really trying to get at if -- is if

23    you had any more information and it sounds like you don't.

24           **MR. CLAASSEN:**  I do not, Your Honor.

25           **THE COURT:**  All right.  And I interrupted you.

1    Please continue.

2         **MR. CLAASSEN:**  Well, Your Honor, we are willing to

3    explore any possible solutions that you are contemplating,

4    including extending the length of the deposition, the duration

5    of the deposition so that it's broken up into several shorter

6    days.  We are willing to accommodate an outdoor venue.  We

7    could do it in conference rooms that are very spread apart that

8    would normally accommodate hundreds of people with air

9    filtration.

10        There are a number of possible alternatives that we

11   are willing to consider.  And all the attorneys and everyone

12   who would be attending the deposition, other than Dr. Lamego,

13   would be vaccinated.

14        **THE COURT:**  What -- how much time -- and I'm not --

15   this is not a binding thing and I don't want anybody citing to

16   this at the deposition as some sort of cap but how much time do

17   you think on the clock you would need -- and let's assume it

18   was in person -- you would need to show your client's own

19   source code to Mr. Lamego?

20        **MR. CLAASSEN:**  How much of the deposition would

21   require showing my client's source code?  Is that the question,

22   Your Honor?

23        **THE COURT:**  Yes, a time estimate.  Is it --

24        **MR. CLAASSEN:**  I would estimate up to three to four

25   hours.

30

1        **THE COURT:**  That's how much physical time -- physical

2  time, that's an oxymoron.  That's how much time you anticipate

3  you would be actually showing Mr. -- or Dr. Lamego your

4  client's source code, three to four hours?

5        **MR. CLAASSEN:**  Your Honor, between and showing and

6  questioning him about that source code, yes.

7        **THE COURT:**  All right.  And the parties have agreed

8  between his personal capacity and his 30(b)(6) capacity two

9  seven-hour sessions; is that correct?

10        **MR. CLAASSEN:**  That is correct, Your Honor.

11        **THE COURT:**  All right.  Tell me about the outdoor

12  space you were contemplating.

13        **MR. CLAASSEN:**  Well, Your Honor, we have multiple

14  options.  My client is a very large medical device manufacturer

15  who has a courtyard space.  If Dr. Lamego is not comfortable

16  handling it there, we could have it at his office.  We also

17  have a large parking structure outside of our office where we

18  could set up tents.  We have a number of possibilities.

19  Frankly, Your Honor, we're willing to come to the courthouse.

20        **THE COURT:**  Tell me about Dr. Lamego's office.

21        **MR. CLAASSEN:**  I have never been to Dr. Lamego's

22  office.  So I don't know what it's able to accommodate inside.

23  He does have a parking lot outside.  I don't know if he's

24  comfortable with us setting up tents or something outside in

25  his parking lot.

1          **THE COURT:**  All right.  What else do you want to tell

2  me that bears on the motion?  And tell me if you would prefer

3  to have an evidentiary hearing on the motion.

4          **MR. CLAASSEN:**  Oh, I think there are a couple of

5  points, Your Honor.  I think you brought up a good point

6  regarding the schedule.  We are willing to accommodate a short

7  extension to the schedule in order to accommodate any -- or

8  alleviate concerns that Dr. Lamego has.

9          We are also -- in addition to accommodating those

10  concerns in terms of extended time period, we're willing to

11  accommodate just about any scenario in which we could see

12  Dr. Lamego and exchange physical documents with him, whether

13  that be clear masks to alleviate those concerns, whether it be

14  barriers, certifications of fully vaccinated people.  We are

15  willing to consider just about any option in order to

16  accommodate this deposition.

17          **THE COURT:**  All right.  Anything else?

18          **MR. CLAASSEN:**  No, Your Honor.

19          **THE COURT:**  All right.  Let me circle back to you,

20  Mr. Fletcher.  Tell me a little bit about Dr. Lamego's office

21  and any open air space that he has there.

