Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
stephen.jensen@knobbe.com Irfan
Irfan A. Lateef (Bar No. 204004)
irfan.lateef@knobbe.com
Perry D. Oldham (Bar No. 216016)
perry.oldham@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
**KNOBBE, MARTENS, OLSON**
**& BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

Attorneys for Plaintiffs,
Masimo Corporation and
Cercacor Laboratories, Inc.

Mark D. Kachner (Bar No. 234192)
mark.kachner@knobbe.com
**KNOBBE, MARTENS, OLSON**
**& BEAR, LLP**
1925 Century Park East, Suite 600
Los Angeles, CA 90067 Telephone:
(310) 551-3450 Facsimile: (310)
601-1263

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs/Counterdefendants, <br><br> v. <br><br> TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual, <br><br> Defendants/Counterclaimants. | Case No. 8:18-CV-02001-JVS-JDE <br><br> **PLAINTIFFS' EXHIBITS 3-5, 8, AND 10 TO THE DECLARATION OF MARK D. KACHNER IN SUPPORT OF OPPOSITION TO APPLE INC.'S MOTION TO QUASH AND FOR A PROTECTIVE ORDER** <br><br> **Hon. James V. Selna** <br> **Hon. Magistrate John D. Early** <br><br> **[Discovery Document: Referred to Magistrate Judge John D. Early]** <br><br> **Hearing: June 24, 2021** <br> **Time: 10:00 a.m.** <br> **Court: Room: 6A** |

UNREDACTED VERSION OF DOCUMENTS FILED PURSUANT TO ORDER OF THE COURT DATED JUNE 24, 2021 (DKT. NO. 311)

# EXHIBIT 3

**[[EXCERPTS] 2021-05-20 & 2021-05-21 Deposition Transcripts of Marcelo Lamego, Vols. I & II]**

Case 8:18-cv-02001-JVS-JDE Document 321-1 Filed 07/02/21 Page 3 of 94 Page ID #:18218

5/20/2021                    Masimo Corp. et al v. True Wearables, Inc., et al Marcelo Lamego, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

_____

MASIMO CORPORATION, a      : CASE NO.:
Delaware                   : 8:18-cv-2001-
Corporation; and           : JVS-JDE
CERCACOR                   :
LABORATORIES, INC., a      :
Delaware                   :
corporation,               :
     Plaintiff          :
     vs.                :
TRUE WEARABLES, INC.,      :
a Delaware                 :
corporation; and           :
MARCELO LAMEGO,            :
an individual ,            :
     Defendant          :
_____:

*   *   *

THURSDAY, MAY 20, 2021
ATTORNEYS' EYES ONLY
*   *   *

    Videotaped deposition of MARCELO
MALINI LAMEGO, PH.D., taken remotely,
commencing at 8:05 a.m. before Debbie
Leonard, Registered Diplomate Reporter,
Certified Realtime Reporter.

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

**EXHIBIT 3**

Page 2

```
 1   APPEARANCES:

 2

 3        KNOBBE MARTENS
          BY:  BRIAN C. CLAASSEN, ESQ.
 4             JOSEPH R. RE, ESQ.
          2040 Main Street
 5        Irvine, California 92614
          (949) 760-0404
 6        brian.claassen@knobbe.com
          joe.re@knobbe.com
 7        Representing the Plaintiff

 8

 9        MERCHANT & GOULD P.C.
          BY:  RYAN FLETCHER, ESQ.
10        1801 California Street
          Denver, Colorado 80202
11        (303) 357-1651
          rfletcher@merchantgould.com
12        Representing the Defendant

13

14        MERCHANT & GOULD P.C.
          BY:  PAIGE STRADLEY, ESQ.
15        150 South Fifth Street
          Minneapolis, Minnesota 55402
16        (612) 336-4671
          pstradley@merchantgould.com
17        Representing the Defendant

18

19   ALSO PRESENT:

20        Billy Fahnert, Videographer

21

22
```

**EXHIBIT 3**

Case 8:18-cv-02001-JVS-JDE  Document 321-1  Filed 07/02/21  Page 5 of 94  Page ID #:18220

5/20/2021                 Masimo Corp. et al v. True Wearables, Inc., et al Marcelo Lamego, Ph.D.

Page 3

1                    INDEX TO WITNESSES

2

3     WITNESS:    MARCELO MALINI            PAGE

4                 LAMEGO, PH.D.

5          BY MR. CLAASSEN                    6

6

7                 INDEX TO EXHIBITS

8     EXHIBIT      DESCRIPTION              PAGE

9   Exhibit 300  LinkedIn profile           198

10   Exhibit 301  E-mail chain, top e-mail    269

                 dated October 2, 2013

11               TRUE016520 - 522

12   Exhibit 302  E-mail dated 1/13/2014      334

                 MASM0202191

13   Exhibit 303  E-mail chain, top email     344

                 dated January 9, 2014

14               MASM0205500

15

16

17

18    REPORTER'S NOTE:  All quotations from exhibits

19    are reflected in the manner in which they

20    were read into the record and do not

21    necessarily indicate an exact quote from the

22    document.

**EXHIBIT 3**

Page 4

1           THE VIDEOGRAPHER:  We are on

2      the record.  This is the remote video

3      deposition of Dr. Marcelo Lamego in

4      the matter of Masimo Corporation, et

5      al., versus True Wearables, Inc., et

6      al., in the United States District

7      Court for the Central District of

8      California, Southern Division.

9           My name is Billy Fahnert.  I am

10      the video technician today.  The court

11      reporter is Debbie Leonard.  We are

12      here on behalf of Digital Evidence

13      Group.

14           Today's date is May 20th, 2021.

15      The time is 8:05 a.m. Pacific Daylight

16      Time.

17           All parties have stipulated to

18      the witness being sworn in remotely.

19           Will counsel please identify

20      yourselves for the record, and then

21      the witness will be sworn in.

22           MR. CLAASSEN:  Good morning.

**EXHIBIT 3**

Page 5

1          Brian Claassen on behalf of Masimo and

2          Cercacor.

3               MR. FLETCHER:  Good morning.

4          Ryan Fletcher from Merchant & Gould on

5          behalf of defendants, and I think also

6          potentially joining me today will be

7          Paige Claassen from Merchant & Gould

8          on behalf of defendants.

9               MR. CLAASSEN:  Just a quick

10          correction.  I think you meant Paige

11          Stradley.  And with me --

12               MR. FLETCHER:  Oh, my goodness.

13          You're not married to Paige, Brian?

14          Sorry.

15               Paige Stradley from Merchant &

16          Gould on behalf of defendants.

17                    *   *   *

18          MARCELO MALINI LAMEGO, PH.D.,

19     having been first duly sworn, testified as

20     follows:

21                    *   *   *

22

**EXHIBIT 3**

Page 10

1          A.     No.

2          Q.     So you didn't discuss this

3    deposition with anyone outside of True

4    Wearables; is that right?

5          A.     Well, with the exception of

6    Mr. Fletcher.

7          Q.     Okay.  So with the exception of

8    Mr. Fletcher, your counsel for True

9    Wearables, you didn't discuss this with

10   anyone else outside of True Wearables; is

11   that right?

12         A.     Yes, correct.

13         Q.     Have you met with any attorneys

14   representing Apple since this case was filed?

15              MR. FLETCHER:  Just real quick,

16         Brian.  To the extent you're going to

17         ask Dr. Lamego about his employment

18         with Apple, I'm going to instruct him

19         not to answer.

20              MR. CLAASSEN:  I said, "since

21         this case was filed," so it's clearly

22         a question that's not about his

**EXHIBIT 3**

Page 11

1        employment with Apple.

2                MR. FLETCHER:  I'm just -- I

3        understand.  I'm just -- I'm not

4        objecting to this exact question.  I'm

5        just letting you know that I'm going

6        to object to, and instruct him not to

7        answer, on any questions related to

8        his employment with Apple.  But go

9        ahead.

10               MR. CLAASSEN:  Ryan, what's

11       your basis for that objection?

12               MR. FLETCHER:  He's got a

13       confidentiality non-disclosure

14       agreement with Apple from his

15       employment there that prohibits him

16       from discussing confidential and

17       attorney-client privileged

18       information.

19               And I honestly don't know what

20       is confidential or attorney-client

21       privileged to Apple, so it kind of

22       puts me in a tough spot.  I don't --

**EXHIBIT 3**

Case 8:18-cv-02001-JVS-JDE  Document 321-1  Filed 07/02/21  Page 10 of 94  Page ID #:18225

5/20/2021          Masimo Corp. et al v. True Wearables, Inc., et al Marcelo Lamego, Ph.D.

Page 12

1          essentially you'd be asking me to make

2          decisions I'm unaware of and

3          potentially put Dr. Lamego in a

4          position where he'd violate that

5          agreement.

6                    MR. CLAASSEN:  Is there any

7          other reason for your objection?

8                    MR. FLETCHER:  My objection to

9          what?

10                   MR. CLAASSEN:  Your objection

11         to me asking questions about

12         Dr. Lamego's employment at Apple.

13                   MR. FLETCHER:  Well, that's --

14         no, that's the primary reason, yes.

15                   MR. CLAASSEN:  Is there any

16         other reason?

17                   MR. FLETCHER:  Not at this

18         present moment, no.

19    BY MR. CLAASSEN:

20         Q.    Dr. Lamego, have you met with

21    any attorneys representing Apple since this

22    case was filed?

**EXHIBIT 3**

Page 250

1          him, increased the value, gave much

2          more shares than the most senior

3          members in my team, like Sean Merritt,

4          Christiano Dalvi.  Disrespect me

5          completely.

6                    And after that I said, "Look,

7          you know, I'm done with this thing,"

8          because first he makes the company

9          feasible, and now he's violating the

10         very agreement we had in 2009 where he

11         was not supposed to interfere with

12         engineering.  I said, "Well, I'm done

13         with this."

14                   And then after that, I believe

15         beginning of 2013, then I was

16         contacted by Apple.  Towards the end

17         of 2012, beginning of 2013.

18    BY MR. CLAASSEN:

19         Q.    Who contacted you from Apple

20    while you were working at Cercacor?

21         A.    It was a headhunter from Apple.

22         Q.    Did the headhunter work for

**EXHIBIT 3**

Page 251

1    Apple or for an independent firm?

2           A.     To the best of my knowledge, he

3    worked for Apple.

4           Q.     So a headhunter within Apple;

5    is that correct?

6           A.     Yes.  Recruiter.  They call

7    that recruiter, right?  He was a senior

8    executive recruiter, something like that.

9           Q.     Did you meet with that

10   recruiter?

11          A.     Face-to-face?

12          Q.     Face-to-face.

13          A.     No, just a phone call.

14          Q.     How many phone calls did you

15   have with that recruiter?

16          A.     Well, I had one at Cercacor.

17   He called me.  I said I didn't want a -- I

18   wasn't looking for a job.  My initial

19   reaction was to say that I was not looking

20   for a job.

21                And then he said, "Well, I just

22   want to talk to you a little bit.  I said,

**EXHIBIT 3**

Page 327

1    received to the Tim Cook e-mail?

2          A.     I think so.  Maybe there might

3    be other e-mails before that, like -- well,

4    no, David authored it.  He replied.  Yeah,

5    that was him.

6                So I think somebody got ahold

7    of that e-mail, and then he was the person

8    that I mention in the e-mail, so they

9    probably forward that e-mail to David.  David

10   contact me.

11         Q.     This e-mail was sent on

12   October 2nd, 2013, right?

13         A.     Yes.

14         Q.     To you, right?

15         A.     It was, like, a few hours

16   after, right?  I'm not sure how many hours.

17         Q.     So it was not long after you

18   sent the Tim Cook e-mail, right?

19         A.     I sent the Tim Cook e-mail

20   Wednesday, 1 o'clock in the morning.  What

21   was the time that you had there?

22         Q.     12:54 a.m.

**EXHIBIT 3**

Page 328

1          A.     Exactly.  So it was

2     1 o'clock -- well, 1 o'clock in the morning,

3     just to round it.  And then 10:30 in the

4     morning of the same day, they replied.

5          Q.     And the first line of this

6     e-mail says, "Thank you for your voicemail."

7                 Do you see that?

8          A.     Yes.

9          Q.     You also left a voicemail for

10    David?

11         A.     No, I think he probably called

12    me.  See, that's the thing.  I think there is

13    more information there that is not there

14    because I don't have access to it.

15                But the net result was that he

16    sent an e-mail saying, "Look, I'm no longer

17    in charge of that project," whatever that

18    was, "but I have -- I'm forwarding to you --

19    you to this lady called Denby, who's going to

20    help you."

21         Q.     What was the voicemail?

22         A.     I don't remember, because he

**EXHIBIT 3**

Page 366

1                   C E R T I F I C A T E

2

3          I do hereby certify that I am a Notary
    Public in good standing; that the aforesaid
4    testimony was taken before me, pursuant to
    notice, at the time and place indicated; that
5    said deponent was by me duly sworn to tell
    the truth, the whole truth, and nothing but
6    the truth; that the testimony of said
    deponent was correctly recorded in machine
7    shorthand by me and thereafter transcribed
    under my supervision with computer-aided
8    transcription; that the deposition is a true
    and correct record of the testimony given by
9    the witness; that reading and signing of the
    transcript was requested; and that I am
10   neither of counsel nor kin to any party in
    said action, nor interested in the outcome
11   thereof.

12          WITNESS my hand and official seal this
    28th of May, 2021.

13

14

15

16

17

18

19   _____

20          Debbie Leonard, RMR, CRR

21          Notary Public

22

**EXHIBIT 3**

Page 367

1     Marcelo Lamego, Ph.D., c/o

      MERCHANT & GOULD P.C.

2     1801 CALIFORNIA STREET, SUITE 3300

      DENVER, COLORADO  80202

3

4     Case: Masimo Corp. et al v. True Wearables, Inc., et al

      Date of deposition: May 20, 2021

5     Deponent Name: Marcello Lamego, Ph.D.

6

7     Please be advised that the transcript in the above

8     referenced matter is now complete and ready for signature.

9     The deponent may come to this office to sign the transcript,

10    a copy may be purchased for the witness to review and sign,

11    or the deponent and/or counsel may waive the option of

12    signing. Please advise us of the option selected.

13    Please forward the errata sheet and the original signed

14    signature page to counsel noticing the deposition, noting the

15    applicable time period allowed for such by the governing

16    Rules of Procedure. If you have any questions, please do

17    not hesitate to call our office at (202)-232-0646.

18

19

20    Sincerely,

      Digital Evidence Group

21    Copyright 2021 Digital Evidence Group

      Copying is forbidden, including electronically, absent

22    express written consent.

