Scott P. Shaw (Bar No. 223592)
SShaw@Merchantgould.com
MERCHANT & GOULD, P.C.
611 Wilshire Blvd.
Suite 808
Los Angeles, CA 90017
Telephone: (303) 357-1690
Facsimile: (612) 332-9081

Peter A. Gergely (Pro Hac Vice)
PGergely@merchantgould.com
Ryan James Fletcher, Ph.D. (Pro Hac Vice)
RFletcher@merchantgould.com
MERCHANT & GOULD P.C.
1801 California St., Suite 3300
Denver, CO 80202
Telephone: (303) 357-1651
Facsimile: (612) 332-9081

Paige S. Stradley (Pro Hac Vice)
PStradley@merchantgould.com
Eric R. Chad (Pro Hac Vice)
EChad@merchantgould.com
MERCHANT & GOULD P.C.
150 South Fifth Street, Suite 2200
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081

Attorneys for Defendants True Wearables, Inc.
and Marcelo Lamego

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MASIMO CORPORATION, a Delaware Corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, | Case No. 8:18-cv-02001-JVS-JDE |
| | **DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| Plaintiffs, | |
| vs. | Hon. James V. Selna |
| TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual, | Hon. Magistrate John D. Early |
| Defendants. | Complaint Filed: November 8, 2018 |
| | Trial Date: January 11, 2020 |

Defendants True Wearables, Inc. and Dr. Marcelo Lamego submit the following Memorandum of Contentions of Fact and Law pursuant to L.R. 16-4.

## I. L.R. 16-4.1: CLAIMS AND DEFENSES

### A. <u>L.R. 16-4.1(a): Defendants understand Plaintiffs intend to pursue the following claims</u>.

Claim 1: Dr. Lamego's Breach of Contracts with Masimo.

Claim 2: Dr. Lamego's Breach of Contract with Cercacor.

Claim 3: Dr. Lamego's and TW's Violation of the California Uniform Trade Secret Act.

Claim 5: Dr. Lamego's Breach of his Fiduciary Duty to Cercacor.

Claims 7 and 11: Defendants' Infringement of the '271 and '848 Patents under 35 U.S.C §§ 271(a)-(c).

**B.**     **L.R. 16-4.1(b): The elements required to establish Plaintiffs' claims.**

1.     Claim 1: Elements of Dr. Lamego's alleged breach of contracts with Masimo.

Masimo must prove by a preponderance of the evidence that:

a.     Dr. Lamego entered into a contract with Masimo;

b.     Masimo did all, or substantially all, of the significant things that the contract required it to do;

c.     That Dr. Lamego failed to do something that the contract required him to do or that Dr. Lamego did something the contract prohibited him from doing;

d.     That Masimo was harmed by Dr. Lamego's breach of contract; and

e.     That Dr. Lamego's breach of contract was a substantial factor in causing Masimo's harm.

Source: Judicial Council of California Civil Jury Instructions No. 303 (2020); Cal. Civ. Code § 1549.


2.     Claim 2: Elements of Dr. Lamego's alleged breach of contract with Cercacor.

Cercacor must prove by a preponderance of the evidence that:

a.     Dr. Lamego entered into a contract with Cercacor;

b.     Cercacor did all, or substantially all, of the significant things that the contract required it to do;

c.     That Dr. Lamego failed to do something that the contract required him to do or that Dr. Lamego did something the contract prohibited him from doing;

d.     That Cercacor was harmed by Dr. Lamego's breach of contract; and

e.     That Dr. Lamego's breach of contract was a substantial factor in causing Cercacor's harm.

Source: Judicial Council of California Civil Jury Instructions No. 303 (2020); Cal. Civ. Code § 1549.

3.      Claim 3: Elements of Dr. Lamego's and TW's violation of the California Uniform Trade Secret Act.

Plaintiffs must prove by a preponderance of the evidence for each of Trade Secrets ("TS") 1, 2, 5, 6, 7, 8, 9, 11, 12, and/or 14 ("Asserted Trade Secrets"):

a.      Plaintiffs owned and/or were a licensee of the Asserted Trade Secret;

b.      The Asserted Trade Secret was secret and had independent economic value because it was secret;

c.      TW improperly acquired, used, or disclosed the Asserted Trade Secret;

d.      Plaintiffs were harmed, or TW was unjustly enriched; and

e.      TW's acquisition, use, or disclosure was a substantial factor in causing Masimo's harm, or TW to be unjustly enriched.

Source:   West's Ann. Cal. Civ. Code § 3426.1 (1984 Legislative Committee Comments); Judicial Council of California Civil Jury Instructions No. 4401 (2020).

4.      Claim 5: Elements of Dr. Lamego's breach of his fiduciary duty to Cercacor.

To establish this claim, Cercacor must prove that:

a.      Dr. Lamego was Cercacor's corporate officer;

b.      Dr. Lamego knowingly acted against Cercacor's interests in connection with the feasibility of certain non-invasive parameters;

c.      Cercacor did not give informed consent to Dr. Lamego's conduct;

d.      Cercacor was harmed; and

e.      Dr. Lamego's conduct was a substantial factor in causing Cercacor's harm.

Source: Judicial Council of California Civil Jury Instructions No. 4102 (2020).

5.      Claims 7 and 11: Elements of Defendants' Infringement of the '271 and '848 Patents under 35 U.S.C §§ 271(a)-(c).

For each asserted patent, Masimo must prove by a preponderance of the evidence that:

a.      TW directly infringes at least one of claims 1, 2, 7-11, and 15-18 of the '271 Patent or claims 1-5, 9-15, and 18-26 of the '848 Patent; or

b.      TW actively induces infringement of claim 6 of the '271 Patent; or

c.      TW contributorily infringes at least one of claims 1, 2, 7-11, and 15-18 of the '271 Patent.

Source: 35 U.S.C. §§ 271(a)-(c); American Intellectual Property Law Association ("AIPLA") Model Patent Jury Instructions V.3.1-3.10 (2019); 35 U.S.C. § 271(a).

i.      Elements required to establish direct infringement under 35 U.S.C. § 271(a).

1.      Masimo must prove that it is more likely than not that TW made, used, imported, offered to sell, or sold the invention defined in at least one claim of Masimo's patents.

2.      Masimo can show literal direct infringement by proving that TW's Oxxiom product includes each and every element recited in Masimo's patent claim.

3.      Masimo can show direct infringement under the doctrine of equivalents. Under the doctrine of equivalents, TW's Oxxiom product or the process of making or using the Oxxiom can infringe an asserted patent claim if it includes components or method steps that are equivalent to the patent claim elements that are not literally infringed by the product or method. A component or method step is equivalent to a claim element if the component performs substantially the same function, in substantially the same way, to achieve substantially the same result as would be achieved by the element that is not literally infringed by the accused product or method.

Source: AIPLA Model Patent Jury Instructions V.3.1, 3.2, 3.7 (2019).

ii.   Elements for actively inducing infringement under 35 U.S.C. § 271(b).

Masimo must prove that it is more likely that not that:

1.   An Oxxiom user infringes at least one patent claim;

2.   TW aided, instructed, or otherwise acted with the intent to cause the user's patent infringement; and

3.   TW knew of the patent, or showed willful blindness to the existence of the patent, at that time; and

4.   TW knew, or showed willful blindness, that the user's actions would infringe at least one of the patent's claims.

Source: 35 U.S.C. § 271(b); AIPLA Model Patent Jury Instructions V.3.8 (2019).

iii.   Elements required to establish contributory infringement under 35 U.S.C. § 271(c).

Masimo must prove that it is more likely than not that:

1.   An Oxxiom user directly infringed a claim of the patent;

2.   TW sold, offered for sale, or imported within the United States an Oxxiom for use in the infringing method;

3.   The Oxxiom is not a staple article or commodity of commerce capable of substantial non-infringing use;

4.   The Oxxiom constitutes a material part of the claimed invention; and

5.   TW knew that the Oxxiom was especially made or adapted for use in the infringing method.

Source: 35 U.S.C. § 271(c); AIPLA Model Patent Jury Instructions V.3.10 (2019).

iv.   Elements to prove willful infringement of the '271 and '848 patents.

For each asserted patent, Masimo must prove by a preponderance of the evidence

that TW knew of Masimo's patent and recklessly infringed at least one asserted claim of the patent. For example, the jury may consider whether TW's behavior was malicious, wanton, deliberate, consciously wrongful, flagrant, or in bad faith.

<u>Source</u>: AIPLA Model Patent Jury Instructions V.11.0 (2019).

**C.** **L.R. 16-4.1(c): Defendants' brief description of the key evidence in opposition to each of Plaintiffs' claims.**

1.      Claim 1: Dr. Lamego's alleged breach of contracts with Masimo.

Dr. Lamego will testify that he never took or used Masimo's confidential information. Defendants' experts Dr. Daft, Dr. Goldstein, and Mr. Baer will testify that Dr. Lamego never used or disclosed Masimo's confidential information, including never using or disclosing Masimo's confidential information in the Oxxiom® source code or in TW patent applications. Dr. Lamego will testify that he complied with the obligations of the Masimo Agreement. Defendants' expert Mr. Pedigo will testify that Masimo was not harmed by Dr. Lamego's alleged breach of the contracts.

2.      Claim 2: Dr. Lamego's alleged breach of contract with Cercacor.

Dr. Lamego will testify that he never took or used Cercacor's confidential information. Defendants' experts Dr. Daft, Dr. Goldstein, and Mr. Baer will testify that Dr. Lamego never used or disclosed Cercacor's confidential information, including never using or disclosing Cercacor's confidential information in the Oxxiom® source code or in TW patent applications. Dr. Lamego will testify that he complied with the obligations of the Cercacor Agreement. Defendants' expert Mr. Pedigo will testify that Cercacor was not harmed by Dr. Lamego's alleged breach of the contract.

3.      Claim 3: Dr. Lamego's and TW's alleged violation of the California Uniform Trade Secret Act.

Dr. Lamego, Mrs. Lamego, Isadora Lamego, and Larissa Lamego will testify that

Dr. Lamego independently developed the Oxxiom® device. Dr. Lamego will testify that he never took, used, or disclosed any of Plaintiffs' alleged trade secrets. Dr. Widrow will testify to Dr. Lamego's technical and leadership skills that he possessed before employment with Plaintiffs.

Dr. Lamego independently developed the Oxxiom® Device, which was the idea of Mrs. Lamego. Dr. Lamego is a Stanford Ph.D. electrical engineer. He was Chief Technology Officer of Cercacor, which used to be a division of Masimo Corp. He left Cercacor in 2014. After leaving, he first worked for Apple Inc., and later founded True Wearables. After founding True Wearables, Dr. Lamego set out to create an inexpensive, disposable noninvasive monitoring device. He understood that device cost could be lowered by efficiently distributing processing tasks between the device itself and an auxiliary computing device, such as an iPhone, that has significant processing power. Dr. Lamego designed a distributed processing scheme in which time-critical, high-frequency, low-latency, and low-complexity tasks are executed by the device, with more complex tasks executed by the auxiliary "host" device.

Dr. Lamego worked night and day for several years developing algorithms. Drawing on extensive experience with complex mathematics, including experience teaching matrix algebra and optimization as a professor and researcher at multiple academic institutions, Dr. Lamego created an optimization problem and corresponding efficient solution that could serve as the core algorithm of his new monitoring device. Dr. Lamego taught himself an entirely new programming language, Swift, in order to enable him to create an iOS Application for use in Apple devices. After years of development, Dr. Lamego shipped the first commercial version of his "Oxxiom" device on August 28, 2018.

Defendants' products do not use or disclose any of the alleged trade secrets. Overall, Defendants' Oxxiom device uses an entirely different regime than Plaintiffs to determine blood constituents. Regarding Trade Secret 1, Defendants have not used or disclosed Trade Secret 1. Specifically, the Oxxiom® uses a different approach to

determining pulse rate, SpO2, and perfusion as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer.

Regarding Trade Secret 2, Defendants have not used or disclosed Trade Secret 2. The Oxxiom® device does not practice Trade Secret 2 because it does not practice elements (a)-(c) as identified by Plaintiffs, as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer.

