Scott Shaw (CA Bar No. 223592)
SShaw@merchantgold.com
**MERCHANT & GOULD P.C.**
8383 Wilshire Blvd, Suite 935
Beverly Hills, CA 90211
Telephone: (949) 330-0202
Facsimile: (612) 332-9081

Hayley M. Ostrin (*Pro Hac Vice*)
HOstrin@merchantgould.com
**MERCHANT & GOULD P.C.**
1900 Duke Street, Suite 600
Alexandria, Virginia 22314
Telephone: 703-684-2500
Facsimile: 612-332-9081

Peter A. Gergely
PGergely@merchantgould.com
**MERCHANT & GOULD P.C.**
767 Third Avenue, 23rd Floor
New York, NY 10017
Telephone: (303) 357-1646
Facsimile: (612) 332-9081

Ryan J. Fletcher (*Pro Hac Vice*)
RFletcher@merchantgould.com
Kristen M. Geary (*Pro Hac Vice*)
KGeary@merchantgould.com
**MERCHANT & GOULD P.C.**
1801 California St., Suite 3300
Denver, CO 80202
Telephone: (303) 357-1651
Facsimile: (612) 332-9081

Paige S. Stradley (*Pro Hac Vice*)
*PStradley@merchantgould.com*
**MERCHANT & GOULD P.C.**
150 S. Fifth Street Suite 2200
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081

*Attorneys for Defendants*
*True Wearables, Inc. and Marcelo*
*Lamego*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware Corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation,, <br><br> Plaintiffs, <br><br> v. <br><br> TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual, <br><br> Defendants. | CASE No. 8:18-cv-2001-JVS-JDE <br><br> **DECLARATION OF DIRECT TESTIMONY FROM NIKOLAUS BAER** <br><br> **Hon. James V. Selna** <br><br> Trial: 3/15/2022 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1
2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

3
4
I.     INTRODUCTION ............................................................................. 1

II.    SUMMARY OF OPINIONS ............................................................ 2

III.   BACKGROUND AND QUALIFICATIONS ................................... 3

IV.   RELEVANT LEGAL PRINCIPLES ............................................... 6

V.    TECHNICAL BACKGROUND ..................................................... 11

    A.    SOURCE CODE ................................................................. 11

    B.    ████████████ .......................................... 15

    C.    ███████████████ ............................... 15

    D.    ███████████████ ............................... 16

    █    ████████████████████ ....... 16

    F.    SIGNAL PROCESSING ................................................... 17

       █    ███████████ ....................................... 17

       █    ██████████████ ............................. 18

       █    █████████████ ................................ 18

VI.   BASES AND REASONS FOR MY OPINIONS ............................ 19

    A.    ASSUMPTIONS ................................................................ 19

    B.    PLAINTIFFS' TECHNOLOGY SUMMARY ................... 19

       1.    Masimo Code .......................................................... 19

       2.    Cercacor Code ........................................................ 23

    C.    DEFENDANTS' TECHNOLOGY SUMMARY ................ 32

       1.    Model Analysis ....................................................... 32

       2.    Source Code Implementation ................................. 32

       3.    Difference in Implementation ................................. 41

    D.    TRADE SECRET 1 ........................................................... 46

       1.    Plaintiffs' Implementation ...................................... 46

-i-

■ ███████████████████ .......................................... 50

        3.     Oxxiom Accused Code ............................................................... 53

   E.    TRADE SECRET 5 ...................................................................... 55

        1.     Cercacor and Masimo Implementation ..................................... 56

        2.     Oxxiom Accused Code ............................................................... 56

   F.    TRADE SECRET 8 ...................................................................... 57

        1.     Cercacor Implementation .......................................................... 57

        2.     Alleged Trade Secret 8 is not Eligible for Trade Secret Protection ................................................................................ 60

        3.     Oxxiom Accused Code ............................................................... 61

   G.    TRADE SECRET 9 ...................................................................... 63

        1.     Cercacor and Masimo Implementation ..................................... 63

        2.     Oxxiom Accused Code ............................................................... 66

   H.    TRADE SECRET 11 .................................................................... 67

        1.     Cercacor Implementation .......................................................... 67

VII.   CONCLUSION ................................................................................... 68

CONFIDENTIAL – ATTORNEYS' EYES ONLY

I, Nikolaus Baer, submit this Direct Testimony on behalf of Defendants True Wearables, Inc. and Marcelo Lamego (collectively, "Defendants") and I declare, and state as follows:

## I.  **INTRODUCTION**

1.  I have been retained by Defendants in connection with the matter of *Masimo Corporation and Cercacor Laboratories, Inc. v. True Wearables, Inc., et al.*, 8:18-CV-02001-JVS-JDE. I have analyzed and provide my opinions regarding whether Defendants misappropriated alleged trade secrets from Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Plaintiffs"). I have reviewed the "Expert Report of Professor James McNames, PH.D," the deposition transcript of James McNames dated August 4, 2021, and the Direct Testimony of Dr. James McNames, Ph.D. dated February 23, 2022. In addition, I have also reviewed the Expert Report of Jack Goldberg regarding Trade Secret 5, the deposition transcript of Jack Goldberg dated August 6, 2021, and the Direct Testimony of Jack Goldberg dated February 23, 2022. I have also reviewed all the documents and testimony cited in the material considered section of my expert report and the documents relied upon in the direct testimony of McNames and Goldberg. This Declaration provides my response to their reports and testimony with respect to alleged trade secrets and/or confidential information.[1]

2.  I am an independent expert and not an employee of any party or counsel to any party in this lawsuit. I am being compensated at my customary rate of $500 for my work and testimony in this case. My compensation is not contingent upon the outcome of this litigation. The fact that I am being compensated has not altered the opinions I have given or will give in this case.

---

[1] Although I frame my opinions in terms of trade secret misappropriation, my opinions and analysis are applicable to allegations regarding alleged confidential information.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

3. I have personal knowledge of the facts set forth in this Declaration.

## II.  **SUMMARY OF OPINIONS**

4. Based upon my review of the alleged trade secrets, source code, documents, and testimony on behalf of Plaintiffs and Defendants, it is my opinion that the implementation of photoplethysmography technology by Plaintiffs and Defendants are starkly different. The techniques used in Plaintiffs' and Defendants' implementations are fundamentally different approaches— ███████████ ████████████████████████████████████—so the evaluations and comparisons of the alleged similarities, are not meant to imply that these implementations are correlated in a manner deserving of comparison.

- Both Plaintiffs and Defendants have developed photoplethysmography technology that necessarily involves signal processing of plethysmography ("pleth") data.

- Despite the shared area of technological development, the Plaintiffs' and Defendants' implementations are fundamentally different and were developed in different software languages with different software architectures with no substantial similarities in the source code implementations.

- ████████████████████████████████████ ████████████████████████████████████ ██████████████████

- ████████████████████████████████████ ██████████████████████████████

- ████████████████████████████████████ ████████████████████████████████

- ████████████████████████████████████ ██████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- ████████████████████████████████████
- ████████████████████████████████████
- ████████████████████████████

- ████████████████████████████████████
- ████████████████████████████████████
- █████████████████████████████████

- ████████████████████████████████████
- ████████████████████████████████████
- ████████████████████████████████████
- ████

- ████████████████████████████████████
- ████████████████████████████████████
- ████████████████████

5.      Based upon these differences in implementation and underlying technique, as set forth in detail herein and my detailed analysis of the alleged source code and related document and testimony, it is my opinion that Defendants do not use alleged Trade Secrets 1, 5, 8, 9, or 11.

## III.   BACKGROUND AND QUALIFICATIONS

6.      I began my formal academic study of computer technology at the University of California, Santa Barbara ("UCSB"), where I attended on a Regents Scholarship. In 2004, I received a Bachelor of Science degree from UCSB, with high honors, in Computer Engineering. In 2004, I also received a certificate in Technology Entrepreneurship from UCSB. At UCSB, I placed first in the Start Cup business plan competition.

7.      From April 2003 to January 2005, I worked as a Project Engineer/Programmer at Vareda Engineering in Santa Barbara, California.

8.      From January 2005 to March 2006, I worked as a Software Developer at

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Nascent Systems Technology in Monterey, California.

2          9.     In 2006, I worked as a Software Developer at Ziedman Technologies in

3   San Jose, California before joining Theranos, Inc. in Palo Alto, California as a

4   Firmware Developer from August 2006 to February 2008.

5          10.    From February 2008 to June 2012, I worked as a Research Engineer and

6   then as a Project Manager for Zeidman Consulting in Cupertino, California.

7          11.    Since June 2012, I have been a principle of my own company, Baer

8   Consulting.

9          12.    Professionally, I have developed software for marine research, optical

10  testing equipment, military terrain databases, mobile applications, and medical

11  devices. I have worked at a variety of technology firms as a developer of software,

12  firmware, and drivers. This work has involved developing software in the C and C++

13  programming languages and in the LabVIEW engineering software from National

14  Instruments. I have also developed and analyzed software in other languages

15  including Swift.