22          **MR. FLETCHER:**  Assuming, Your Honor, that he is still

23  in the same office space that I saw some years ago, it's a

24  relatively small office space.  It's a small company.  It

25  amounts to essentially a strip-mall-like environment where he

1    has office space in the strip mall.  Outside of his office,

2    yes, there is a parking lot just like you would imagine in any

3    kind of industrial-type strip mall.  I don't particularly feel

4    it's very suitable to it for that vision but, yeah, that's the

5    best I know.

6         THE COURT:  Does any -- I'm going to open up to any

7    other counsel for Defendants and if you don't have anything to

8    say, you can remain silent.  But does anyone else know anything

9    more about True Wearables' office and available outdoor space

10   at True Wearables' office?

11        MR. FLETCHER:  Your Honor, I'll represent that I'm

12   the only one on the phone for Defendants that has ever been to

13   his office space.

14        THE COURT:  Understood but sometimes people can --

15   have done research and I'm going to give them an opportunity to

16   speak but if they don't have any information, they'll just stay

17   silent and I'll note that.

18        All right.  Not hearing anything, I'm going to assume

19   that that's all we know about Dr. Lamego's space.

20        Mr. Fletcher, before I try to come to a ruling which

21   could be ordering an evidentiary hearing where your client

22   would be required to provide further testimony on the issue or

23   just simply trying to rule with the information that's in front

24   of me, noting that your client bears the burden -- not a

25   Herculean task but there's the burden to obtain the protective

1   order.  Let me know if there's anything else that you want to

2   either respond to that Plaintiffs' counsel advised or any other

3   issue.

4          **MR. FLETCHER:**  Sure.  And I -- just two minutes.

5   Regarding burden, I think the fact that we're in the middle of

6   a global pandemic establishes that burden.  As far as

7   videotaping of the deposition, Plaintiff had been videotaping

8   the depositions.

9          **THE COURT:**  Can I ask you?  Have they shown -- have

10  the Plaintiffs shown their own source code in any of these

11  video depositions to witnesses?

12         **MR. FLETCHER:**  Your Honor, you jumped -- yes.  No,

13  they haven't shown the source code but you got way ahead of me.

14  I was going there next and I was just going to say, there has

15  been use of attorneys'-eyes-only documents in depositions that

16  are videotaped, so obviously one step below source code.

17         **THE COURT:**  Well, I want to be clear.  Wait, wait,

18  slow down because I may have not understood that.  I'm drawing

19  a distinction here.  I'm talking about the source code.  Has

20  source code been shown to witnesses in depositions via Zoom by

21  Plaintiff?  And by "source code," I mean Plaintiffs' own source

22  code.

23         **MR. FLETCHER:**  No, Your Honor.  And I want to be very

24  clear about that.  No one has used any source code in any

25  deposition to date.

34

1          **THE COURT:**  All right.

2          **MR. FLETCHER:**  There's been the use of attorneys'-

3  eyes-only documentation and other highly confidential

4  information but there has been no use of source code.

5          **THE COURT:**  All right, please continue.

6          **MR. FLETCHER:**  And I was going to make the point that

7  as you correctly noted, we needed to stop the videotaping of

8  the deposition if there was going to be source code discussed.

9  So there was no -- there wasn't a videotape record of that,

10  particularly in view of the fact that they don't really need a

11  videotape of Dr. Lamego giving -- he has every intention of

12  attending trial.

13          There was some reference by Mr. Claassen to all the

14  people attending the deposition should it happen in person and

15  I think that is -- that goes to our concern that I don't know

16  who all of these people are but I would certainly think if

17  somehow we ended up with some small portion of time in an

18  in-person deposition here, it would be limited to the

19  presentation in that deposition, the person attending the

20  deposition, the witness and a court reporter.  I don't know why

21  it would need to be anything more than that.  That seems like

22  an unnecessary risk.

23          And then it seems like, Your Honor, you were

24  indicating -- and maybe I'm jumping ahead but it seems like you

25  were potentially considering this idea that we would do three-

1    quarters of the deposition remote and then potentially like a

2    quarter of the deposition in person, the hours that are needed

3    to address the source code.  I guess that's certainly something

4    we could consider.