**EXHIBIT 3**

Page 368

1     Digital Evidence Group, L.L.C.
      1730 M Street, NW, Suite 812
2     Washington, D.C. 20036
      (202) 232-0646
3
4     SIGNATURE PAGE
      Case: Masimo Corp. et al v. True Wearables, Inc., et al
5     Witness Name: Marcelo Lamego, Ph.D.
      Deposition Date: May 20, 2021
6
7     I do hereby acknowledge that I have read
      and examined the foregoing pages
8     of the transcript of my deposition and that:
9
10    (Check appropriate box):
      (  ) The same is a true, correct and
11    complete transcription of the answers given by
      me to the questions therein recorded.
12    (  ) Except for the changes noted in the
      attached Errata Sheet, the same is a true,
13    correct and complete transcription of the
      answers given by me to the questions therein
14    recorded.
15
16    _____          _____
17     DATE                     WITNESS SIGNATURE
18
19
20
21    _____          _____
22     DATE                          NOTARY

**EXHIBIT 3**

Case 8:18-cv-02001-JVS-JDE   Document 321-1   Filed 07/02/21   Page 18 of 94   Page ID #:18233

5/20/2021          Masimo Corp. et al v. True Wearables, Inc., et al Marcelo Lamego, Ph.D.

Page 369

1      Digital Evidence Group, LLC

2      1730 M Street, NW, Suite 812

3      Washington, D.C.  20036

4      (202)232-0646

5

6                      ERRATA SHEET

7

8      Case: Masimo Corp. et al v. True Wearables, Inc., et al

9      Witness Name: Marcelo Lamego, Ph.D.

10     Deposition Date: May 20, 2021

11     Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21     _____      _____

22          Signature                            Date

**EXHIBIT 3**

Page 370

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

------------------------------X

MASIMO CORPORATION, a Delaware :

corporation, and CERCACOR      :

LABORATORIES, INC., a Delaware :

corporation,                   :

                               :

          Plaintiffs,          :   Civil Action No.

                               :

     vs.                       :    8:18-cv-02001

                               :      JVS-JDE

TRUE WEARABLES, INC., a        :

California corporation, and    :

MARCELO LAMEGO, an individual, :

                               :

          Defendants.          :

------------------------------X


     ** CONFIDENTIAL - ATTORNEYS' EYES ONLY **

        VIRTUAL VIDEOTAPED DEPOSITION OF

         MARCELO LAMEGO - VOLUME 2

            Friday, May 21, 2021

        8:05 a.m. Pacific Daylight Time


REPORTER:  Dawn A. Jaques, CSR, CLR


_____

          DIGITAL EVIDENCE GROUP

        1730 M Street, NW, Suite 812

          Washington, D.C. 20036

            (202) 232-0646

**EXHIBIT 3**

Page 371

1    APPEARANCES:

2    On behalf of the Plaintiff:

3          BRIAN C. CLAASSEN, ESQ.

4          Knobbe, Martens, Olson & Bear, LLP

5          2040 Main Street, 14th Floor

6          Irvine, California  92614

7          PHONE:   (949) 760-0404

8          EMAIL:  brian.claassen@knobbe.com

9

10   On behalf of the Defendants:

11         RYAN J. FLETCHER, Ph.D., ESQ.

12         PAIGE S. STRADLEY, ESQ.  (Minneapolis)

13         Merchant & Gould, P.C.

14         1801 California Street , Suite 3300

15         Denver, Colorado  80202

16         PHONE:   (303) 357-1651  (Mr. Fletcher)

17                  (612) 336-4671  (Ms. Stradley)

18         EMAIL:   RFletcher@merchantgould.com

19                  PStradley@merchantgould.com

20

21   VIDEOGRAPHER AND EXHIBIT TECHNICIAN:

22         Billy Fahnert

**EXHIBIT 3**

Case 8:18-cv-02001-JVS-JDE   Document 321-1   Filed 07/02/21   Page 21 of 94   Page ID #:18236

5/21/2021                Masimo Corp. et al v. True Wearables, Inc., et al        Marcelo Lamego, Ph.D. Vol II
                                    Confidential - Attorneys' Eyes Only

Page 372

1                           I-N-D-E-X

2     WITNESS:                                               PAGE:

3     Marcelo Lamego

4          Continued Examination by Mr. Claassen       377

5

6

7                           E-X-H-I-B-I-T-S

8     M. LAMEGO DEPOSITION EXHIBIT:                          PAGE:

9     Exhibit 304   April 11, 2020, email to
                    Abbey Johnson from Marcelo
10                  Lamego, SUBJECT:  Oxxiom
                    (Portions redacted)
11                  TRUE0058872                             377

12    Exhibit 305   October 23, 2013, email to
                    Joe Kiani from Marcelo Lamego
13                  SUBJECT: final slide deck
                    MASM0113838                             432

14    Exhibit 306   October 2013 PowerPoint deck
15                  "Project Updates Cercacor
                    189 Technology"  (88 pages)
16                  MASM0113839 - 0113926                   434

17    Exhibit 307   6/26/2000 Masimo Corporation
                    Employee Confidentiality Agreement
18                  with Marcelo Lamego
                    (No Bates number)  (7 pages)        449

19    Exhibit 308   1/28/2003 Masimo Corporation
20                  Employee Confidentiality Agreement
                    with Marcelo Lamego
21                  (No Bates number)  (4 pages)        458

22

**EXHIBIT 3**

Page 373

```
 1                    INDEX (Continued)
 2                    E-X-H-I-B-I-T-S
 3     M. LAMEGO DEPOSITION EXHIBIT:              PAGE:
 4     Exhibit 309  01/31/05 Masimo Employee
                    Confidentiality Agreement
 5                  with Marcelo Lamego
                    (No Bates number) (4 pages)    463
 6     Exhibit 310  5/14/09 (could be 5/19/09)
                    Masimo Labs Employee
 7                  Confidentiality Agreement
                    with Marcelo Lamego
 8                  (No Bates number) (4 pages)    465
 9     Exhibit 311  July 23, 2016, letter to
                    Brian Horne of Knobbe Martens
10                  from J. Mark Holland
                    RE:  Your letter of May 25,
11                  2016 (with attachments)
                    TRUE016528 - 016566  (39 pgs)   472
12     Exhibit 312  November 8, 2016, letter to
                    Brian Horne of Knobbe Martens
13                  from J. Mark Holland
                    RE:  Your Clients: Masimo
14                  Corporation and Cercacor
                    Laboratories, Inc.; Our File
15                  TRUEW-G3986 (with attachments)
                    TRUE016571 - 016656  (86 pages) 476
16     Exhibit 313  April 30, 2010 - September 19,
                    2012, series of emails
17                  TRUE016662 - 016715 (44 pages)  484
18     Exhibit 314  Lab notebook
                    TRUE052892_A - 052924_A (33 pgs) 511
19     Exhibit 315  Handwritten notes (loose leaf)
                    TRUE052591_A - 052623_A (33 pgs) 525
20
21
22
```

**EXHIBIT 3**

Case 8:18-cv-02001-JVS-JDE  Document 321-1  Filed 07/02/21  Page 23 of 94  Page ID #:18238

5/21/2021          Masimo Corp. et al v. True Wearables, Inc., et al       Marcelo Lamego, Ph.D. Vol II
                              Confidential - Attorneys' Eyes Only

Page 374

1                      INDEX (Continued)
2                      E-X-H-I-B-I-T-S
3     M. LAMEGO DEPOSITION EXHIBIT:                    PAGE:
4     Exhibit 316  Exhibit H, Article "Fast
                   Iteratively Reweighted Least
5                  Squares for Lp Regularized
                   Image Deconvolution and
6                  Reconstruction" by Zhou,
                   et. al. (pages 1783 - 1787)
7                  (No Bates numbers)                  537
8     Exhibit 317  Exhibit B, Article, "Iteratively
                   Reweighted Algorithms for
9                  Compressive Sensing" by
                   Rick Chartrand and Wotao Yin
10                 (pages 3869 - 3872)
                   (No Bates numbers)                  541
11    Exhibit 318  August 28, 2013, email chain
                   between Marcelo Lamego and
12                 Hoi Wong, SUBJECT: Thesis draft
                   MASM0113683  (1 page)               546
13    Exhibit 319  10/27/2010 PowerPoint deck
                   Workshop 1: Design by
14                 Optimization, Section 13:
                   Turbo Sparse Solver
15                 (No Bates number) (13 pages)        548
16    Exhibit 320  August 28, 2013, email chain
                   between Marcelo Lamego and
17                 Hoi Wong, SUBJECT: L1 literature
                   MASM0113836 - 0113837               553
18    Exhibit 321  August 30, 2013, email to
                   Marcelo Lamego from Hoi Wong
19                 SUBJECT:  Updated thesis
                   MASM0135414                         560
20    Exhibit 322  September 11, 2013, email
                   to Hoi Wong from Jesse Chen
21                 SUBJECT: Thesis
22                 MASM0135150 - 135151                561

**EXHIBIT 3**

Case 8:18-cv-02001-JVS-JDE   Document 321-1   Filed 07/02/21   Page 24 of 94   Page ID #:18239

5/21/2021          Masimo Corp. et al v. True Wearables, Inc., et al       Marcelo Lamego, Ph.D. Vol II
                            Confidential - Attorneys' Eyes Only

Page 375

1                    INDEX (Continued)
2                    E-X-H-I-B-I-T-S
3    M. LAMEGO DEPOSITION EXHIBIT:                  PAGE:
4    Exhibit 323   Provisional Patent
                   Application 62591158 (49 pgs)
5                  TRUE028808 - 028856                567
6    Exhibit 324   Provisional Patent
                   Application 62722676 (81 pgs)
7                  TRUE029327 - 029407                579
8    Exhibit 325   4/7/2016 email to Marcelo
                   Lamego from Marcelo Lamego
9                  SUBJECT: notes  (5 pages)
                   TRUE023191 - 023195                597
10   Exhibit 326   10/27/2015 email to Marcelo
                   Lamego from Marcelo Lamego
11                 SUBJECT: Important Patents
                   TRUE023420 - 023422 (3 pgs)        600
12   Exhibit 327   10/27/2015 email to Marcelo
                   Lamego from Marcelo Lamego
13                 SUBJECT: Pulse Oximeter Patents
                   TRUE023423  (1 page)               605
14   Exhibit 328   Excel spreadsheet
                   TRUE023424                         606
15   Exhibit 329   October 2019 PowerPoint deck
                   "Oxxiom, The world's first
16                 wireless, continuous,
                   single-use, fully disposable
17                 pulse oximeter  (6 pages)
                   TRUE019879 - 019884                612
18   Exhibit 330   02/08/2016 Confirmation letter
                   from USPTO of Provisional Patent
19                 Application 62/264,233 (102 pgs)
20                 TRUE028525 - 028626                638
21
22

**EXHIBIT 3**

Page 376

1            P R O C E E D I N G S

2            THE VIDEOGRAPHER:   We are on the

3    record.   This is Volume 2 in the continuing

4    deposition of Dr. Marcelo Lamego, in the matter of

5    Masimo Corporation, et. al., vs. True Wearables,

6    Inc., et. al.

7            My name is Billy Fahnert; I am the

8    video technician.   The court reporter is

9    Dawn Jaques.   We are here on behalf of Digital

10   Evidence Group.

11           Today's date is May 21st, 2021.   The

12   time is 8:05 a.m. Pacific Daylight Time.   The

13   witness remains under oath, and counsel may

14   proceed.

15   Whereupon,

16           MARCELO LAMEGO,

17      called as a witness, after having been

18      previously duly sworn by the Notary Public,

19      was examined and testified further as

20      follows:

21

22

**EXHIBIT 3**

Page 423

1    acquired True Wearables instead of suing us, but

2    you guys decided to give the money to Steve Jensen

3    in a litigation instead of acquiring

4    True Wearables, because not only you want to take

5    advantage of me, use your dirty hands to, you

6    know, use my technology in your products, and then

7    say that I'm violating your intellectual property,

8    but also to send a signal to the marketplace that

9    if you are an employee of Joe Kiani and you try to

10   leave the company, he's going to destroy you.

11           I mean, he gave -- he gave me a phone

12   call on my last day of employment where Joe Kiani

13   said very clearly — my wife was listening to the

14   phone call — he said, "Look, I'm going to destroy

15   your life, your professional life, your personal

16   life."  That's what he said.  So that's what he's

17   doing, or at least trying to do.

18       Q    Where were you when Joe Kiani made

19   that call?

20       A    My house.

21       Q    What time of day was it?

22       A    I think it was in the evening.

**EXHIBIT 3**

Page  424

1          Q     Your wife listened to the call?

2          A     She -- I put it on speaker phone.

3          Q     Did anyone else hear the call?

4          A     No, just my wife.

5          Q     And what did Joe Kiani say

6    specifically?

7          A     He said he was going to ruin my life

8    professionally and personally.

9          Q     Did he say anything else?

10         A     He said he was going to contact Apple

11   and make sure that I was the last laugh for a very

12   short period of time.

13         Q     Did he say anything else?

14         A     No.  And then I told him, look, I

15   can't go back.  I made my decision.  If you have

16   to do your thing, you have to do it, right?  I

17   can't prevent you from trying to cause harm to me,

18   right?  I'm going to work, and let's see what

19   happens.

20         Q     Did he say anything else?

21         A     That's what I recall.  He might have

22   said other things that maybe my wife recall, but,

**EXHIBIT 3**

Page 669

1            CERTIFICATE OF NOTARY PUBLIC

2        I, DAWN A. JAQUES, a Notary Public in and for

the Commonwealth of Virginia, before whom the

3   foregoing deposition was taken, do hereby certify

that witness whose testimony appears in the

4   foregoing pages was duly sworn by me; that the

testimony of said witness was taken by me in

5   shorthand at the time and place mentioned in the

caption hereof and thereafter reduced to typewriting

6   under my supervision; that said deposition is a true

record of the testimony given by said witness; that

7   I am neither counsel for, related to, nor employed

by any of the parties to the action in which this

8   deposition is taken; and, further, that I am not a

relative or employee of any attorney or counsel

9   employed by the parties thereto, nor financially or

otherwise interested in the outcome of the actions.

10

11

12

13

14

15

16

17        Dawn A. Jaques, CSR, CLR

18        Notary Public in and for

19        the Commonwealth of Virginia

20   My commission expires:

21   August 31, 2023

22   Registration No. 132328

**EXHIBIT 3**

Page 670

1    Marcelo Lamego, Ph.D. Vol II, c/o

     MERCHANT & GOULD P.C.