Regarding Trade Secret 5, Defendants have not used or disclosed Trade Secret 5. Defendants' source code for the Oxxiom® SA and Oxxiom® Rx uses libraries provided by component manufacturers, and there is no reasonable basis to suggest Defendants utilize an implementation that is specific and unique to Plaintiffs as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer. Moreover, Plaintiffs' and Defendants' products are simply not comparable when it comes to wearability as Defendants' Oxxiom® is significantly smaller and utilizes a tape-like wrap, unlike Plaintiffs' wireless products.

Regarding Trade Secret 6, Defendants have not used or disclosed Trade Secret 6. The Oxxiom® does not use Trade Secret 6 because, unlike Cercacor and Masimo, the Oxxiom® does not apply the allegedly trade secret check to specific data. This is because the Oxxiom® is a different system that functions in a manner fundamentally different from the Cercacor and Masimo algorithms as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer.

Regarding Trade Secret 7, Defendants have not used or disclosed Trade Secret 7. The Oxxiom® does not calculate a correlation as recited by Plaintiffs' alleged Trade Secret 7 as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer. Indeed, Plaintiffs have not identified any part of Oxxiom's code where there is a calculation that uses the alleged trade secret.

Regarding Trade Secret 8, Defendants have not used or disclosed Trade Secret 8. Defendants have not used or disclosed Trade Secret 8 because the signal processing

techniques employed by the Oxxiom® are fundamentally different from those of Masimo and Cercacor as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer.

Regarding Trade Secret 9, Defendants have not used or disclosed Trade Secret 9. Neither the Oxxiom® App. nor Defendants patent applications use or disclose Trade Secret 9 as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer. For similar reasons regarding Trade Secrets 6 and 8, Defendants do not use or disclose Trade Secret 9.

Regarding Trade Secret 11, Defendants have not used or disclosed Trade Secret 11. Specifically, Defendants' patent applications do not disclose Trade Secret 11, and the Oxxiom® source code does not use or disclose Trade Secret 11 as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' expert Dr. Goldstein. For Example, the optimization problem used by True Wearables is different than that used in the Masimo documents.

Regarding Trade Secret 12, Defendants have not used or disclosed Trade Secret 12. Dr. Lamego's confidential notebooks, patent applications, and the Oxxiom® source code do not use or disclose the TSS as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' expert Dr. Goldstein. These notebooks and patent applications describe formulations that are not solvable by the TSS as described in Masimo documents.

Regarding Trade Secret 14, Defendants have not used or disclosed Trade Secret 14 for at least the reasons to be disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer. In addition, Plaintiffs point to no documents, such as business or strategic plans, that show Masimo and Cercacor planned to use this alleged Trade Secret as a product differentiator.

Defendants' experts Dr. Goldstein, Dr. Daft, and Mr. Baer will testify that each of the alleged trade secrets is generally known or readily ascertainable and/or that Plaintiffs did not take reasonable steps to maintain the secrecy of their asserted Trade Secrets.

Trade Secret 1 cannot be a trade secret under California Law because it is disclosed in multiple Masimo's patents as supported by at least the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 2 cannot be a trade secret under California Law because it was disclosed by Plaintiffs or others in a variety of patents and patent applications as supported by at least the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 5 cannot be a trade secret under California Law because it was disclosed by Plaintiffs, including on its own website, as supported by at least the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 6 cannot be a trade secret under California Law because it is disclosed in Plaintiffs' patents as supported by at least the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 7 cannot be a trade secret under California Law because it is disclosed in Plaintiffs' patents as supported by at least the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 8 cannot be a trade secret under California Law because it is disclosed in Plaintiffs' patents as supported by at least the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 9 cannot be a trade secret under California Law because it is disclosed in Plaintiffs' patents, on Masimo's website, and in the patents of other medical device companies as supported by at least the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 11 cannot be a trade secret under California Law because it is disclosed in a widely used, generally known book and numerous other publications, including Masimo's own patents as supported by at least the testimony of Mathew Paul, Jesse Chen, and Mohammad Diab, and Defendants' expert Dr. Goldstein and accompanying exhibits.

Trade Secret 12 and the TSS cannot be a trade secret under California Law because it is widely known, widely used, and disclosed in several publications as supported by at least the testimony of Mathew Paul, Jesse Chen, and Mohammad Diab and Defendants' expert Dr. Goldstein and accompanying exhibits.

Trade Secret 14 cannot be a trade secret under California Law because it was disclosed by Masimo on numerous occasions, including in its own press releases, annual reports, on its website, as supported by at least Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits, and Mr. Kiani and Mr. Diab.

Jonathan Rosario will testify that issues with Dr. Lamego's hard drive do not support that Dr. Lamego took information on his hard drive upon his departure.

Mr. Dalvi, Mr. Paul, Mr. Merritt, Mr. Chen, and Defendants' experts Dr. Goldstein, Dr. Daft, and Mr. Baer will testify that Plaintiffs alleged trade secrets do not have any independent economic value and Defendants' expert Mr. Pedigo will testify that Defendants alleged misappropriation has not caused Plaintiffs any harm.

       4.     Claim 5: Dr. Lamego's alleged breach of his fiduciary duty to Cercacor.

Dr. Lamego will testify that he accurately represented all information and never knowingly acted against Cercacor's interests in connection with the feasibility of certain non-invasive parameters. Mr. Merritt, Mr. Paul, and Mr. Dalvi will corroborate Dr. Lamego's testimony and will testify regarding facts to support that Plaintiffs' claim should be barred by the statute of limitations. Defendants' expert Mr. Pedigo will testify that Cercacor did not suffer any harm.

       5.     Claim 7: Defendants' alleged infringement of the '271 Patent under 35 U.S.C §§ 271(a)-(c).

Dr. Lamego and Defendants' expert Dr. Stone will testify that Defendants to not infringe any claim of the '271 patent and that every asserted claim of the '271 patent is

1     also invalid under 35 U.S.C. § 103(a).

2               i.      The Oxxiom® System does not take measurements until the
3                       Oxxiom® Device is paired with the Oxxiom® iOS App.

4     The Oxxiom® System has two modes—standby mode and operation mode. Once
5     powered on, the Oxxiom® Device is in standby mode until it is paired with the Oxxiom®
6     iOS App. While in standby mode, the Oxxiom® Device emits a flashing light from a green
7     LED. Once paired with the Oxxiom® iOS App, the Oxxiom® Device enters operation
8     mode. In operation mode, the green LED no longer emits light, and the Oxxiom® Device
9     instead utilizes a red LED and an infrared LED to determine blood oxygen saturation.

10    True Wearables instructs users how to get the Oxxiom® Device into standby mode
11    and ready for placement on the measurement site by removing Tab 2 prior to placement
12    of the Oxxiom® Device onto the measurement site, while the Oxxiom® Device is in
13    standby mode. Following removal of Tab 2, True Wearables instructs users to place the
14    Oxxiom® Device onto the measurement site (e.g., a finger) while the Device is in standby
15    mode. After the Device is on the measurement site, True Wearables instructs users to pair
16    the Oxxiom® Device with the iOS App. Once paired with the iOS App, the Oxxiom®
17    System is in operation mode and is ready and able to take measurements through use of
18    red and infrared light.

19    The Oxxiom® Device cannot take measurements until it is paired with its the
20    Oxxiom® iOS App. Accordingly, while in standby mode (i.e., when the green emitter is
21    on/flashing), the Oxxiom® Device cannot take any measurements because it is not yet
22    connected to the Oxxiom® iOS App.  Plaintiffs' expert, Jack Goldberg, admitted in his
23    deposition and expert report that while in standby mode the Oxxiom® Device cannot take
24    measurements.

25              ii.     The Oxxiom® System is not "designed to block a range of
26                      wavelengths of light sufficient to prevent measurements" as
27                      required by the asserted claims.

28

Each claim of the '271 Patent requires that the opaque portion of the sensor cover be "configured to block readings" (claim 1 of the '271 Patent and its dependents) or be "configured to block optical readings" (claim 10 of the '271 Patent and its dependents). The Court construed "an opaque portion attachable to the sensor and configured to block readings by the sensor"/"an opaque portion attachable to the sensor and configured to block optical readings by the sensor" to mean "a portion attachable to the sensor designed to block a range of wavelengths of light sufficient to prevent measurements" and held that the phrase "configured to" requires some level of intentionality. The Court further construed "readings" to mean "physiological measurements" (whether actual or false)." (Dkt. 359; Dkt. 356.)

Because Tab 2 is only intended to be attached to the Oxxiom® Device while in standby mode and because the Oxxiom® System cannot take measurements while in standby mode, Tab 2 is not designed to block a range of wavelengths of light sufficient to prevent measurements. In other words, when Tab 2 attached to the Oxxiom® Device, there are simply no measurements to prevent because none can even be taken.

This is further confirmed by Dr. Lamego's own testimony regarding the selection of an opaque tape for Tab 2. When asked the technical reasons he preferred opaque tape instead of clear tape, Dr. Lamego identified a number of benefits but did not identify the blocking of light or prevention of measurement as a reason for his selection of an opaque tape.

        iii.     When used as designed and instructed, the alleged cover of the Oxxiom® Device is not in place when the sensor is active.

Each of the asserted claims of the '271 Patent requires a sensor cover—or the opaque portion thereof—that is configured to prevent the detector from receiving light when the sensor is active or during sensor activation. The Parties agreed that the term "active" should receive its plain and ordinary meaning. The Court later construed "active"/"activation" means "able to measure." (Dkt. 359 at 15; Dkt. 356 at 15.) The Oxxiom® System does not practice this claim element because the Oxxiom® System is

not active (i.e., able to measure) until the Oxxiom® Device is paired with the iOS App, which when used according to True Wearables' instructions only ever happens after removal of Tab 2. In other words, the Oxxiom® Device is not able to measure (i.e., the plain and ordinary meaning of "active" as used in the '271 Patent) until it pairs with the iOS App.

"Active" as utilized in the Patents in Suit must mean the claimed device is ready and able measure because the stated purpose of Patents in Suit is to reduce or eliminate false readings. There can be no such false readings if a sensor is not even able to measure in the first place. Therefore, contrary to Plaintiffs' contentions, "active" cannot be interpreted as encompassing any state in which a device is not even capable of making readings.

> iv.   The alleged cover of the Oxxiom® Device does not prevent light from reaching the detector.

The alleged cover of the Oxxiom® Devices, Tab 2, causes some light from the green emitter to be reflected onto the detector. In operation mode, the Oxxiom® System operates by measuring the amount of light that is *reflected* by a user's skin, as shown in the User Guide:



In standby mode, however, Tab 2 is in place causing the emitted light to reflect off of the cover and back towards the detector—just like the emitted light reflects off a user's skin back towards the detector:

Accordingly, Tab 2 of Oxxiom® Device is not "configured to block readings/optical readings by the sensor" as construed by the Court because the cover actually *causes* (and does not *prevent*) light from the emitter to be reflected to the detector.

All of the elements of claims 1-2, 6-11, and 15-18 of the '271 patent are disclosed by U.S. Patent No. 7,486,977 to Sweitzer ("Sweitzer"), U.S. Patent No. 6,140,549 to Pompei ("Pompei), U.S. Patent No. 4,136,818 to Larrabee ("Larrabee), or U.S. Patent No. 6,661,140 to Agnes ("Agnes").

Regarding independent claim 1 of the '271 patent, all of the elements of the claim are disclosed by Sweitzer in view of Pompei. The only difference between claim 1 and the prior art before the examiner during prosecution was that claim 1 recited "wherein the sensor cover is configured to prevent the detector from receiving light when the sensor is active." However, it was known in the art to provide a cover for a sensor that prevented the detector from receiving light when the sensor is active. This is shown in Larrabee which disclose an opaque sensor cover for a blood washing apparatus which shields the sensor from external light while the device is active to ensure accurate readings. Alternatively, it is also shown by Agnes which discloses an opaque sensor cap that protects the sensor from "accidental triggering by external light sources," meaning that the opaque cover shields the sensor from ambient light when the sensor is active.