16         13.    As a software engineer with experience in product development,

17  including with experience in medical device development and signal processing

18  software, I consider myself to be a person who could obtain economic value from the

19  disclosure or use of the information I discuss in my report as being generally known.

20         14.    I am a member of the Institute of Electrical and Electronics Engineers

21  ("IEEE") and an officer of the Northern California Scholarship Foundation's Alumni

22  Association.

23         15.    Since 2006, I have consulted on a wide range of matters involving

24  software intellectual property. I have served as both a consulting and testifying expert

25  in over fifty litigation matters as well as serving as an outside analyst for internal

26  technical investigations. These representations all involved software and technical

27  systems. These matters have included assertions of copyright infringement, trade

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   secret misappropriation, patent infringement, breach of contract, software plagiarism,
2   and other misappropriations of intellectual property rights. I have extensive
3   experience in providing expert opinions based on my technical analysis and I have
4   served as a testifying witness in depositions, hearings, and arbitrations. Clients that
5   have engaged me include Salesforce.com, Nest Labs, Inc., Electronic Arts, Oracle,
6   Applied Materials, and Facebook.

7       16.     In addition to these matters, I am serving as a Special Master for U.S.
8   District Court, Western District of Tennessee, where I have been involved in
9   overseeing the post-trial resolution of a copyright and trade secret matter between
10  ECIMOS, LLC v. Carrier Corporation.

11      17.     In providing such services, I have performed source code analysis, and I
12  have developed significant expertise in the analysis of software. I am experienced in
13  the art of analyzing the functionality, strengths, and weaknesses of software through
14  the use of detailed source code reviews, debugging, reverse-engineering, utilizing
15  tools for mapping the workflow of the source code, and examining records of the
16  development history. I am skilled in the use of state-of-the-art forensic software to
17  conduct such source code analysis, including comparison between source code for
18  distinct software to identify overlapping code, architecture, features, and functions.
19  This includes analyzing possible reasons for overlapping code and distinguishing the
20  reasons why similarities exist. I have developed tools and scripts for analyzing
21  software in the furtherance of my litigation consulting services. I have developed a
22  skill set in analyzing claims of the presence of copying, or a lack thereof, within
23  software. I have extensive experience in assessing the strengths and weaknesses of
24  claims of intellectual property infringement in the context of software, particularly
25  with respect to claims of copyright infringement, trade secret misappropriation and
26  patent infringement. I have authored several papers on engineering and software
27  analysis, based upon my experience analyzing software, such as the article "What,

28

-5-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1 Exactly, Is Software Trade Secret Theft?"

2     18.    A true and correct copy of my resume is attached to my Declaration as

3 Appendix A. A list of software IP litigation matters that I have been involved with,

4 including cases that I have testified as an expert at trail or deposition, and a list of

5 publications is included in Appendix A.

6 **IV.   RELEVANT LEGAL PRINCIPLES**

7     19.    I've read the Order regarding revived motion for preliminary injunction

8 dated April 28, 2021, and the Order regarding motion to reconsideration dated June

9 16, 2021.

10     20.    I understand that under California state law (Title 5. Uniform Trade

11 Secrets Act [3426 - 3426.11].) the definition of a "trade secret" is as follows:

12     21.    "Trade secret" means information, including a formula, pattern,

13 compilation, program, device, method, technique, or process, that:

14 (1) Derives independent economic value, actual or potential, from not being

15 generally known to the public or to other persons who can obtain economic

16 value from its disclosure or use; and

17 (2) Is the subject of efforts that are reasonable under the circumstances to

18 maintain its secrecy.

19     22.    The definition of a "Misappropriation" is as follows:

20 (1) Acquisition of a trade secret of another by a person who knows or has reason

21 to know that the trade secret was acquired by improper means; or

22 (2) Disclosure or use of a trade secret of another without express or implied

23 consent by a person who:

24     (A) Used improper means to acquire knowledge of the trade secret; or

25     (B) At the time of disclosure or use, knew or had reason to know that his

26     or her knowledge of the trade secret was:

27         (i) Derived from or through a person who had utilized improper

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY

means to acquire it;

    (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

    (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

23.    The definition of a "Improper means" is as follows:

(a) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone shall not be considered improper means.

24.    To apply my understanding of trade secret law to an analysis of software there are several factors that I consider in the qualification and evaluation of a trade secret.

25.    In software development, there are many known techniques, algorithms, and architectures that are taught and practiced in the industry as well as substantial collections of open source and third-party source code and software. Furthermore, software is often built to automate or streamline well known business processes, so software may include functionality directly related to those publicly known business processes. Therefore, properly identifying a software trade secret typically involves determining the boundaries and special characteristics of the alleged trade secret within the universe of public knowledge.

26.    Determining the boundaries of an alleged software trade secret typically means identifying the alleged trade secret in relation to the implementation of the source code. This means identifying the implementation of the alleged trade secret as

-7-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

a section of source code, an algorithm, or an architectural element. In defining the alleged trade secret, the level of software abstraction that the alleged trade secret exists at and any qualifying characteristics should also be made clear. For example, an alleged trade secret may involve a well-known algorithm used in a novel manner, so should be defined as such because the well-known algorithm by itself would not qualify as a trade secret.

27. It is my understanding that in a software trade secret misappropriation matter it is the role of the plaintiff, and their experts, to properly identify the alleged software trade secret with enough specificity to distinguish the alleged trade secret from what is publicly known.

28. After the alleged trade secret is identified, an expert can evaluate whether the identified sections of source code or algorithms implement a trade secret or implement a known concept that does not qualify as a trade secret.[2] This involves determining whether the alleged trade secret (1) is distinguishable from what is generally known to the public or to other persons who can obtain economic value from its disclosure or use, (2) provides some value or advantage from not being generally known, and (3) was properly maintained as secret (i.e., subject of efforts that are reasonable under the circumstances to maintain its secrecy). With respect to this first prong, I understand that California law does not specify that those persons to whom the information is generally known must be able to obtain economic value in exactly the same way as the Plaintiffs. If the alleged trade secret does not meet one of more of these above three qualifications, then it does not qualify as a trade secret.

29. When evaluating a software trade secret, an expert determines whether

---

[2] I discussed this concept in a paper I coauthored and that was published by Intellectual Property Today in March 2008 and is entitled: Baer, N. and Zeidman, B., What, Exactly, Is Software Trade Secret Theft? Intellectual Property Today, March 2008. JTX 2863 is a true and correct copy of my publication.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1 the alleged trade secret can be defined within the bounds of what is secret. Relatedly,

2 if the alleged trade secret is undistinguishable from the many known techniques,

3 algorithms, and architectures that are taught and practiced in the software

4 development industry (i.e., an example of persons that could obtain economic value)

5 as well as the substantial collections of open source and third-party source code and

6 software or is undistinguishable from well-known business processes, then it does not

7 qualify as a trade secret.

8      30.     When evaluating an alleged trade secret, an expert should also examine

9 whether the alleged trade secret provides an advantage or independent economic

10 value. Again, there are many known techniques, algorithms, architectures, and

11 publicly available software implementations, which should be considered.

12      31.     Furthermore, the alleged trade secret may have been implemented, but

13 not provide independent economic value. For example, if the alleged trade secret was

14 implemented as part of a test or demonstration software that was abandoned and did

15 not become part of a product, then it may not provide an economic benefit and would

16 therefore not qualify as a trade secret.

17      32.     An expert may also examine whether there were sufficient measures

18 taken to maintain the secrecy of the alleged trade secret. This may include an

19 evaluation of the business agreements, the level and consistency of confidential

20 markings on documents and source code, the accessibility of source code, and

21 discloser of information in patents, user guides, websites, and other publications. For

22 software development, this may also involve an evaluation of the software user

23 interface and even the accessibility of the underlying source code. For example, there

24 are certain software languages that allow a user to readily view or access the

25 underlying source code and technology and if measures are not taken to maintain the

26 secrecy, then the exposed source code and technology may not qualify as a trade

27 secret.

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY

33.    Based on my understanding of trade secret law, the evaluation of an alleged misappropriation of a trade secret between two parties comprises determining whether the alleged trade secret qualifies as a trade secret, as discussed above, and also determining whether there is a correlation between the software that indicates the alleged trade secret was derived from one party by the other.

34.    When identifying correlation between the software, it is important to stay within the boundaries of the alleged trade secret, including the boundaries of the level of software abstraction that the alleged trade secret has been defined within. If the alleged trade secret has been identified as a specific section of source code, specific algorithm, or specific design concept, then to show misappropriation a correlation should be identified within a section of source code or algorithm or module, not at an entirely different level of abstraction. While it may be tempting to identify a correlation in the overall function of two pieces of software, this correlation may be inconsequential if the trade secret is defined at the source code or algorithm level of abstraction. Likewise, it may be tempting to identify a correlation in the use of the same algorithm, but this correlation may be inconsequential if the trade secret is defined as only the use of an otherwise well-known algorithm for a special purpose.