5         And normally -- so the concern I would raise there is

6    obviously for the in-person deposition, I would like to be

7    present in person as well which then means for all intents and

8    purposes, that's -- we kind of bypassed that protection aspect

9    of me traveling and me interacting with my clients.  So that

10   was it, Your Honor.

11        **THE COURT:**  All right.  Well, you have local counsel.

12   And you are correct.  I am thinking about that and if I were to

13   issue a ruling -- and I'm not yet but I may be heading this

14   direction -- it would be to grant the underlying motion in part

15   to order that the deposition proceed on May 20th and 21st

16   remotely by videoconference for a total of five hours per day

17   and the remaining four hours to be conducted on Saturday, May

18   22nd at the courthouse here in Courtroom 6A.

19        And if someone can convince me, we do have outdoor

20   space that could conceivably used but -- be used but I can't

21   guarantee issues like sound and lighting.  May 20th, I can't

22   quite guarantee that there won't be rain but I can come close.

23   But I'll make my -- not "my," the courtroom, Courtroom 6A,

24   which is a substantial courtroom that has some Plexiglas

25   installed available for the deposition on Saturday morning, May

36

1    22nd starting at 9:00 a.m. and concluding at 1:00 p.m.

2         Tell me what you think about that, Mr. Fletcher?

3         **MR. FLETCHER:**  Well, I appreciate the clear thinking.

4    My preference would still be that you grant our motion in whole

5    and that we proceed entirely remotely but obviously if you are

6    inclined not to do that --

7         **THE COURT:**  I want you to be heard.  Here's what I --

8    I'm going to tell you something but I'm going to be a little

9    delicate with it.  I don't want to make any findings about your

10   client's credibility in terms of the material that's been

11   presented.  And I'm not saying I would find that there's any

12   intentional misrepresentation but as I mentioned, the

13   declarations are a little squishy.

14        And I don't really want to get into it because I'm

15   really uncomfortable -- and I'll say this directly to

16   Plaintiffs' counsel.  I'm uncomfortable with parties in a trade

17   secret and patent case sending private investigators out to

18   investigate witnesses the day before Monday -- the day before

19   Mother's Day and the Friday before Mother's Day as they're out

20   shopping and with their families.  The whole thing makes me

21   squeamish.

22        And I don't really want to have a full evidentiary

23   hearing on this because I don't think anyone comes out looking

24   good.  But I will if that's what's required.

25        And so, Mr. Fletcher, if you want to stand on your

37

1    motion, I may decide that we need to hear and have cross

2    examination of Mr. -- or Dr. Lamego.  I don't really want to do

3    that.  I want to try to make an accommodation and work with you

4    folks and make this courthouse available to you.

5          I'll let you know.  You'll be the first people to

6    have a deposition in this courthouse in over a year.  We've got

7    one trial going on.  We've got another trial starting on Monday

8    with Judge Carter.  Judge Carney is in trial right now.  We're

9    going to be getting a slew of trials going on.

10          So we're going to have a lot of people but the reason

11    why I picked Saturday is for Mr. -- for Dr. Lamego.  There

12    won't be anybody here.  It'll be you -- or whoever is

13    representing him, whoever is representing Plaintiffs, a

14    videographer, a court reporter and me and I won't even be in

15    the court room.  I'll be back in my chambers working.

16          So that's what I -- that's my suggestion to you.  I

17    think the other backup is to either to have an evidentiary

18    hearing or order that it be done -- the deposition be done at a

19    mutually agreeable location outdoors since it does appear

20    Dr. Lamego has less discomfort outdoors than he does indoors.

21    And maybe spread it out over three days outdoors so that he can

22    do it in one-hour chunks.

23          Just like going into a store, do it in one-hour

24    chunks, take a break, clean, do another one-hour chunk, take a

25    break, clean and do another one-hour chunk and have it be five

38

1   hours, five hours and four hours.  That way, we'd have it all

2   done outside at a mutually agreeable location.

3          But I think that doing it by video for the first ten

4   hours and the final four hours in person is a fair outcome, a

5   reasonable outcome and I want to help you.  So tell me what you

6   think having heard that.