2    1801 CALIFORNIA STREET, SUITE 3300

     DENVER, COLORADO  80202

3

4    Case: Masimo Corp. et al v. True Wearables, Inc., et al

     Date of deposition: May 21, 2021

5    Deponent Name: Marcello Lamego, Ph.D. Vol II

6

7    Please be advised that the transcript in the above

8    referenced matter is now complete and ready for signature.

9    The deponent may come to this office to sign the transcript,

10   a copy may be purchased for the witness to review and sign,

11   or the deponent and/or counsel may waive the option of

12   signing. Please advise us of the option selected.

13   Please forward the errata sheet and the original signed

14   signature page to counsel noticing the deposition, noting the

15   applicable time period allowed for such by the governing

16   Rules of Procedure. If you have any questions, please do

17   not hesitate to call our office at (202)-232-0646.

18

19

20   Sincerely,

     Digital Evidence Group

21   Copyright 2021 Digital Evidence Group

     Copying is forbidden, including electronically, absent

22   express written consent.

**EXHIBIT 3**

Page 671

1       Digital Evidence Group, L.L.C.

        1730 M Street, NW, Suite 812

2       Washington, D.C. 20036

        (202) 232-0646

3

4       SIGNATURE PAGE

        Case: Masimo Corp. et al v. True Wearables, Inc., et al

5       Witness Name: Marcelo Lamego, Ph.D. Vol II

        Deposition Date: May 21, 2021

6

7       I do hereby acknowledge that I have read

        and examined the foregoing pages

8       of the transcript of my deposition and that:

9

10      (Check appropriate box):

        (  ) The same is a true, correct and

11      complete transcription of the answers given by

        me to the questions therein recorded.

12      (  ) Except for the changes noted in the

        attached Errata Sheet, the same is a true,

13      correct and complete transcription of the

        answers given by me to the questions therein

14      recorded.

15

16      _____          _____

17        DATE                    WITNESS SIGNATURE

18

19

20

21      _____          _____

22        DATE                         NOTARY

**EXHIBIT 3**

Page 672

1     Digital Evidence Group, LLC

2     1730 M Street, NW, Suite 812

3     Washington, D.C.   20036

4     (202)232-0646

5

6                           ERRATA SHEET

7

8     Case: Masimo Corp. et al v. True Wearables, Inc., et al

9     Witness Name: Marcelo Lamego, Ph.D. Vol II

10    Deposition Date: May 21, 2021

11    Page No.    Line No.     Change

12

13

14

15

16

17

18

19

20

21    _____        _____

22    Signature                              Date

**EXHIBIT 3**

Page 669

1          CERTIFICATE OF NOTARY PUBLIC

2          I, DAWN A. JAQUES, a Notary Public in and for

the Commonwealth of Virginia, before whom the

3    foregoing deposition was taken, do hereby certify

that witness whose testimony appears in the

4    foregoing pages was duly sworn by me; that the

testimony of said witness was taken by me in

5    shorthand at the time and place mentioned in the

caption hereof and thereafter reduced to typewriting

6    under my supervision; that said deposition is a true

record of the testimony given by said witness; that

7    I am neither counsel for, related to, nor employed

by any of the parties to the action in which this

8    deposition is taken; and, further, that I am not a

relative or employee of any attorney or counsel

9    employed by the parties thereto, nor financially or

otherwise interested in the outcome of the actions.

10

11

12

13

14

15

16

17                      Dawn A. Jaques, CSR, CLR

18                      Notary Public in and for

19                      the Commonwealth of Virginia

20    My commission expires:

21    August 31, 2023

22    Registration No. 132328

**EXHIBIT 3**

Page 670

1      Marcelo Lamego, Ph.D. Vol II, c/o

       MERCHANT & GOULD P.C.

2      1801 CALIFORNIA STREET, SUITE 3300

       DENVER, COLORADO  80202

3

4      Case: Masimo Corp. et al v. True Wearables, Inc., et al

       Date of deposition: May 21, 2021

5      Deponent Name: Marcello Lamego, Ph.D. Vol II

6

7      Please be advised that the transcript in the above

8      referenced matter is now complete and ready for signature.

9      The deponent may come to this office to sign the transcript,

10     a copy may be purchased for the witness to review and sign,

11     or the deponent and/or counsel may waive the option of

12     signing. Please advise us of the option selected.

13     Please forward the errata sheet and the original signed

14     signature page to counsel noticing the deposition, noting the

15     applicable time period allowed for such by the governing

16     Rules of Procedure. If you have any questions, please do

17     not hesitate to call our office at (202)-232-0646.

18

19

20     Sincerely,

       Digital Evidence Group

21     Copyright 2021 Digital Evidence Group

       Copying is forbidden, including electronically, absent

22     express written consent.

**EXHIBIT 3**

Page 671

1      Digital Evidence Group, L.L.C.

       1730 M Street, NW, Suite 812

2      Washington, D.C. 20036

       (202) 232-0646

3

4      SIGNATURE PAGE

       Case: Masimo Corp. et al v. True Wearables, Inc., et al

5      Witness Name: Marcelo Lamego, Ph.D. Vol II

       Deposition Date: May 21, 2021

6

7      I do hereby acknowledge that I have read

       and examined the foregoing pages

8      of the transcript of my deposition and that:

9

10     (Check appropriate box):

       (  ) The same is a true, correct and

11     complete transcription of the answers given by

       me to the questions therein recorded.

12     (  ) Except for the changes noted in the

       attached Errata Sheet, the same is a true,

13     correct and complete transcription of the

       answers given by me to the questions therein

14     recorded.

15

16     _____            _____

17      DATE                       WITNESS SIGNATURE

18

19

20

21     _____            _____

22      DATE                            NOTARY

**EXHIBIT 3**

Page 672

1    Digital Evidence Group, LLC

2    1730 M Street, NW, Suite 812

3    Washington, D.C.  20036

4    (202)232-0646

5

6                    ERRATA SHEET

7

8    Case: Masimo Corp. et al v. True Wearables, Inc., et al

9    Witness Name: Marcelo Lamego, Ph.D. Vol II

10   Deposition Date: May 21, 2021

11   Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21   _____      _____

22        Signature                              Date

**EXHIBIT 3**

# EXHIBIT 4

**[TRUE016520-522]**



Marcelo Lamego <mmlamego@alumni.stanford.edu>

## The three equations

**Marcelo Lamego** <mmlamego@stanfordalumni.org>
To: tcook@apple.com

Wed, Oct 2, 2013 at 12:54 AM

Dear Tim Cook,

I was approached by Apple in the beginning of this year (by David Affourtit and James Foster) and was asked if I would like to join the executive technical team. Because I did not want to sign the Apple's NDA for an onsite interview, the process came to a halt. I felt that it was not appropriate to receive confidential information from or disclose confidential information to Apple given my fiduciary responsibilities as the Chief Technical Officer of Cercacor.

I have developed several medical devices in the last 10 years and I am positively sure I could add a significant value to the Apple team, if I was given the chance of becoming part of it in a senior technical executive position and without conflicting with the large IP I have developed for Masimo and Cercacor during the same period.

What I am sure Apple soon will realize is that medical, wellness and fitness technologies are very deceptive in the sense that they are easy to develop for products that work in most (~80%) he users. Getting the same technology to work in almost the entire population is a problem extremely more complex . This is the very reason most medical device startups become insolvent. Knowing Apple's reputation, I am sure you would not settle for even 99%, imagine then, 80%.

As you probably know, regulatory barriers are another important consideration when dealing with medical technologies in general. If the FDA or any other regulatory agency worldwide (i.e., Canada, Japan, Korea, Europe, etc.) believe your product should be regulated by their standards then, the choice of intended use combined with the technology realization strategy can make the development shorten or longer by several years.

The reason I feel attracted by Apple as a company is not related to the things most people are interested in, i.e., brand recognition, great culture, great products, great people. It has to do with the fact that, as an engineer, I realized that there are three important equations to be solved in order to create a competitive global medical, wellness and fitness product portfolio:

(i) The user equation - Apple has solved it and created the industry standard. With a brand recognition similar to the ones from luxury products, everybody is interested in understanding and using Apple's intuitive interfaces.

(ii) The patient equation - This is the deceptive part.

(iii) The connectivity equation - This can only be solved with scale and brand recognition, which e synonymous for Apple. Reliable wireless technology and device interoperability will become a must in the medical device segment.

**EXHIBIT 4**

-36-

CONFIDENTIAL

TRUE016520

I believe Apple has solved (i) and has enough resources to solve (iii). I can help you to solve (ii).

I ~ould appreciate if the content of this letter could be kept confidential, since it can jeopardize ~ outcome of my career at Cercacor.

I strongly believe that we can develop the  new wave of technology that will make Apple the number one brand in the medical, fitness and wellness device market. If you agree, feel free to contact me anytime.

All the best,

Marcelo Malini Lamego

18 Lyra Way

Coto de Caza CA 92679

Home phone: (949) 216-9294

My resume is available at http://www.linkedin.com/pub/marcelo-lamego/54/644/725

Confidentiality notice: This e-mail may contain information confidential and/or privileged from disclosure. If the reader is not the intended recipient, copying, dissemination or continued possession of this communication is strictly prohibited.

**EXHIBIT 4**

CONFIDENTIAL                                          **-37-**                                          TRUE016521



## Apple

---

**David Affourtit** <affourtit@apple.com>
To: Marcelo Lamego <mmlamego@stanfordalumni.org>
Cc: Denby Frazier <denby@apple.com>

Wed, Oct 2, 2013 at 10:25 AM

Hello Marcelo,

Thank you for your voicemail and follow up. I saw your note to Tim Cook. I'm glad you remain enthusiastic about Apple.

As I've transitioned out of the Exec Recruiting team into a management role, I've asked my associate from the Exec Recruiting team to reach out to you directly. Her name is Denby Frazier, cc'd.

Denby, meet Marcelo, Marcelo, Denby.

All the best and thanks again!

Cheers,
Dave

**EXHIBIT 4**

CONFIDENTIAL          **-38-**          TRUE016522

# EXHIBIT 5

**[Email re Masimo v. True Wearables dated June 1, 2021]**

| | |
|---|---|
| **From:** | Paige Stradley <PStradley@MerchantGould.com> |
| **Sent:** | Tuesday, June 1, 2021 9:29 AM |
| **To:** | Mark.Kachner; Truewearables |
| **Cc:** | Lit MASIMOL.1085L |
| **Subject:** | RE: Masimo v. True Wearables |

Mark,

We are considering your below email, but we will not be able to respond by noon today as we need time to confer with our client. We will get back to you after we have had an opportunity to speak with him and confer internally regarding the same. Until then, we do not agree that you may disclose any of the below documents or testimony to Apple's counsel.

Best,
Paige

**Paige Stradley**
she/her/hers
Partner
Merchant & Gould P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402-4247
USA

**Telephone** (612) 336-4671
**Fax** (612) 332-9081
**merchantgould.com**

GUARDIANS OF GREAT IDEAS*

Note: This email message is confidential and may be privileged or otherwise protected by law. If you are not the intended recipient, please: (1) reply via email to the sender; (2) destroy this communication entirely, including deletion of all associated text files from all individual and network storage devices; and (3) refrain from copying or disseminating this communication by any means whatsoever.
Please consider the environment before printing this email. Thank you.

**From:** Mark.Kachner <Mark.Kachner@knobbe.com>
**Sent:** Sunday, May 30, 2021 7:26 PM
**To:** Truewearables <Truewearables@MerchantGould.com>
**Cc:** Lit MASIMOL.1085L <LitMASIMOL.1085L@knobbe.com>
**Subject:** Masimo v. True Wearables

**CAUTION - External.**

Counsel,

Apple is moving to quash Plaintiffs' subpoena based on relevance. To explain the relevance of the requested discovery, Plaintiffs intend to rely on TRUE016520-21, TRUE016528-66, and deposition testimony. The document at TRUE016520-21 is a communication between Marcelo Lamego and certain Apple employees. Paragraph 6(g) of the Protective Order allows Plaintiffs to disclose this document to Apple counsel. We request your authorization to disclose TRUE016528-66 to Apple's counsel pursuant to the Protective Order. We further request your authorization to disclose Marcelo Lamego's deposition testimony on pages 10-12, 231-236, 250-257, 327-328, and 423-424, and Tatiana Lamego's

deposition testimony at pages 49 and 56.  Please let us know by no later than noon on Tuesday 6/1, whether you authorize Plaintiffs to disclose this information to Apple's counsel.

Regards, Mark

**Mark Kachner**
Partner
Mark.Kachner@knobbe.com
310-407-3472 Direct

Knobbe|Martens
INTELLECTUAL PROPERTY LAW
**five decades. one focus.**
1925 Century Park East, Suite 600
Los Angeles, CA 90067
www.knobbe.com/mark-kachner

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

2
**EXHIBIT 5**

# EXHIBIT 8

**[TRUE016528-566]**

# J. Mark Holland & Associates

19800 MACARTHUR BLVD., SUITE 300
IRVINE, CALIFORNIA 92612
TELEPHONE: (949) 718-6750
FACSIMILE: (949) 718-6756
E-MAIL: office@jmhlaw.com

PATENT, TRADEMARK, COPYRIGHT,
AND RELATED MATTERS

J. Mark Holland, PC

July 23, 2016

## *SETTLEMENT COMMUNICATION – ALL EVIDENTIARY RULES APPLY TO LIMIT THE USE OF THE STATEMENTS HEREIN IN ANY LEGAL PROCEEDING*

### *Via Email*

Brian C. Horne, Esq.
Knobbe Martens
2040 Main Street, 14th Floor
Irvine, California 92614

> Re:   Your Letter of May 25, 2016
>        Your Clients: Masimo Corporation and Cercacor Laboratories, Inc.;
>        Our File: TRUEW-G3986

Mr. Horne:

This responds to your letter dated May 25, 2016. We represent True Wearables, Inc. and Dr. Marcelo Lamego in intellectual property matters.

Preliminarily, we note the date of your letter. My client did not receive any copy or version of it until just a few days ago, nearly two months after the date of the letter, via an email dated July 15, 2016. On July, 18, 2016, the hardcopy arrived by FedEx. We hope and expect that the date of that communication will not become critical, but in an excess of caution, we set forth the following related information.

Our client is at a loss as to why it took you almost two months to get your letter delivered. Among other things, we understand that Dr. Lamego's and True Wearables' addresses are widely known at Masimo, Cercacor, and your firm (Knobbe Martens). Also, Dr. Lamego is a neighbor of Masimo's President, Mr. Jon Coleman. In addition, True Wearables' address is available on its website. In 2015, John Grover, a partner at Knobbe Martens, contacted Dr. Lamego through another attorney and was informed that Dr. Lamego had left Apple and started True Wearables in Orange County, CA. Finally, there have been multiple press releases announcing True Wearables' products and company location. Regardless, as noted above, we hope that the date is not of critical importance.