As stated in the '271 Patent, it was known that that sensors were "kept attached to monitors to reduce the setup time needed to begin monitoring a patient" and that it was a known problem that "[w]hile attached, the sensor can generate false readings by detecting ambient light even though the sensor is not in use." Per Sweitzer, it was known to cover the emitter and detector of a pulse oximeter with an opaque cover to prevent light from any source from activating the device, which would otherwise cause the sensor to make

readings. And it was known to protect sensors from ambient light with opaque covers while the devices were active to ensure accurate readings or prevent accidental triggering per Larrabee and/or Agnes.

Claim 2 (dependent of claim 1) of the '271 patent adds the element "wherein the non-adhesive portion that protrudes from the sensor comprises an elongate portion that extends past the sensor." As discussed by the examiner during prosecution, this additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 6 (dependent of claim 1) of the '271 patent adds the element "activating the light source of sensor to emit light from the one or more emitters of the sensor; and blocking with the sensor cover, the light from one or more the emitters from being received by the detector of the sensor." This additional element is shown through combining Sweitzer with Larrabee or Agnes.

Claim 7 (dependent of claim 1) of the '271 patent adds the element of "wherein the opaque portion is attachable over at least one of the detector or the or more emitters." This additional element is shown by Sweitzer.

Claim 8 (dependent of claim 1) of the '271 patent adds the element "wherein the opaque portion is configured to block ambient light from a surrounding area." This additional element is shown by Sweitzer.

Claim 9 (dependent of claim 1) of the '271 patent of the '271 patent adds the element "wherein the sensor is a pulse oximeter sensor." This additional element is shown by Sweitzer.

Regarding independent claim 10 of the '271 patent, this claim is similar in scope to independent claim 1. All of its elements were shown by Sweitzer and Pompei, except the element added by amendment during prosecution to distinguish Sweitzer and Pompei: "wherein the opaque portion is configured to prevent the detector from receiving light during sensor activation." However, as with claim 1, it was known in the art to provide an opaque cover configured to prevent the detector from receiving light during sensor

activation. This is shown by Larrabee or Agnes. Specifically, it was known in the optical sensor art to provide an opaque cover configured to prevent the detector from receiving light during sensor activation to provide accurate readings per Larrabee or prevent accidental triggering of the sensor per Agnes.

Claim 11 (dependent of claim 10) of the '271 patent adds the element "wherein the non-adhesive portion that protrudes from the sensor comprises an elongate portion that extends past the sensor." As discussed by the examiner during prosecution, this additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 15 (dependent of claim 10) of the '271 patent adds the element "wherein the sensor cover is configured to block the light from the one or more emitters from being received by the detector." This additional element is shown through combining Sweitzer with Larrabee or Agnes.

Claim 16 (dependent of claim 10) of the '271 patent adds the element "wherein the opaque portion is attachable over at least one of the detector or the one or more emitters." This additional element is shown by Sweitzer.

Claim 17 (dependent of claim 10) of the '271 patent of the '271 patent adds the element "wherein the opaque portion is configured to block ambient light from a surrounding area." This additional element is shown by Sweitzer.

Claim 18 (dependent of claim 10) of the '271 patent of the '271 patent adds the element "wherein the sensor is a pulse oximeter sensor." This additional element is shown by Sweitzer.

      6.     Claim 11: Defendants' alleged infringement of the '848 Patent under 35 U.S.C §§ 271(a).

Dr. Lamego and Defendants' expert Dr. Stone will testify that Defendants to not infringe any claim of the '848 patent and that every asserted claim of the '848 patent is also invalid under 35 U.S.C. § 103(a).

i.      The Oxxiom® System does not take measurements until the Oxxiom® Device is paired with the Oxxiom® iOS App.

The Oxxiom® System has two modes—standby mode and operation mode. Once powered on, the Oxxiom® Device is in standby mode until it is paired with the Oxxiom® iOS App. While in standby mode, the Oxxiom® Device emits a flashing light from a green LED. Once paired with the Oxxiom® iOS App, the Oxxiom® Device enters operation mode. In operation mode, the green LED no longer emits light, and the Oxxiom® Device instead utilizes a red LED and an infrared LED to determine blood oxygen saturation.

True Wearables instructs users how to get the Oxxiom® Device into standby mode and ready for placement on the measurement site by removing Tab 2 prior to placement of the Oxxiom® Device onto the measurement site, while the Oxxiom® Device is in standby mode. Following removal of Tab 2, True Wearables instructs users to place the Oxxiom® Device onto the measurement site (e.g., a finger) while the Device is in standby mode. After the Device is on the measurement site, True Wearables instructs users to pair the Oxxiom® Device with the iOS App. Once paired with the iOS App, the Oxxiom® System is in operation mode and is ready and able to take measurements through use of red and infrared light.

The Oxxiom® Device cannot take measurements until it is paired with its the Oxxiom® iOS App. Accordingly, while in standby mode (i.e., when the green emitter is on/flashing), the Oxxiom® Device cannot take any measurements because it is not yet connected to the Oxxiom® iOS App.  Plaintiffs' expert, Jack Goldberg, admitted in his deposition and expert report that while in standby mode the Oxxiom® Device cannot take measurements.

ii.      When used as designed and instructed, the alleged cover of the Oxxiom® Device is not in place when the sensor is active.

Each of the asserted claims of the '848 Patent requires a sensor cover that covers the sensing components while the sensor is active. The Parties agreed that the term "active" should receive its plain and ordinary meaning. The Court later construed

"active"/"activation" means "able to measure." (Dkt. 359 at 15; Dkt. 356 at 15.) The Oxxiom® System does not practice this claim element because the Oxxiom® System is not active (i.e., able to measure) until the Oxxiom® Device is paired with the iOS App, which when used according to True Wearables' instructions only ever happens after removal of Tab 2. In other words, the Oxxiom® Device is not able to measure (i.e., the plain and ordinary meaning of "active" as used in the '848 Patent) until it pairs with the iOS App.

"Active" as utilized in the Patents in Suit must mean the claimed device is ready and able measure because the stated purpose of Patents in Suit is to reduce or eliminate false readings. There can be no such false readings if a sensor is not even able to measure in the first place. Therefore, contrary to Plaintiffs' contentions, "active" cannot be interpreted as encompassing any state in which a device is not even capable of making readings.

> iii.   The alleged cover of the Oxxiom® Device does not prevent light from reaching the detector.

Each of the asserted independent claims of the '848 Patent includes a limitation that a sensor cover prevents light for reaching a detector. Tab 2, the alleged "sensor cover" of the Oxxiom® Devices, is not designed or configured or intended to block light from reaching the detector present in these devices. Rather, Tab 2 is intended to protect adhesive that is a permanent part of the Oxxiom® Devices. Without Tab 2, the adhesive would collect environmental debris prior to use and be unable to adhere to the skin of a user.

The alleged cover of the Oxxiom® Devices, Tab 2, causes some light from the green emitter to be reflected onto the detector. In operation mode, the Oxxiom® System operates by measuring the amount of light that is *reflected* by a user's skin, as shown in the User Guide. In standby mode, however, Tab 2 is in place causing the emitted light to reflect off of the alleged cover and back towards the detector—just like the emitted light reflects off a user's skin back towards the detector.

Accordingly, Tab 2 of Oxxiom® Device is not a sensor cover that "blocks at least a portion of light from the one or more emitters from being received by the detector."

All of the elements of claims 1-29 of the '848 patent are disclosed by U.S. Patent No. 7,486,977 to Sweitzer ("Sweitzer"), U.S. Patent No. 6,140,549 to Pompei ("Pompei), U.S. Patent No. 7,190,986 to Hannula ("Hannula"), and U.S. Patent No. 4,136,818 to Larrabee ("Larrabee") or U.S. Patent No. 6,661,140 to Agnes ("Agnes").

Regarding independent claim 1 of the '848 patent, all of the elements of the claim are disclosed by Sweitzer in view of Pompei. The only difference between claim 1 and the prior art before the examiner during prosecution was that claim 1 recited "the sensor cover, when adhered to the pulse oximeter sensor, covers at least one of the sensing components while the pulse oximeter sensor is active and blocks at least a portion of light from the one or more emitters from being received by the detector." However, it was known in the art to provide a cover for a sensor that prevented the detector from receiving light when the sensor is active. This is shown in Larrabee which disclose an opaque sensor cover for a blood washing apparatus which shields the sensor from external light while the device is active to ensure accurate readings. Alternatively, it is also shown by Agnes which discloses an opaque sensor cap that protects the sensor from "accidental triggering by external light sources," meaning that the opaque cover shields the sensor from ambient light when the sensor is active.

As stated in the '848 Patent, it was known that that sensors were "kept attached to monitors to reduce the setup time needed to begin monitoring a patient" and that it was a known problem that "[w]hile attached, the sensor can generate false readings by detecting ambient light even though the sensor is not in use." This is an obvious problem to solve. Per Sweitzer, it was known to cover the emitter and detector of a pulse oximeter with an opaque cover to prevent light from any source from activating the device, which would otherwise cause the sensor to make readings. And it was known to protect sensors from ambient light with opaque covers while the devices were active to ensure accurate readings or prevent accidental triggering per Larrabee and/or Agnes.

Claim 2 (dependent of claim 1) of the '848 patent adds the element "wherein the portion of the sensor cover that protrudes from the pulse oximeter sensor extends beyond an edge of the pulse oximeter sensor to enable removal of the sensor cover from the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 3 (dependent of claim 2) of the '848 patent adds the element "wherein the portion of the sensor cover that protrudes from the pulse oximeter sensor comprises a rectangular planar shape." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 4 (dependent of claim 3) of the '848 patent adds the element "wherein the portion of the sensor cover that protrudes from the pulse oximeter sensor is not adhered to the pulse oximeter sensor when the sensor cover is adhered to the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 5 (dependent of claim 4) of the '848 patent adds the element "wherein the sensor cover, when adhered to the pulse oximeter sensor, further blocks at least a portion of ambient light from a surrounding area from being received by the detector." This additional element is shown by Sweitzer.

Claim 6 (dependent of claim 5) of the '848 patent adds the element "wherein the sensor cover reduces false readings by the pulse oximeter sensor until the pulse oximeter sensor is in use." This additional element is shown by Sweitzer.

Claim 7 (dependent of claim 6) of the '848 patent adds the element "wherein the sensor cover is opaque." This additional element is shown by Sweitzer.

Claim 8 (dependent of claim 7) of the '848 patent adds the element "wherein: the pulse oximeter sensor further comprises a window formed on a surface of the pulse oximeter sensor that is aligned with the light-emitting component and the light-detecting-component to allow light to reach the light-emitting component and the light-detecting-component, and the sensor cover, when adhered to the pulse oximeter sensor, covers the

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

window while the pulse oximeter sensor is active and blocks at least a portion of light from the one or more emitters from being received by the detector." This additional element is shown by Hannula.

Regarding independent claim 9 of the '848 patent, all of the elements of the claim are disclosed by Sweitzer in view of Pompei, except "the cover portion, when adhered to the pulse oximeter sensor, covers one or more sensing components of the pulse oximeter sensor while the pulse oximeter sensor is active and blocks at least a portion of light from one or more emitters of the pulse oximeter sensor from being received by a detector of the pulse oximeter sensor." However, as with claim 1, it was known in the art to provide an opaque cover to prevent the detector from receiving light while the sensor is active. This is shown by Larrabee or Agnes. Specifically, it was known in the optical sensor art to provide an opaque cover configured to prevent the detector from receiving light during sensor activation to provide accurate readings per Larrabee or prevent accidental triggering of the sensor per Agnes.

Claim 10 (dependent of claim 9) adds the element "wherein the sensing components of the pulse oximeter sensor include at least: the one or more emitters; and the detector configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site." This additional element is shown by Sweitzer.

Claim 11 (dependent of claim 10) adds the element "wherein the protruding portion extends beyond an edge of the pulse oximeter sensor to enable removal of the sensor cover from the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 12 (dependent of claim 11) adds the element "wherein the protruding portion comprises a rectangular planar shape." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 13 (dependent of claim 12) adds the element "wherein the protruding portion is not adhered to the pulse oximeter sensor when the cover portion is adhered to the pulse

oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 14 (dependent of claim 13) adds the element "wherein the cover portion, when adhered to the pulse oximeter sensor, further blocks at least a portion of ambient light from a surrounding area from being received by the detector." This additional element is shown by Sweitzer.