35.    Even after a correlation with the alleged trade secret is identified, the reason for the correlation must still be evaluated. It is entirely possible for two parties to independently develop and use the same trade secret, which would then not be a misappropriation. Likewise, it is possible that the identified correlation is due to a generally known software development industry practice, formula, or technique. Therefore, to show that trade secret misappropriation has occurred, reasons for the correlation must be considered to determine whether a reasonable explanation for the existence of the alleged trade secret in the software of both parties is misappropriation.

36.    These steps of evaluating the qualifications of an alleged trade secret and whether misappropriation has occurred are summarized in Figure 1, which I created.

-10-

CONFIDENTIAL – ATTORNEYS' EYES ONLY



**Figure 1. Evaluating software trade secrets**

## V.    TECHNICAL BACKGROUND

37.    This section includes background descriptions of certain technical terminology discussed herein.

### A.    Source Code

38.    Software is developed as source code. Source code is composed of sequences of instructions that cause a computer to perform some functionality. Human developers write and edit source code to provide specific features and functions, so it is generally arranged to be human readable.

39.    Source code can be written in a variety of software languages. The

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   various languages generally include statements, which either define operations or
2   data. Traditionally the statements are compiled, or translated, into another format
3   (machine code) which is a series of ones and zeroes that control the operation of a
4   computer.

5       40.    Source code may include comments, which are non-functional
6   information that are often used to document the source code. Comments are not
7   compiled and do not affect the operation of the computer. Although comments are not
8   generally included in the compiled software, they can provide important insight into
9   the functionality and history of a body of source code and aid in the overall
10  accessibility of the surrounding source code.

11      41.    The functionality of software can be understood at multiple levels of
12  abstraction, where each level is an expression of the information from the level above.
13  These levels can be defined as the overall function, the architecture, the algorithms,
14  and the actual expression of the source code.

15      42.    The overall function level represents the purpose of the software as a
16  whole. This level represents the reason that this software exists, in terms of the
17  problem it addresses and the solution it provides.

18      43.    The architecture level represents the organization of the software
19  system. This includes the arrangement and connections between components of the
20  software system that define how they will operate together to perform the purpose of
21  the software as a whole. This may also include an arrangement or definition of what
22  algorithms will be needed.

23      44.    The algorithm level includes the formulas and patterns necessary for the
24  software components to operate. They provide a particular functionality. In addition
25  to developing novel algorithms, developer often rely upon common algorithms, which
26  are generally known and used to provide some common functionality to a piece of
27  software, such as the reading and writing of files.

28

-12-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

45.     Software algorithms are implemented in source code. Algorithms are often organized into software elements called methods, functions, routines, and software classes or objects within the source code.  Depending on the precision with which an algorithm is defined, a developer may implement the algorithm in source code without a greater understanding of the software system or even the overall function of the system.  The specific implementation of an algorithm in source code often reflects the overall function of the software or the purpose of the algorithm, such that identifier names defined by the developer are often related to the purpose of the software and algorithm.

46.     An algorithm is not limited to a single implementation. That is, there may be multiple ways to write source code for an algorithm and variances in the implementations of an algorithm often occur because of differences in software languages, identifier names, commenting, order of operations, or the style of different developers. These variances can be specific to a particular expression of an algorithm, giving the source code a unique identity or fingerprint. When comparing source code that overlaps in either the exact expression or functionality, these variances, or lack thereof, can reveal whether the source code was developed independently or copied.

47.     There are numerous algorithms and bodies of source code that are publicly known and available in the public domain. The evolution of software has included the sharing of algorithms in both papers and books as well as shared research and open-source software. A well-known example of such sharing can be found in the open-source Linux software source code, which can be retrieved, studied, and adapted according to its royalty free license.[3] Even before the advent of the Internet as we

---

[3] "Linux Kernel Licensing Rules." The Linux Kernel. Web. January 23, 2019. https://www.kernel.org/doc/html/v4.18/process/license-rules.html. JTX 2864 is a true and correct copy of the aforementioned website that I visited on January 23, 2019 and was downloaded on October 27, 2021.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

know it, source code was being shared and academic institutions fostered collaboration around software development.[4] Now, websites like GitHub store both confidential proprietary source code as well as millions of users and millions of publicly accessible software projects.[5] The GitHub website was launched in 2008, when it already had 10,000 projects.[6]

48.     Software is also often divided into tiers or layers, such that the individual layers can be modified or replaced without changing the entire application. The layers typically make services available to other layers through strictly defined communication interfaces. They also allow for multiple modules at one layer to share access to a lower layer, so that the individual modules can be modified, enabled, or disabled without effecting the entire application. Common layers included in a multilayered architecture are presentation layer, processing or service layer, business layer, and data access layer. The presentation layer is the user interface, providing input and output to the user. The service layer provides an interface to presentation layers and organizes tasks for the business layer. A façade or façade layer may be

---

[4] E. Hippel and G. Krogh. "Open Source Software and the 'Private-Collective' Innovation Model: Issues for Organization Science." Organization Science (2003) 14 (2)208-223. JTX 2865 is a true and correct copy of the aforementioned publication entitled "Open Source Software and the 'Private-Collective' Innovation Model: Issues for Organization Science."

[5] "The Largest Open Source Community in the World" GitHub. Web. January 23, 2019. https://github.com/open-source. JTX 2866 is a true and correct copy of the aforementioned website that I visited on January 23, 2019 and was downloaded on October 27, 2021.

[6] "GitHub Gist is Pastie on Steroids" SitePoint. Web. July 19, 2021. https://www.sitepoint.com/github-gist-is-pastie-on-steroids/. JTX 2867 is a true and correct copy of the aforementioned website that I visited on July 19, 2021 and was downloaded on July 22, 2021.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

used to organize or streamline a complex collection of services or service layers into a simpler interface. The business layer performs what is known as the business logic, which is how the system stores, changes, and creates data. The data access layer is responsible for storing and retrieving data from a database, file system, or other types of data storage.

## B. Data Buffer(s)

49. In computer science, data buffers are simply memory that is assigned for a specific purpose. These areas are typically implemented to hold a defined amount of a particular type of data in an organized order, which is then accessed by an index or offset from the first location. This would be analogous to a row of numbered parking spaces, where the numbers index the parking spots and where each parking space could hold a car. The program can then store and access data at the indexed locations, much as a car rental agency might store cars at and then direct customers to particular numbered parking spots. The exact size and location within the underlying memory is typically dependent on the processor, memory, and programming language used.

## C. Circular Buffer(s)

50. A circular buffer is simply a finite array (or list) of values that operates as though the first and last values are connected, such that when a program attempts to access the next value after the end of the buffer it is redirected to the very first value. Returning to the parking lot analogy, a circular buffer can be thought of as arranging the row of numbered parking spaces in a circle rather than a straight line, so that if someone walks past the last parking space then she ends up back at the first parking space. Since the underlying computer memory is generally accessed sequentially, like a straight line, a circular buffer is typically accessed with simple functions that connect the first and last memory space of the buffer together.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

### D. **Autocorrelation**

51. Autocorrelation is the publicly known method of correlating a signal with a shifted, or time delayed, version of itself, which is commonly used in signal processing to identify patterns in a signal.[7,8] In autocorrelation the higher values represent more correlation, which can indicate when a pattern is repeating in a signal, i.e. when one portion of a signal is more correlated to another portion of a signal. [9,10]



_____

[7] "Autocorrelation," Wikipedia (Wikimedia Foundation, June 7, 2021), https://en.wikipedia.org/wiki/Autocorrelation#Auto-correlation_of_continuous-time_signal. JTX 2868 is a true and correct copy of the aforementioned webpage that I visited on June 7, 2021 and was downloaded on July 22, 2021.

[8] "Autocorrelation," 1.3.5.12. Autocorrelation (National Institute of Standards and Technology), accessed July 19, 2021, https://www.itl.nist.gov/div898/handbook/eda/section3/eda35c.htm. JTX 2869 is a true and correct copy of the aforementioned webpage that I visited on July 19, 2021 and was downloaded on July 22, 2021.

[9] "Optical Autocorrelation," Wikipedia (Wikimedia Foundation, May 25, 2021), https://en.wikipedia.org/wiki/Optical_autocorrelation. JTX 2870 is a true and correct copy of the aforementioned webpage that I visited on May 25, 2021 and was downloaded on July 22, 2021.