7          **MR. FLETCHER:**  I think I understand you, Your Honor,

8   and I think five hours, five hours and then -- five hours

9   remote, five hours remote and the four hours on Saturday, May

10  22nd in Courtroom 6A with the clients -- with my clients, me as

11  the attorney, one Plaintiffs' attorney taking the deposition

12  and a court reporter, I think that sounds reasonable.

13         **THE COURT:**  Well, I want to be careful about saying

14  one Plaintiffs' attorney.  I don't want to get -- I don't want

15  to micromanage things and this is a large case with a large

16  number of documents and I don't know if that's something that

17  I'm going to make part of it but certainly a limited number of

18  counsel and/or paralegal assistants -- like no more three

19  representatives from Plaintiff.

20         Although others can be available by a personal video

21  hook-up or obviously telephonic and I'll waive the requirement

22  that there be no phones or outside video linkups while it's

23  going on but I don't want to say only one person.  This is a

24  pretty decent size courtroom.  It's not Judge Selna's size but

25  it's a pretty decent size courtroom.

```
 1          And if anyone needs to step outside, we've got -- as
 2   you've all -- or most of you have been -- some of you anyway
 3   have been in the courthouse.  You step outside the courtroom
 4   and the vaulted ceilings in the hallway are, I don't know, 18,
 5   19 feet high.  And there won't be anybody else in the building
 6   if you need to get out and stretch your legs and walk around.
 7   And we can accommodate breaks.
 8          But, anyway, let me turn it over to the Plaintiffs'
 9   side and, Mr. Claassen, tell me what you think about my
10   thoughts.
11          MR. CLAASSEN:  Your Honor, we are willing to
12   compromise on that solution.  It sounds like something that
13   would be workable for both parties to end the dispute.
14          THE COURT:  All right.  So we have a willingness and
15   agreement on behalf of Plaintiffs.
16          So I really want to get back to you, Mr. Fletcher.
17   If you tell me you're okay with that and if you want to nail
18   down any other details, let's do it.  I'd like to just go
19   forward with the parties agreeing to this accommodation.  If
20   they don't agree, then I'll decide whether we need an
21   evidentiary hearing or some other method of proceeding.
22          So what do you want to do, Mr. Fletcher?
23          MR. FLETCHER:  I would like to get nailed down the
24   number of people that are going to attend the deposition so
25   that that's not left up in the air.  And so I think I heard you
```

1   say an attorney and potentially two additional people for

2   Plaintiffs?

3          **THE COURT:**  Well, that sounds like a reasonable group

4   for just four hours to wrap up a source code portion of a

5   deposition.  But I don't know your folks' cases as well.

6          So let me turn to Mr. Claassen.  Does three people --

7   do you need any more than three people to depose Mr. -- to

8   conclude Mr. -- or Dr. Lamego's deposition for four hours on

9   the 22nd?

10          **MR. CLAASSEN:**  Three people would be sufficient, Your

11   Honor.

12          **THE COURT:**  All right.  So you've got that,

13   Mr. Fletcher.  Is there anything else?

14          **MR. FLETCHER:**  No, I think that's it, Your Honor.

15          **THE COURT:**  So subject to that representation, does

16   your client agree to that resolution and solution, meaning I'll

17   issue an order -- and I should probably just say there's always

18   a chance that there's work being done on the building.  So I

19   need to confirm that but I did -- I do believe we'll be able to

20   get it done.  So it's subject to that approval.

21          And my interpretation of Judge Selna's order is

22   because this motion was a timely-brought discovery motion, I

23   can order further examination beyond the discovery cutoff

24   without violating his discovery cutoff.  If you folks want

25   clarification, you can certainly proceed with a stipulation to

41

1    Judge Selna.  I don't think it's necessary and I can reach out

2    to him.  I don't think he's in the building today but I can

3    reach out to him to confirm that.

4            But if we're all agreeable subject to just confirming

5    that there's not any work being done on the building, that's

6    how I'd like to proceed.

7            So, Mr. Fletcher, subject to that limited possible

8    glitch, is that all right with your client?