Turning now to the substance of your letter, you warned that the companies you represent, Masimo and Cercacor, "will take all reasonable steps to protect their confidential and proprietary information" in the light of the facts described in your letter. You then asserted that it appears that True Wearables, Inc. is "either improperly using or intend(s) to improperly use Masimo's and Cercacor's trade secrets in violation of applicable state and Federal law."

## EXHIBIT 8

Brian C. Horne, Esq.
July 23, 2016
Page 2

Among other things, this letter is intended to confirm that those concerns have no basis in fact or law, and that my client is not aware of any past, present, or intended future use by my client of any of Masimo's and/or Cercacor's trade secrets.  Perhaps more importantly, and as further discussed below, it appears that your clients may be continuing their efforts to improperly and perhaps unlawfully interfere with and harass my clients' business undertakings.

If there indeed are any trade secrets about which your clients are concerned, **please identify the same with more specificity, so that my clients may more fully consider any such accusations**. Without more specificity than you have provided in your letter, however, my client can only respond as set forth herein, based on my client's understanding that my client has <u>not</u> used any of your clients' purported trade secrets.

The following comments are not intended to be exhaustive, and my client reserves the right to supplement and/or modify same at any point in the future.

Among other things, the information here demonstrates that **<u>Dr. Lamego not only is highly talented and a person of great integrity, but has founded his company in a way very similar to the way in which your clients' apparently were founded.  In those and other regards, there are a number of factually inaccurate statements in your letter</u>**.

1. Your letter expresses concern over my client's Oxxiom pulse oximeter.  As your clients are aware, pulse oximetry is a technology widely available around the world, and Masimo/Cercacor were not the first, and are not the only companies that have developed and continue to develop pulse oximetry technology.

2. Frankly, and perhaps of greatest concern, your clients' unfounded pursuit of Dr. Lamego and continuing harassment of him in his business ventures (see below) indicates that Masimo/Cercacor may be trying to unlawfully deter competitors from entering the field of pulse oximetry. Among other things, to our knowledge, **<u>Masimo/Cercacor has had no access to my client's Oxxiom technology, and therefore has no basis to assert claims that True Wearables is using or intending to use any technology related to Masimo/Cercacor, especially any to which Masimo/Cercacor allegedly has trade secret rights</u>**.  Absent your clarification on the point, we will continue to understand that your letter's assertions have been made **<u>without</u>** any review of the actual Oxxiom technology.

3. Rather than using trade secrets from your clients, Oxxiom was developed independently by True Wearables, Inc.  Your clients presumably realize that my client's Oxxiom product technology provides the world's first wireless, continuous, fully disposable, single-use pulse oximeter.  To the knowledge of my clients, Masimo and Cercacor do **<u>not</u>** have any devices that both (a) operate wirelessly and (b) are fully disposable. Instead, the only disposable products Masimo develops are wired disposable sensors (see attached Exhibit 1).  Thus, my client's Oxxiom products are an advance beyond anything your clients apparently have done.

4. The fact that technology companies like Masimo, Cercacor, Covidien, Philips, GE, Nonin, Smith Medical, to mention a few, all medical device companies with pulse oximetry business, with hundreds of full-time engineers and scientists working in R&D, could not invent and develop the world's first wireless, continuous, fully disposable, single-use pulse oximeter is further proof of the breakthrough technology Dr. Lamego has been able to independently develop at True Wearables, Inc.  Mr. Kiani himself has

**EXHIBIT 8**

Brian C. Horne, Esq.
July 23, 2016
Page 3

stated multiple times words to this effect: "Technology inventors are really hard to come by… I have met two in my life: One is my partner Mr. Diab, with whom I started Masimo, and the other is Dr. Lamego".

5. Including in some of the materials we are forwarding as exhibits, your clients have further praised Dr. Lamego's creativity and skill and passion about technology, and have acknowledged that Dr. Lamego is a man of very high integrity.  Mr. Kiani and Mr. Diab have admitted this in writing several times (see Exhibits 2 and 4).  In case it carries any weight in this discussion, Dr. Lamego confirms that he would never illegally compete with Masimo, Cercacor, or any other company, much less copy proprietary technology for financial gain.

6. As indicated above, there are a number of factually incorrect statements in your letter.  For example, your assertions that Dr. Lamego was an inexperienced engineer when he was hired by your clients and that he began working with your clients to learn about Masimo's technology are totally erroneous.  As shown in attached Exhibit 2, your clients' Mr. Kiani admitted that Dr. Lamego "brought to (your clients) the expertise of someone who understands the intricate process of developing and testing new ideas in an industrial/academic environment." Mr. Kiani also stated that "the experience in business that Marcelo acquired during his time at BCG, helped him to become a more versatile engineer and researcher and develop his leadership skills."

7. At the time of his hiring by your clients, Dr. Lamego was already a talented technologist.  Before being hired by Masimo, he was a tenured Assistant Professor of Electrical Engineering in Brazil, with extensive experience in research and development and several technical papers published on international journals and magazines.  Dr. Lamego also worked in research and development in Europe and at a technology company he started at a young age.  During his doctoral studies at Stanford University, he worked with Prof. Bernard Widrow, a long-time Stanford Professor, a pioneer in adaptive systems, and author of many adaptive topologies and algorithms, including the noise-cancelation scheme used in Masimo's Signal Extraction Technology (SET).

8. Masimo's and Cercacor's own CEO has admitted that Dr. Lamego is "the leading scientist in the world on non-invasive blood constituent monitoring and Ph.D. from Stanford EE Department" (see attached Exhibit 3), and Mr. Diab has admitted that Dr. Lamego "is an original thinker in that he has the ability to look at new or old problem and come up with new innovative solutions that many other scientists have failed to find while trying to solve the same problem" and has "all the traits that make an excellent research scientist, knowledge, intellectual bandwidth, resourcefulness, work ethics and persistence" (see attached Exhibit 4).  In view of those admissions alone, it appears disingenuous to assert that Dr. Lamego would not be able to independently develop a new and breakthrough technology in pulse oximetry **without** utilizing Masimo's and Cercacor's technology.

9. Dr. Lamego was never a student or apprentice at Masimo or Cercacor. As erroneously stated in your letter, Dr. Lamego was never "taught by the most experienced and senior engineers at Masimo." Instead, Dr. Lamego managed with his technical knowledge and unique talent to propose new solutions for problems that the most experienced senior engineers at Masimo could not solve.

**EXHIBIT 8**

Brian C. Horne, Esq.
July 23, 2016
Page 4

10. Among other things, Dr. Lamego's technical expertise allowed him to teach a 4-month workshop to all key personnel at Masimo and Cercacor teams, including Mr. Diab himself and other technical executives. At the workshop, Dr. Lamego disclosed advanced signal processing, modeling, and optimization techniques for biosensing applications in a deck of slides, with lecture notes, computer algorithm scripts, and homework assignments totaling more than 600 pages. During more than a decade at Masimo and Cercacor, Dr. Lamego initiated, mentored, and trained several engineers, scientists, managers, healthcare professionals, and executives, in the topics of signal processing, optimization, modeling, and non-invasive bio-sensing and medical technologies in general.

11. As also noted above, Dr. Lamego's efforts to start his own company are similar in certain ways to how your clients founded their companies. Like Dr. Lamego did prior to founding True Wearables, Masimo's own founders worked for another pulse oximetry company prior to founding Masimo. As stated in Masimo's written history (see Exhibit 5), "Masimo was founded in 1989 by electrical engineer Joe Kiani, who was later joined by fellow engineer Mohamed Diab". Before founding Masimo, Mr. Kiani and Mr. Diab were both employed in leadership positions at Newport Medical Electronics, a pulse oximeter company, Mr. Kiani as the Engineering Director and Mr. Diab as Chief Engineering Consulting. Mr. Kiani and Mr. Diab left Newport Medical Electronics in 1989 and soon after founded Masimo, also a pulse oximeter company. In addition, Mr. Diab's profile at people.equilar.com clearly states that he developed conventional pulse oximetry at Newport (source - Masimo Corporation on 09/12/2000; see Exhibit 6).

12. From the information currently available to my clients, it appears that Mr. Kiani and Mr. Diab had no knowledge of pulse oximetry before working for Newport Medical Electronics. Previously, Mr. Kiani had worked for Anthem Electronics and Bell Industries, both of which are in the field of semiconductors components and systems (see Exhibit 7), and Mr. Diab worked for Galiso, where he developed precision data acquisition boards to test high pressure gas cylinders and the purification of industrial gases (see Exhibit 6). Mr. Kiani left Newport Medical Electronics and, a month later, started Vital Signals, Inc., later renamed Masimo (see Exhibit 8).

13. We hesitate to assume that, when Mr. Kiani and Mr. Diab started Masimo, they improperly utilized technology developed while they were employees of Newport Medical Electronics. Likewise, we submit that it is improper for your clients, including Mr. Kiani and Mr. Diab, to assume that True Wearables' technology was developed improperly using Masimo's and/or Cercacor's intellectual property. More importantly, that assumption is not factually correct – my client is not aware of any trade secrets of your clients being used in connection with my client's technology and/or business efforts.

14. We assume that you were referring to Mr. Diab in your letter, when you mentioned that Dr. Lamego "became roommates with a company co-founder." While at Masimo and Cercacor, Dr. Lamego was in contact and interacted with several key employees including Mr. Diab and Mr. Kiani, among many others. Throughout his career, including while he worked with Masimo and Cercacor, Dr. Lamego has interacted with key personnel from many other organizations he had previously worked for or with, including Apple Inc., The Boston Consulting Group (BCG), Universidade Federal do Espirito Santo, Noordelijke Hogeschool Leeuwarden, among many others. This is not uncommon activity for highly qualified employees, and in fact benefitted your clients Masimo and Cercacor while Dr. Lamego was working with them. Having such access to key

**EXHIBIT 8**

Brian C. Horne, Esq.
July 23, 2016
Page 5

personnel in other organizations results from having greatly impacted the previous organizations, and benefits the current organizations for which such employees work.

15. Your assertion that Dr. Lamego was handsomely paid while working at Masimo/Cercacor is also incorrect. Dr. Lamego made significantly less than any other Masimo executive and less than Cercacor's Chief Medical Officer who, at the time, only worked 4 days a week, with a fraction of Dr. Lamego's responsibilities, and Cercacor's CEO who made over US$300,000 a year working an average of 1-3 hours a week at Cercacor. All Masimo stocks were taken from Dr. Lamego after he transitioned to Cercacor and he never recovered that income (more than US$2,500,000) since Cercacor never became a public company. Dr. Lamego left Cercacor with about US$42,000.00 from the Cercacor penny stocks he owned, and was obligated to sell back to Cercacor upon employment termination at a pre-defined price that did not reflect the real Cercacor valuation (given the products and IP developments that took place over the course of several years). Even though Dr. Lamego had his Masimo stock options taken from him without his consent within a year or so from those fully vesting, with the excuse he was leaving to an independent company (Cercacor), the first product developed by Cercacor was the Pronto-7 total hemoglobin meter, which was manufactured and commercialized by Masimo. As a matter of fact, in your letter, you treat Masimo/Cercacor as if they were the same enterprise.

16. Since the beginning of 2014, when Dr. Lamego left Cercacor, Mr. Kiani and its law firm (your firm, Knobbe Martens) have repeatedly tried to disrupt Dr. Lamego's career and business efforts. As soon as Mr. Kiani became aware that Dr. Lamego was leaving Cercacor for Apple, Mr. Kiani immediately emailed Mr. Jensen, a partner at Knobbe, wondering where Dr. Lamego's nondisclosure agreement (NDA) was and whether Dr. Lamego had unlawfully removed his NDA from Cercacor files. (see exhibit 9). Dr. Lamego became aware of the concern by Mr. Kiani, and immediately forwarded to Mr. Kiani an email he had sent more than 2 years earlier with a PDF copy of Dr. Lamego's NDA with Cercacor, which had been sent to both Mr. Kiani and Mr. Jensen for their files. Mr. Jensen also sent a letter to Mr. Tim Cook, Apple's CEO, and Mr. Adrian Perica, an Apple executive, admonishing them that Apple would be prosecuted for hiring Dr. Lamego, even though Dr. Lamego was hired to work in a project that had no connection with any products developed by Masimo or Cercacor (see exhibit 10). The letter created a very uncomfortable work situation for Dr. Lamego at Apple, and he had no choice other than to return to Orange County and open his own company, where he had hoped that Mr. Kiani would not be able to harass him. Instead, Mr. Kiani continues with his personal vendetta, trying to disrupt any projects with which Dr. Lamego is involved. Collectively, these ongoing efforts by Mr. Kiani feel as if he is trying to stop Dr. Lamego from earning a living.

17. At the same time, since Dr. Lamego **left** Cercacor in the beginning of 2014, the USPTO online database indicates that your clients have filed more than 25 new patent applications under Dr. Lamego's name, with your clients Masimo or Cercacor identified as the Applicants (see exhibit 13). Your clients have continued this pattern even since my client's Oxxiom product was announced in the beginning of 2016: your law firm filed at least one patent application in the field of biosensing under Dr. Lamego's name (on behalf of Masimo and Cercacor). Given that more than 2 ½ years have passed since my client worked with your clients, my client is concerned that this continued patent filing by your clients, in the name of MY client, may be a pretext for potentially improper or even unlawful ends:  pursuing expanded patent coverage and/or improperly asserting an

**EXHIBIT 8**

Brian C. Horne, Esq.
July 23, 2016
Page 6

overlap of inventive efforts "by" your clients in comparison to my client's legitimate
inventive efforts since leaving your clients.

As set forth herein, True Wearables, Inc. and Dr. Lamego are not aware of any trade secret and/or
proprietary information or technology from Masimo or Cercacor being used by either of them, before,
during or after the development of Oxxiom.

We respectfully submit that the foregoing resolves the matter. If your clients or you have further
concerns or questions regarding this matter, please direct them to the undersigned.