Claim 15 (dependent of claim 14) of the '848 patent adds the element "wherein the cover portion and the protruding portion together comprise a single integral component." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 16 (dependent of claim 15) of the '848 patent adds the element "wherein the sensor cover reduces false readings by the pulse oximeter sensor until the pulse oximeter sensor is in use." This additional element is shown by Sweitzer.

Claim 17 (dependent of claim 16) of the '848 patent adds the element "wherein the cover portion is partially or fully opaque." This additional element is shown by Sweitzer.

Regarding independent claim 18 of the '848 patent, all of the elements of the claim are disclosed by Sweitzer in view of Pompei. The only difference between claim 18 and the prior art before the examiner during prosecution was that claim 18 recited "the cover portion, when adhered to the pulse oximeter sensor, covers one or more sensing components of the pulse oximeter sensor while the pulse oximeter sensor is active and blocks at least a portion of light from one or more emitters of the pulse oximeter sensor from being received by a detector of the pulse oximeter sensor . . . the sensor cover covering one or more sensing components of the pulse oximeter sensor while the pulse oximeter sensor is active." However, as with respect to claims 1 and 9, it was known in the art to provide an opaque cover to prevent the detector from receiving light while the sensor is active. This is shown by Larrabee or Agnes. Specifically, it was known in the optical sensor art to provide an opaque cover configured to prevent the detector from

receiving light during sensor activation to provide accurate readings per Larrabee or prevent accidental triggering of the sensor per Agnes.

Claim 19 (dependent of claim 18) of the '848 patent adds the element "wherein the portion of the cover portion that protrudes from the pulse oximeter sensor extends past the sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 20 (dependent of claim 19) of the '848 patent of the '848 patent adds the element "wherein the protruding portion extends beyond an edge of the pulse oximeter sensor to enable removal of the sensor cover from the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

 Claim 21 (dependent of claim 20) of the '848 patent adds the element "wherein the protruding portion comprises a rectangular planar shape." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 22 (dependent of claim 21) of the '848 patent adds the element "wherein the protruding portion is not adhered to the pulse oximeter sensor when the cover portion is adhered to the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 23 (dependent of claim 22) of the '848 patent adds the element "wherein the cover portion, when adhered to the pulse oximeter sensor, further blocks at least a portion of ambient light from a surrounding area from being received by the detector." This additional element is shown by Sweitzer.

Claim 24 (dependent of claim 23) adds the element "wherein cover portion and the protruding portion together comprise a single integral component." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 25 (dependent of claim 24) of the '848 patent adds the element "wherein the pulse oximeter sensor comprises sensing components including at least: the one or more

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

emitters; and the detector configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site." This additional element is shown by Sweitzer.

Claim 26 (dependent of claim 25) adds the element "activating the one or more emitters of the pulse oximeter sensor to emit light from the one or more emitters; and blocking, with the sensor cover, at least a portion of the light from the one or more emitters from being received by the detector." This additional element is disclosed by Sweitzer combined with either Larrabee or Agnes.

Claim 27 (dependent of claim 26) of the '848 patent adds the element "wherein the sensor cover reduces false readings by the pulse oximeter sensor until the pulse oximeter sensor is in use." This additional element is shown by Sweitzer.

Claim 28 (dependent of claim 27) of the '848 patent adds the element "wherein the cover portion is partially or fully opaque." This additional element is shown by Sweitzer.

Claim 29 (dependent of claim 28) of the '848 patent adds the element "pulling the protruding portion to remove the sensor cover from the pulse oximeter sensor to expose the one or more emitters and the detector and an adhesive surface of the pulse oximeter cover; and applying the pulse oximeter sensor to the tissue site." This additional element is disclosed by Sweitzer and Pompei.

**D.    L.R. 16-4.1(d): Defendants intend to pursue the following counterclaims and defenses.**

Counterclaim 2: Declaratory Judgment of No Infringement of U.S. Patent No. 8,886,271.

Counterclaim 6: Declaratory Judgment of No Infringement of U.S. Patent No. 10,194,848.

Counterclaim 8: Declaratory Judgment of Invalidity of U.S. Patent No. 8,886,271 Under 35 U.S.C. § 103(a).

Counterclaim 12: Declaratory Judgment of Invalidity of U.S. Patent No.
10,194,848 Under 35 U.S.C. § 103(a).

Defense 1:   Failure to State a Claim.

Defense 3:   Statute of Limitations.

Defense 4:   Doctrine of Laches.

Defense 11: Unenforceability per Cal. Bus. & Prof. Code § 16600.

Defense 12: Information Generally Known/Readily Ascertainable.

Defense 13: Independent Development.

Defense 15: Non-infringement of the Asserted Patents in Suit.

Defense 16: Invalidity of the Asserted Patents in Suit.

Defense 23: Speculative Damages.

**E.    L.R.   16-14.1(e):   Elements   required   to   establish   Defendants'
counterclaims and defenses.**

1.    Counterclaim 2: Declaratory Judgment of No Infringement of U.S.
Patent No. 8,886,271.

For each asserted patent, Defendants succeed on counterclaim 2 if Masimo fails to
prove by a preponderance of the evidence that:

a.    TW directly infringes at least one of claims 1, 2, 7-11, and 15-18 of the '271
Patent; or

b.    TW actively induces infringement of claim 6 of the '271 Patent; or

c.    TW contributorily infringes at least one of claims 1, 2, 7-11, and 15-18 of
the '271 Patent.

Source: 35 U.S.C. §§ 271(a)-(c); American Intellectual Property Law Association
("AIPLA") Model Patent Jury Instructions V.3.1-3.10 (2019); 35 U.S.C. § 271(a).

i.      Elements required to establish direct infringement under 35 U.S.C. § 271(a).

1.      Masimo must prove that it is more likely than not that TW made, used, imported, offered to sell, or sold the invention defined in at least one claim of Masimo's patents.

2.      Masimo can show literal direct infringement by proving that TW's Oxxiom product includes each and every element recited in Masimo's patent claim.

3.      Masimo can show direct infringement under the doctrine of equivalents. Under the doctrine of equivalents, TW's Oxxiom product or the process of making or using the Oxxiom can infringe an asserted patent claim if it includes components or method steps that are equivalent to the patent claim elements that are not literally infringed by the product or method. A component or method step is equivalent to a claim element if the component performs substantially the same function, in substantially the same way, to achieve substantially the same result as would be achieved by the element that is not literally infringed by the accused product or method.

Source: AIPLA Model Patent Jury Instructions V.3.1, 3.2, 3.7 (2019).

ii.      Elements for actively inducing infringement under 35 U.S.C. § 271(b).

Masimo must prove that it is more likely that not that:

1.      An Oxxiom user infringes at least one patent claim;

2.      TW aided, instructed, or otherwise acted with the intent to cause the user's patent infringement; and

3.      TW knew of the patent, or showed willful blindness to the existence of the patent, at that time; and

4.      TW knew, or showed willful blindness, that the user's actions would infringe at least one of the patent's claims.

Source: 35 U.S.C. § 271(b); AIPLA Model Patent Jury Instructions V.3.8 (2019).

   iii. Elements required to establish contributory infringement under 35 U.S.C. § 271(c).

Masimo must prove that it is more likely than not that:

1. An Oxxiom user directly infringed a claim of the patent;

2. TW sold, offered for sale, or imported within the United States an Oxxiom for use in the infringing method;

3. The Oxxiom is not a staple article or commodity of commerce capable of substantial non-infringing use;

4. The Oxxiom constitutes a material part of the claimed invention; and

5. TW knew that the Oxxiom was especially made or adapted for use in the infringing method.

<u>Source</u>: 35 U.S.C. § 271(c); AIPLA Model Patent Jury Instructions V.3.10 (2019).

   2. Counterclaim 6: Declaratory Judgment of No Infringement of U.S. Patent No. 10,194,848.

For each asserted patent, Defendants succeed on counterclaim 6 if Plaintiffs fail to prove by a preponderance of the evidence that:

a. TW directly infringes at least one of the asserted claims of the '848 Patent.

<u>Source</u>: 35 U.S.C. §§ 271(a)-(c); American Intellectual Property Law Association ("AIPLA") Model Patent Jury Instructions V.3.1-3.10 (2019); 35 U.S.C. § 271(a).

   i. Elements required to establish direct infringement under 35 U.S.C. § 271(a).

1. Masimo must prove that it is more likely than not that TW made, used, imported, offered to sell, or sold the invention defined in at least one claim of Masimo's patents.

2.      Masimo can show literal direct infringement by proving that TW's Oxxiom product includes each and every element recited in Masimo's patent claim.

3.      Masimo can show direct infringement under the doctrine of equivalents. Under the doctrine of equivalents, TW's Oxxiom product or the process of making or using the Oxxiom can infringe an asserted patent claim if it includes components or method steps that are equivalent to the patent claim elements that are not literally infringed by the product or method. A component or method step is equivalent to a claim element if the component performs substantially the same function, in substantially the same way, to achieve substantially the same result as would be achieved by the element that is not literally infringed by the accused product or method.

Source: AIPLA Model Patent Jury Instructions V.3.1, 3.2, 3.7 (2019).

3.      Counterclaim 8: Declaratory Judgment of Invalidity of U.S. Patent No. 8,886,271 Under 35 U.S.C. § 103(a).

Defendants succeed on counterclaim 8 if they prove by clear and convincing evidence that:

a.      The differences between claims 1, 2, 7-11, and 15-18 of the '271 Patent and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Source: AIPLA Model Patent Jury Instructions V. 4.0 (2019); 35 U.S.C. § 103(a).

4.      Counterclaim 12: Declaratory Judgment of Invalidity of U.S. Patent No. 10,194,848 Under 35 U.S.C. § 103(a).

Defendants succeed on counterclaim 12 if they prove by clear and convincing evidence that:

a.      The differences between the asserted claims of the '848 Patent and the prior art are such that the subject matter as a whole would have been obvious at the time

the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Source: AIPLA Model Patent Jury Instructions V. 4.0 (2019); 35 U.S.C. § 103(a).

5.    Defense 1: Failure to state of claim.

Plaintiffs failed to establish a plausible claim for relief.

6.    Defense 3: Statute of limitations

To succeed on this defense to Plaintiffs' claim for Breach of Fiduciary Duty under a theory of fraud, Defendants must prove:

a.    that Plaintiffs' claimed harm occurred before November 8, 2015 unless plaintiff proves that before November 8, 2015, they did not discover, and did not know of facts that would have caused a reasonable person to suspect, Defendants' wrongful act or omission.

Source: Judicial Council of California Civil Jury Instructions No. 4120 (2020).

To succeed on this defense to Plaintiffs' claim for Breach of Fiduciary Duty if the breach does not amount to fraud, Defendants must prove:

a.    that Plaintiffs' claimed harm occurred before November 8, 2014 unless plaintiff proves that before November 8, 2014, they did not discover, and did not know of facts that would have caused a reasonable person to suspect, Defendants' wrongful act or omission.

Source: Judicial Council of California Civil Jury Instructions No. 4120 (2020).

7.    Defense 4: Doctrine of laches.

To succeed on a defense of laches, Defendants must prove that:

a.    Plaintiffs unreasonably delayed in asserting or diligently pursuing a claim; and

b. Plaintiffs have acquiesced in the act about which the Plaintiffs complains, or the delay has prejudiced Defendants.

<u>Source</u>: *Johnson v. City of Loma Linda*, 24 Cal. 4th 61, 77 (Cal. 2000).

8.      Defense 11: Unenforceability per Cal. Bus. & Prof. Code § 16600.

The agreements signed by Dr. Lamego are not enforceable if Defendants prove:

a.      the agreements improperly restrain Dr. Lamego from engaging in a lawful procession, trade, or business; and

b.      the agreements are not narrowly tailored to protect trade secrets or no trade secrets exist.

<u>Source</u>: *West Air. Charter, Inc. v. Schembari*, No. 2:17-cv-00420-AB (Ksx), 2017 U.S. Dist. LEXIS 217520, at \*12-14 (C.D. Cal. Dec. 14, 2017); Cal. Bus. & Prof. Code § 16600.