[10] "Autocorrelation," Autocorrelators (Society of Photographic Instrumentation Engineers), accessed July 19, 2021, https://spie.org/publications/fg14_p94-96_autocorrelators?SSO=1. JTX 2871 is a true and correct copy of the aforementioned webpage that I downloaded on July 19, 2021.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

### F.    Signal Processing

53.    Signal Processing generally refers to the engineering discipline of analyzing signals. Signal processing is commonly used in many disciplines, including measuring physiological signals, where the data from a variety of sensors is measured as electronic values. The electronic values are often converted, or sampled, from an analog input as a series of discrete digital values. Often, the raw signal values are filtered or pre-processed to remove noise or extract a particular portion of the measured signal. Then characteristics of the signal can be determined and translated into meaningful measurements. The signal can be processed as values along time scale in the time domain or as the sum of one or more frequencies in the frequency domain.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1 ████████████████████████████████████████████

2 ████████

3 ██ ████████████

4 ██ ██████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████

21 ██ ████████████

22 ██ ██████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████████████

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**VI.  BASES AND REASONS FOR MY OPINIONS**

**A.  Assumptions**

57.  For the purposes of this Declaration, unless otherwise noted, I have been instructed to and have assumed that the earliest potential alleged misappropriation by Defendants was February of 2015.

58.  As discussed below, the specific contents of ████████████ were not discernable with a standard text editor during my onsite review, and my analysis is therefore based on the representation of the contents provided by McNames. (Direct Testimony of Dr. James McNames at ¶113).

**B.  Plaintiffs' Technology Summary**

59.  McNames and Goldberg allege that several of Plaintiffs' trade secrets are implemented in Plaintiffs' products, including specifically the algorithms and/or source code that these products use. A more detailed evaluation of the relevant algorithms/code can be found below, where each trade secret is independently analyzed. Before turning to this analysis, though, I will offer an explanation of my understanding of the functionality of the Masimo and Cercacor source code at issue.

**1.  Masimo Code**

60.  Plaintiffs' expert declarations address aspects of Masimo products that are implemented in source code and/or algorithms, including Masimo's pulse rate detection code. Below is an overview of the functionality of each based on my review of the cited code and documentation.

**(a)  Pulse Rate Detection**

61.  Examples of plaintiff Masimo's implementation of their pulse rate detection technology are generally limited to the design document Pulse Rate Algorithm Specification (ADS-1022). (*See* JTX 491 at MASM0140627-812.) ADS-

-19-

1  1022 is a design document, including ██████████████████

2  ████████████ It is not production code. In my experience, design concepts and actual

3  production software implementations can vary widely. Since Masimo production

4  code was not relied upon in the direct testimony of McNames or Goldberg, I will

5  describe the design document that was relied upon.

6  ██ ███████████████████████████████████

7  ███ █ ███ ████ █ █ ███████ ██ ███ █ █ █████

8  █████████████████████████████████████████

9  █████████████████████████████████████████

10 ██ ██ ██ █ ████████ ███████████

11 █████████████████████████████████████████

12 █████████████████████████████████████████

13 ██████████

14 ██ ██████████████████████████████████

15 █████████████████████████████████████████

16 █████████████████████████████████████████

17 █████████████████████████████████████████

18 █████████████████████████████████████████

19 █████████████████████████████████████████

20 █████████████████████████████████████████

21 █████████████████████████████████████████

22 █████████████████████████████████████████

23 █████████████████████████████████████████

24 █████████████████████████████████████████

25 █████████████████████████████████████████

26 ████████████████████████████████

27

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

(i)     **Plethysmograph Model**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

2. **Cercacor Code**

69.    Plaintiffs' expert declarations address two aspects of Cercacor products that are implemented in source code and/or algorithms. The first is Cercacor's ████ ████████████████████████████████ The second is Cercacor's ████████████ ████████████ Below is an overview of the functionality of each based on my review of the cited code and documentation.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



[16] "Optical Autocorrelation," Wikipedia (Wikimedia Foundation, May 25, 2021), https://en.wikipedia.org/wiki/Optical_autocorrelation. JTX 2870 is a true and correct copy of the aforementioned webpage that I visited on May 25, 2021 and was downloaded on July 22, 2021.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C.   **Defendants' Technology Summary**

88.    In their declarations, McNames and Goldberg allege that several of Plaintiffs' trade secrets are implemented in Defendants' Oxxiom App. A more detailed evaluation of the relevant algorithms/code can be found below, where each trade secret is independently analyzed. Before turning to this analysis, though, I will offer an explanation of my understanding of the functionality of the True Wearable's source code at issue.

[25] ████████████████████ is also used for the low-level operations of the Oxxiom device.

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



-37-

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████████████████████████

████████████████████████████████████████████

### 3. Difference in Implementation

108. Plaintiff has not asserted any substantial similarities between Plaintiffs' and Defendant's source code implementations, and I found no indication of such. Based on my analysis, it is my opinion that Defendants have not misappropriated Plaintiffs' source code through use in Defendants' source code.

109. Defendant's source code is starkly different from Plaintiffs' source code. The software language, underlying architecture, and functionality for the ████ ████ are all different. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

███ ████████████████████████████████████████

█████████████ █ ██████████████████████████████████████████

██████████████████████████████████████████████████████████

██ ██ ████ ██ ████ ██ █ ██ ███ ██ ████ ██ ███ ██ ██

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

███ ████████████████████████████████████████████████████

_____

██ ██████████████████████████████████████████████████████

███████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY



[47] *See* function ████████████████████████████ (JTX 2503 at MASMSC000156).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

114.   These differences are also recognized by McNames who stated during his deposition that "Masimo and Cercacor's implementation of Trade Secret 1 does not involve █████████████████████████████████████████████████████████ as I understand it, by True Wearables." (McNames Depo. Transcript (August 4, 2021), 113:18-24).   He   further   clarified   the   difference   between   True   Wearables implementation, which has ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████ and Masimo and Cercacor, "I didn't really have source code for Masimo. But I did not see – in the ADS-1022 specification, I did not recall seeing a place where █████████████████████████████████████ … Likewise for Cercacor: In studying their source code, forming my opinions and preparing for this, I don't recall seeing a ███████████████████████████████████. (McNames Depo. Transcript (August 4, 2021), 150:13-16 & 153:13-23).

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

1.   **Plaintiffs' Implementation**

115.   McNames asserts that both Masimo and Cercacor use "aspects of" Trade Secret 1. (McNames, ¶¶49, 71.) For Masimo, McNames does not identify any source

-46-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

code files as evidence of Masimo's use, but instead cites to ADS-1022, which he refers to as " ███████████████████████████ and which he claims provides examples of how Masimo uses Trade Secret 1. (*Id.*, ¶49.) I understand that Dr. Chris Daft has reviewed this document and has provided opinions about what it discloses. I have also reviewed the ADS-1022 document (*see* Section VI.B.1) and spoken with Dr. Daft regarding his analysis. Based on that review and discussion, I agree with the opinions expressed in Dr. Daft's declaration regarding what is disclosed in ADS-1022. In addition, the ADS-1022 document states that rather than analyzing the ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

██  ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██  ██  ██  ██  ██  ██  ██  ██  ██

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

1 ████████████████████████████████████████████████████████ ▪

2 ████ ████████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████████████

6 **2.** ████████████████ **is Generally Known**

7     124.   I understand that Dr. Daft will address the known nature of Trade Secret

8 1 as a whole. However, in addition, I also address the general knowledge of ████████

9 ██████████████████████ portion of Trade Secret 1. As discussed above in Section

10 VI.B.1, I found that the ████████████ that McNames points to as Masimo's

11 implementation of a ████████████████████████████████

12 ██████████████████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████████████████████

20

21

22

23

24 ————————————————

25 ▪ ████████████████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████████████████████

27 ██████████████████████████████████████████████████████████████████████

28 ████████████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 3.    Oxxiom Accused Code

125.    As described above, the Oxxiom uses a ███████████████ to estimating pulse rate, saturation, and perfusion. Based on my review of the Oxxiom code, I can make several observations relevant to the alleged misappropriation of Trade Secret 1.

██  ████████████████████████████████████

█████████████

██  ████████████████████████████████████

███████████████████████████████████████

███████████████████████████

██  ██  ██  ████  ██████  ██  ██  ████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██  ██  ████  ██  ████  ██████  ██  ██  ████

██████████████████████

██  ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

-53-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY

E. **Trade Secret 5**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

██████████████████████

### 1.  Cercacor and Masimo Implementation

134.   Plaintiffs and Goldberg have not alleged or described an implementation for Trade Secret 5. Goldberg specifically states that "Trade Secret 5 is not a device. Trade Secret 5 is about ████████████████████████████████████████ ████████████████████████ (Goldberg Depo. Transcript (August 6, 2021), 159:18-22). As such, there is no implementation upon which Trade Secret 5 can be defined more specifically than the description and asserted documents showing the idea of ██████████████████████████████████████████ ███████

### 2.  Oxxiom Accused Code

135.   Since there was no implementation of Trade Secret 5 by Cercacor or Masimo, there is no implementation from the Plaintiffs to compare the Defendants' implementation against.