9            **MR. FLETCHER:**  Well, I haven't -- I have to be

10   honest, Your Honor.  I haven't had a chance to talk to my

11   client about it but I think that's how we should proceed, yes.

12           **THE COURT:**  All right.  I'll accept that on behalf of

13   your client understanding you didn't you speak to him but

14   sometimes lawyers have to make calls and explain them to

15   clients as being in everybody's best interest.

16           And then just to confirm again, Mr. Claassen, your

17   client is agreeable subject to that little provision that I

18   need to verify, there's no work being done on the building that

19   day?  Is that agreeable?

20           **MR. CLAASSEN:**  Yes, Your Honor.

21           **THE COURT:**  All right.  So that's probably what I'm

22   going to do.  I'm going to issue an order on that today.  And I

23   do -- while I have everybody on the phone, let you know that I

24   haven't forgotten about Dr. Inon (phonetic).  I want to tell

25   you I'm -- I was looking at it just now.  I'm inclined to give

42

1    some but not all of -- where the parties disagree, give a

2    little bit to one side, give a little bit to the other side.

3              But one of the problems I have is I don't have a -- I

4    don't think I have a Word version of the various proposals that

5    were sent.  Does anyone know if that was sent to my chambers, a

6    Word version of the filing from April 22nd regarding Dr. Inon?

7              **MR. FLETCHER:**  Your Honor, I do not know offhand.  I

8    apologize.  But we can certainly get you a Word version of

9    Defendants' proposal right away.

10             **THE COURT:**  All right.  And some of this -- I don't

11   understand the -- why some language is altered or changed and I

12   know you probably weren't expecting to be getting into this.

13   So, for instance, there's -- I have a big question mark next to

14   -- there was a red-line addition by Defendant stating that --

15   adding the word "intentionally" -- that Dr. Inon agrees he will

16   not during the pendency of the litigation or any time

17   thereafter intentionally view any materials designated by

18   Plaintiffs as restricted source code.

19             I'm at loss what that potentially -- why that adverb

20   is added.

21             **MR. FLETCHER:**  I -- let me see if -- this is Ryan

22   again, Your Honor.  Let me see if I can provide some background

23   there.  Dr. Inon, like you, very carefully looks at the

24   language of these agreements and his point was, what happens if

25   someone accidentally showed me this and then I've somehow

1    violated the protective order?  And so he wanted the word

2    "intentionally" meaning he certainly is not going to do that

3    but he would not be held accountable if someone somehow

4    accidentally did something.

5         **THE COURT:**  All right.  Well, I'll go through this

6    and assure him that no one can be found to have -- be in

7    contempt in violation of an order unless the person takes some

8    intentional act.  One can't accidentally violate an order.  So

9    I don't even know if that's a word that Plaintiffs care about.

10   There's also a separate insertion of the word "personally."

11   And I understand there's a distinction here about overseeing

12   students versus personally doing something but I interpret --

13   let me just take a step out.

14        Sometimes when you add adverbs, you actually -- you

15   think you're making things (audio glitch) but what you're

16   really doing is the opposite.  You are making other instances

17   where adverbs are not inserted by negative implication less

18   inclusive.  And so I may be changing some of those instances.

19        And then what is "algorithm or computer executable

20   code"?  What does that mean?

21        **MR. FLETCHER:**  This is Ryan Fletcher, Your Honor, on

22   behalf of the Defendants.  Algorithm or computer executable

23   code, I think the intention there is to cover obviously source

24   code, I believe -- and I'm looking at my colleague who knows

25   the background on this.  I believe it was meant to cover things

1    like MATLAB documents.

2          **THE COURT:**  Okay.  And so -- I don't know if you have

3    it in front of you.  Again, I don't expect you to because you

4    didn't know it was coming but I grabbed it on my way out here.

5    In Paragraph 3, there's an -- the phrase, "algorithms signal

6    processing or code."  "Algorithms," "signal processing," and

7    "or" are stricken and then the next word is "algorithmsor" as

8    one word and then "computer executable code."  I'm assuming but

9    I'm -- it's the reason why I'm asking.  And I'm assuming that

10   that's just a typo, that there should be a space between the

11   "algorithms" and "or."