Very truly yours,

J. Mark Holland & Associates,
  a Professional Law Corporation

/J. Mark Holland/

J. Mark Holland

JMH:ms
Enc.
ec: Dr. Marcelo Lamego (w/enc.)
https://d.docs.live.net/365d5d3a52bd96fe/Clients/TRUEW/G3986/2016-07-15_Masimo_Employment_Matter/2016-07-23_JMH_Ltr_to_Masimo_attys_FINAL.docx

**EXHIBIT 8**

# Masimo's Reusable Monitors

Masimo Root



Radius 7



Radical 7



Rad 87



Exhibit 1
**EXHIBIT 8**

Pronto 7



Pronto



Rad 8



Rad 5-V



Exhibit 1
**EXHIBIT 8**

MightySat Rx 

SatShare 

Cercacor Ember 

Exhibit 1
**EXHIBIT 8**

# Masimo Rainbow Wired Disposable Sensors



Rainbow ReSposable

Adult

Pedriatric

# Masimo's Rainbow Wired Reusable Spot Check Sensors



Rainbow DCI-SC-200

Rainbow DCI-P-SC200

Exhibit 1
**EXHIBIT 8**

Rainbow DCI SC-400

Rainbow DCI-P SC-400



## Masimo's Rainbow 4D DC Wired Reusable Sensors

Rainbow 4D

Small

Rainbow 4D

Medium

Rainbow 4D Sensor

Large

Exhibit 1
**EXHIBIT 8**

CONFIDENTIAL                    -67-                    TRUE016538

# Masimo's Rainbow Adhesive Wired Disposable Sensors



Rainbow R1 25

Rainbow R1 20

Rainbow R1 25L

Rainbow R1 20L

# Masimo's Rainbow Wired Disposable Adhesive Sensors



Rainbow R 25

Rainbow R20

Exhibit 1
**EXHIBIT 8**

Rainbow R25-L



Rainbow R20-L

## Maximo's Rainbow Wired Reusable Spot Check Sensors

Rainbow DCI



Rainbow DCI-P

Rainbow DCI-6

Rainbow DCI-P-6

Exhibit 1
**EXHIBIT 8**

# Masimo's Rainbow Reusable Wired Direct Connect Sensors

Rainbow DCI dc3 Sensor

Rainbow DCI-P dc3 Sensor



# Masimo's Rainbow Patient Cables



Exhibit 1
**EXHIBIT 8**

## Oxxiom from True Wearables



Wireless, completely disposable, continuous, single-use pulse oximeter.

Technical Specifications:

Size: 1.2 x 0.7 x 0.3 inches (30 x 17 x 7.5 mm).
Weight: 0.12 ounces (3.5 grams).
Wireless Range: 33 feet (10 meters).
Battery Life: over 24 hours.
SpO2 Accuracy (70-100%): +/-3% on 68% of the population.
Pulse Rate Accuracy (25-250BPM): +/-3BPM on 68% of the population.

Specifications are subject to change without notice.

Exhibit 1
**EXHIBIT 8**



4 8  P a r k e r
Irvine,  CA  72618
Tel: 949-297-7000
Fax: 949-297-7001

September 27, 2006

TO WHOM IT MAY CONCERN:

This is a letter of recommendation on behalf of Dr. Marcelo Malini Lamego, currently working as Senior Research Scientist at Masimo Corporation, Irvine, the company wherein I am Chairman and CEO.

I first met Dr. Lamego in the year of 2000. He was invited to interview for a research position as part of Masimo's engineering team. Dr. Bernard Widrow, a long-time Professor of Electrical Engineering at Stanford University, referred him to us because Marcelo was one of his brightest Ph.D. students. Soon after completion of his doctoral studies, Marcelo joined Masimo.

Upon joining Masimo, Marcelo managed to grasp all the important concepts in Masimo's core technology, and very soon, started proposing and developing mathematical models and algorithms that had a significant impact in the way the engineering team conducted research and development. He brought to the company the expertise of someone who understands the intricate process of developing and testing new ideas in an industrial/academic environment, where the use of time and resources defines the likelihood of success. Marcelo rejoined Masimo in 2003 as a senior Research Scientist, after working for The Boston Consulting Group (BCG) as a management consultant. The experience in business that Marcelo acquired during his time at BCG, helped him to become a more versatile engineer and researcher, and to develop his leadership skills. After rejoining Masimo, Marcelo concentrated his efforts on developing concepts that today play a crucial role in Masimo's technology portfolio. As a result of his contributions to the team, Masimo developed and launched in 2005 the RAD-57, the first portable noninvasive pulse co-oximeter device in the world capable of measuring the content of carbon monoxide in blood, and the level of blood oxidation in human subjects. For this groundbreaking technology, Marcelo and the Masimo team received the AeA 2006 High Tech Innovations Award.

Marcelo is an outstanding individual with a strong research and engineering background. He is a great asset to the Masimo team and in fact, I have recently notified Marcelo that we intend to promote him to the role of Chief Technical Officer. I recommend him most highly and hope that we can have Marcelo on our Team for years to come.

Sincerely,

Joe E. Kiani
Chairman and CEO

Exhibit 2
**EXHIBIT 8**

CONFIDENTIAL                                    -72-                                    TRUE016543

**Marcelo Lamego**

---

| | |
|---|---|
| **From:** | Joe Kiani <JKiani@masimo.com> |
| **Sent:** | Monday, December 16, 2013 9:52 AM |
| **To:** | 'jlasersohn@vertical-group.com'; 'mpalin@aalrr.com'; Anand Sampath; 'elenabaca@paulhastings.com'; 'gmasoudi@cov.com'; Marcelo Lamego; 'RBonner@sidley.com'; 'sdanzis@cov.com'; 'stephenberry@paulhastings.com'; Steve Barker; 'steve.jensen@knobbe.com'; 'thomasobrien@paulhastings.com'; Tom McClenahan; Yongsam Lee |
| **Subject:** | Re: Urgent |

I've got a meeting beginning in 10 min.

---

**From:** Jack Lasersohn [mailto:jlasersohn@vertical-group.com]
**Sent:** Monday, December 16, 2013 09:47 AM
**To:** Joe Kiani; Mark T. Palin <MPalin@aalrr.com>; Anand Sampath; Elena Baca <elenabaca@paulhastings.com>; Gerald Masoudi <gmasoudi@cov.com>; Marcelo Lamego; Raymond Bonner <RBonner@sidley.com>; Scott Danzis <sdanzis@cov.com>; Stephen Berry <stephenberry@paulhastings.com>; Steve Barker; Steve Jensen <steve.jensen@knobbe.com>; Thomas O'Brien <thomasobrien@paulhastings.com>; Tom McClenahan; Yongsam Lee
**Subject:** RE: Urgent

I am finished with Jeff if you want to discuss now.

Jack W. Lasersohn
General Partner
The Vertical Group

---

**From:** Joe Kiani [mailto:JKiani@masimo.com]
**Sent:** Sunday, December 15, 2013 8:42 PM
**To:** Mark T. Palin; Anand Sampath; Elena Baca; Gerald Masoudi; Jack Lasersohn; Marcelo Lamego; Raymond Bonner; Scott Danzis; Stephen Berry; Steve Barker; Steve Jensen; Thomas O'Brien; Tom McClenahan; Yongsam Lee
**Subject:** RE: Urgent

Look at what the arbitrator said last:

21 MS. BACA: Your Honor, we've covered all of
22 this.
23 THE ARBITRATOR: I think we have. We're
24 not getting anything in the way of knowledge from
25 the witness. We're just having a little argument.

This just shows he didn't care what we said. He was not going to believe what Marcelo, the leading scientist in the world on noninvasive blood constituent monitoring and Ph.D from Stanford EE Department, was saying.

Joe

---

**From:** Mark T. Palin [mailto:MPalin@aalrr.com]
**Sent:** Sunday, December 15, 2013 11:57 AM
**To:** Anand Sampath; Elena Baca; Gerald Masoudi; Jack Lasersohn; Joe Kiani; Marcelo Lamego; Raymond Bonner; Scott

1
Exhibit 3
**EXHIBIT 8**

 TRUE016544



**MASIMO**

40  Parker
Irvine,  CA  92618
Tel: 949-297-7000
Fax: 949-297-7001

**MOHAMED K. DIAB**                                    Aug 22 2006
**Chief Technical Officer**
**TEL (949) 297-7110**
**FAX (949) 297-7099**

## TO WHOM IT MAY CONCERN

Dear Sir(s):

Dr. Marcelo M. Lamego is currently a senior research scientist working on advanced
noninvasive medical diagnostic devices at Masimo Corporation.

Masimo Corporation is the leading innovator and producer of pulse oximeters in the
medical industry with over 1100 employees worldwide. Dr. Lamego joined Masimo in
the year 2000, working closely with me on the advanced project for noninvasive blood
constituents' measurements. This research project has resulted in the introduction of the
first FDA approved, noninvasive blood carbon monoxide as well as methemoglobin
monitors in the world today.

This multifaceted project required a deep understanding of light interactions with body
tissue since this is the way we probe the human body safely and non-invasively. The
project required a firm understanding of mathematical concepts in transport theory, light
modulation, statistics, mathematical modeling of physical processes as well as oxygen
transport in the human body.

Marcelo has a deep understanding of mathematical concepts in several fields ranging
from optimal control theory, adaptive systems, neural networks, convex optimization and
statistics. He has a great ability to quickly grasp abstract mathematical concepts and find
links and relationships between them and physical processes. Through my research
experience, I have come to regard these abilities as the most valued in a researcher
because they are prerequisite to any serious problem solving and by far, are the rarest to
find in any university graduate.

Marcelo is an original thinker in that he has the ability to look at new or old problems and
come up with new innovative solutions that many other scientists have failed to find
while trying to solve the same problems. He has proven this many times at Masimo and
hence, he is the original author or co-author on fifteen (15) patents that cover the most
advanced research done by our team at Masimo corporation. He was a recipient of the
AeA 2006 High Technology Innovation Award  for his work on the noninvasive blood
carbon monoxide monitor.

---

Masimo Corporation

Exhibit 4
**EXHIBIT 8**

Marcelo is excellent at acquiring new knowledge independently and very efficiently. This ability has served him well because when he joined Masimo he did not have the medical background necessary for the project but was able to acquire it in record time. His relentless thirst for knowledge continues to be a great help to our team. I continually see him acquire new mathematical concepts and apply them to help solve the problems and challenges we face every day.

Marcelo has an exceptional track record for handling many complex research projects either working independently or as part of a team. He has the perseverance needed when faced with setbacks, a crucial trait for a good researcher -- as setbacks are typical in any research project.

Dr. Lamego has all the traits that make an excellent research scientist; knowledge, intellectual bandwidth, resourcefulness, work ethics and persistence. I highly recommend him.

Sincerely,

Mohamed K. Diab

Exhibit 4
**EXHIBIT 8**

## Joe E. Kiani

Mr. Joe E. Kiani founded Masimo Corporation in 1989 and has been its Chairman and Chief Executive Officer since 1989. Mr. Kiani serves as the Chairman and Chief Executive Officer of Cercacor Laboratories, Inc. He served as Acting Chief Technology Officer at Masimo Corporation since December 2009 and served as its President since 1989. He served as a Regional Technical Manager of Antherm Electronics and as a Field Applications Engineer of Bell Industries. Mr. Kiani served as an Engineering Director of Newport Medical Electronics. He served as Product Engineer of Unisys Corporation. He served as the Chairman of the Board of The Medical Device Manufacturers Association. He serves as a Director of Atheer, Inc. He serves as a Director of Bioniz, LLC, and Masimo Laboratories. He has been Director of Bioniz Therapeutics, Inc. since 2015. He served as a Director of Saba Software Inc. from July 1997 to March 15, 2013. In 2010, he established the Masimo Foundation for Ethics, Innovation, and Competition in Healthcare. He is active in efforts to reform U.S. health care and encourage medical innovation. His innovative technology pioneered products such as Masimo Patient SafetyNet™—the first remote monitoring and wireless clinician notification system designed to help hospitals improve patient safety and clinical outcomes by dramatically decreasing rescue events and costly ICU transfers; and Masimo Rainbow SET® Acoustic MonitoringTM—the first noninvasive and continuous acoustic respiration rate (RRaTM) monitoring technology. He is an Inventor on more than 50 patents related to signal processing, sensors and patient monitoring including patents for the invention of read-through motion and low-perfusion pulse oximetry. He has over 575 issued and pending patents worldwide. He have garnered more than 50 awards and honors, including the Frost and Sullivan CEO of the Year Award, the Society for Critical Care Medicine Technology Excellence Award, and the Ernst & Young (Orange County) Entrepreneur of the Year Award. In February 2000, he received the first Society of Critical Care Medicine Industry & Technology Critical Care Technology Excellence Achievement Award and also received the Ernst & Young (Orange County) Entrepreneur of the Year Award. Mr. Kiani holds a BSEE degree and an MSEE degree from San Diego State University.

Source: http://www.bloomberg.com/research/stocks/people/person.asp?personId=541010&privcapId=31167

Exhibit 5
**EXHIBIT 8**

## Mohamed Diab

Mr. Diab is a founder of Masimo and has served as Chief Technical Officer and director since September 1989. Prior to founding Masimo, Mr. Diab served as Chief Engineering Consultant at Newport Medical Electronics, developing conventional pulse oximetry, and as Senior Design Engineer at Galiso, developing precision data acquisition boards for testing high pressure gas cylinders and the purification of industrial gases. Mr. Diab holds a B.S.E.E. degree from California State University, Fullerton.
Source: Masimo Corporation on 09/12/2000

Source: http://people.equilar.com/bio/mohamed-diab-masimo-corporation/salary/210657#.V4pBxFc8aOq

Exhibit 6
**EXHIBIT 8**

CONFIDENTIAL                    -77-                    TRUE016548

## Joseph E. Kiani
— Marion Webb

Chief executive, chairman, Masimo Corp.

Estimated net worth: $140 million

Joseph E. Kiani, 45, chief executive and chairman of the board of the publicly traded medical technology company Masimo Corp. in Irvine, ranks No. 11 on the 2009 San Diego's Wealthiest list. Kiani is worth an estimated $140 mil- lion. He reportedly owns about 10 percent of the company stock, which is traded on the Nasdaq stock exchange under the symbol MASI.

Since Kiani founded Masimo in 1989 as a private garage startup, Masimo has grown to 1,500 people worldwide with annual sales growth of nearly 25-fold in the last five years, accord-ing to Masimo's Kiani is an inventor with more than 50 patents related to signal processing, sensors and patient monitoring, including patents for inventing read-through motion and low-perfusion pulse oximetry, according to published reports.

Prior to founding Masimo, Kiani served as the regional technology manager for Anthem Electronics Inc., a distributor of semiconductor and subsystems products, and as a field applications engineer for Bell Industries Inc., which distributes advanced semiconductor components. He also previously served as product engineer at Unisys Corp., a computer manufacturer.

He currently serves on the board of directors of Saba Software Inc., a publicly traded software company that focuses on human capital development and management solutions, and is the chairman of the Medical Device Manufacturers Association, according to Forbes.

Kiani holds bachelor's and master's degrees in electrical engineering from San Diego State University.

In an interview with the journal Smart Business dating back to January 2007, Kiani spoke about the importance of integrity, maintaining the right culture and keeping an open-door policy.