9.      Defense    12:    Information    generally    known    and/or    readily ascertainable.

Defendants did not misappropriate Plaintiffs' trade secrets if Defendants prove:

a.      that the alleged trade secrets were generally known to the public or to other persons who can obtain economic value from their disclosure or use; or

b.      that the alleged trade secrets were readily ascertainable by proper means at the time of the alleged use or disclosure.

There is no fixed standard for determining what is "readily ascertainable by proper means." In general, information is readily ascertainable if it can be obtained, discovered, developed, or compiled without significant difficulty, effort, or expense. For example, information is readily ascertainable if it is available in trade journals, reference books, or published materials. On the other hand, the more difficult information is to obtain, and the more time and resources that must be expended in gathering it, the less likely it is that

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

the information is readily ascertainable by proper means. Readily ascertainable does not require that Defendants actually ascertained the material.

Source: Judicial Council of California Civil Jury Instructions No. 4420 (2020); Cal. Civ. Code § 3426.1(b); Cal. Civ. Code § 3426.1 (1984 Legislative Committee Comments)

10.     Defense 13: Independent development.

Defendants did not misappropriate Plaintiffs' trade secrets if Defendants prove:

a.     that the alleged trade secrets were independently developed because misappropriation requires improper means were used to acquire knowledge of the trade secrets, and independent derivation alone shall not be considered improper means.

Source: Cal. Civ. Code § 3426.1.

11.     Defense 15: No infringement of asserted patents.

For each asserted patent, Defendants succeed on Defense 15 if Masimo fails to prove by a preponderance of the evidence that:

a.     TW directly infringes at least one of claims of the '271 Patent or '848 Patent; or

b.     TW actively induces infringement of claim 6 of the '271 Patent; or

c.     TW contributorily infringes at least one of claims 1, 2, 7-11, and 15-18 of the '271 Patent.

Source: 35 U.S.C. §§ 271(a)-(c); American Intellectual Property Law Association Model Patent Jury Instructions V.3.1-3.10 (2019); 35 U.S.C. § 271(a).

i.     Elements required to establish direct infringement under 35 U.S.C. § 271(a).

1.     Masimo must prove that it is more likely than not that TW made, used, imported, offered to sell, or sold the invention defined in at least one claim of Masimo's

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

patents.

2.     Masimo can show literal direct infringement by proving that TW's Oxxiom product includes each and every element recited in Masimo's patent claim.

3.     Masimo can show direct infringement under the doctrine of equivalents. Under the doctrine of equivalents, TW's Oxxiom product or the process of making or using the Oxxiom can infringe an asserted patent claim if it includes components or method steps that are equivalent to the patent claim elements that are not literally infringed by the product or method. A component or method step is equivalent to a claim element if the component performs substantially the same function, in substantially the same way, to achieve substantially the same result as would be achieved by the element that is not literally infringed by the accused product or method.

Source: AIPLA Model Patent Jury Instructions V.3.1, 3.2, 3.7 (2019).

                    ii.     Elements   for   actively   inducing   infringement   under
                            35 U.S.C. § 271(b).

Masimo must prove that it is more likely that not that:

1.     An Oxxiom user infringes at least one patent claim;

2.     TW aided, instructed, or otherwise acted with the intent to cause the user's patent infringement; and

3.     TW knew of the patent, or showed willful blindness to the existence of the patent, at that time; and

4.     TW knew, or showed willful blindness, that the user's actions would infringe at least one of the patent's claims.

Source: 35 U.S.C. § 271(b); AIPLA Model Patent Jury Instructions V.3.8 (2019).

                    iii.    Elements required to establish contributory infringement under
                            35 U.S.C. § 271(c).

Masimo must prove that it is more likely than not that:

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1.      Someone other than TW directly infringed a claim of the patent;

2.      TW sold, offered for sale, or imported within the United States an Oxxiom for use in the infringing method;

3.      The Oxxiom is not a staple article or commodity of commerce capable of substantial non-infringing use;

4.      The Oxxiom constitutes a material part of the claimed invention; and

5.      TW knew that the Oxxiom was especially made or adapted for use in the infringing method.

<u>Source</u>: 35 U.S.C. § 271(c); AIPLA Model Patent Jury Instructions V.3.10 (2019).

12.      Defense 16: Invalidity of asserted patents.

Defendants succeed on Defense 16 if they prove by clear and convincing evidence that:

a.      The differences between the asserted claims of the '271 Patent or '848 Patent and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

<u>Source</u>: AIPLA Model Patent Jury Instructions V. 4.0 (2019); 35 U.S.C. § 103(a).

13.      Defense 23: Speculative damages.

Plaintiffs must prove the amount of damages, and although it does not have to be exact, jurors must not speculate or guess in awarding damages.

<u>Source</u>: Judicial Council of California Civil Jury Instructions No. 350 (2020); Cal. Civ. Code § 3301; *Julian Petroleum Corp. v. Courtney Petroleum Co.*, 22 F.2d 360, 362 (9th Cir. 1927); *Kuffel v. Seaside Oil Co.*, 11 Cal. App. 3d 354, 370, 90 Cal. Rptr. 209 (1970).

**F.**     **L.R. 16-4.1(f): Defendants' brief description of the key evidence in support of its counterclaims and defenses.**

1.     Counterclaim 2: Evidence in Support of Declaratory Judgment of No Infringement of U.S. Patent No. 8,886,271.

Dr. Lamego and Defendants' expert Dr. Stone will testify that Defendants to not infringe any claim of the '271 patent. Defendants will also rely on the testimony of Plaintiffs' expert Mr. Goldberg.

i.     The Oxxiom® System does not take measurements until the Oxxiom® Device is paired with the Oxxiom® iOS App.

The Oxxiom® System has two modes—standby mode and operation mode. Once powered on, the Oxxiom® Device is in standby mode until it is paired with the Oxxiom® iOS App. While in standby mode, the Oxxiom® Device emits a flashing light from a green LED. Once paired with the Oxxiom® iOS App, the Oxxiom® Device enters operation mode. In operation mode, the green LED no longer emits light, and the Oxxiom® Device instead utilizes a red LED and an infrared LED to determine blood oxygen saturation.

True Wearables instructs users how to get the Oxxiom® Device into standby mode and ready for placement on the measurement site by removing Tab 2 prior to placement of the Oxxiom® Device onto the measurement site, while the Oxxiom® Device is in standby mode. Following removal of Tab 2, True Wearables instructs users to place the Oxxiom® Device onto the measurement site (e.g., a finger) while the Device is in standby mode. After the Device is on the measurement site, True Wearables instructs users to pair the Oxxiom® Device with the iOS App. Once paired with the iOS App, the Oxxiom® System is in operation mode and is ready and able to take measurements through use of red and infrared light.

The Oxxiom® Device cannot take measurements until it is paired with its the Oxxiom® iOS App. Accordingly, while in standby mode (i.e., when the green emitter is on/flashing), the Oxxiom® Device cannot take any measurements because it is not yet

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  connected to the Oxxiom® iOS App.  Plaintiffs' expert, Jack Goldberg, admitted in his
2  deposition and expert report that while in standby mode the Oxxiom® Device cannot take
3  measurements.

        ii.     The Oxxiom® System is not "designed to block a range of wavelengths of light sufficient to prevent measurements" as required by the asserted claims.

     Each claim of the '271 Patent requires that the opaque portion of the sensor cover be "configured to block readings" (claim 1 of the '271 Patent and its dependents) or be "configured to block optical readings" (claim 10 of the '271 Patent and its dependents). The Court construed "an opaque portion attachable to the sensor and configured to block readings by the sensor"/"an opaque portion attachable to the sensor and configured to block optical readings by the sensor" to mean "a portion attachable to the sensor designed to block a range of wavelengths of light sufficient to prevent measurements" and held that the phrase "configured to" requires some level of intentionality. The Court further construed "readings" to mean "physiological measurements" (whether actual or false)." (Dkt. 359; Dkt. 356.)

     Because Tab 2 is only intended to be attached to the Oxxiom® Device while in standby mode and because the Oxxiom® System cannot take measurements while in standby mode, Tab 2 is not designed to block a range of wavelengths of light sufficient to prevent measurements. In other words, when Tab 2 attached to the Oxxiom® Device, there are simply no measurements to prevent because none can even be taken.

     This is further confirmed by Dr. Lamego's own testimony regarding the selection of an opaque tape for Tab 2. When asked the technical reasons he preferred opaque tape instead of clear tape, Dr. Lamego identified a number of benefits but did not identify the blocking of light or prevention of measurement as a reason for his selection of an opaque tape.

        iii.    When used as designed and instructed, the alleged cover of the Oxxiom® Device is not in place when the sensor is active.

Each of the asserted claims of the '271 Patent requires a sensor cover—or the opaque portion thereof—that is configured to prevent the detector from receiving light when the sensor is active or during sensor activation. The Parties agreed that the term "active" should receive its plain and ordinary meaning. The Court later construed "active"/"activation" means "able to measure." (Dkt. 359 at 15; Dkt. 356 at 15.) The Oxxiom® System does not practice this claim element because the Oxxiom® System is not active (i.e., able to measure) until the Oxxiom® Device is paired with the iOS App, which when used according to True Wearables' instructions only ever happens after removal of Tab 2. In other words, the Oxxiom® Device is not able to measure (i.e., the plain and ordinary meaning of "active" as used in the '271 Patent) until it pairs with the iOS App.

"Active" as utilized in the Patents in Suit must mean the claimed device is ready and able measure because the stated purpose of Patents in Suit is to reduce or eliminate false readings. There can be no such false readings if a sensor is not even able to measure in the first place. Therefore, contrary to Plaintiffs' contentions, "active" cannot be interpreted as encompassing any state in which a device is not even capable of making readings.

iv.     The alleged cover of the Oxxiom® Device does not prevent light from reaching the detector.

The alleged cover of the Oxxiom® Devices, Tab 2, causes some light from the green emitter to be reflected onto the detector. In operation mode, the Oxxiom® System operates by measuring the amount of light that is *reflected* by a user's skin, as shown in the User Guide:



In standby mode, however, Tab 2 is in place causing the emitted light to reflect off of the cover and back towards the detector—just like the emitted light reflects off a user's skin back towards the detector:



Accordingly, Tab 2 of Oxxiom® Device is not "configured to block readings/optical readings by the sensor" as construed by the Court because the cover actually *causes* (and does not *prevent*) light from the emitter to be reflected to the detector.

2.      Counterclaim 6: Evidence in Support of Declaratory Judgment of No Infringement of U.S. Patent No. 10,194,848.

Dr. Lamego and Defendants' expert Dr. Stone will testify that Defendants to not infringe any claim of the '848 patent. Defendants will also rely on the testimony of Plaintiffs' expert Mr. Goldberg.

i.      The Oxxiom® System does not take measurements until the Oxxiom® Device is paired with the Oxxiom® iOS App.

The Oxxiom® System has two modes—standby mode and operation mode. Once powered on, the Oxxiom® Device is in standby mode until it is paired with the Oxxiom®

iOS App. While in standby mode, the Oxxiom® Device emits a flashing light from a green LED. Once paired with the Oxxiom® iOS App, the Oxxiom® Device enters operation mode. In operation mode, the green LED no longer emits light, and the Oxxiom® Device instead utilizes a red LED and an infrared LED to determine blood oxygen saturation.

True Wearables instructs users how to get the Oxxiom® Device into standby mode and ready for placement on the measurement site by removing Tab 2 prior to placement of the Oxxiom® Device onto the measurement site, while the Oxxiom® Device is in standby mode. Following removal of Tab 2, True Wearables instructs users to place the Oxxiom® Device onto the measurement site (e.g., a finger) while the Device is in standby mode. After the Device is on the measurement site, True Wearables instructs users to pair the Oxxiom® Device with the iOS App. Once paired with the iOS App, the Oxxiom® System is in operation mode and is ready and able to take measurements through use of red and infrared light.

The Oxxiom® Device cannot take measurements until it is paired with its the Oxxiom® iOS App. Accordingly, while in standby mode (i.e., when the green emitter is on/flashing), the Oxxiom® Device cannot take any measurements because it is not yet connected to the Oxxiom® iOS App.  Plaintiffs' expert, Jack Goldberg, admitted in his deposition and expert report that while in standby mode the Oxxiom® Device cannot take measurements.

ii.   When used as designed and instructed, the alleged cover of the Oxxiom® Device is not in place when the sensor is active.