136.   However, Goldberg alleges that the Oxxiom implements Trade Secret 5 with the Oxxiom App and sensor, ████████████████████ ████████████████████████████████████████. (Goldberg, ¶¶61, 62 and 65). To the extent that Goldberg asserts Oxxiom implements Trade Secret 5, Oxxiom's implementation is not based on Plaintiffs' nonexistent implementation.

███████ ██████████████████████████████
██████████████████████████████████████████
██████████████████████████████████ ████████████
██████████████████████████████████████████
██████████████████████████████████████████

█████ ████████████████████████████████████████
██████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**F.** **Trade Secret 8**

**1.** **Cercacor Implementation**

138. McNames asserts that Cercacor implements Trade Secret 8 when determining pulse rate. Specifically, McNames believes that Cercacor implements Trade Secret 8 because:

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████

5          **2.**     **Alleged Trade Secret 8 is not Eligible for Trade Secret**

6                     **Protection**

7          144.   Plaintiffs have not shown that Plaintiffs have ever implemented or used

8 Trade Secret 8. As discussed, this is experimental code and not part of a product and

9 was commented out, which indicates it was not useful.

10 ████  ██████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ██████████████████████  ████  ██████████████  ██████

16 ████████████

17    ████  ████████████████████████████████████

18 ─────────────────────

19

20    ██  ██████████████████████████████████████

21 ████████████████████████████████████████████

22 ████████████████

23    ██  ██████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████

27

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ███████████████████████████████████████████

4      3.    <u>**Oxxiom Accused Code**</u>

5      ███   ████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ██ ████████ ██ ████████ ████ ████ ████ ██ ██ ████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ███████████

14      ███   ████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ██ ████████ ██ ██ ████ ████ ██ ████ ████ ██ ██ ████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████

24      ███   ████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28

CONFIDENTIAL – ATTORNEYS' EYES ONLY



CONFIDENTIAL – ATTORNEYS' EYES ONLY

154. For at least these reasons, it is my opinion that Oxxiom does not use Trade Secret 8.

**G.    Trade Secret 9**

**1.    Cercacor and Masimo Implementation**

155. Plaintiffs and McNames have not alleged or described an implementation for Trade Secret 9 beyond the separate implementation of the

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1     ████████████████████ discussed in conjunction with Trade Secret 6 and the

2 ████████████████████████████████ discussed in conjunction

3 with Trade Secret 8. They do not allege or describe the use of ████████████████

4 in production. As discussed, the alleged implementation of Trade Secret 8 by

5 Plaintiffs is unused experimental source code.

6     156. McNames alleges that Cercacor ████████████████████████

7 ██████████ (McNames, ¶¶236-237.) Specifically, he states that the ██████████

8 ██████████████████████████████████ Based on my

9 review of the relevant function ████████████████ at lines 223-229 of

10 ████████████████ in section VI.B.2.a.i above, I can make the following observations

11 about the functionality of the source code. Based on the source code, ████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████

16 ██████

17     157. McNames also alleges that Masimo's "ADS-1022 (Ex. 491) discusses

18 the ████████████████ and that "pages MASM0140671-MASM0140680, ADS-

19 1022 ████████████████████ (McNames, ¶223.) Specifically, he quotes two

20 statements from page 54 of ADS-1022. (*See* JTX 491 at MASM0140680). Although,

21 these statements do correspond to a ████████████████, as discussed further below,

22 McNames is incorrect, and they are not part of the "████████ The range of pages

23 MASM0140671-MASM0140680 of ADS-1022 ████████████████████████

24 ████████████████████████████████████████

25

26 ───────────────────

27 ██ ██████████████████████████████████

28 ████████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY

check. Only a subsection of this at pages MASM0140674-MASM0140677 describe █████████████████████ The statements on MASM0140680 are part of Section 5.2.9.7.6.8 ████████ in ADS-1022. That is, McNames mistook the sawtooth check in Trade Secret 6, steps 8 of the ████████████████████, and the Cercacor source code for the wrong check in the Masimo design document.

158.   A review of the additional details for the ████████████ described in Appendix A - Design Notes. (*See* JTX 491 at MASM0140765- 0140778), further clarify that the correct check in the Masimo design document is the 'Ratio Check.' The ████████ is described as follows, ██████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ (*See* JTX 491 at MASM0140776). ████████ ██ also corresponds to the deposition testimony of Mohamed Diab, who when discussing the ████████████ said that at Masimo ████████████████ (Diab Depo. Transcript (May 4, 2021), 114:9.)

159.   The ████ ████ █████████ ██ ██ is therefore Masimo's implementation of a ████████████. Aside from the use of a different ratio, Masimo's ████████ described in ADS-1022 is a substantially similar calculation to that found in ██████████████████████ and the Cercacor source code discussed above.

160.   Although, the design document ADS-1022, discussed above and in Section VI.B.1, describes the ████████████████ and █████████████ ████████, this is a design document not an actual implementation.

161.   ████████████████████████ ████████████████████████████████ ████████████████████████ (*See* JTX 491 at

CONFIDENTIAL – ATTORNEYS' EYES ONLY

MASM0140633). As such, there is no implementation upon which Trade Secret 9 can be defined more specifically than the description, asserted documents, and deposition testimony that ██████████████████████████████████████████ ██████████████████████

### 2. **Oxxiom Accused Code**

162. Since there was no implementation of Trade Secret 9 by Cercacor or Masimo, there is no implementation from the Plaintiffs to compare the True Wearables implementation against.

163. However, McNames alleges that the Oxxiom implements Trade Secret 9 when it allegedly ████████████████████████████████████████ ████████████████ (McNames, ¶¶262-269). McNames further alleges that ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ According to McNames, ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

164. However, the method ████████████████████████████████ ███ ██ ████ █ ███ ████ ██ ████ ████ ███████. ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

-66-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ██████████████████████████

8 ████     ████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████

12 ████     ████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ███████████████████

18 **H.    Trade Secret 11**

19
20
21
22
23
24
25 ████████████████████████████████████████████

26 **1.    Cercacor Implementation**

27 167.    McNames describes the alleged implementation of Step 10 in Cercacor's

28

-67-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Defendants do not use those trade secrets.

2   169.   I understand that to establish misappropriation of trade secrets under
3   California law, Plaintiffs must establish that Masimo or Cercacor owned or was a
4   licensee of the trade secret allegedly misappropriated. Where my analysis in this
5   report shows Plaintiffs do not implement and/or possess the asserted trade secret, then
6   with respect to the information analyzed in my report, Plaintiffs have not established
7   ownership of the trade secret. Accordingly, in my opinion Plaintiffs do not obtain any
8   alleged benefit from the trade secret. For example, Plaintiff's has not provided
9   exemplary implementations for several of the alleged trade secrets. Instead of
10  exemplary implementations, Plaintiffs point to design documents, unused
11  experimental code snippets, and unimplemented ideas. Although Plaintiffs do assert
12  that they implemented source code for Trade Secret 1, a detailed analysis of Plaintiffs'
13  source code and design documents shows the contrary. Unlike the description of
14  Trade Secret 1, Plaintiff's source code ███████████████████████████
15  █████████████████████████████████████████

16  I declare under penalty of perjury under the laws of the United States that the
17  foregoing is true and correct to the best of my knowledge.

18

19  Dated:  March 2, 2022          By:  _____
20                                     Nikolaus Baer

21

22

23

24

25

26

27

28

-69-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  ███████  ████  ████  ████  ████  within the following source code files:
2  ████████████████████████████████ (McNames at ¶¶294-
3  296.) I have reviewed McNames' description of these source code files and disagree
4  with his characterization. For example, McNames description does not correlate with
5  the Step 10 workflow, namely, ████████████████████████████████
6  ████████████████████████████████████████████
7  ████████████████████████████████████████████
8  ████████████████████████████████████████████
9  ████████████████████████████████████████████
10 ████████████████████████████████████████████
11 ████████████████████  ████████  ████████████████
12 ████████████████████████████████████████████
13 ████████████████████████████████████████████
14 ████████████████

15 **VII.  <u>CONCLUSION</u>**

16     168.   Based upon my review of the alleged trade secrets, source code, and
17 documents from Plaintiffs, it is my opinion that even though Plaintiff and Defendant
18 are both developing photoplethysmography technology necessarily involving signal
19 processing of plethysmography data, their implementations are substantially different.
20 ████████████████████████ to analyzing photoplethysmography signals is
21 fundamentally different than ████████████████████ across various
22 sections of Plaintiffs' source code and design documents. Plaintiff's own design
23 documents even state that Plaintiffs ████████████████████.
24 Furthermore, the pleth analysis source code ████████████████████
25 ████████████████████████████████████████████
26 ████████████████ Based upon these differences and my detailed analysis of the
27 source code alleged for Trade Secrets 1, 5, 8, 9, and 11, it is my opinion that
28