12          But later on in the next paragraph, Paragraph --

13   actually later on in the same paragraph, it refers to -- it

14   adds the language, "for commercial use any algorithm," no "s"

15   or "computer executable code."  Is that a typo?  Should there

16   be a space before the word "or" in each of those instances?

17          **MR. FLETCHER:**  Yes, Your Honor, there should be a

18   space.

19          **THE COURT:**  All right.  So is there anything -- and

20   since what I have here -- I've read it all through.  Is there

21   anything particularly important to Plaintiffs other than

22   Dr. Inon's respectable and understandable caution about signing

23   on to something too restrictive?  Is there anything extremely

24   important about any particular provision that's been added or

25   deleted in the Defendants' proposal to -- I'm sorry -- in the

45

1   Plaintiffs' proposal to Dr. Inon?

2           **MR. CLAASSEN:**  Your Honor, I'm just pulling up the

3   document right now.  At the bottom of Paragraph 4, which is on

4   Page 9 of the red-line -- hopefully that's the document that

5   you're also looking at.

6           **THE COURT:**  Uh-huh.

7           **MR. CLAASSEN:**  There's a strike-through right at the

8   beginning, "explained to him by another."

9           **THE COURT:**  Uh-huh.

10          **MR. CLAASSEN:**  The concern there is that this would

11  be a way around to be compromised as otherwise set forth and

12  that one expert or one first (indisc.) reviewer could explain

13  the code to him and not trigger the obligation in detail.

14          **THE COURT:**  All right.  And you folks have briefed

15  that.  So is there anything else in particular you want me to

16  focus on, on the edits?

17          **MR. CLAASSEN:**  No, Your Honor.

18          **THE COURT:**  And, Mr. Claassen, is there anything that

19  you want me in particular to focus on with respect to the

20  proposed edits by Dr. -- on behalf of Dr. Inon?

21          **MR. FLETCHER:**  Your Honor, this is Ryan Fletcher from

22  Merchant and Gould on behalf of Defendants.  I think you were

23  just speaking to Mr. Claassen.

24          **THE COURT:**  Oh, I'm sorry.  I thought it was you.  So

25  let me then turn to you, Mr. Fletcher, on behalf of Dr. Inon.

1    Is there anything else that you --

2        **MR. FLETCHER:**  Well, I actually -- I don't have it in

3    front of me but I think the language you just asked

4    Mr. Claassen about, the concern there is not to circumvent his

5    obligations.  It's just that Dr. Inon has agreed he's not going

6    to personally look at their source code which we had always

7    understood to be Plaintiffs' primary concern that Dr. Inon

8    would like at the source code.

9        So he said, listen, I don't need to look at the

10   source code but to the extent he's developing opinions and he

11   wants to talk to an expert who has looked at the source code,

12   we have to be able to have some kind of conversation there.

13   And it's not intended for the absolute proof of the source code

14   to then give him a line-by-line recitation of exactly what the

15   source code said.  I think the intention there is for them to

16   be able to discuss general composition about the source code,

17   not for him to look at it and not for him to get -- or to

18   circumvent his direct access.

19       **THE COURT:**  Well, tell me -- I don't know the first

20   thing about how complicated it is to discuss source code.

21   You're talking about the actual language of the source code or

22   are you talking about the effect of the operations described by

23   the source code at a high level?

24       **MR. FLETCHER:**  I'm talking about the effect of the

25   operations, not the actual coding in the source code.  And I

1    think that's what Plaintiffs' primary concern is.  They'll --

2    I'm sure they'll correct me if I'm wrong.  But they didn't want

3    Dr. Inon viewing the actual line-by-line underlying source code

4    and I think the way we restructured the restrictions is he

5    would not but he would certainly like to be able to talk to

6    Mr. Bower (phonetic), Nick Bower, about the high level

7    aspects --

8            **THE COURT:**  All right.

9            **MR. FLETCHER:**  -- if it even became necessary.