Success, he is quoted as saying, is being happy most of the time, which can only be attained if you live up to your own principles.

"Success for the company is the same; building a successful company based on principles and integrity, not greed and power," he added.

Source: http://ocbj.media.clients.ellingtoncms.com/static/sdbj/supplements/
SDWealthiest09.pdf

Exhibit 7
**EXHIBIT 8**

# Mallinckrodt, Inc. v. Masimo Corp., 293 F. Supp. 2d 1102 (C.D. Cal. 2003)

**U.S. District Court for the Central District of California - 293 F. Supp. 2d 1102 (C.D. Cal. 2003)**
**July 3, 2003**

### 293 F. Supp. 2d 1102 (2003)

### MALLINCKRODT INC. et al.,
### v.
### MASIMO CORPORATION et al.,
### This Document Relates to All Actions

No. CV 00-06506 MRP.

### United States District Court, C.D. California.

July 3, 2003.

**\*1103** Craig N. Hentschel of Arnold & Porter, Los Angeles, CA, Robert C. Morgan of Fish & Neave, New York City, Kevin P.B. Johnson, Terrence Kearney and Brian C. Cannon of Fish & Neave, Palo Alto, CA, for Plaintiffs.

Exhibit 8
**EXHIBIT 8**

CONFIDENTIAL                    -79-                    TRUE016550

James F. Lesniak, Joseph R. Re, Stephen C. Jensen, and Jon W. Gurka of Knobbe, Martens, Olson & Bear, LLP, Irvine, CA, for Defendants.

## MEMORANDUM OF DECISION AND ORDER RE:

## Masimo's Motion for Summary Judgment Re Ownership of Patents

PFAELZER, District Judge.

### I. Background

In this patent infringement suit, defendant Masimo Corp. ("Masimo") counterclaims, alleging that plaintiffs Nellcor Puritan Bennett Inc. and Mallinckrodt Inc. ("Nellcor") infringe on certain Masimo patents through the sale of certain products. On its part, Nellcor, in its Third Counterclaim, seeks a declaratory judgment that it owns each and every one of the Masimo patents asserted in this case. The issue presented by the Motion for Summary Judgment before the Court is the ownership of those Masimo patents.

At the center of this controversy is Newport Medical Electronics, Inc. ("Newport"), a California corporation incorporated in March 1988 for the purposes of developing and marketing inexpensive pulse oximeters. In pursuit of this goal, Newport hired Joe Kiani in May 1988. Kiani was granted 160,000 shares of Newport stock as well as a seat on Newport's Board of Directors. Additionally, Kiani's sister received 30,000 shares of Newport stock.

In the summer of 1988, Kiani conceived of employing an adaptive filter in a pulse oximeter. He suggested using an adaptive filter to the Newport Board of Directors, but also warned that this effort would cause further delay. As things stood, Kiani had already informed the board that the team would be unable to meet the original February 1989 deadline, and it would take until May 1989 to develop just a rudimentary oximeter without an adaptive filter.

Exhibit 8
**EXHIBIT 8**

Employment of an adaptive filter would further push the timetable out until October 1990. Unwilling to tolerate further delays, Newport rejected Kiani's idea.

Newport contends that its decision with respect to adaptive filters was a temporary one. In the interest of time and for marketing purposes, Newport ordered Kiani to complete a simplified version of the pulse oximeter without adaptive filters, designated "Rev. 1." No efforts were made to develop a pulse oximeter that incorporated adaptive filters. At all times, however, Newport claims that its intent was to eventually create an oximeter that used an adaptive filter. (Opp'n at 5.)

Kiani resigned from Newport in April 1989. Upon leaving the company, Kiani and Newport had various disputes over the shares that Newport had previously granted *1104 to him and over the ownership of work that Kiani purportedly had done for Newport. Ultimately, Kiani agreed to return the 190,000 shares of Newport stock he and his sister owned pursuant to a Mutual Release entered into with Newport in May 1990. The terms and the interpretation of the Mutual Release are the subject of the current motion and are described in more detail below.

In May 1989, Kiani formed his own company to pursue the design and sale of pulse oximeters, Vital Signals, Inc. This company later became known as Masimo, Inc., the defendant/counter-claimant in this case. At the same time, Newport suffered financially. Eventually, the pulse oximeter project was shuttered, and the company abandoned. Newport was officially suspended by the State of California on January 2, 1992 for failure to pay fees and taxes. At the time that Newport was closed, it had completed a prototype pulse oximeter, but it had not done any work on the incorporation of adaptive filters.

Newport remained inactive until 2002 when Nellcor, in the midst of this patent infringement lawsuit, revived Newport by paying the latter's delinquent California corporate fees and taxes for the previous ten years. It executed an asset purchase agreement

Exhibit 8
**EXHIBIT 8**

whereby Nellcor purchased "pulse oximetry algorithms and systems" for $200,000. Having resurrected Newport and now standing in its shoes, Nellcor pleads that Masimo does not own its patents-in-suit.

Masimo, for its part, requests summary judgment against Nellcor's ownership claims on four alternative theories. First, it argues that the Mutual Release precludes any claim that Nellcor owns Masimo's patents. Second, Masimo claims that even before it was shuttered, Newport had already abandoned any rights it could have had in Kiani's idea. Third, Masimo argues that the applicable two year statute of limitations bars Nellcor's claim. Finally, it argues that Nellcor cannot possess a shop right in the invention of Masimo's patents. As discussed below, the Court finds Masimo's first argument to be dispositive.

## II. Legal Standard

Summary judgment is appropriate when the moving party has demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Under the summary judgment standard, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S. Ct. 2505. The interpretation of a written agreement is a question of law. *See Pacific Gas & Electric Co. v. Zuckerman,* 189 Cal. App. 3d 1113, 1143, 234 Cal. Rptr. 630 (Cal.Ct.App.1987).

## III. Discussion

Exhibit 8
**EXHIBIT 8**

CONFIDENTIAL                    -82-                    TRUE016553

## A. Terms of the Mutual Release

The Mutual Release was executed on May 19, 1990. It recites that part of the background to the Mutual Release is the fact that Newport "has previously threatened to sue Kiani for working in any competitive industry, or with companies which may be competitors, to Newport and for theft of corporate proprietary information." (Mutual Release at 1.) Having recited this history, Newport provided Kiani with a comprehensive release of liabilities. (Mutual Release ¶ 2.) In addition, the Mutual Release separately makes clear the intent of the parties to "release any and all rights and claims that may exist or come **\*1105** into being between the parties and to eliminate any potential for disputes between the parties in the future." (Mutual Release ¶ 3.) Kiani gave a substantially similar release to Newport. (Mutual Release ¶ 1.)

Perhaps most relevant to the motion at hand, however, is the Mutual Release's treatment of the intellectual property developed by Kiani while he was employed by Newport. The agreement defines "Product" as "that certain pulse-oximeter which was developed by Newport under supervision by Kiani." (Mutual Release at 1.) In the Mutual Release, Kiani released all claims against Newport, including "any claim of ownership to the Product by Kiani" (the "ownership clause"). (Mutual Release ¶ 1.) On the other hand, Newport also acknowledged that Kiani was not in possession of any proprietary information of Newport (the "possession clause"). (Mutual Release ¶ 2.)

## B. The Release

At the center of the dispute between the two parties is the proper interpretation of Paragraphs 1 and 2 of the Mutual Release. Kiani argues that the terms of the Mutual Release gave him free reign to start Masimo and his quest to build a pulse oximeter with adaptive filters. He argues that by acknowledging in the possession clause in Paragraph 2 that Kiani was not in

Exhibit 8
**EXHIBIT 8**

possession of any Newport proprietary information, Newport meant just thatKiani did not have anything that belonged to Newport. Whatever skills, knowledge, and otherwise that Kiani brought to Masimo could not have belonged to Newport.

Nellcor contends that Kiani specifically disclaimed ownership over the Product in the ownership clause in Paragraph 1 of the Mutual Release, and thereby confirmed Newport's ownership of ideas created during Kiani's tenure, including the idea of incorporating an adaptive filter in a pulse oximeter. According to Nellcor, the definition of Product encompasses all works and ideas related to pulse oximetry conceived and developed by Kiani during his tenure. Under this view, it matters not that the specifications for Rev. 1 did not call for adaptive filters or that Rev. 1 appears to not have been completed during Kiani's time. The critical facts are that Kiani was hired to develop a pulse oximeter and he conceived of the idea of incorporating an adaptive filter while he was at Newport. These two facts, say Nellcor, make the adaptive filter idea part of the Product covered by the Mutual Release.

Nellcor's reading of the Mutual Release is a flawed one. To begin with, the definition of Product is not as broad as Nellcor would have it. Product is defined as "that certain pulse-oximeter which was developed by Newport under supervision by Kiani." (Mutual Release at 1.) Three portions of this definition contradict Nellcor's reading by suggesting that the parties meant to define Product narrowly only as the specific pulse oximeter (i.e., Rev.1) that Kiani developed. First, the definition of product refers to a "certain pulse-oximeter." This implies that the Product is a specific product, and does not encompass everything that Kiani worked on while at Newport. Second, the Product is one that was actually "developed" by Newport. Although Newport contends that it intended all along to pursue a pulse oximeter with adaptive filters at a later time, there is no dispute that one with adaptive filters was never pursued during Kiani's time. Kiani specifically requested permission to "develop" such a pulse oximeter, but this

Exhibit 8
**EXHIBIT 8**

CONFIDENTIAL                                    -84-                                    TRUE016555

request was denied. Third, the product is necessarily one
developed "under supervision by Kiani." Again, this contradicts
Nellcor's broad claim since Kiani neither developed nor
supervised the development of pulse oximeters incorporating
adaptive filters.

*1106 Other portions of the Mutual Release fortify Masimo's
position that the Mutual Release was not intended to prevent
Kiani from using the adaptive filter concept. The clause that
actually uses the term "Product" proclaims that Kiani releases
"any claim of ownership to the Product." Whether an idea is
owned by someone is a legally distinct question from whether one
is entitled to use an idea. If the parties actually intended not only
to clarify the ownership of the Product, but also to exclude Kiani
from practicing certain technologies, it would have been more
logical for the Mutual Release to not merely define the ownership
of the Product, but to also explicitly exclude Kiani from practicing
any of the technologies developed or conceived during his tenure
at Newport.

Not only does the Mutual Release appear not to equate
ownership with right to use, but it seems to state just the opposite
relationship. To begin with, the Recitals state that there is a
history of dispute between Kiani and Newport over both the
"Product as developed by Newport and the proprietary nature of
the technology utilized in the Product." (Mutual Release at 1.) It
thus makes a distinction between the Producti.e., the resulting
object developedand the technology incorporated in the Product.
Kiani, however, releases only his claim of ownership "to the
Product" and not to any underlying technology. (Mutual Release ¶
2.)

Furthermore, Newport releases Kiani from any liability that might
otherwise accrue "related to or based upon the Product and/or
Newport or upon the development and production of any product
which may be deemed to be competitive with the Product or with
Newport ..., or with any company which may be in competition

Exhibit 8
**EXHIBIT 8**

**-85-**

with Newport." (Mutual Release ¶ 2.) If, in fact, Product comprised not only Rev. 1, but any other ideas associated with pulse oximetry, this release by Newport would be nonsensical. How could Kiani realistically compete with Newport if use of adaptive filters in pulse oximetersor for that matter, work on pulse oximeters in generalwould violate the ownership clause? The two sections, however, are in harmony if the ownership clause in Paragraph 1 only refers to who owns the property that was developed at Newport while the competition release in Paragraph 2 clarifies that the underlying technology is free to be used by either party.

The last sentence of Paragraph 2 confirms the reading that the Mutual Release is not intended to prevent Kiani from practicing any skills acquired during his time at Newport. There, Newport "acknowledges that Kiani is not in possession of any proprietary information of Newport." (Mutual Release ¶ 2.) It appears unambiguous that this possession clause was intended to be an acknowledgment by Newport that Kiani did not leave with any Newport proprietary information, whether stored in his brain or in physical, tangible form.

Notwithstanding the apparent meaning of this sentence however, Nellcor suggests that the "proprietary information" is limited only to "software and other proprietary materials." (Opp'n at 17.) In other words, Nellcor argues that in the last sentence of Paragraph 2, Kiani meant only for Newport to acknowledge that Kiani had not stolen any tangible products or designs.

That this reading reflects the intent is implausible. To begin with, nothing in the sentence suggests that the Newport proprietary information is only proprietary information in physical form. As well, Nellcor's reading would render the competition release in Paragraph 2 redundant. If, as Nellcor argues, Kiani's release of ownership in Paragraph 1 was also a release of any right to use the underlying *1107 technology, the competition release in Paragraph 2 would be essentially moot, since any proprietary

Exhibit 8
**EXHIBIT 8**

CONFIDENTIAL **-86-** TRUE016557

information in the hands of Kiani could not be used by Kiani without otherwise breaching the Mutual Release. *See* Cal. Civ.Code § 3451 ("An interpretation which gives effect is preferred to one which makes void.").

Thus, the only reasonable reading of the Mutual Release is that while Newport owned any physical product produced by Kiani during his time at Newport, the ideas developed and conceived during that period are not the property of Newport. *See* Cal. Civ.Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

## IV. Conclusion

For the foregoing reasons, Masimo's motion for summary judgment is GRANTED.
IT IS SO ORDERED.



## Search this Case

Google Scholar
Google Books
Legal Blogs

Exhibit 8
**EXHIBIT 8**

**From:** Joe Kiani [mailto:JKiani@masimo.com]
**Sent:** Thursday, January 9, 2014 3:15 PM
**To:** Gerry Hammarth
**Cc:** Steve Jensen
**Subject:** RE: NDA Request

Thx. I wonder if he took it. Please send Hong Vo's to us too.

**From:** Gerry Hammarth [mailto:ghammarth@cercacor.com]
**Sent:** Thursday, January 09, 2014 3:13 PM
**To:** Joe Kiani
**Cc:** Valerie Begnoche; Steve Jensen
**Subject:** RE: NDA Request

Joe,

I am going to review all files. When I looked at Marcelo's file, I also looked at Hug Vo's file. He also started in 2008 and he has a Masimo Labs agreement. We probably do not have too many like Marcelo, but I will check all.

Gerry

#### *****************************************
#### CONFIDENTIALITY NOTICE

This e-mail communication may contain information that is proprietary, confidential and/or privileged from disclosure under applicable law. If the reader of this e-mail is not the intended recipient, you are hereby notified that use, copying, dissemination or continued possession of this communication is strictly prohibited. If you have any reason to believe you are not the intended recipient of this e-mail, please notify us immediately by e-mail to postmaster@cercacor.com, delete all copies of this e-mail from computer memory or storage and return all hard-copies via regular mail to Cercacor Laboratories, 189 Technology, Irvine, California, U.S.A. 92618. Thank you.