Each of the asserted claims of the '848 Patent requires a sensor cover that covers the sensing components while the sensor is active. The Parties agreed that the term "active" should receive its plain and ordinary meaning. The Court later construed "active"/"activation" means "able to measure." (Dkt. 359 at 15; Dkt. 356 at 15.) The Oxxiom® System does not practice this claim element because the Oxxiom® System is not active (i.e., able to measure) until the Oxxiom® Device is paired with the iOS App, which when used according to True Wearables' instructions only ever happens after

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

removal of Tab 2. In other words, the Oxxiom® Device is not able to measure (i.e., the plain and ordinary meaning of "active" as used in the '848 Patent) until it pairs with the iOS App.

"Active" as utilized in the Patents in Suit must mean the claimed device is ready and able measure because the stated purpose of Patents in Suit is to reduce or eliminate false readings. There can be no such false readings if a sensor is not even able to measure in the first place. Therefore, contrary to Plaintiffs' contentions, "active" cannot be interpreted as encompassing any state in which a device is not even capable of making readings.

iii.   The alleged cover of the Oxxiom® Device does not prevent light from reaching the detector.

Each of the asserted independent claims of the '848 Patent includes a limitation that a sensor cover prevents light for reaching a detector. Tab 2, the alleged "sensor cover" of the Oxxiom® Devices, is not designed or configured or intended to block light from reaching the detector present in these devices. Rather, Tab 2 is intended to protect adhesive that is a permanent part of the Oxxiom® Devices. Without Tab 2, the adhesive would collect environmental debris prior to use and be unable to adhere to the skin of a user.

The alleged cover of the Oxxiom® Devices, Tab 2, causes some light from the green emitter to be reflected onto the detector. In operation mode, the Oxxiom® System operates by measuring the amount of light that is *reflected* by a user's skin, as shown in the User Guide. In standby mode, however, Tab 2 is in place causing the emitted light to reflect off of the alleged cover and back towards the detector—just like the emitted light reflects off a user's skin back towards the detector.

Accordingly, Tab 2 of Oxxiom® Device is not a sensor cover that "blocks at least a portion of light from the one or more emitters from being received by the detector.

3.     Counterclaim 8: Evidence in Support of Declaratory Judgment of Invalidity of U.S. Patent No. 8,886,271 Under 35 U.S.C. § 103(a).

Dr. Lamego and Defendants' expert Dr. Stone will testify that each asserted claim of the '271 patent is invalid under 35 U.S.C. § 103(a).

All of the elements of claims 1-2, 6-11, and 15-18 of the '271 patent are disclosed by U.S. Patent No. 7,486,977 to Sweitzer ("Sweitzer"), U.S. Patent No. 6,140,549 to Pompei ("Pompei), U.S. Patent No. 4,136,818 to Larrabee ("Larrabee), or U.S. Patent No. 6,661,140 to Agnes ("Agnes").

Regarding independent claim 1 of the '271 patent, all of the elements of the claim are disclosed by Sweitzer in view of Pompei. The only difference between claim 1 and the prior art before the examiner during prosecution was that claim 1 recited "wherein the sensor cover is configured to prevent the detector from receiving light when the sensor is active." However, it was known in the art to provide a cover for a sensor that prevented the detector from receiving light when the sensor is active. This is shown in Larrabee which disclose an opaque sensor cover for a blood washing apparatus which shields the sensor from external light while the device is active to ensure accurate readings. Alternatively, it is also shown by Agnes which discloses an opaque sensor cap that protects the sensor from "accidental triggering by external light sources," meaning that the opaque cover shields the sensor from ambient light when the sensor is active.

As stated in the '271 Patent, it was known that that sensors were "kept attached to monitors to reduce the setup time needed to begin monitoring a patient" and that it was a known problem that "[w]hile attached, the sensor can generate false readings by detecting ambient light even though the sensor is not in use." Per Sweitzer, it was known to cover the emitter and detector of a pulse oximeter with an opaque cover to prevent light from any source from activating the device, which would otherwise cause the sensor to make readings. And it was known to protect sensors from ambient light with opaque covers while the devices were active to ensure accurate readings or prevent accidental triggering per Larrabee and/or Agnes.

Claim 2 (dependent of claim 1) of the '271 patent adds the element "wherein the non-adhesive portion that protrudes from the sensor comprises an elongate portion that extends past the sensor." As discussed by the examiner during prosecution, this additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 6 (dependent of claim 1) of the '271 patent adds the element "activating the light source of sensor to emit light from the one or more emitters of the sensor; and blocking with the sensor cover, the light from one or more the emitters from being received by the detector of the sensor." This additional element is shown through combining Sweitzer with Larrabee or Agnes.

Claim 7 (dependent of claim 1) of the '271 patent adds the element of "wherein the opaque portion is attachable over at least one of the detector or the or more emitters." This additional element is shown by Sweitzer.

Claim 8 (dependent of claim 1) of the '271 patent adds the element "wherein the opaque portion is configured to block ambient light from a surrounding area." This additional element is shown by Sweitzer.

Claim 9 (dependent of claim 1) of the '271 patent of the '271 patent adds the element "wherein the sensor is a pulse oximeter sensor." This additional element is shown by Sweitzer.

Regarding independent claim 10 of the '271 patent, this claim is similar in scope to independent claim 1. All of its elements were shown by Sweitzer and Pompei, except the element added by amendment during prosecution to distinguish Sweitzer and Pompei: "wherein the opaque portion is configured to prevent the detector from receiving light during sensor activation." However, as with claim 1, it was known in the art to provide an opaque cover configured to prevent the detector from receiving light during sensor activation. This is shown by Larrabee or Agnes. Specifically, it was known in the optical sensor art to provide an opaque cover configured to prevent the detector from receiving

light during sensor activation to provide accurate readings per Larrabee or prevent accidental triggering of the sensor per Agnes.

Claim 11 (dependent of claim 10) of the '271 patent adds the element "wherein the non-adhesive portion that protrudes from the sensor comprises an elongate portion that extends past the sensor." As discussed by the examiner during prosecution, this additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 15 (dependent of claim 10) of the '271 patent adds the element "wherein the sensor cover is configured to block the light from the one or more emitters from being received by the detector." This additional element is shown through combining Sweitzer with Larrabee or Agnes.

Claim 16 (dependent of claim 10) of the '271 patent adds the element "wherein the opaque portion is attachable over at least one of the detector or the one or more emitters." This additional element is shown by Sweitzer.

Claim 17 (dependent of claim 10) of the '271 patent of the '271 patent adds the element "wherein the opaque portion is configured to block ambient light from a surrounding area." This additional element is shown by Sweitzer.

Claim 18 (dependent of claim 10) of the '271 patent of the '271 patent adds the element "wherein the sensor is a pulse oximeter sensor." This additional element is shown by Sweitzer.

4.    Counterclaim 12: Evidence in Support of Declaratory Judgment of Invalidity of U.S. Patent No. 10,194,848.

Dr. Lamego and Defendants' expert Dr. Stone will testify that each asserted claim of the '848 patent is invalid under 35 U.S.C. § 103(a).

All of the elements of claims 1-29 of the '848 patent are disclosed by U.S. Patent No. 7,486,977 to Sweitzer ("Sweitzer"), U.S. Patent No. 6,140,549 to Pompei ("Pompei"),

U.S. Patent No. 7,190,986 to Hannula ("Hannula"), and U.S. Patent No. 4,136,818 to Larrabee ("Larrabee") or U.S. Patent No. 6,661,140 to Agnes ("Agnes").

Regarding independent claim 1 of the '848 patent, all of the elements of the claim are disclosed by Sweitzer in view of Pompei. The only difference between claim 1 and the prior art before the examiner during prosecution was that claim 1 recited "the sensor cover, when adhered to the pulse oximeter sensor, covers at least one of the sensing components while the pulse oximeter sensor is active and blocks at least a portion of light from the one or more emitters from being received by the detector." However, it was known in the art to provide a cover for a sensor that prevented the detector from receiving light when the sensor is active. This is shown in Larrabee which disclose an opaque sensor cover for a blood washing apparatus which shields the sensor from external light while the device is active to ensure accurate readings. Alternatively, it is also shown by Agnes which discloses an opaque sensor cap that protects the sensor from "accidental triggering by external light sources," meaning that the opaque cover shields the sensor from ambient light when the sensor is active.

As stated in the '848 Patent, it was known that that sensors were "kept attached to monitors to reduce the setup time needed to begin monitoring a patient" and that it was a known problem that "[w]hile attached, the sensor can generate false readings by detecting ambient light even though the sensor is not in use." This is an obvious problem to solve. Per Sweitzer, it was known to cover the emitter and detector of a pulse oximeter with an opaque cover to prevent light from any source from activating the device, which would otherwise cause the sensor to make readings. And it was known to protect sensors from ambient light with opaque covers while the devices were active to ensure accurate readings or prevent accidental triggering per Larrabee and/or Agnes.

Claim 2 (dependent of claim 1) of the '848 patent adds the element "wherein the portion of the sensor cover that protrudes from the pulse oximeter sensor extends beyond an edge of the pulse oximeter sensor to enable removal of the sensor cover from the pulse

oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 3 (dependent of claim 2) of the '848 patent adds the element "wherein the portion of the sensor cover that protrudes from the pulse oximeter sensor comprises a rectangular planar shape." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 4 (dependent of claim 3) of the '848 patent adds the element "wherein the portion of the sensor cover that protrudes from the pulse oximeter sensor is not adhered to the pulse oximeter sensor when the sensor cover is adhered to the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 5 (dependent of claim 4) of the '848 patent adds the element "wherein the sensor cover, when adhered to the pulse oximeter sensor, further blocks at least a portion of ambient light from a surrounding area from being received by the detector." This additional element is shown by Sweitzer.

Claim 6 (dependent of claim 5) of the '848 patent adds the element "wherein the sensor cover reduces false readings by the pulse oximeter sensor until the pulse oximeter sensor is in use." This additional element is shown by Sweitzer.

Claim 7 (dependent of claim 6) of the '848 patent adds the element "wherein the sensor cover is opaque." This additional element is shown by Sweitzer.

Claim 8 (dependent of claim 7) of the '848 patent adds the element "wherein: the pulse oximeter sensor further comprises a window formed on a surface of the pulse oximeter sensor that is aligned with the light-emitting component and the light-detecting-component to allow light to reach the light-emitting component and the light-detecting-component, and the sensor cover, when adhered to the pulse oximeter sensor, covers the window while the pulse oximeter sensor is active and blocks at least a portion of light from the one or more emitters from being received by the detector." This additional element is shown by Hannula.

Regarding independent claim 9 of the '848 patent, all of the elements of the claim are disclosed by Sweitzer in view of Pompei, except "the cover portion, when adhered to the pulse oximeter sensor, covers one or more sensing components of the pulse oximeter sensor while the pulse oximeter sensor is active and blocks at least a portion of light from one or more emitters of the pulse oximeter sensor from being received by a detector of the pulse oximeter sensor." However, as with claim 1, it was known in the art to provide an opaque cover to prevent the detector from receiving light while the sensor is active. This is shown by Larrabee or Agnes. Specifically, it was known in the optical sensor art to provide an opaque cover configured to prevent the detector from receiving light during sensor activation to provide accurate readings per Larrabee or prevent accidental triggering of the sensor per Agnes.

Claim 10 (dependent of claim 9) adds the element "wherein the sensing components of the pulse oximeter sensor include at least: the one or more emitters; and the detector configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site." This additional element is shown by Sweitzer.

Claim 11 (dependent of claim 10) adds the element "wherein the protruding portion extends beyond an edge of the pulse oximeter sensor to enable removal of the sensor cover from the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 12 (dependent of claim 11) adds the element "wherein the protruding portion comprises a rectangular planar shape." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 13 (dependent of claim 12) adds the element "wherein the protruding portion is not adhered to the pulse oximeter sensor when the cover portion is adhered to the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 14 (dependent of claim 13) adds the element "wherein the cover portion, when adhered to the pulse oximeter sensor, further blocks at least a portion of ambient light from a surrounding area from being received by the detector." This additional element is shown by Sweitzer.