-68-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

APPENDIX A

# Nikolaus Baer
1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

## *EXPERIENCE*

### **Baer Consulting**, Mountain View, CA
JUN 2012 - Present

Principal
Intellectual Property Technical Advisor
- Testifying expert witness and technical analyst and for software intellectual property (IP) litigations including evidence of patents, trade secrets, and copyright matters
- Patent evidence of use, prior art, invalidity, and non-infringement analysis
- Software source code analysis for active litigation and pre-litigation matters
- Software functionality and technology evaluation
- Reverse engineering, decompiling, disassembling, and testing of software on mobile, desktop, and server platforms
- Patent prosecution
- Software design and development

### **Zeidman Consulting**, Cupertino, CA
FEB 2008 - JUN 2012

Project Manager
MAR 2010 - JUN 2012
Research Engineer
FEB 2008 - MAR 2010
- Managed software development and analysis projects
- Over 20 software intellectual property (IP) litigations
  - Managed software IP analysis and composed expert reports regarding patents, trade secrets, and copyright matters
  - Composed claim charts for patent invalidity, infringement, and non-infringement
  - Scoured academic papers, books, articles, and software manuals, as well as installed software over 20 years old on even older computers to find prior art
  - Testified in deposition for software IP litigation
- Increased security of our client's valuable materials by developing an internal asset tracking web application
- Created a customer relationship management tool that exponentially increased the number of potential customers contacted
- Independently developed a report automation tool that became an integral part of the company workflow and a key selling point of the consulting services
- Developed source code comparison relational filtering and analysis tool
- Authored seven published papers and articles based upon detailed research in several aspects of software comparison technologies

### **Theranos, Inc.**, Palo Alto, CA
AUG 2006 - FEB 2008

Firmware Developer
- Lead developer of device control system that provided a static interface and API to users while concurrently allowing interchangeability of multiple communication and device drivers to match actual hardware
- Designed and built multi-threaded system initialization, movement control, and communications
- Performed product development, including prototype design, implementation, and testing in pre-clinical settings on a multiprocessor system with Java J2ME in the communication environment and real-time C in the device control environment
- Responsible for development and documentation of use cases, test cases, system requirements, class models, safety, and critical systems analysis

### **Zeidman Technologies**, San Jose, CA
MAR 2006 - AUG 2006

Software Developer
- Developed multifaceted GUI in VB for Ethernet networking emulation software
- Upgraded complex multi-threaded DLL in VC++
- Designed and built large data post-processing methodology

# Nikolaus Baer

1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

- Researched and developed data-passing algorithms between multi-threaded VC++ and VB applications

JAN 2005 - MAR 2006

### Nascent Systems Technology, Monterey, CA
Software Developer

- Ported line-of-sight terrain database desktop application onto mobile devices using VC++, eVC++ and Windows API with RS232, Bluetooth, Wi-Fi, and USB communication
- Managed and recruited software consultants to reduce development time and increase profit
- Built and maintained marketing website using HTML and JavaScript with Flash Demo
- Wrote and published complex applications' demonstrations and tutorials
- Developed search solution in Java for making extensive documentation user-friendly which reduced a month-long documentation job to a few hours

APR 2003 - JAN 2005

### Vareda Engineering, Santa Barbara, CA
Project Engineer/Programmer

- Designed and built specialized testing and research equipment using Orcad, PADS, LabView, Assembly, Flash, Eagle, C, C++, and Java
- Built embedded circuits and matching custom drivers for PC control and setup
- Engaged directly with customers to customize products to their needs
- Supervised embedded programming of commercial product

JUN 2002 - SEP 2002

### Organic Photometrics, Santa Barbara, CA
Product Development Engineer

- Led the development of new commercial testing equipment addressing the unique needs of organic LED developers
- Developed drivers for light spectrum/strength meters and power supply
- Integrated complex hardware sensors with a user-friendly interface

## EDUCATION

- B.S. Computer Engineering (Honors), UC Santa Barbara 2004
- Technology Entrepreneurship Certificate, UC Santa Barbara 2004

## AWARDS

- First place ($10,000) Start Cup 2004 Business Plan Competition
- UCSB's Regents Scholarship, Chancellors Award, Honors, Dean's Honors
- Tau Beta Pi: Engineering Honor Society

## PAPERS AND PRESENTATIONS

- Baer, N., and Ahuja, J., "Protecting and Tracking Confidential Materials," Intellectual Property Today, May 2012.
- Baer, N. and Zeidman, B., "Measuring Whitespace Pattern Sequences as an Indication of Plagiarism," Journal of Software Engineering and Applications, 2012, April 2012.
- Shay, I., Baer, N., and Zeidman, R., "Measuring Whitespace Patterns in Computer Source Code as an Indication of Plagiarism," Intellectual Property Today, May 2010.
- Shay, I., Baer, N., and Zeidman, R., "Measuring Whitespace Patterns as an Indication of Plagiarism," ADFSL Conference on Digital Forensics, Security and Law, May 20, 2010.
- Baer, N. and Zeidman, B., "Measuring Changes in Software with CLOC," Embedded.com (www.embedded.com), July 28, 2009.
- Baer, N. and Zeidman, B., "Measuring Changes in Software IP," Intellectual Property Today, May 2009.

# Nikolaus Baer

1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

- Baer, N. and Zeidman, B., "Measuring Software Evolution with Changing Lines of Code," 24th International Conference on Computers and Their Applications (CATA-2009), April 10, 2009.
- Baer, N., "Discovering Software Trade Secret Theft," Silicon Valley CodeCamp, 11/2008
- Baer, N. and Zeidman, B., "What, Exactly, Is Software Trade Secret Theft?" Intellectual Property Today, March 2008.
- Baer, W., Baer, N., and Campbell, T., "Battlefield Visualization and Database Creation System Using One Meter Terrain," Proceedings of the ITEA Modeling and Simulation Workshop, 12/2005.

## *PATENTS*

- Baer, N. and Baer, W., Interest-Attention Feedback System for Separating Cognitive Awareness into Different Left and Right Sensor Displays, U.S. Patent 9,805,612.
- Baer, N., Marini, F., Lodi, A., and Faetani, S., Portable Unit for Determining the Position With
  Respect to a Reference, Particularly for Substantially Shielded Environments, USPTO application number 11/282,832 and EPO application number 20050110937.

## *MEMBERSHIP*

- Alumni aid officer, past-president, webmaster, and student advisor of the Northern California Scholarship Foundation (NCSF) Alumni Association
- Past Membership Chair of the Belmont Lions
- IEEE, member
- Volunteer with the Lucile Packard Children's Hospital
- Volunteer with the Mid-Peninsula Boys & Girls Club

**Nikolaus Baer**   1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

## *LITIGATION CONSULTING*

**1/2021 – 9/2021:  Jaguar Land Rover Limited and Jaguar Land Rover North America, LLC, v. Dr. Ing. h.c. F. Porsche AG, Porsche Cars North America, Inc., Volkswagen AG, Volkswagen Group of America, Inc., Automobili Lamborghini S.p.A, Automobili Lamborghini America, LLC, Audi AG, and Audi of America, LLC**
Law Firm: Latham & Watkins
Client: Jaguar Land Rover Limited and Jaguar Land Rover North America, LLC
Court: United States International Trade Commission
Investigation: 337-TA-1235
Alleged patent infringement certain vehicle control systems, vehicles containing the same, and components thereof
Provided expert report
Testified in deposition

**2/2020 – Present:  Masimo Corporation and Cercacor Laboratories, Inc., v. True Wearables, Inc. and Marcelo Lamego**
Law Firm: Merchant & Gould, P.C.
Client: True Wearables, Inc. and Marcelo Lamego
Court: U.S. District Court, Central District of California, Southern Division
Case: 8:18-cv-2001-JVS-JDE
Alleged trade secret misappropriation
Provided expert declaration
Testified in deposition

**10/2020 – Present: AMO Development, LLC, AMO Manufacturing USA, LLC and AMO Sales and Service, Inc v. Alcon LenSx, Inc., Alcon Vision, LLC, Alcon Laboratories, Inc., and Alcon Research, LLC**
Law Firm: Latham & Watkins
Client: AMO Development, LLC, AMO Manufacturing USA, LLC and AMO Sales and Service, Inc.
Court: U.S. District Court, District of Delaware
Case: 20-842 (CFC)
Alleged copyright infringement
Provided expert declaration

**12/2019 - Present: EcoFactor v. ecobee**
Law Firm: Russ August & Kabat
Client: EcoFactor
Court: United States International Trade Commission
Investigation: 337-TA-1258
Alleged patent infringement of smart thermostats, smart HVAC systems, smart HVAC control systems, and components thereof

**Nikolaus Baer** 1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

**7/2019 – Present: Neodron v. Samsung, Microsoft, Amazon, Lenovo, Motorola, Dell, and HP**
Law Firm: Russ, August & Kabat
Client: Neodron Ltd
Forum: United States International Trade Commission
Investigation: 337-TA-1162
Alleged patent infringement of capacitive touch screens