10           **THE COURT:**  So, Mr. Claassen, with that

11   clarification, tell me what you think about if I were to try to

12   craft something to essentially refer to that this provision is

13   designed to -- and I don't way to say "permit" but to some

14   extent, there's a line between the actual source code itself

15   and the operations of the source code or what the source code

16   does -- what the code does.

17           And the source code is the -- I understand that each

18   has value but the source code itself is the reason why it's got

19   a different tier of protection, has the highest and greatest

20   value.  How the source code operates is also important but is

21   less protected and my understanding, as clarified by

22   Mr. Fletcher, is that they desire Mr. Inon to have the ability

23   to speak with other experts about how the source code may

24   operate without that being a violation of the protective order.

25           **MR. CLAASSEN:**  Well, Your Honor, I understand the

48

1  representation that opposing counsel is making.  I think the

2  issue here is the level of detail at which the experts were to

3  discuss the operation of the source code.  The operation of the

4  source code means Line 252 does X and Line 253 does Y.  That's

5  what we're trying to avoid.

6       If what we're talking about is the overall operation

7  of the device as a whole, that might be something that's very

8  different.  And I am speaking a little bit out of turn because

9  I wasn't fully prepared to address this issue.

10       **THE COURT:**  All right.  Well, here's what I'm going

11  to ask if possible.  I want to -- I know I've been sitting on

12  this a little bit partly because of other issues that have come

13  up.  I want whoever has this on Word -- and I think it's

14  Plaintiffs that filed this but I may be wrong.  I want a Word

15  copy of this but I want to give you an opportunity to see if

16  there's something that can be done to address the issue.

17       If it can be worded by the parties, it's always

18  better than having me try to create something.  If there's

19  something that can be done to -- you folks give this one more

20  look-over and then send me a Word copy -- both a clean version

21  of each party's proposal and I don't -- and the red-line

22  version.  I want a Word copy of all three.  All right?

23       **MR. CLAASSEN:**  Yes, Your Honor.

24       **MR. FLETCHER:**  Okay.

25       **THE COURT:**  And that doesn't need to be filed per se

1    unless there's a change.  If there's a change, please file it

2    as supplement or supplemental report and -- but email the Word

3    copy to my chambers and the sooner you get it to me, the sooner

4    I can get this out for you.  All right?

5            **MR. CLAASSEN:**  Thank you, Your Honor.

6            **THE COURT:**  All right.  Is there anything further

7    that you folks want to take up with me while you have me on the

8    phone?

9            **MR. CLAASSEN:**  No, Your Honor.

10           **MR. FLETCHER:**  Not from the Defendants, Your Honor.

11           **THE COURT:**  All right.  And just so you know, in

12   terms of logistics on the 22nd, what's going to happen unless

13   something changes is I will be meeting you down at the front

14   door to the courthouse, the east-facing door to the courthouse

15   -- it doesn't matter which door you go to, I'll find you -- at

16   9:00 -- yeah, at 9:00 a.m.

17           And then I'll walk everybody up and you can take

18   separate elevators.  We'll take everybody up to the sixth

19   floor.  We'll open up the courtroom and -- you know what?

20   Let's start at 8:30 if that's agreeable to everyone.  That way,

21   your videographer can get set up and you can get going and get

22   out of here as quickly as possible.

23           And I will be in the building and you'll be able to

24   reach me but I'm not going to be presiding over the deposition.

25   You're going to have the witness sit at the -- in the witness

1    stand.  He'll be far away from everyone and the questioning can

2    begin.  And you folks will let me know when you're done and if

3    you need to take breaks, you can take breaks.

4         I probably should have checked with my wife to make

5    sure I'm free on the 22nd but be that as it may, we'll make it

6    work.  Otherwise, I'll issue an order that the motion's been

7    resolved by agreement with the agreement that we've set forth

8    and I'll await any further documents on the Dr. Inon issue.

9         All right.  With that, we're adjourned.

10        **(This proceeding adjourned)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

## CERTIFICATION

      I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____           May 18, 2021

        Signed                                 Dated

              *TONI HUDSON, TRANSCRIBER*