**From:** Joe Kiani [mailto:JKiani@masimo.com]
**Sent:** Thursday, January 9, 2014 3:12 PM
**To:** Gerry Hammarth
**Cc:** Valerie Begnoche; Steve Jensen
**Subject:** RE: NDA Request

Gerry,
Is anyone else missing an agreement in their files?
Thx,
Joe

**From:** Gerry Hammarth [mailto:ghammarth@cercacor.com]
**Sent:** Thursday, January 09, 2014 2:48 PM
**To:** Joe Kiani
**Cc:** Valerie Begnoche
**Subject:** NDA Request

Joe,

Attached are the confidentiality and arbitration agreements you requested. However, these are the agreements signed with Masimo in 2003, not Cercacor. I could not find anything in the files with Cercacor.

4

Exhibit 9
**EXHIBIT 8**

**To:** Valerie Begnoche
**Subject:** FW: NDA Request

Valerie,

Attached is Hung Vo's confidentiality agreement with Masimo Labs. Joe would like you to forward this to Bill Waldo.

Gerry

*****************************************
CONFIDENTIALITY NOTICE

This e-mail communication may contain information that is proprietary, confidential and/or privileged from disclosure under applicable law. If the reader of this e-mail is not the intended recipient, you are hereby notified that use, copying, dissemination or continued possession of this communication is strictly prohibited. If you have any reason to believe you are not the intended recipient of this e-mail, please notify us immediately by e-mail to postmaster@cercacor.com, delete all copies of this e-mail from computer memory or storage and return all hard-copies via regular mail to Cercacor Laboratories, 189 Technology, Irvine, California, U.S.A. 92618. Thank you.

**From:** Joe Kiani [mailto:JKiani@masimo.com]
**Sent:** Thursday, January 9, 2014 3:40 PM
**To:** Gerry Hammarth
**Cc:** Steve Jensen
**Subject:** RE: NDA Request

Send this to Valerie too and have her send it to Bill Waldo since we can't find Marcelo's.

**From:** Gerry Hammarth [mailto:ghammarth@cercacor.com]
**Sent:** Thursday, January 09, 2014 3:19 PM
**To:** Joe Kiani
**Cc:** Steve Jensen
**Subject:** RE: NDA Request

Joe,

Attached is Hung Vo's confidentiality agreement.

Gerry

*****************************************
CONFIDENTIALITY NOTICE

This e-mail communication may contain information that is proprietary, confidential and/or privileged from disclosure under applicable law. If the reader of this e-mail is not the intended recipient, you are hereby notified that use, copying, dissemination or continued possession of this communication is strictly prohibited. If you have any reason to believe you are not the intended recipient of this e-mail, please notify us immediately by e-mail to postmaster@cercacor.com, delete all copies of this e-mail from computer memory or storage and return all hard-copies via regular mail to Cercacor Laboratories, 189 Technology, Irvine, California, U.S.A. 92618. Thank you.

3

Exhibit 9
**EXHIBIT 8**

**Marcelo Lamego**

| | |
|---|---|
| **From:** | Steve.Jensen <Steve.Jensen@knobbe.com> |
| **Sent:** | Friday, January 10, 2014 11:03 AM |
| **To:** | Marcelo Lamego |
| **Cc:** | Joe Kiani; Gerry Hammarth |
| **Subject:** | RE: NDA Request |

Thanks Marcelo,

My fault. I guess that is why assumptions so often lead to miscommunications. We thought that you had access to everything at Cercacor, without restriction, since you have been running the company's operations day-to-day.

Your date is really soon. Hope to see you before then.

Steve

**From:** Marcelo Lamego [mailto:MLamego@cercacor.com]
**Sent:** Friday, January 10, 2014 10:41 AM
**To:** Steve.Jensen
**Cc:** Joe Kiani; Gerry Hammarth
**Subject:** RE: NDA Request

Steve,

Thank you for your email.

I don't have access to HR files at the present, and as result, your assumption is false, since I would need permission from the HR team to obtain such a copy.

In any event, my last day will be on the 24th. Please have everything ready for my exit at that day, unless Joe would like to make it sooner.

I will be, in the meantime, working with the engineers to make sure the transfer process is completed.

All the best,
Marcelo

**From:** Steve.Jensen [mailto:Steve.Jensen@knobbe.com]
**Sent:** Friday, January 10, 2014 10:30 AM
**To:** Marcelo Lamego
**Cc:** Joe Kiani; Gerry Hammarth
**Subject:** RE: NDA Request

1

Exhibit 9
**EXHIBIT 8**

Thanks for the copies Marcelo.

Please understand that the inquiry does not suggest that you had stolen your agreement or removed something improperly. The question, as I understood it and confirmed, was whether you might have it somewhere else. It was logical that you would have been looking for it and would have wanted a copy, which is fine. It is standard procedure to gather this when someone is leaving so we can provide a copy in the exit interview. I guess I should have explained that in my email to avoid misunderstandings.

Thanks again,

Steve

**From:** Marcelo Lamego [mailto:MLamego@cercacor.com]
**Sent:** Friday, January 10, 2014 9:34 AM
**To:** Steve.Jensen
**Cc:** Joe Kiani; Gerry Hammarth
**Subject:** RE: NDA Request

Steve,

Thank you for letting me know.

Attached is copy of email I sent you and Joe in 2010 with pdf copies of NDAs from all employees including myself.

I think the idea that somebody could suggest in an email (please chain below) that I could have potentially stolen/removed Cercacor's property is mindboggling.

All the best,
Marcelo


**From:** Steve.Jensen [mailto:Steve.Jensen@knobbe.com]
**Sent:** Thursday, January 09, 2014 5:14 PM
**To:** Marcelo Lamego
**Subject:** FW: NDA Request


**From:** Valerie Begnoche [mailto:VBegnoch@masimo.com]
**Sent:** Thursday, January 09, 2014 4:02 PM
**To:** WWaldo@bononilawgroup.com
**Cc:** Steve.Jensen
**Subject:** FW: NDA Request


**From:** Gerry Hammarth [mailto:ghammarth@cercacor.com]
**Sent:** Thursday, January 09, 2014 3:44 PM

2

Exhibit 9
**EXHIBIT 8**

# Knobbe | Martens

INTELLECTUAL PROPERTY LAW

KNOBBE MARTENS OLSON & BEAR LLP

2040 Main St., 14th Fl., Irvine, CA 92614
T (949) 760-0404

Stephen C. Jensen
Steve.Jensen@knobbe.com

January 24, 2014

## VIA U.S. MAIL

Timothy D. Cook
Chief Executive Officer
Apple Inc.
1 Infinite Loop
Cupertino, CA 95014

　　　　Re:　　*Employment Obligations of Marcelo Lamego*
　　　　　　　　Our Reference No.: CERCAL.096L

Dear Mr. Cook:

This firm represents Cercacor Laboratories, Inc. We understand that Apple recently offered employment to Cercacor's Chief Technology Officer, Marcelo Lamego. We believe that Apple has hired Mr. Lamego to design and develop products that are likely the same as the products that he was responsible for developing for Cercacor. Apple's design, development, or sales efforts on any such product would compete directly with Cercacor's efforts.

In his capacity as Cercacor's CTO, Mr. Lamego was responsible for *all* of Cercacor's research and development and *all* projects that are underway, or even contemplated, at Cercacor. These projects include mobile health devices and applications and physiological measurements. Mr. Lamego has been the key engineer at Cercacor for more than 10 years. Mr. Lamego learned, and personally conceived, a large number of very valuable trade secrets while he was at Masimo, and he continued to use and improve those trade secrets under license from Masimo when Cercacor was spun off from Masimo. Mr. Lamego possesses detailed knowledge of trade secrets that only a very few individuals know, pertaining to technologies that other companies have for decades tried and failed to develop.

We note that Apple expressed great interest in the Masimo technology on which Mr. Lamego was trained—the same technology that Mr. Lamego applied at Cercacor. Apple has been targeting Masimo and Cercacor personnel for some time. Apple hired Masimo's Chief Medical Officer, Michael O'Reilly. Thereafter, Apple expressed to Masimo and Cercacor's CEO that Apple had even greater interest in Cercacor. The CEO responded that Cercacor's owners had no current desire to sell the company. Shortly thereafter, we understand that Apple increased its efforts to recruit Mr. Lamego. It is difficult to imagine any reason for this sequence of events other than Apple is attempting to gain access to, or at least the benefit of, Cercacor and Masimo's trade secrets.

Mr. Lamego executed an Employee Confidentiality Agreement (the "Agreement") with Cercacor,[1] a copy of which is enclosed. The Agreement prohibits Mr. Lamego, for a period of two years after the end of his employment with Cercacor, from competing with Cercacor, and it specifically recites that the purpose of this non-compete provision is to protect Cercacor's trade secrets. As you may know, California law recognizes the enforceability of a non-compete agreement designed to accomplish that purpose. The Agreement provides in pertinent part as follows:

---

[1]　　The parties to the Agreement are Mr. Lamego and Masimo Laboratories. Masimo Laboratories subsequently changed its name to Cercacor Laboratories, Inc.

knobbe.com

Exhibit 10
**EXHIBIT 8**

12.     During my employment, . . . I will not render services to anyone outside [Cercacor], accept competing employment, or make preparations to compete with [Cercacor].

13.     During my employment and for a period of five (5) years immediately following termination of my employment with [Cercacor], I will not (a) solicit or induce any employee or consultant of [Cercacor] to quit their employment or cease doing business with [Cercacor], or (b) solicit [Cercacor's] customers or suppliers, unless I am specifically authorized to do (a) or (b) by [Cercacor].

14.     I agree that, during the term of my employment and for a period of two (2) years immediately following my termination of employment with [Cercacor] (voluntary or otherwise), I shall be prohibited from competing with any business, product or service of [Cercacor].

15.     I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of [Cercacor's] trade secrets and proprietary and confidential information and are necessary to protection of [Cercacor's] trade secrets and proprietary and confidential information.  I understand that none of my activities will be prohibited under paragraphs 13 and 14 to the extent that I can prove that the action was taken without the use or disclosure of any of [Cercacor's] trade secrets or proprietary or confidential information.

As you can see, the Agreement also prohibits Mr. Lamego from soliciting other employees and from soliciting business from any of Cercacor's customers or suppliers.  In view of Mr. Lamego's obligations arising from the Agreement, we trust that Apple will employ Mr. Lamego in an area that does not involve healthcare technology, including mobile health applications and the measurement of physiological information.  We also ask that Apple refrain from inducing Mr. Lamego to take actions that would violate the Agreement while he performs services for Apple and that Apple will direct Mr. Lamego to honor his obligations to all of his prior employers.  Of course, Cercacor reserves any and all rights and remedies that it may have, now and in the future, against Apple and Mr. Lamego relating to this matter.

Very truly yours,

Steve Jensen a.h.

Stephen C. Jensen

Enclosure

cc (via email, w/ encl.):
        Adrian Perica (perica@apple.com)
        Marcelo Lamego (via U.S. mail)

17102982

knobbe.com

Exhibit 10
**EXHIBIT 8**

CONFIDENTIAL                    -93-                    TRUE016564

# US PATENT & TRADEMARK OFFICE

## PATENT APPLICATION FULL TEXT AND IMAGE DATABASE

| Help | Home | Boolean | Manual | Number | PTDLs |

| Next List | Bottom | View Shopping Cart |

*Searching PGPUB Production Database March 15th - September 30th 2001 ...*

**Results of Search in PGPUB Production Database March 15th - September 30th 2001 for:**
**IN/lamego AND IN/marcelo: 86 applications.**
*Hits 1 through 50 out of 86*

List of patent applications filed where Dr. Lamego is an author:
(a) Cercacor's or Masimo's after Dr. Lamego left Cercacor/Masimo

Final 36 Hits
(b) Cercacor's after Oxxiom annoucement
(c) Apple's patent application

Jump To

Refine Search    IN/lamego AND IN/marcelo

| | PUB. APP. NO. | Title |
|---|---|---|
| 1 | 20160196388 | MEDICAL DEVICE MANAGEMENT SYSTEM (b),(a) |
| 2 | 20160166188 | EMITTER DRIVER FOR NONINVASIVE PATIENT MONITOR (a) |
| 3 | 20160166183 | MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE (a) MEASUREMENT OF BLOOD CONSTITUENTS |
| 4 | 20160073967 | PHYSIOLOGICAL PARAMETER CONFIDENCE MEASURE (a) |
| 5 | 20160061726 | Reflective Surface Treatments for Optical Sensors (c) |
| 6 | 20150272514 | ROBUST ALARM SYSTEM (a) |
| 7 | 20150245773 | HANDHELD PROCESSING DEVICE INCLUDING MEDICAL APPLICATIONS FOR (a) MINIMALLY AND NON INVASIVE GLUCOSE MEASUREMENTS |
| 8 | 20150230755 | DISPOSABLE COMPONENTS FOR REUSABLE PHYSIOLOGICAL SENSOR (a) |
| 9 | 20150196237 | TISSUE PROFILE WELLNESS MONITOR (a) |
| 10 | 20150133755 | MULTIPLE WAVELENGTH SENSOR EMITTERS (a) |
| 11 | 20150112169 | FINGER-PLACEMENT SENSOR (a) |
| 12 | 20150073241 | MEDICAL DEVICE MANAGEMENT SYSTEM (a) |
| 13 | 20150038859 | BLOOD PRESSURE MONITOR WITH VALVE-CHAMBER ASSEMBLY (a) |
| 14 | 20150012231 | INTERFERENCE DETECTOR FOR PATIENT MONITOR (a) |
| 15 | 20150005600 | FINGER-PLACEMENT SENSOR TAPE (a) |
| 16 | 20140330098 | REFLECTANCE CALIBRATION OF FLUORESCENCE-BASED GLUCOSE (a) MEASUREMENTS |
| 17 | 20140309506 | PHYSIOLOGICAL PARAMETER CONFIDENCE MEASURE (a) |
| 18 | 20140296720 | REFLECTION-DETECTOR SENSOR POSITION INDICATOR (a) |
| 19 | 20140296664 | EMITTER DRIVER FOR NONINVASIVE PATIENT MONITOR (a) |
| 20 | 20140276115 | HEART SOUND SIMULATOR (a)    (a) |
| 21 | 20140275881 | PATIENT MONITOR AS A MINIMALLY INVASIVE GLUCOMETER (a) |
| 22 | 20140275872 | SYSTEMS AND METHODS FOR TESTING PATIENT MONITORS (a) |