Claim 15 (dependent of claim 14) of the '848 patent adds the element "wherein the cover portion and the protruding portion together comprise a single integral component." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 16 (dependent of claim 15) of the '848 patent adds the element "wherein the sensor cover reduces false readings by the pulse oximeter sensor until the pulse oximeter sensor is in use." This additional element is shown by Sweitzer.

Claim 17 (dependent of claim 16) of the '848 patent adds the element "wherein the cover portion is partially or fully opaque." This additional element is shown by Sweitzer.

Regarding independent claim 18 of the '848 patent, all of the elements of the claim are disclosed by Sweitzer in view of Pompei. The only difference between claim 18 and the prior art before the examiner during prosecution was that claim 18 recited "the cover portion, when adhered to the pulse oximeter sensor, covers one or more sensing components of the pulse oximeter sensor while the pulse oximeter sensor is active and blocks at least a portion of light from one or more emitters of the pulse oximeter sensor from being received by a detector of the pulse oximeter sensor . . . the sensor cover covering one or more sensing components of the pulse oximeter sensor while the pulse oximeter sensor is active." However, as with respect to claims 1 and 9, it was known in the art to provide an opaque cover to prevent the detector from receiving light while the sensor is active. This is shown by Larrabee or Agnes. Specifically, it was known in the optical sensor art to provide an opaque cover configured to prevent the detector from receiving light during sensor activation to provide accurate readings per Larrabee or prevent accidental triggering of the sensor per Agnes.

Claim 19 (dependent of claim 18) of the '848 patent adds the element "wherein the portion of the cover portion that protrudes from the pulse oximeter sensor extends past the sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 20 (dependent of claim 19) of the '848 patent of the '848 patent adds the element "wherein the protruding portion extends beyond an edge of the pulse oximeter sensor to enable removal of the sensor cover from the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 21 (dependent of claim 20) of the '848 patent adds the element "wherein the protruding portion comprises a rectangular planar shape." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 22 (dependent of claim 21) of the '848 patent adds the element "wherein the protruding portion is not adhered to the pulse oximeter sensor when the cover portion is adhered to the pulse oximeter sensor." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 23 (dependent of claim 22) of the '848 patent adds the element "wherein the cover portion, when adhered to the pulse oximeter sensor, further blocks at least a portion of ambient light from a surrounding area from being received by the detector." This additional element is shown by Sweitzer.

Claim 24 (dependent of claim 23) adds the element "wherein cover portion and the protruding portion together comprise a single integral component." This additional element is shown by Pompei and is an obvious design choice available at the time of the inventions.

Claim 25 (dependent of claim 24) of the '848 patent adds the element "wherein the pulse oximeter sensor comprises sensing components including at least: the one or more emitters; and the detector configured to receive at least a portion of the light emitted by

the one or more emitters after the light has passed through a tissue site." This additional element is shown by Sweitzer.

Claim 26 (dependent of claim 25) adds the element "activating the one or more emitters of the pulse oximeter sensor to emit light from the one or more emitters; and blocking, with the sensor cover, at least a portion of the light from the one or more emitters from being received by the detector." This additional element is disclosed by Sweitzer combined with either Larrabee or Agnes.

Claim 27 (dependent of claim 26) of the '848 patent adds the element "wherein the sensor cover reduces false readings by the pulse oximeter sensor until the pulse oximeter sensor is in use." This additional element is shown by Sweitzer.

Claim 28 (dependent of claim 27) of the '848 patent adds the element "wherein the cover portion is partially or fully opaque." This additional element is shown by Sweitzer.

Claim 29 (dependent of claim 28) of the '848 patent adds the element "pulling the protruding portion to remove the sensor cover from the pulse oximeter sensor to expose the one or more emitters and the detector and an adhesive surface of the pulse oximeter cover; and applying the pulse oximeter sensor to the tissue site." This additional element is disclosed by Sweitzer and Pompei.

5.    Defense 1:  Evidence in Support of Failure to State a Claim.

Plaintiffs cannot prove a claim for breach of contract with Plaintiffs by Dr. Lamego because they cannot prove every element of the claim. Specifically, Plaintiffs cannot prove that there is a valid contract because the contract unlawfully restrains Dr. Lamego from engaging in his lawful profession, trade, or business.

Plaintiffs cannot prove a claim for misappropriation of trade secrets because i) they cannot prove that any of the alleged trade secrets are in fact trade secrets, and ii) they cannot prove that Defendants have used or disclosed any of the alleged trade secrets.

Plaintiffs cannot prove a claim for breach of fiduciary duty because they cannot prove every element of the claim. Specifically, Plaintiffs cannot prove that Dr. Lamego

knowingly acted against Cercacor's interests in connection with the feasibility of certain non-invasive parameters.

### 6.     Defense 3: Evidence in Support of Statute of Limitations.

Plaintiffs' breach of fiduciary duty claim is barred by the applicable statute of limitations because Plaintiffs' claim accrued by April/May 2014, and certainly no later than August 2014.

Plaintiffs suspected the facts supporting their claim as early as January of 2014, around when Dr. Lamego informed Plaintiffs of his decision to leave Cercacor. After Dr. Lamego left, Plaintiffs held a meeting where, under Plaintiffs theory of the facts and case, Plaintiffs knew or reasonably believed Dr. Lamego breached his alleged fiduciary to Cercacor.

Soon after Dr. Lamego left Cercacor, Plaintiffs undertook to "retest" the technologies. These efforts were led by Sean Merritt, who had become the VP of Engineering following Dr. Lamego's departure. When Dr. Lamego left, Cercacor continued development of the technology and retesting started in early 2014. The retesting led the Cercacor team to believe the original feasibility was not supported.

Additional Documentary evidence and testimony supports this timeline. Cercacor determined that they had been mistaken about the status of certain technologies. Although Cercacor was still hopeful they would be able to improve the technology to achieve the level of feasibility that Cercacor purportedly believed it had achieved in October 2013, testimony indicates that the then-existing technology didn't work. This is supported by contemporaneous documents. Thus, by April/May 2014, Plaintiffs had knowledge of the facts that form the basis of their claim that Dr. Lamego breached a fiduciary duty to Plaintiffs.

### 7.     Defense 4: Evidence in Support of Doctrine of Laches.

Defendants raise the doctrine of laches as an equitable defense to Plaintiffs' claim

for misappropriation of trade secrets. Plaintiffs have known about Dr. Lamego's efforts as founder and CEO of True Wearables since at least 2015. Plaintiffs did not take any action with respect to Dr. Lamego's work at True Wearables and the development of the Oxxiom® Device until at least July 18, 2016, when Plaintiffs suddenly began threatening Dr. Lamego and True Wearables with a lawsuit for alleged breach of contract and alleged trade secret misappropriation. By waiting until November of 2018 to file a Complaint against Dr. Lamego, Plaintiffs unreasonably delayed in asserting a claim.

8.     Defense 11: Evidence in Support of Unenforceability per Cal. Bus. & Prof. Code § 16600.

Plaintiffs' claims for breach of contract with Plaintiffs by Lamego fails because the Agreements are void under Cal. Bus. & Prof. Code § 16600. The Agreements contain a provision that restricts Dr. Lamego from engaging in a lawful profession or business. Specifically, the Agreements prevents Dr. Lamego from competing with any business, product, or service of Masimo Labs for a period of two (2) years immediately following his termination of employment with Masimo Labs. Although a contract restricting the right to work may be enforceable notwithstanding the California Business and Professions Code § 16600 if it is necessary to protect an employer's trade secrets, this exception to the Code does not apply when a restriction on the right to work is put in place to protect confidential information that does not rise to the level of a trade secret. See *West Air. Charter*, 2017 U.S. Dist. LEXIS 217520, at *12-14. Here, because Plaintiffs' alleged trade secrets are not in fact trade secrets, the exception to the Code for trade secrets does not apply. Therefore, the Cercacor Agreement is void. Without an enforceable contract, Plaintiffs' claim for breach of contract with Cercacor by Dr. Lamego fails

9.     Defense 12: Evidence in Support of Information Generally Known and/or Readily Ascertainable.

Defendants' experts Dr. Goldstein, Dr. Daft, and Mr. Baer will testify that each of the alleged trade secrets is generally known or readily ascertainable and testimony from Mr. Paul, Mr. Merritt, Mr. Chen, Mr. Diab, and Mr. Kaini will also support this defense.

Trade Secret 1 cannot be a trade secret under California Law because it is disclosed in multiple Masimo's patents as supported by the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 2 cannot be a trade secret under California Law because it was disclosed by Plaintiffs or others in a variety of patents and patent applications as supported by the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 5 cannot be a trade secret under California Law because it was disclosed by Plaintiffs, including on its own website, as supported by the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 6 cannot be a trade secret under California Law because it is disclosed in Plaintiffs' patents as supported by the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 7 cannot be a trade secret under California Law because it is disclosed in Plaintiffs' patents as supported by the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 8 cannot be a trade secret under California Law because it is disclosed in Plaintiffs' patents as supported by the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 9 cannot be a trade secret under California Law because it is disclosed in Plaintiffs' patents, on Masimo's website, and in the patents of other medical device companies as supported by the testimony of Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits.

Trade Secret 11 cannot be a trade secret under California Law because it is disclosed in a widely used, generally known book and numerous other publications,

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

including Masimo's own patents as supported by the testimony of Defendants' expert Dr. Goldstein and accompanying exhibits.

Trade Secret 12 and the TSS cannot be a trade secret under California Law because it is widely known, widely used, and disclosed in several publications as supported by the testimony of Defendants' expert Dr. Goldstein and accompanying exhibits.

Trade Secret 14 cannot be a trade secret under California Law because it was disclosed by Masimo on numerous occasions, including in its own press releases, annual reports, on its website, as supported by Defendants' experts Dr. Daft and Mr. Baer, and accompanying exhibits, and Mr. Kiani and Mr. Diab.

10.     Defense 13: Evidence in Support of Independent Development.

Dr. Lamego, Mrs. Lamego, Isadora Lamego, and Larissa Lamego will testify that Dr. Lamego independently developed the Oxxiom® device. Dr. Lamego will testify that he never took, used, or disclosed any of Plaintiffs' alleged trade secrets. Dr. Widrow will testify to Dr. Lamego's technical and leadership skills that he possessed before employment with Plaintiffs. At least Mr. Paul and Mr. Merritt will testify as to Dr. Lamego's character and his technical skills and abilities.

Dr. Lamego independently developed the Oxxiom® Device, which was the idea of Mrs. Lamego. Dr. Lamego is a Stanford Ph.D. electrical engineer. He was Chief Technology Officer of Cercacor, which used to be a division of Masimo Corp. He left Cercacor in 2014. After leaving, he first worked for Apple Inc., and later founded True Wearables. After founding True Wearables, Dr. Lamego set out to create an inexpensive, disposable noninvasive monitoring device. He understood that device cost could be lowered by efficiently distributing processing tasks between the device itself and an auxiliary computing device, such as an iPhone, that has significant processing power. Dr. Lamego designed a distributed processing scheme in which time-critical, high-frequency, low-latency, and low-complexity tasks are executed by the device, with more complex tasks executed by the auxiliary "host" device.

Dr. Lamego worked night and day for several years developing algorithms. Drawing on extensive experience with complex mathematics, including experience teaching matrix algebra and optimization as a professor and researcher at multiple academic institutions, Dr. Lamego created an optimization problem and corresponding efficient solution that could serve as the core algorithm of his new monitoring device. Dr. Lamego taught himself an entirely new programming language, Swift, in order to enable him to create an iOS Application for use in Apple devices. After years of development, Dr. Lamego shipped the first commercial version of his "Oxxiom" device on August 28, 2018.

Defendants' products do not use or disclose any of the alleged trade secrets. Regarding Trade Secret 1, Defendants have not used or disclosed Trade Secret 1. Specifically, the Oxxiom® uses a different approach to determining pulse rate, SpO2, and perfusion as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer.

Regarding Trade Secret 2, Defendants have not used or disclosed Trade Secret 2. The Oxxiom® device does not practice Trade Secret 2 because it does not practice elements (a)-(c) as identified by Plaintiffs, as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer.