**6/2019 – Present: LIION, LLC v. Vertiv Group Corporation, et al.**
Law Firm: Benesch, Friedlander, Coplan & Aronoff LLP
Client: Vertiv Group Corporation, et al.
Court: U.S. District Court, Northern District of Illinois, Eastern Division
Case: 1:18-CV-06133
Alleged trade secret misappropriation

**6/2020 – 1/2021: In re: Tiktok, Inc.,**
Law Firm: Freed Kanner London & Millen / Carlson Lynch
Client: Plaintiffs
Court: U.S. District Court, Northern District of Illinois, Eastern Division
Case: 20-cv-4699
Class action lawsuit

**5/2019 – 5/2020: ECI Software Solutions. v. John Plyler Plumbing and Hardware, Olshan Lumber Company, Prosperity Computer Solutions, Greg Matatall, Wade Frazier, and Ed Baldridge**
Law Firm: Lewis Brisbois Bisgaard & Smith LLP
Client: Prosperity Computer Solutions
Court: U.S. District Court, Northern District of Texas
Case: 3:18-cv-02758-S
Alleged copyright infringement and trade secret misappropriation

**3/2019 – 5/2021: CallRail, Inc. v. PhoneWagon Inc. and Ryan Shank**
Law Firm: Nelson Mullins Riley & Scarborough LLP
Client: CallRail, Inc.
Court: U.S. District Court, Northern District of Georgia, Atlanta Division
Case: 1:18-cv-02207-AT
Alleged copyright infringement

**2/2019 – 9/2021: Overhead Door Corporation and GMI Holdings Inc. v. The Chamberlain Group, Inc.**
Law Firm: Latham & Watkins
Client: Overhead Door Corporation and GMI Holdings Inc.
Forum: United States International Trade Commission
Investigation: 337-TA-1209
Alleged patent infringement of movable barrier operator systems and components thereof
Provided expert report
Testified in deposition
Testified in hearing

# Nikolaus Baer

1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

**3/2019 – 5/2021: The County of Alameda v. Asif Ahsan**
Law Firm: Summit Defense
Client: Asif Ahsan
Court: Superior Court of California, County of Alameda
Case: 154286
Provided expert report
Testified in trial

**11/2018 – Present: ECIMOS, LLC v. Carrier Corporation**
Court: U.S. District Court, Western District of Tennessee
Case: 2:15-CV-2726-JPM-cgc
Appointed by the Court as Special Master

**2/2020 – 3/2021: Slingshot Printing LLC v. HP Inc.**
Law Firm: Morgan, Lewis, Bockius LLP
Client: HP Inc.
Court: U.S. District Court, Western District of Texas
Case: 6:19-CV-00362, 00363, 00364, and 00549
Alleged patent infringement of printer components

**8/2019 – 5/2020: O Web Technologies, LTD. v. Bloomin Brands, Inc.**
Law Firm: GrayRobinson, P.A.
Client: Bloomin Brands, Inc.
Forum: American Arbitration Association
Investigation: 01-1-0001-0180
Alleged trade secret misappropriation
Contract dispute
Provided expert report
Testified in arbitration

**9/2018 – 5/2019: CardioNet, LLC v. InfoBionic, Inc.**
Law Firm: Latham & Watkins
Client: InfoBionic, Inc.
Forum: American Arbitration Association
Case: AAA Case No. 01-17-00044742
Alleged trade secret misappropriation
Provided expert report
Testified in deposition
Testified in arbitration

**6/2018 – 7/2019: VKGS, LLC v. Planet Bingo, LLC, et al**
Law Firm: Stinson Leonard Street LLP
Client: VKGS, LLC
Court: District Court of Douglas County, Nebraska
Case: CI 11-8953
Alleged trade secret misappropriation
Provided expert report

**Nikolaus Baer**   1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

Testified in deposition
Testified in trial

**4/2018 – 5/2018: The State of Missouri v. Eric Greitens**
Attorney Office: St. Louis Circuit Attorney's Office
Client: The State of Missouri
Court: 22nd Judicial Circuit Court, Missouri
Case: 1822-CR00642
Alleged invasion of privacy

**1/2018 – 9/2019: Video Gaming Technologies, Inc. v. Castle Hill Studios, LLC, et al**
Law Firm: Saul Ewing Arnstein & Lehr LLP
Client: Castle Hill Studios
Court: U.S. District Court, Northern District of Oklahoma
Case: 17-cv-454-GKF-JF
Alleged trade secret misappropriation

**10/2016 – 5/2018: One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment v. The Chamberlain Group, Inc., Inter Partes Review**
Law Firm: Morgan, Lewis & Bockius LLP
Client: One World Technologies, Inc.
Forum: Patent Trial and Appeal Board (PTAB)
Proceeding: IPR2017-00214
Inter partes review
Provided expert report
Testified in deposition

**12/2017 – 9/2018: Uchytil Ex Rel. U.S. v. Avanade Inc et al**
Law Firm: Lowe Graham Jones, PLLC
Client: Uchytil Ex Rel. U.S.
Court: U.S. District Court, Western District Washington, Seattle
Case: C12-2091-JCC
Alleged fraud in procurement of government contracts

**12/2016 – 9/2019: Papst Licensing v. Apple, LG Electronics, ZTE Corporation, Samsung Electronics, Lenovo, Motorola Mobility, Huawei Technologies**
Law Firm: DiNovo Price Ellwanger
Client: Papst Licensing
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: 6:15-CV-1095
Alleged patent infringement of mobile phones

**9/2016 – 10/2016: CSS v. Christopher Herrington, Gene Yoho and Compiled Technologies**
Law Firm: Robinson & McElwee
Client: Christopher Herrington, Gene Yoho and Compiled Technologies
Court: U.S. District Court, Southern District of West Virginia, Charleston Division
Case: 2:16-CV-01762

# Nikolaus Baer

1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

Alleged copyright infringement

**8/2016 – 1/2020: Optumsoft, Inc. v. Arista Networks, Inc.**
Law Firm: Latham & Watkins
Client: Arista Networks, Inc.
Location: Santa Clara County Superior Court
Case: 1-14-CV-263257
Alleged breach of license agreement and trade secret misappropriation

**1/2016 – 6/2016: Verasonics v. Alpinion Medical Systems**
Law Firm: Davis Wright Tremaine
Client: Verasonics
Location: American Arbitration Association, International Centre for Dispute Resolution
Case: 01-15-0002-9484
Alleged trade secret misappropriation

**12/2015 – 2/2017: ACI Worldwide v. MasterCard Technologies**
Law Firm: Faegre Baker Daniels; Robins Kaplan
Client: ACI Worldwide
Court: U.S. District Court, District of Nebraska
Case: 8:14-CV-00031
Alleged trade secret misappropriation

**11/2015 – 2/2016: SalesForceOne LLC. v. Salesforce.com, Inc.**
Law Firm: Wilson Sonsini Goodrich & Rosati
Client: Salesforce.com, Inc.
Court: U.S. District Court, Northern District of California
Case: 4:2015-CV-02174
Alleged trademark infringement

**2/2015 – 1/2016: NNG, Kft. v. Ava Enterprises, Inc.**
Law Firm: Lewis Roca Rothgerber Christie LLP
Client: NNG, Kft
Court: U.S. District Court, Central District of California
Case: 2:2014-CV-00220
Alleged copyright infringement

**10/2014 – 4/2018: ObjectiVision v. Visionsearch Pty Ltd and University of Sydney**
Law Firm: K&L Gates / Marque Lawyers / Allens
Client: ObjectiVision
Court: Federal Court of Australia
Case: NSD 385 of 2014
Alleged copyright infringement

**10/2014 – 1/2016: Cross Mediaworks, LLC and Telamerica Media, LLC v. EMT Holdings, LLC and EMT & S Incorporated**
Law Firm: Maxwell & Anderson, LLC
Client: EMT Holdings, LLC

**Nikolaus Baer**   1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

Court: U.S. District Court, Southern District of New York
Case:  14 Civ. 561 (VSB)
Alleged trade secret misappropriation
Testified in deposition
Testified at a hearing

**9/2015 - 12/2015: Good Technology Corporation et al v. MobileIron, Inc.**
Law Firm: Orrick, Herrington & Sutcliffe LLP.
Client: MobileIron, Inc.
Court: U.S. District Court, District of Delaware
Case: 1:14-CV-01308-LPS-CJB
Alleged patent infringement of mobile device management

**10/2014 - 12/2015: Good Technology Corporation et al v. Airwatch, LLC**
Law Firm: Kilpatrick, Townsend, & Stockton LLP.
Client: Airwatch, LLC
Court: U.S. District Court, California Central District Court
Case: CV12-05827-EJD
Alleged patent infringement of mobile device management

**10/2014 - 8/2015: Good Technology Corporation et al v. MobileIron, Inc.**
Law Firm: Orrick, Herrington & Sutcliffe LLP.
Client: MobileIron, Inc.
Court: U.S. District Court, Northern District of California, San Jose Division
Case: CV12-05826-EJD
Alleged patent infringement of mobile device management