Exhibit 11

**EXHIBIT 8**

CONFIDENTIAL    -94-    TRUE016565

23 20140275871 WIRELESS OPTICAL COMMUNICATION BETWEEN NONINVASIVE (a) PHYSIOLOGICAL SENSORS AND PATIENT MONITORS

24 20140275835 CLOUD-BASED PHYSIOLOGICAL MONITORING SYSTEM (a)

25 20140275808 PATIENT MONITOR PLACEMENT INDICATOR (a)

26 20140163402 PATIENT MONITORING SYSTEM (a)

27 20140155712 MULTI-STREAM SENSOR FRONT ENDS FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

28 20140129702 PHYSIOLOGICAL TEST CREDIT METHOD

29 20140121482 MULTI-STREAM SENSOR FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

30 20140114199 MAGNETIC-FLAP OPTICAL SENSOR

31 20140066783 NOISE SHIELDING FOR A NONINVAISE DEVICE

32 20140051953 ADAPTIVE CALIBRATION SYSTEM FOR SPECTROPHOTOMETRIC MEASUREMENTS

33 20130344708 MAGNETIC CONNECTOR

34 20130344707 MAGNETIC CONNECTOR

35 20130338461 MULTI-WAVELENGTH PHYSIOLOGICAL MONITOR

36 20130317370 CONTOURED PROTRUSION FOR IMPROVING SPECTROSCOPIC MEASUREMENT OF BLOOD CONSTITUENTS

37 20130317327 MULTIPLE WAVELENGTH SENSOR DRIVERS

38 20130278430 INTERFERENCE DETECTOR FOR PATIENT MONITOR

39 20130211264 REFLECTION-DETECTOR SENSOR POSITION INDICATOR

40 20130178749 TISSUE PROFILE WELLNESS MONITOR

41 20130172701 MULTIPLE WAVELENGTH SENSOR EMITTERS

42 20130046204 MODULATED PHYSIOLOGICAL SENSOR

43 20130041591 MULTIPLE MEASUREMENT MODE IN A PHYSIOLOGICAL SENSOR

44 20130023775 Magnetic Reusable Sensor

45 20120330112 PATIENT MONITORING SYSTEM

46 20120296178 PERSONAL HEALTH DEVICE

47 20120283524 PEDIATRIC MONITOR SENSOR STEADY GAME

48 20120253150 MULTI-STREAM SENSOR FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

49 20120226117 HANDHELD PROCESSING DEVICE INCLUDING MEDICAL APPLICATIONS FOR MINIMALLY AND NON INVASIVE GLUCOSE MEASUREMENTS

50 20120165629 SYSTEMS AND METHODS OF MONITORING A PATIENT THROUGH FREQUENCY-DOMAIN PHOTO MIGRATION SPECTROSCOPY

| | Next List | Top | View Shopping Cart |
|---|---|---|---|
| Help | Home | Boolean | Manual | Number | PTDLs |

CONFIDENTIAL -95- TRUE016566

# EXHIBIT 10

**[[EXCERPTS] 2020-12-21 Deposition Transcript of Tatiana Buticosky Lamego]**

12/21/2020        Masimo Corp. et al v. True Wearables, Inc., et al        Tatiana B. Lamego
Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

_____

MASIMO CORPORATION, a Delaware

Corporation; and CERCACOR

LABORATORIES, INC., a Delaware

corporation,                              Case No.

                  Plaintiff,        8:18-cv-2001-

                             JVS-JDE

       -against-

TRUE WEARABLES, INC., a Delaware

corporation; and MARCELO LAMEGO,

an individual,

                  Defendants.

_____


ATTORNEYS' EYES ONLY

VIDEO-RECORDED DEPOSITION OF

TATIANA BUTICOSKY LAMEGO

Zoom Recorded Videoconference

12/21/2020

9:58 a.m. (Pacific Time)


REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**EXHIBIT 10**

Page 2

1                                    12/21/2020

2                                    9:58 a.m. (Pacific Time)

3

4              VIDEO-RECORDED DEPOSITION OF TATIANA

5      BUTICOSKY LAMEGO, held virtually via Zoom

6      Videoconferencing, before Amanda Gorrono, Certified

7      Live Note Reporter, and Notary Public of the State of

8      New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**EXHIBIT 10**

12/21/2020          Masimo Corp. et al v. True Wearables, Inc., et al          Tatiana B. Lamego
Attorneys' Eyes Only

Page 3

1   A P P E A R A N C E S
2   (Via Zoom Videoconferencing):
3
4   ON BEHALF OF PLAINTIFF MASIMO CORPORATION, a Delaware
    Corporation; and CERCACOR LABORATORIES, INC., a
5   Delaware corporation:
            Brian C. Claassen, Esquire
6           Radhika Raman, Esquire
            Josepher Li, Esquire
7           Knobbe Martens
            2040 Main Street
8           Irvine, CA 92614
            PHONE:  949-760-0404
9           E-MAIL: Brian.claassen@knobbe.com
            E-MAIL: Radhika.raman@knobbe.com
10          E-MAIL: Josepher.li@knobbe.com
11
12  ON BEHALF OF DEFENDANT TRUE WEARABLES, INC., a
    Delaware corporation; and MARCELO LAMEGO, an
13  individual:
            Ryan Fletcher, Esquire
14          Merchant & Gould P.C.
            1801 California Street
15          Denver, Colorado 80202
            PHONE: 303.357.1651
16          E-MAIL: Rfletcher@merchantgould.com
17
18  ALSO PRESENT:
19  Henry Marte, Trial Tech, Legal Videographer, Digital
20  Evidence Group
21
22

**EXHIBIT 10**

Page 49

1    letters to us; and then you guys started looking at

2    our LinkedIn, you know, E-mailing me, some people

3    mailed me asking for Marcelo to sign some patents or

4    do something, and then, you know, it was so much

5    contact, that Apple had to hire an attorney for

6    Marcelo, you know.  Because you guys were constantly

7    trying to get him, reaching out to him to do

8    something.

9                     And then, you know, you guys involved

10   him in the Dominion Assets lawsuit.  You guys

11   involved him in the FDA investigation.  They were

12   investigating the Pronto.  Marcelo was not

13   responsible to the Pronto.  You guys tried to make

14   him sign, as if he was responsible for the Pronto.

15                     Then, you know, the criminal

16   investigation unit from the FDA arrived at Apple, you

17   know, with those big vests, screaming, we are

18   investigating you, to talk to my husband.

19                     He didn't know they were going, you

20   know.  It caused a lot of stress, and then also, you

21   know, with the grand jury, with the, related to the

22   FDA thing, and my husband, you know, didn't have any

**EXHIBIT 10**

Page 56

1          A.      Yes, there was an FDA investigation.

2          Q.      I think you mentioned something about

3    the Pronto.  Were you talking about the Pronto-7

4    there?

5          A.      No, I'm talking about the Pronto.

6    The product that Masimo developed.  My understanding

7    is that the Pronto-7 was not involved within the

8    investigation, but I may be mistaken.

9          Q.      You also mentioned a criminal

10   investigation, right?

11         A.      Yes, there was a criminal

12   investigation.  The FDA, you know, barged inside

13   Apple, you know, badges, guns and vests.  It was a

14   very uncomfortable situation for my husband.

15         Q.      Do you think that Masimo and Cercacor

16   control criminal investigations?

17         A.      Well, someone had to give the FDA our

18   address, right?  Where Marcelo worked.

19         Q.      You don't think someone in the

20   federal government could have figured that out on

21   their own?

22         A.      I don't think so.  In order for them

**EXHIBIT 10**

Page 274

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2              I, Amanda Gorrono, the officer before
     whom the foregoing deposition was taken, do hereby

3    certify that the foregoing transcript is a true and
     correct record of the testimony given; that said

4    testimony was taken by me stenographically and
     thereafter reduced to typewriting under my direction;

5    and that I am neither counsel for, related to, nor
     employed by any of the parties to this case and have

6    no interest, financial or otherwise, in its outcome.

7              IN WITNESS WHEREOF, I have hereunto
     set my hand this 21st day of December, 2020.

8

9

10

11

12

13

14    _____

15    AMANDA GORRONO, CLR

16    CLR NO:  052005 - 01

17

18

19    Notary Public in and for the State of New York

20    County of Suffolk

21    My Commission No.  01G06041701

22    Expires:  01/07/2023

**EXHIBIT 10**

Page 275

1    Tatiana Buticosky Lamego, c/o

     Merchant & Gould P.C.

2    1801 California Street, Suite 3300

     Denver, Colorado  80202

3

4    Case: Masimo Corp. et al v. True Wearables, Inc., et al

     Date of deposition: December 21, 2020

5    Deponent Name: Tatiana Buticosky Lamego

6

7    Please be advised that the transcript in the above

8    referenced matter is now complete and ready for signature.

9    The deponent may come to this office to sign the transcript,

10    a copy may be purchased for the witness to review and sign,

11    or the deponent and/or counsel may waive the option of

12    signing. Please advise us of the option selected.

13    Please forward the errata sheet and the original signed

14    signature page to counsel noticing the deposition, noting the

15    applicable time period allowed for such by the governing

16    Rules of Procedure. If you have any questions, please do

17    not hesitate to call our office at (202)-232-0646.

18

19

20    Sincerely,

     Digital Evidence Group

21    Copyright 2020 Digital Evidence Group

     Copying is forbidden, including electronically, absent

22    express written consent.

**EXHIBIT 10**

Page 276

1      Digital Evidence Group, L.L.C.

       1730 M Street, NW, Suite 812

2      Washington, D.C. 20036

       (202) 232-0646

3

4      SIGNATURE PAGE

       Case: Masimo Corp. et al v. True Wearables, Inc., et al

5      Witness Name: Tatiana Buticosky Lamego

       Deposition Date: December 21, 2020

6

7      I do hereby acknowledge that I have read

       and examined the foregoing pages

8      of the transcript of my deposition and that:

9

10     (Check appropriate box):

       (  ) The same is a true, correct and

11     complete transcription of the answers given by

       me to the questions therein recorded.

12     (X) Except for the changes noted in the

       attached Errata Sheet, the same is a true,

13     correct and complete transcription of the

       answers given by me to the questions therein

14     recorded.

15

16     01-13-21                        *Blcaugo*

17        DATE                     WITNESS SIGNATURE

18

19

20

21     _____        _____

22        DATE                         NOTARY

**EXHIBIT 10**

Page 277

1     Digital Evidence Group, LLC

2     1730 M Street, NW, Suite 812

3     Washington, D.C. 20036

4     (202)232-0646

5

6              ERRATA SHEET

7

8     Case: Masimo Corp. et al v. True Wearables, Inc., et al

9     Witness Name: Tatiana Buticosky Lamego

10     Deposition Date: December 21, 2020

11     Page No.     Line No.     Change

12     *See attached document.*

13

14

15

16

17

18

19

20

21     *TBLauys*             1 - 13 - 21

22       Signature                     Date

**EXHIBIT 10**

Revisions

Page 8 Line 11 - Trabuco Canyon
Page 25 Line 3 - they were this big, plastic box
Page 26 Line 9 - It was from 2014, end of 2014 and the beginning of 2015
Page 26 Line 22 - from, not form
Page 27 Line 8 - the wearables, you know
Page 28 Line 14 - an industrial designer
Page 29 Line 4 - we never hired any consultants to do the T-shirt
Page 30 Lines 7,8,9 - and as Joe Kiani has said many times "there is no monopoly on who can
have ideas, you know, and that's is my idea"
Page 30 Line 17 - I developed some of the app screens
Page 31 Line 11 - we go to the app and we scan the barcode
Page 32 Line 9 - and when you pull that on the device
Page 33 Line 6 - The Extended SpO2 is my idea
Page 34 Line 18 - anti-tampering pack, you know
Page 37 Line 19 - any samples that were
Page 42 Line 8 – Universidade Federal do Espirito Santo
Page 44 Line 12 – Neurointerfaces
Page 45 Line 3 - Stanford University
Page 45 Line 11- on neurointerfaces for controlling trucks, right?
Page 46 Line 2 - auto companies are doing that too, you know, but I
Page 46 Line 7 - Back then, Marcelo was a young
Page 47 Line 20 - NDA (Non-Disclosure Agreement), you know, and
Page 47, Line 22 - He is, you know, a patent attorney,
Page 48 Line 5 - own NDA
Page 48 Line 7 - NDA
Page 48 Line 8 - NDA
Page 49 Line 3 - e-mailed
Page 49 Line 13 - For the Pronto
Page 64 Line 8,9 - I only had an accompanying visa. Marcelo was a student, so I was not able to
work, so....
Page 66 Line 17 - Stanford
Page 70 Line 4 - at 10:00 AM
Page 70 Line 6 - he would leave early
Page 77 Line 13 - offer from them
Page 82 Line 3 - I couldn't know for sure
Page 86 Lines 3, 4, 5 - I am aware of the lawsuit against Apple, you know, but you mention him
(Michael O'Reilly) there very sporadically.
Page 90 Lines 19,20, 21 - we had to put those plans, you know, you know on hold, we had to
put them apart, sorry, apart...
Page 100 Line 1 - that in 2013..13, that he
Page 102 Line 1 - 300,000
Page 106 Line 2 - Bilal Muhsin went into my daughter's Berkeley

EXHIBIT 10

Page 106 Line 6 - Masimo's COO
Page 115 - Lines 18, 19, 20 It does modulation, demodulation. It does decimation. It does multiplexing and demultiplexing.
Page 126 Line 8 - At the time I checked it
Page 144 Line 10 - changed
Page 151 Line 2 - differentiate
Page 189 Line 6 - unhappy
Page 189 Line 10 - extended SpO2
Page 192 Line 5 - glucose monitoring device
Page 193 Line 6 - expected ship date
Page 202 Line 16 - emitter
Page 202 Line 17 - emitter
Page 202 Line 21 - emitter
Page 203 Line 15 - adhesive
Page 204 Line 19 - it, and he finishes it.
Page 209 Line 2 - provisional
Page 209 Line 16 - to start the patent process
Page 216 Line 3 - drawers, you know. So, I can't see that, if it's
Page 218 Line 13 - of getting ready, you know, rudimentary.
Page 220 Line 5 - I believe it was done by Marcelo.
Page 226 Line 19, 20 - when it is placed here, Tab 1 is already in...
Page 228 Line 22 - with each other
Page 237 Line 6 - the little poles
Page 242 Line 15 - priority date, right.
Page 245 Line 11 - slow
Page 248 Line 21 - also to keep the device in place, instead of
Page 254 Line 13 - protects your products overseas
Page 260 Line 11- Maya
Page 261 Line 11 - way less than Joe Kiani
Page 263 Line 14 - Ali Al Hawi
Page 270 Line 19 - them

**EXHIBIT 10**