Regarding Trade Secret 5, Defendants have not used or disclosed Trade Secret 5. Defendants' source code for the Oxxiom® SA and Oxxiom® Rx uses libraries provided by component manufacturers, and there is no reasonable basis to suggest Defendants utilize an implementation that is specific and unique to Plaintiffs as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer. Moreover, Plaintiffs' and Defendants' products are simply not comparable when it comes to wearability as Defendants' Oxxiom® is significantly smaller and utilizes a tape-like wrap, unlike Plaintiffs' wireless products.

Regarding Trade Secret 6, Defendants have not used or disclosed Trade Secret 6. The Oxxiom® does not use Trade Secret 6 because, unlike Cercacor and Masimo, the

Oxxiom® does not apply the allegedly trade secret check to specific data. This is because the Oxxiom® is a different system that functions in a manner fundamentally different from the Cercacor and Masimo algorithms as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer.

Regarding Trade Secret 7, Defendants have not used or disclosed Trade Secret 7. The Oxxiom® does not calculate a correlation as recited by Plaintiffs' alleged Trade Secret 7 as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer. Indeed, Plaintiffs have not identified any part of Oxxiom's code where there is a calculation that uses the alleged trade secret.

Regarding Trade Secret 8, Defendants have not used or disclosed Trade Secret 8. Defendants have not used or disclosed Trade Secret 8 because the signal processing techniques employed by the Oxxiom® are fundamentally different from those of Masimo and Cercacor as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer.

Regarding Trade Secret 9, Defendants have not used or disclosed Trade Secret 9. Neither the Oxxiom® App. nor Defendants patent applications use or disclose Trade Secret 9 as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer. For similar reasons regarding Trade Secrets 6 and 8, Defendants do not use or disclose Trade Secret 9.

Regarding Trade Secret 11, Defendants have not used or disclosed Trade Secret 11. Specifically, Defendants' patent applications do not disclose Trade Secret 11, and the Oxxiom® source code does not use or disclose Trade Secret 11 as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' expert Dr. Goldstein. For Example, the optimization problem used by True Wearables is different than that used in the Masimo documents.

Regarding Trade Secret 12, Defendants have not used or disclosed Trade Secret 12. Dr. Lamego's confidential notebooks and patent applications do not disclose the TSS

as disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' expert Dr. Goldstein. These notebooks describe formulations that are not solvable by the TSS as described in Masimo documents.

Regarding Trade Secret 14, Defendants have not used or disclosed Trade Secret 14 for at least the reasons to be disclosed by the Oxxiom® source code, testimony of Dr. Lamego, and testimony of Defendants' experts Dr. Daft and Mr. Baer. In addition, Plaintiffs point to no documents, such as business or strategic plans, that show Masimo and Cercacor planned to use this alleged Trade Secret as a product differentiator.

        11.    Defense 15: Evidence in Support of No infringement of the Asserted Patents in Suit.

Defendants incorporate the evidence discussed *supra* for counterclaims 2 and 6.

        12.    Defense 16: Evidence in Support of Invalidity of the Asserted Patents in Suit.

Defendants incorporate the evidence discussed *supra* for counterclaims 8 and 12.

        13.    Defense 23: Evidence in Support of Speculative Damages.

Defendants' damages expert Mr. Pedigo will testify as to the speculative nature of Plaintiffs' damages theories. Jerry Hammarth will also provide testimony that supports the speculative nature of Plaintiffs' damages theories.

Plaintiffs' alleged damages for its breach of fiduciary duty claim are speculative. Plaintiffs' damages expert, Gregory Pinsonneault, opined on the damages to Cercacor for the breach of fiduciary duty claim under two scenarios: Regarding, the first scenario, Pinsonneault admitted he did not have enough information to show future lost profits, so instead, he chose to calculate the amount Cercacor spent on its project developing the alleged technology as a proxy for lost profits. This calculation of lost profits is entirely speculative. Using research and development costs to prove lost profit damages is not a

generally accepted method for the calculation of lost profits, particularly where the overarching project is not limited to work which forms the basis of the breach of fiduciary duty claim.

Regarding the second scenario, Pinsonneault significantly overstated the research and developing costs associated with the project. For example, Pinsonneault failed to account for the value of expenditures that was retained by Cercacor, and the project was an overarching project encompassing multiple facets beyond the accusations in this case. As a result, Pinsonneault's calculations of additional R&D costs associated with the project after Dr. Lamego left were done using flawed methodology.

Plaintiffs' alleged damages for its trade secret misappropriation claim are also speculative. Pinsonneault opined that Plaintiffs' damages for Defendants' alleged misappropriation of Trade Secrets is the amount Defendants have been unjustly enriched. But this amount is based solely on True Wearables' self-valuation of the company, and is therefore entirely speculative. Pinsonneault did not perform any independent valuation of True Wearables. Mr. Pinsonneault's chosen metric for measuring unjust enrichment is inappropriate and his opinions are speculative, not supported by reliable information or analyses, are fundamentally flawed, and do not measure True Wearables' unjust enrichment, if any, with any reasonable degree of certainty. Moreover, Pinsonneault relied on a forecast in an April 2016 True Wearables presentation, but this forecast was merely speculative and simply estimated what Dr. Lamego hoped would occur in a perfect world. Plaintiffs alleged damages, which are based on a single non-arms-length family member transaction and a hopeful forecast that was never sent to any potential investors, do not have any reasonable degree of certainty.

Plaintiffs' alleged damages for its breach of contract claims are speculative. Plaintiffs claim that its remedies for the breach of contract claims include lost profits and unjust enrichment (i.e., the damages with respect to the alleged misappropriation of trade secrets), and further include the damages available for breach of fiduciary duty to the extent the acts leading to the breach of fiduciary are determined to lead to breach of

contract. Thus, Plaintiffs' alleged damages for its breach of contract claims are speculative for the same reasons as discussed above with respect to damages for breach of fiduciary duty and trade secret misappropriation.

**G.  L.R. 16-4.1(g): Similar statement for all third parties.**

Defendants are not currently aware of any similar statement from a third party.

**H.  L.R. 16-4.1(h): Identification of any anticipated evidentiary issues.**

Defendants are not currently aware of any anticipated evidentiary issues but both parties have submitted objections to proposed trial exhibits and designated deposition testimony.

**I.  L.R. 16-4.1(i): Identification of any issues of law which are germane to the case.**

Defendants filed an appeal of the grant of preliminary injunction in this case. The appeal, No. 2021-2146, is scheduled for hearing on January 10, 2022 at 10:00 a.m. before the United States Court of Appeals for the Federal Circuit. This hearing is a day before the current trial date in this case. The legal issues on appeal include interpretation and application of the legal standard for determining whether a trade secret is generally known and the defense of independent derivation, among other issues. The outcome of the Federal Circuit's consideration of these legal issues, and others, directly affects the trade secret claims and defenses in this case.

**II.  L.R. 16-4.3: Bifurcation of Issues.**

Defendants are not currently aware of any need for bifurcation of issues.

**III.  L.R. 16-4.4: Jury Trial**

Defendants understand Plaintiffs have timely requested a jury trial on all claims.

## IV.    L.R. 16-4.5: Attorneys' Fees

Defendants may recover reasonable attorneys' fees under Cal. Civ. Code § 3426.4 if Plaintiffs have pursued claims of misappropriation in bad faith. At the Scheduling Conference the Court explained that "Presumably [Plaintiffs] had a good idea of what the trade secrets were when the suit was filed."

At the outset of this case, Plaintiffs provided a list of 15 categories of "knowhow," "techniques," and "knowledge" that Plaintiffs identified as the alleged trade secrets that Defendants had allegedly misappropriated (hereinafter the "First Identification"). The First Identification specified which of the two Plaintiffs owned each of the alleged trade secrets, and it was designated "Confidential" under the Protective Order. The First Identification was followed by a list of over 500 documents, containing a total of nearly 1,500 pages that Plaintiffs alleged to be "representative of" their trade secrets (the "First Document List"). Discovery commenced, and, eager to establish that Plaintiffs' claims lacked merit, Defendants produced the source code of their Oxxiom Device, which Dr. Lamego had independently developed years after leaving his position with Plaintiffs.

Roughly one year after production of these highly confidential materials, Plaintiffs had not provided any greater detail about the alleged trade secrets in their First Identification, despite repeated requests by Defendants that Plaintiffs supplement their interrogatory responses to provide, among other things, a more particular identification of their alleged trade secrets. When Plaintiffs repeatedly refused to commit to providing a supplemental response, Defendants prepared a Motion to Compel and provided Plaintiffs with Defendants' portion of a Joint Stipulation. Faced with this pending motion, Plaintiffs provided, for the first time, a date certain by which they would supplement their responses. Plaintiffs' counsel indicated that the supplementation "should moot the pending Joint Stipulation." On July 1, 2020, a little over two weeks before the then-scheduled discovery cut-off, Plaintiffs provided their Supplemental Responses to

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Interrogatory Nos. 1 and 11 (the "Second Identification" and "Second Document List," respectively).

Not only did Plaintiffs' Second Identification fail to moot the pending Joint Stipulation, but the supplementation created an entirely new set of problems. Most notably, Plaintiffs seized on Defendants' requests for greater particularity as an opportunity to completely shift course in their trade secret case. Plaintiffs removed 10 of their 15 original trade secret categories and replaced them with (i) 17 entirely new and unrelated categories and (ii) multiple paragraphs of catch-all language asserting trade secret rights in nebulous concepts. Additionally, Plaintiffs removed any indication of which entity owns the alleged trade secret(s) and increased the confidentiality designation to "AEO," thereby preventing Defendant Dr. Lamego from seeing the new alleged trade secret categories.

Defendants promptly brought each of these issues to Plaintiffs' attention, and the cycle began anew. Plaintiffs denied that the supplementation was inadequate and that the inclusion of new trade secrets was improper. Detailed letters were exchanged about the adequacy and propriety of the supplementation. When faced with a motion to compel, Plaintiffs agreed to provide a supplementation, then delayed the supplementation by multiple weeks before providing—over three months after the issues were first raised—a supplementation (the "Third Identification" and the "Third Document List"). This most recent supplementation retained the newly added trade secrets.

Returning to Judge Selna's observation at the scheduling conference: "Presumably [Plaintiffs] had a good idea of what the trade secrets were when the suit was filed." To the extent Plaintiffs actually had a good idea of their trade secrets when the suit was filed, they have since, under the guise of "supplementation," completely changed course from the one they originally charted at the outset of this case after accessing Defendants' source code and crafting "trade secrets" that allow Plaintiffs to continue harassment of Defendants.

## V.     L.R. 16-4.6: Abandonment of Issues

Defendants pleaded the following claims and defenses, but do not intend to pursue them at trial:

1.  Declaratory Judgment of No Infringement of U.S. Patent No. 8,983,564

2.  Declaratory Judgment of No Infringement of U.S. Patent No. 7,295,866

3.  Declaratory Judgment of No Infringement of U.S. Patent No. 7,186,966

4.  Declaratory Judgment of No Infringement of U.S. Patent No. 10,194,847

5.  Declaratory Judgment of Invalidity of U.S. Patent No. 8,983,564

6.  Declaratory Judgment of Invalidity of U.S. Patent No. 7,295,866

7.  Declaratory Judgment of Invalidity of U.S. Patent No. 7,186,966

8.  Declaratory Judgment of Invalidity of U.S. Patent No. 10,194,847

9.  Statute of Frauds

10. Doctrine of Equitable Estoppel

11. Doctrine of Waiver

12. Doctrine of Acquiescence

13. Doctrines of Implied License and Shop Rights

14. Doctrine of Unconscionability

15. Failure to Mitigate

16. Lack of Fiduciary Relationship

17. Failure to Mark under 35 U.S.C. § 287

18. Alleged Acts Prior to Defendants' Knowledge

19. Doctrine of Unclean Hands

20. Acts of Omissions of Plaintiffs

21. Prosecution History Estoppel

22. No Damages

23. Lack of Standing

Dated:  November 22, 2021          MERCHANT & GOULD P.C.


                                   By: *Ryan J. Fletcher*

                                   Ryan J. Fletcher, Ph.D.
                                   Attorneys for Defendants True Wearables, Inc.
                                   and Marcelo Lamego