**11/2014 - 8/2015: Allure Energy Inc. v. Nest Labs, Inc. et al**
Law Firm: White and Case LLP
Client: Nest Labs, Inc.
Court: U.S. District Court, Eastern District of Texas
Case: 9:13-CV-102
Alleged patent infringement of smart thermostats
Provided expert report
Testified in deposition

**6/2014 - 10/2016: Delphix Corp. v. Actifio, Inc.**
Law Firm: Latham & Watkins
Client: Actifio, Inc.
Court: U.S. District Court, California Northern District Court
Case: 5:14-CV-04613-BLF, 5:14-CV-01047
Alleged patent infringement of data management

**1/2014 - 3/2015: Trebro Manufacturing v. Firefly Equipment et al**
Law Firm: Antoinette M. Tease, P.L.L.C.
Client: Trebro Manufacturing
Court: U.S. District Court, Montana District Court, Billings Division
Case:  CV -13-36-BLG-SEH

**Nikolaus Baer**   1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

Alleged copyright infringement
Provided expert report
Testified in deposition

**12/2013 – 12/2016: InfoSpan Inc et all v. Emirates NBD Bank PJSC**
Law Firm: Latham & Watkins
Client: Emirates NBD Bank PJSC
Court: U.S. District Court, California Central District Court
Case: 8:2011cv01062
Alleged copyright infringement and trade secret misappropriation
Provided expert report
Testified in deposition

**6/2013-1/2014: Cellebrite Mobile Synchronization v. Micro Systemation**
Law Firm: Pearl Cohen Zedek Latzer Baratz LLP
Client: Cellebrite Mobile Synchronization
Court: U.S. District Court, Virginia Eastern District Court, Alexandria Division
Case: 1:13-CV-01014
Alleged copyright infringement and trade secret misappropriation

**2/2013 – 5/2017: Metropolitan Health Corporate v. Neil Harvey Associates**
Law Firm: Attorneys Zumpt and Kritzinger & Co
Client: Metropolitan Health Corporate
Court: Western Cape High Court, Cape Town, South Africa
Case: 10264/2010
Alleged copyright infringement

**1/2012-7/2013: Robin Antonick v. Electronic Arts**
Law Firm: Keker & Van Nest LLP
Client: Electronic Arts
Court: U.S. District Court, Northern District of California
Case: 3:11-CV-01543
Alleged copyright infringement

**1/2012-6/2012: ThinkOptics v. Nintendo of America, et al.**
Law Firm: Nix Patteron & Roach LLP
Client: ThinkOptics
Court: U.S. District Court, Eastern District of Texas
Case: 6:2011CV00454
Alleged patent infringement of handheld controllers

**1/2012-6/2012: E-Micro Corporation v. Google, et al.**
Law Firm: Nix Patteron & Roach LLP
Client: E-Micro
Court: U.S. District Court, Eastern District of Texas
Case: 6:11-CV-465
Alleged patent infringement of mobile payment

**Nikolaus Baer**  1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

**8/2011-6/2012: Bally Technologies, Inc. v. Business Intelligence Systems Solutions**
Law Firm: Morgan, Lewis, Bockius LLP
Client: Business Intelligence Systems Solutions
Court: U.S. District Court, District of Nevada
Case: 2:2010cv00440
Alleged patent infringement of data visualization system
Provided expert report
Testified in deposition

**4/2011-6/2012: Motorola Mobility v. Microsoft**
Law Firm: Sidley Austin
Client: Microsoft
Court: U.S District Court, Southern District of Florida
Case: 1:10-CV-2406J
Alleged patent infringement of voice processing

**4/2010 – 8/2012: Brocade v. A10 Networks**
Law Firm: Orrick, Herrington & Sutcliffe and McDermott, Will & Emery
Client: Brocade
Court: U.S. District Court, Northern District of California, San Jose Division
Case: C 10-03428 LHK (PSG)
Alleged copyright infringement

**8/2010 – 3/2011: Cross Match Technologies v. Suprema and Mentalix**
Law Firm: Latham & Watkins
Client: Cross Match Technologies
Forum: United States International Trade Commission
Investigation: 337-TA-720
Alleged patent infringement of fingerprint scanning software

**3/2010 – 9/2010: Datamaxx v. Computer Products of Illinois**
Law Firm: Ausley & McMullen
Client: Computer Products of Illinois
Court: U.S. District Court, Northern District of Florida, Tallahassee Division
Case: 4:09CV435-RH/WCS
Alleged copyright infringement

**2/2010 – 7/2010: SplitFish v. Bannco**
Law Firm: Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Client: SplitFish
Court: U.S. District Court, Northern Easter District of Virginia, Alexandria Division
Case: l:10CV297
Alleged copyright infringement

**10/2009-11/2009: Sigma Six Technologies and Sigma Six Consulting. v. Nagarro and T-Systems**
**Enterprise Services.**
Law Firm: Ropers, Majeski, Kohn & Bentley PC

**Nikolaus Baer**   1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

Client: Nagarro
Court: U.S. District Court, Northern District of California, San Jose Division
Case: C 08-05633 JW
Alleged trade secret misappropriation
Provided expert report

**8/2009 – 11/2010: Zynga v. Green Patch**
Law Firm: Quinn Emanuel Urquhart & Sullivan
Client: Zynga
Court: U.S. District Court, Northern District of California
Case: CV-09-3636 SC (EMC)
Alleged copyright infringement

**8/2009 – 12/2009: De Lage Landen Operational Services v. Third Pillar Systems**
Law Firm: Wilson Sonsini Goodrich & Rosati
Client: Third Pillar Systems
Court: U.S. District Court, Eastern District of Pennsylvania
Case: 09-cv-02439-HB
Alleged trade secret misappropriation

**3/2009 – 2/2011: Financial Systems Technology v. Oracle Corporation**
Law Firm: Orrick, Herrington & Sutcliffe
Client: Oracle
Court: U.S. District Court, Eastern District of Texas
Case: 2:08-CV-371
Alleged patent infringement

**2/2009 – 10/2009: Minden Schipper & Associates v. Cancercare Manitoba (Varian Medical Systems)**
Client: Varian Medical Systems
Court: Queen's Bench, Winnipeg Centre, Canada
Case: CI 05-01-45377
Alleged copyright infringement

**11/2008 – 1/2010: Applied Materials v. Advanced Micro-Fabrication Equipment Co.**
Law Firm: Goodwin Procter
Client: Applied Materials
Court: U.S. District Court, Northern District of California
Case: C07 05248 JW (PVT)
Alleged copyright infringement

**9/2008 – 3/2010: Personnel Department v. CareerBuilder**
Law Firm: Jones, Day, Reavis & Pogue
Client: CareerBuilder
Court: U.S. District Court, District of Vermont
Case: 2:08-CV-59-wks
Alleged trade secret misappropriation

# Nikolaus Baer

1864 Walnut Dr. • Mountain View, CA • (650) 933-5292 • Nik@BaerIP.com

**9/2008 – 9/2009: Abanco Investments LLC v. GuestLogix Inc.**
Law Firm: Patterson, Thuente, Skaar & Christensen
Client: GuestLogix
Court: U.S. District Court, Northern District of Illinois
Case: 07 C 1071
Alleged trade secret misappropriation

**7/2008-10/2008: Facebook, Inc. v. StudiVZ Ltd.**
Law Firm: Orrick, Herrington & Sutcliffe
Client: Facebook
Court: U.S. District Court, Northern District of California
Case: 5:08-CV-03468 JF
Alleged copyright infringement

**4/2008 – 12/2010: Esbin & Alter v. Zappier, et al.**
Law Firm: Alter & Alter
Client: Esbin & Alter
Court: U.S. District Court, Southern District of New York
Case: 08 Civ. 313
Contract dispute

**04/2008 – 11/2008: Intelligraphics, Inc. v. Marvell Semiconductor, Inc.**
Law Firm: Sommers and Schwartz
Client: Intelligraphics
Court: U.S. District Court, Northern District of California – San Francisco Division
Case number: C-07-2499 JCS
Contract dispute

**03/2008 – 08/2008: Carl Zeiss Meditec v. Optovue**
Law Firm: Nixon Peabody
Client: Carl Zeiss Meditec
Court: U.S. District Court, Northern District of California - Oakland Division
Case number: C 07-03010 CW
Alleged copyright infringement and trade secret misappropriation

**2/2008 – 7/2008: Symantec v. Commissioner of Internal Revenue**
Law Firm: Baker & McKenzie
Client: Symantec
Court: US Tax Court
Case: 12075-06
Software tax dispute

**08/2006 – 08/2007: AdTech RFID v. Adept Identification Technologies**
Law Firm: Wilson Sonsini Goodrich & Rosati
Client: Adept Identification Technologies
Court: Santa Clara County Superior Court
Case: 1-06-CV-057464
Alleged trade secret misappropriation