1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

MASIMO CORPORATION, et al.,   )CERTIFIED TRANSCRIPT
                Plaintiffs, )
    vs.                       )
                              )  SACV-18-02001-JVS
TRUE WEARABLES, INC., et al., )
                Defendants. )
-----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 16, 2022

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

2

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiffs:

 3   JOSEPH R. RE
     STEPHEN C. JENSEN
 4   BRIAN CHRISTOPHER CLAASEN
     KNOBBE MARTENS OLSON & BEAR, LLP
 5   2040 Main Street, 14th Floor
     Irvine, CA  92614
 6   (949) 760-0404

 7   For the Defendants:

 8   PETER A. GERGELY
     MERCHANT & GOULD, PC
 9   767 Third Avenue, Suite 23C
     New York, NY  10017
10   (212) 223-6520

11   RYAN J. FLETCHER
     KRISTEN M. GEARY
12   MERCHANT & GOULD, PC
     1801 California Street, Suite 3300
13   Denver, CO  80202
     (303) 357-1670
14
     SCOTT P. SHAW
15   MERCHANT & GOULD, PC
     611 Wilshire Boulevard, Suite 808
16   Los Angeles, CA  90017
     (303) 357-1670
17

18

19

20

21

22

23

24

25
```

|     |     |
| --- | --- |
|  | 1 |
| 01:32 | 2 |
| 01:32 | 3 |
| 01:32 | 4 |
| 01:32 | 5 |
| 01:32 | 6 |
| 01:32 | 7 |
| 01:32 | 8 |
| 01:32 | 9 |
| 01:32 | 10 |
| 01:32 | 11 |
| 01:33 | 12 |
| 01:33 | 13 |
| 01:33 | 14 |
| 01:33 | 15 |
| 01:33 | 16 |
| 01:33 | 17 |
| 01:33 | 18 |
| 01:33 | 19 |
| 01:33 | 20 |
| 01:33 | 21 |
| 01:33 | 22 |
| 01:33 | 23 |
| 01:33 | 24 |
| 01:33 | 25 |

1   SANTA ANA, CALIFORNIA; MONDAY, MAY 16, 2022; 1:32 P.M.

2           THE CLERK:  Calling Item 6, SACV-18-02001-JVS,

3   Masimo Corporation, et al., versus True Wearables, Inc., et

4   al.

5           Appearances please, counsel.

6           MR. RE:  Good afternoon, Your Honor.  For the

7   plaintiffs, Joseph Re from Knobbe Martens.  With me sharing

8   the duties today are my partners Steve Jensen and Brian

9   Claassen.  I regret that Mr. Kiani couldn't be here.  He

10  tried, but he couldn't.  But in his stead is the Executive

11  Vice-President and General Counsel, Tom McClenahan.

12          THE COURT:  Very good.  Good afternoon.

13          MR. GERGELY:  Good afternoon, Your Honor.  Peter

14  Gergely from Merchant & Gould, P.C., representing the

15  defendants.  With me today are Scott Shaw and Ryan Fletcher.

16  Also today in the courtroom are Marcelo Lamego and Tatiana

17  Lamego.

18          THE COURT:  Good afternoon.

19          Any thoughts, comments, about the format I

20  proposed to go back and forth on the issues?

21          MR. RE:  None, Your Honor.  It seems reasonable.

22          THE COURT:  I'll lead off with you, Mr. Re.

23          MR. RE:  I didn't know if you wanted to deal with

24  the Motion to Strike first and get that out of the way.

25          THE COURT:  Yes, let's deal with that.

01:33   1          MR. RE:  I don't have any argument.  I just wanted
01:33   2   to point out one correction.
01:33   3          THE COURT:  Okay.
01:33   4          MR. RE:  It's page 7, and it's a significant
01:33   5   correction.  It's page 7.  It's the sentence in the third
01:33   6   paragraph, the second sentence:  "When the board later
01:33   7   concluded that no feasibility existed, plaintiffs allege
01:34   8   this was either because (1)" -- I want to correct that.
01:34   9          THE COURT:  Okay.
01:34   10          MR. RE:  We never made any allegation in this case
01:34   11   and this case had nothing to do with regard to the specifics
01:34   12   of Dr. Lamego taking things to Apple.  That's the subject of
01:34   13   a different case.  And I'm going to take the correct
01:34   14   language right out of the Findings of Facts and Conclusions
01:34   15   of Law written by the defendants.  It should say:  "Lamego
01:34   16   failed to fully disclose information critical to
01:34   17   feasibility."  That's what it should say.
01:34   18          THE COURT:  Okay.
01:34   19          MR. RE:  And with that, I have nothing further on
01:34   20   the Motion to Strike.
01:34   21          THE COURT:  Do you want to be heard on this, Mr.
01:34   22   Gergely -- Mr. Fletcher?
01:34   23          MR. FLETCHER:  Good morning, Your Honor.  I don't
01:34   24   think defendants -- this is the first I'm digesting this.
01:35   25   But I think as I sit here today, I don't think defendants

01:35    1    have an issue with that change.

01:35    2              THE COURT:  Okay.

01:35    3              MR. FLETCHER:  Thank you, Your Honor.

01:35    4              THE COURT:  Do you otherwise want to be heard on

01:35    5    the motion?

01:35    6              MR. FLETCHER:  No, Your Honor.

01:35    7              THE COURT:  Okay.

01:35    8              MR. FLETCHER:  I think we have other things to

01:35    9    focus on today.

01:35    10             THE COURT:  Okay.  Very good.

01:35    11             Where are we going to begin, Mr. Re?

01:35    12             MR. RE:  We are going to begin with Question 1.

01:35    13   I'm going to go through -- we're dividing it out, and we'll

01:35    14   go one issue at a time if that's the way you want to do it.

01:35    15             THE COURT:  That's fine.

01:35    16             MR. RE:  So we'll start with the breach of

01:35    17   contract.  I do want to address the breach of contract

01:35    18   because I don't think it was genuinely in dispute about the

01:35    19   breach of contract.  The first question is:  Do plaintiffs

01:35    20   contend that Lamego "disclosed or made use of" the folder of

01:35    21   emails he took from Cercacor, and, if so, how?  The answer

01:35    22   is, yes, we do contend that.

01:35    23             This is one area -- of all of the areas, this is

01:35    24   the one area where there really wasn't a dispute.  And in

01:36    25   all the other areas throughout this trial, we saw Dr. Lamego

01:36  1    make all sorts of excuses, blaming other people in our view,

01:36  2    making some things up that didn't make logical sense.  He

01:36  3    did what was best for him and him alone, and this was one

01:36  4    such example.

01:36  5         You'll notice from the examination of Dr. Lamego,

01:36  6    I let him go.  I let him go freely.  I think he testified

01:36  7    for four or five hours.  I stopped him on cross-examination

01:36  8    after the first 40 to 50 minutes, and then you did a

01:36  9    cross-examination for about 30 minutes.

01:36  10        THE COURT:  Well, I prefer to just call it an

01:36  11   examination.

01:36  12        MR. RE:  Examination.  But you did more tight

01:36  13   questions that I wasn't able to do.  I let him go

01:36  14   open-ended, and you tried to not let him do that.  I read

01:36  15   the transcript, and there's at least four, five, six times

01:37  16   when you say, no, no, no, no, no.  Those are examples of the

01:37  17   witness not wanting to be forthcoming in answering the

01:37  18   questions.

01:37  19        But this question that you've asked him, No. 1, is

01:37  20   actually one area where he tried to say that they weren't

01:37  21   worthy of protection under the agreement, but they were

01:37  22   confidential.  He first said, "I didn't take anything

01:37  23   confidential" in paragraphs 31 and 50 of his direct witness

01:37  24   statement.  But then the argument now goes, well, they

01:37  25   weren't technical in nature and blah, blah, blah, and they

01:37  1  made more excuses.

01:37  2          But this use --

01:37  3          THE COURT:  This leads into a question later on,

01:37  4  but whether they're trade secrets or not, his

01:37  5  Confidentiality Agreement wouldn't have allowed him to have

01:37  6  taken anything.

01:37  7          MR. RE:  Correct, and that is one of your other

01:37  8  questions.  We'll get to that.

01:37  9          THE COURT:  Yes.  It's down the line.

01:37  10          MR. RE:  We'll get to that question, too.  Yes,

01:37  11  these were clearly confidential.  The witness admitted they

01:37  12  were all marked "Confidential."  The excuse he gave -- I

01:38  13  will now read his answer when I specifically asked him:

01:38  14          "Q.  And the reason you printed these out and took

01:38  15  them was to protect yourself, right?"

01:38  16          And you asked questions, too, along this same

01:38  17  subject.  I'm reading from the March 18 transcript, page 14,

01:38  18  starting at line 4.  This is the answer he gave, and this is

01:38  19  why the answer to your question on No. 1 is yes:

01:38  20          "A.  Well, I think yesterday it shows very clearly

01:38  21  that if I had not printed these out, I would be in real

01:38  22  trouble here."

01:38  23          So not only is Dr. Lamego agreeing that he had a

01:38  24  purpose for taking the documents, but he's actually

01:38  25  explaining to us in this answer -- and it goes on -- that he

01:38    1    succeeded.  The purpose for use that he made of these

01:38    2    documents was to prepare for litigation in this case.

01:38    3           And he expected litigation since 2009, well before

01:38    4    some of the other excuses he gave about Masimo being

01:39    5    litigious against the Sotera employees, which didn't start

01:39    6    until 2013.  But he admitted taking documents since 2009 to

01:39    7    prepare, and he continued to work at Cercacor through

01:39    8    January 2014.  We submitted Findings of Fact 790 and

01:39    9    Conclusion of Law 122 that specifically goes to this issue.

01:39    10           He continues in this answer on page 14 of the

01:39    11    Friday transcript, and now he's going to give one of the

01:39    12    excuses.  And by the way, this excuse he gives is the only

01:39    13    acknowledgment the defendants ever give in their brief or

01:39    14    their Findings of Facts and Conclusions of Law of Dr. Lamego

01:39    15    testifying in answering any questions that I asked or that

01:39    16    you asked.

01:39    17           There's no mention in their brief of any answers

01:39    18    Dr. Lamego gave other than we made a document public by not

01:40    19    having it under seal in front of Judge Early in 2021.  Other

01:40    20    than that statement, they never acknowledge a single answer,

01:40    21    any testimony, that Dr. Lamego gave if there was a response

01:40    22    to a question I asked or if it's a question that you asked.

01:40    23    So all those admissions that Dr. Lamego gave you, none were

01:40    24    referred to in their briefs, their findings of fact, or

01:40    25    their closing argument brief.

01:40  1          And he continued in this answer, and he said:  "So

01:40  2  if I did not keep this document, they would never produce

01:40  3  these documents."  So now he's giving the reason.  It's a

01:40  4  good thing I stole them because now it had to be produced in

01:40  5  the litigation, ha, ha.  And he said:  "You tried to

01:40  6  disqualify me as much as you could."  See, he thinks this is

01:40  7  about his reputation.  "But then since I kept that email, it

01:40  8  is now part of the information thanks to you" -- he's

01:40  9  thanking me -- "where Joe Kiani calls me the world's expert

01:41  10  scientist.  You could not come here and try to downgrade me

01:41  11  or misrepresent my qualifications."

01:41  12          So the answer to your question is not only is that

01:41  13  a use, he is bragging that his use was fulfilled, that he

01:41  14  got the documents he liked to use in litigation that he

01:41  15  anticipated for many, many years.  So I think that is a use.

01:41  16          Now, I don't want the Court to think that's the

01:41  17  only breach.  We have failure to return, which is another

01:41  18  breach.  But I also think it's significant, the guilty

01:41  19  conscience that he had, thinking he'd be in litigation since

01:41  20  2009 and began to start collecting documents.

01:41  21          We also don't know the extent of the documents.  I

01:41  22  want to make that clear.  If you look at Exhibit 311, which

01:41  23  was the Mark Holland letter, it's a selection of some of the

01:41  24  documents that Mark Holland, the lawyer, and Dr. Lamego

01:41  25  thought were favorable to Dr. Lamego in responding to

01:41  1    Masimo's first letter back in 2016.  But if you look at
01:42  2    Exhibit 313, which is another group of documents, you'll see
01:42  3    there's no overlap.  311 was not a subset of 313.  The
01:42  4    binder of 313 was purportedly the documents he took, but it
01:42  5    can't be anywhere near the full amount of the documents that
01:42  6    were taken because 311 has additional documents, and there's
01:42  7    no overlap in the documents.
01:42  8            Also, you asked Dr. Lamego some questions that it
01:42  9    didn't make much sense to just keep the cover emails:
01:42  10   "Where are all the attachments referred to?  How does that
01:42  11   help you just to have a cover email?"  He responded:  "Well,
01:42  12   it shows that I was a senior member of the Masimo and
01:42  13   Cercacor team." Nonsensical.
01:42  14           So I just think the record is pretty clear, well
01:42  15   beyond a preponderance, that we don't know the extent of the
01:43  16   documents that were in fact taken.
01:43  17           I'd like to go now to your next question, which is
01:43  18   actually I think to them about do they object to the
01:43  19   returning.  I just want to make it clear that they shouldn't
01:43  20   object, but we probably don't know the extent of all the
01:43  21   documents that were in fact taken.
01:43  22           You also asked on this issue:  If the Court finds
01:43  23   breach, besides ordering return of the emails, what is left
01:43  24   to be done regarding remedy?  This is a great question
01:43  25   because it allows me to explain some of the significance of

01:43 1    the case.  The significance of this case is -- obviously at

01:43 2    Masimo and Cercacor, this case is very significant to them

01:43 3    because they have been trying through trade secret law to

01:43 4    protect some of their non-patented technology, particularly

01:43 5    the Rainbow technology.  You'll hear more about that when we

01:44 6    come to the remedy phase of this discussion.

01:44 7            But it is very important and I think it's an

01:44 8    agreement that this case is an important example, because

01:44 9    this was the highest technical officer at Cercacor.  He

01:44 10   obviously had access to the -- he reported to the CEO of

01:44 11   both Masimo and Cercacor.  It's very important, one, that

01:44 12   there's a declaration that he did in fact take confidential

01:44 13   documents in violation of his Employment Agreement.  We do

01:44 14   want the Employment Agreement upheld.  We do want there to

01:44 15   be a finding and a declaration that he in fact did take

01:44 16   these documents.

01:44 17           Also, there needs to be an injunction.  We also

01:44 18   fear use of any of the information.  So this should cover

01:44 19   beyond trade secrets, including confidential information.

01:44 20   And one of your questions goes to that, that the trade

01:44 21   secret law takes care of the trade secrets.  But we have a

01:44 22   lot of information here that may not fit in the CUTSA

01:44 23   definition of "trade secret" like personnel information.  We

01:44 24   talked about the hiring of Tom Blank, his salary, and how

01:45 25   much money was spent on various programs.  Some of that is

01:45  1  clearly confidential even though it may not rise to the

01:45  2  technical definition of a "trade secret" under CUTSA.

01:45  3          So we do want the injunction and the declaration.

01:45  4  And we do think the Court is free to find that he did take

01:45  5  more than the documents that were produced in this case.

01:45  6  There are more documents.  There clearly are more documents,

01:45  7  not only the attachments, but we have a mismatch between 311

01:45  8  and 313.  And he wasn't able to give you a credible

01:45  9  response.

01:45  10          Now, your next question is:  Do the rights to

01:45  11  compel the return of information extend beyond trade

01:45  12  secrets?  The answer is yes.  The statute is clear on this,

01:45  13  by the way.  First of all, the Confidentiality Agreement

01:46  14  protects all confidential information under the definition

01:46  15  in that contract.  That is set forth in paragraph two of the

01:46  16  contracts.  But CUTSA itself in Section 3426.7(b) is

01:46  17  explicit that the CUTSA law does not affect contractual

01:46  18  remedies, whether or not based upon the misappropriation of

01:46  19  a trade secret.  So the preemption law of CUTSA was

01:46  20  carefully laid out in the statute to not impact contract

01:46  21  remedies.

01:46  22          Now I'd like to go to the breach of fiduciary

01:46  23  duty.

01:46  24          THE COURT:  Well, let's hear from --

01:46  25          MR. RE:  Oh, that's right.  That's a separate

01:46    1   issue.  Okay.

01:46    2              THE COURT:  Mr. Gergely.

01:46    3              MR. GERGELY:  Thank you, Your Honor.

01:46    4         With respect to the first question, it's a fairly

01:46    5   narrow question, whether Dr. Lamego "disclosed or made use

01:46    6   of" the information.  I think it's uncontested that he

01:47    7   didn't disclose any of the information to the public.  He

01:47    8   testified that he kept it confidential, kept it "Attorney's

01:47    9   Eyes Only," and produced it in this litigation.  So there's

01:47   10   been no disclosure of that information.

01:47   11         With respect to whether he made use of it, I know

01:47   12   Mr. Re is arguing he's made use -- you know, that basically

01:47   13   he made use of it to basically bolster his litigation

01:47   14   position.  I think if that is a quote from one of the

01:47   15   agreements that a fair reading of that would be some type of

01:47   16   business or commercial use.  I don't think that's what the

01:47   17   agreement contemplated, that it would be some type of a --

01:47   18   almost like a self-protection mechanism.  I don't think

01:47   19   that's what the agreement contemplated.

01:47   20              THE COURT:  Are you saying consistent with his

01:47   21   obligations he could take documents to protect himself?

01:47   22              MR. GERGELY:  I don't think he can take documents

01:47   23   to protect himself, but he certainly didn't make use of them

01:48   24   within the scope of this particular question.  And we don't

01:48   25   object to the return of those physical documents.  That's

01:48    1    certainly a fair request, and I think Dr. Lamego is ready,

01:48    2    willing, and able to turn it back over.  It's only I think

01:48    3    maybe a hundred or so pages of documents.

01:48    4             But really with respect to breach, I mean, I think

01:48    5    one of the issues that needs to be examined is whether given

01:48    6    the scope of documents and electronic information that's at

01:48    7    issue in this case -- I mean, it's -- we all saw the

01:48    8    hundreds of notebooks in the courtroom full of exhibits, as

01:48    9    well as -- I mean, there's probably gigabytes of electronic

01:48   10    information at issue.

01:48   11             In order to establish breach, the plaintiff has to

01:48   12    prove that Dr. Lamego did not substantially perform his

01:49   13    Confidentiality Agreement.

01:49   14             THE COURT:  Is that measured by volume or

01:49   15    significance?

01:49   16             MR. GERGELY:  Probably both.  I would say both.

01:49   17             THE COURT:  Three pages of crown jewel information

01:49   18    can be enough, couldn't it?

01:49   19             MR. GERGELY:  Correct, but that's not we're

01:49   20    dealing with.  There's no crown jewels in that hundred

01:49   21    pages.  There's no showing of lack of substantial

01:49   22    performance.  I think he did.  And I think he did

01:49   23    substantially comply with those agreements.

01:49   24             The fact that he --

01:49   25             THE COURT:  So how much does he get to take before

| | | |
|---|---|---|
| 01:49 | 1 | it constitutes substantial? |
| 01:49 | 2 | MR. GERGELY:  Well, I think Your Honor's point is |
| 01:49 | 3 | a good one.  If it was a trade secret -- |
| 01:49 | 4 | THE COURT:  Well, how much does he get to take? |
| 01:49 | 5 | You're saying that there wasn't a substantial breach.  How |
| 01:49 | 6 | much does he get to take before it's substantial? |
| 01:49 | 7 | MR. GERGELY:  I think that's up to the Court. |
| 01:49 | 8 | THE COURT:  Well, do you want to help me with the |
| 01:49 | 9 | record or your view? |
| 01:49 | 10 | MR. GERGELY:  I would say that's a tough question |
| 01:49 | 11 | to answer, because -- |
| 01:50 | 12 | THE COURT:  Well, if it's going to be -- |
| 01:50 | 13 | MR. GERGELY:  -- it's a question of fact, and yet |
| 01:50 | 14 | I think you have to look at what was -- |
| 01:50 | 15 | THE COURT:  But it's your job to marshal the facts |
| 01:50 | 16 | and help me answer the question. |
| 01:50 | 17 | MR. GERGELY:  Where do you draw that line?  I |
| 01:50 | 18 | think you would draw it at whether or not there was a trade |
| 01:50 | 19 | secret that was in those documents.  I would say if there |
| 01:50 | 20 | was, then there wouldn't be substantial performance.  But |
| 01:50 | 21 | the fact that there is maybe a hundred pages of |
| 01:50 | 22 | miscellaneous stuff that he really kept to protect himself |
| 01:50 | 23 | that basically describes his experience, his qualifications, |
| 01:50 | 24 | and also his disputes with Mr. Kiani, that's not a lack of |
| 01:50 | 25 | substantial compliance. |

01:50    1          I appreciate that it is difficult to define.  It
01:50    2   may be one of those issues, if this was, say, a jury trial
01:50    3   that, you know, a jury would have to decide.  But I think
01:50    4   you're -- I think that's right.  It probably would be
01:50    5   dependent on volume but also significance of the issue.
01:50    6          THE COURT:  Okay.
01:51    7          MR. GERGELY:  With respect to the issue of --
01:51    8   well, Mr. Re was getting into the issue of, you know, he was
01:51    9   speculating that there must be some other documents as well
01:51   10   that were taken.  The plaintiffs had every discovery tool at
01:51   11   their disposal.  Dr. Lamego testified under oath that that's
01:51   12   what he had.  He turned it back over.  Mr. Re is speculating
01:51   13   that there must be some other stuff.
01:51   14          Well, we all know, because we know what happened
01:51   15   in the Sotera Wireless case, that there is the ability of a
01:51   16   third-party expert to come in, a forensic expert, to
01:51   17   determine if documents were downloaded, printed, et cetera.
01:51   18   We all know that that didn't occur in this case.  I think
01:51   19   that speaks volumes as to what Dr. Lamego may or may not
01:52   20   have done.
01:52   21          I can speculate, but my guess is that given the
01:52   22   fact that a forensic analysis was done in Sotera Wireless,
01:52   23   it's probably fair to say that it possibly and probably
01:52   24   occurred in this case.  I don't know because it's work
01:52   25   product if a firm is in charge of that.  We don't know if

01:52    1    that occurred or not, but I suspect it probably did.  And my

01:52    2    suspicion is it probably didn't turn up any good results,

01:52    3    because if it did, we would have seen that evidence in

01:52    4    court, and we did not.

01:52    5            So for Mr. Re to speculate that, oh, there must be

01:52    6    some other stuff out there that Dr. Lamego took, I think is

01:52    7    just pure speculation, and it's not supported by any

01:52    8    evidence of record.  It's just argument of counsel.

01:52    9            THE COURT:  Okay.

01:52    10           MR. GERGELY:  With respect to remedy, they want a

01:52    11   declaration that he took confidential documents.  Again, I

01:53    12   guess this gets into the issue of was there a breach?  I

01:53    13   mean, I think if the Court makes a finding, it makes a

01:53    14   finding.  I don't know that Dr. Lamego has to sign some sort

01:53    15   of document like a -- on a mea culpa basis saying that he

01:53    16   took this folder of documents.  I think that's been fairly

01:53    17   admitted at this point.

01:53    18           They say that they want an injunction beyond trade

01:53    19   secrets.  I'm not sure that that's allowable.  I think we

01:53    20   cited a case in our briefing, and I don't have the cite in

01:53    21   front of me.  But my memory is that under California law

01:53    22   trade secrets may be protectable under a Confidentiality

01:53    23   Agreement.  I don't think there's any dispute about that.

01:53    24   But the issue is if we start getting into other

01:53    25   documentation which is not a trade secret, it may offend the

01:54    1    law against non-competes in California.  And I believe that

01:54    2    we briefed that issue.

01:54    3            So it's kind of a fine line.  I mean, I -- we

01:54    4    stipulate that he will return any of those documents.  But

01:54    5    whether that extends to sort of ambiguous or nebulous

01:54    6    information that may be in his head that is not a trade

01:54    7    secret, I don't think he can be compelled to quote/unquote

01:54    8    "return" that.  I think that would -- it's -- number one,

01:54    9    it's impossible.  But, number two, I think it would violate

01:54    10   the law on non-competes.

01:54    11           So, Your Honor, I think that answers all of your

01:54    12   questions with respect to contract.

01:54    13           THE COURT:  Well, I'm inclined to agree with you

01:54    14   in terms of an injunction.  If it's not a trade secret, I

01:54    15   don't think he can be enjoined from using it.  But he would

01:54    16   still have to return any confidential information as a

01:55    17   matter of contract.

01:55    18           MR. GERGELY:  Right, the hundred pages of --

01:55    19           THE COURT:  Right.  Okay.

01:55    20           MR. GERGELY:  -- of stuff.  Yeah, we have no

01:55    21   objection there.

01:55    22           THE COURT:  Okay.  Thank you.

01:55    23           Move on to the next topic.

01:55    24           MR. RE:  Okay.  I can imagine the message that

01:55    25   would be sent to the thousands of Masimo employees that it's

01:55    1    okay to take it as long as you don't think it's substantial.

01:55    2    I hope we don't get into that.

01:55    3            Breach of fiduciary duty, your first question is

01:55    4    on the statute of limitations:  Does the four-year statute

01:55    5    of limitations begin to run when Cercacor returned the

01:55    6    licensing fees to Masimo (August 2014)?  The answer is no.

01:55    7    First of all, that's not when the license fees were

01:55    8    returned.  They were returned March 2015.  So it's

01:55    9    conclusions of law we have in our Findings 139 through 141.

01:56    10   Cercacor in August of 2014 had to do more testing.

01:56    11           And on the statute of limitations, the leading

01:56    12   case which I have in front of me here Fox v. Ethicon Endo,

01:56    13   35 Cal.4th, 797, 808 to 813, in order for the statute of

01:56    14   limitations to begin, the plaintiff must have had, quote,

01:56    15   "reason to suspect that a type of wrongdoing has injured

01:56    16   them essential to the cause of action."

01:56    17           Back in 2014, as we heard from Mr. Kiani in his

01:56    18   direct, no one suspected any nefarious or wrongdoing of any

01:56    19   type from Dr. Lamego in 2014.  So that's why the statute of

01:56    20   limitations -- in fact, Kiani testified in Findings of Fact

01:56    21   318, Kiani 205, that he believed Lamego was going to go on

01:57    22   and work on something unrelated, noncompetitive, which is

01:57    23   what he was told.  It wasn't until the announcement of the

01:57    24   Oxxiom that Joe Kiani, as he explained -- and it's

01:57    25   Conclusion of Law 144 -- that he realized that there might

01:57  1   have been wrongdoing to investigate.

01:57  2          The next question on the breach of fiduciary duty

01:57  3   is another very good one in the sense that it asks:  What

01:57  4   impact, if any, does Chen's review of the slide deck have on

01:57  5   plaintiffs' ability to prove that Lamego knowingly acted

01:57  6   against Cercacor's interests in making the presentation?

01:57  7   The answer is none, zero.  Chen never attended the board

01:57  8   meetings.  Chen did not know what Lamego said to the board

01:57  9   and knew nothing about what happened at the board meeting.

01:57  10  Chen testified affirmatively that he had no information on

01:57  11  whether Lamego withheld any information in his presentation.

01:57  12         And we know from this trial that Dr. Lamego did

01:57  13  withhold because he admitted it to you.  He admitted that he

01:58  14  didn't believe in the timeline.  He said to you, and I

01:58  15  quote, "Honestly, to tell you the truth, no, I didn't

01:58  16  believe in the timeline."  And then you asked through

01:58  17  another two pages of transcript:  "Did you tell anybody?

01:58  18  Did you tell anyone on the board?"  And he said:  "No."

01:58  19         He also admitted that he thought that -- the

01:58  20  excuse about the new data, that it would have taken more

01:58  21  data wouldn't affect the timeline.  He admitted that to you

01:58  22  as well.  And he admitted that it was reasonable for the

01:58  23  board to rely upon the presentation and the timeline.

01:58  24         So their argument that the timeline is merely

01:58  25  aspirational, nothing in the record suggests it's

01:58    1    aspirational.  That is just contrary to the record.  I can't

01:58    2    find the word "aspirational" anywhere in the testimony.  So

01:58    3    it was a timeline that Dr. Lamego did not believe in but

01:58    4    didn't tell anybody.

01:58    5         So what Chen knew and didn't participate at the

01:58    6    board level can be irrelevant.  Obviously, an officer who

01:58    7    has a fiduciary can't wash his hands by showing something to

01:59    8    a lower level employee.  The duty is to the corporation, in

01:59    9    this case, Kiani and his fellow board members.

01:59   10         The next question you have is a little more

01:59   11    complicated:  Is the 50/50 data split -- you have two

01:59   12    questions.  Is the 50/50 data split underlying Lamego's

01:59   13    analyses apparent from the slides?  That has one answer.

01:59   14    But I think the second question is much more significant:

01:59   15    Was there testimony about how using this method was known to

01:59   16    cause errors or skew feasibility results?

01:59   17         I'm going to answer in reverse order because it's

01:59   18    a little easier.  That is, this question obviously came from

01:59   19    their brief, and it came from their brief at page 44, lines

01:59   20    2 through 7.  They cite one thing for this argument,

01:59   21    paragraph 30 of Sean Merritt.  Sean Merritt was the Rockley

01:59   22    engineer who came and testified, and Mr. Jensen

02:00   23    cross-examined him.

02:00   24         He gave some testimony we did object to.  So this

02:00   25    question raises objectionable testimony.  We objected

02:00    1    because they tried to use Dr. Merritt as an expert, and

02:00    2    there was no disclosure of him as an expert.  I objected at

02:00    3    trial about that issue.  There was no Rule 26 disclosure.

02:00    4            This paragraph 30 of Dr. Merritt is 100 percent

02:00    5    speculative opinion on his part.  If you go to his witness

02:00    6    statement, his witness statement discusses this 50/50 split,

02:00    7    but it's all in hindsight.  It's all afterwards, after Dr.

02:00    8    Lamego left the company.  In fact, it's in the section

02:00    9    entitled "The G2 Project After Dr. Lamego's Departure" on

02:00   10    page 7.  Then he goes several paragraphs talking about his

02:00   11    hypothesis and what he suspected was likely the cause, and

02:00   12    he has several paragraphs about that retrospective analysis

02:01   13    in 2014.

02:01   14            And it's in paragraph 30 where he says:  "The

02:01   15    results of this further analysis demonstrated that the prior

02:01   16    correlations were not correct."  Dr. Merritt determined

02:01   17    "that the primary error that likely occurred" -- so

02:01   18    "likely."  It was still a hypothesis, so it's not apparent

02:01   19    to anybody.  And this is in hindsight, not at the time of

02:01   20    the board presentation -- "was due to the data being

02:01   21    randomly split 50/50 across the whole data set for test and

02:01   22    training.  However, this 50/50 data split is clear in the

02:01   23    presentation and is not hidden."

02:01   24            What's really significant about this argument is

02:01   25    they no where suggest that it was -- apparently would lead

02:01    **1**    to an error.  There's no argument on the second part that

02:01    **2**    using this method was known to cause errors.  In fact, Dr.

02:02    **3**    Lamego testified affirmatively that he believed in the

02:02    **4**    methodology at the time of the presentation.  Dr. Lamego --

02:02    **5**    it's paragraph 26 of his direct witness statement.  He says:

02:02    **6**    "The 50/50 split was not error and was a valid method."  And

02:02    **7**    he explains that in detail in his direct witness statement.

02:02    **8**         So the closing argument that they made about the

02:02    **9**    50/50 split from where this question comes is contrary to

02:02   **10**    their own client's direct testimony that he believed in the

02:02   **11**    50/50 split, and he explains that's how other devices are

02:02   **12**    done at Masimo and Cercacor.

02:02   **13**         So was it apparent?  The answer is no.  In fact,

02:02   **14**    it's unclear what the 50/50 data split even is.  And was

02:03   **15**    there testimony about how using this method was known to

02:03   **16**    cause errors?  No.  In fact, Dr. Lamego said the opposite.

02:03   **17**    It's good, valid, and he thought so at the time.  So error

02:03   **18**    it is not.

02:03   **19**         You might ask yourself why did Dr. Lamego go

02:03   **20**    through all this?  I think the record is clear that he was

02:03   **21**    upset about not being CTO.  He wrote to Tim Cook that night,

02:03   **22**    and then he gave the board presentation.  He promised -- in

02:03   **23**    Exhibit 1083, he promised Joe Kiani that he would not leave

02:03   **24**    the company until feasibility was either proven or proven

02:03   **25**    not to be feasible.  And I think he picked let me show that

02:03  1    it's feasible, and that's what happened.  That explains why

02:03  2    he was overly optimistic.

02:03  3            Oh, Mr. Jensen wants me to cite to the record the

02:03  4    page where it's ambiguous in Exhibit 306.  Now, Dr. Lamego

02:03  5    gave particular cites to his statement to Exhibit 306.  Sean

02:04  6    Merritt did not.  Sean Merritt did not refer to any

02:04  7    particular page in Exhibit 306, because Sean Merritt said he

02:04  8    just read it for proofreading and word choice.  He was not

02:04  9    really the author of this presentation.

02:04  10           But if you go to Masimo 113893, this heading shows

02:04  11   you why it's ambiguous about the 50/50 split.  Here it says:

02:04  12   "Half of patient population was used for global calibration

02:04  13   design.  The other half was used for testing with first two

02:04  14   blood samples of each run used for bias correction."  So

02:04  15   that's much more clear than the statement that Dr. Lamego

02:04  16   pointed to, which was the 22 subjects, the 48 sensors.

02:04  17           So the answer to the question is, no, none of this

02:04  18   was apparent.  It's ambiguous.  And only Dr. Lamego -- he's

02:04  19   the only one that actually addressed the statements, and he

02:04  20   thought it was fine in his direct statement.  I have nothing

02:05  21   further.

02:05  22           THE COURT:  Mr. Shaw.

02:05  23           MR. SHAW:  Thank you, Your Honor.  Good afternoon.

02:05  24           The first question from the Court is with respect

02:05  25   to the four-year statute of limitations.  In the plaintiffs'

02:05    1    briefing, they contend that they did not have any reason to

02:05    2    suspect Dr. Lamego of any wrongdoing until January 2016 when

02:05    3    the Oxxiom was released by True Wearables.  But plaintiffs'

02:05    4    position is the release of the Oxxiom had no relation to the

02:05    5    October 2013 board presentation.  It had to do with the

02:05    6    Chem-5 panel.

02:05    7            If Dr. Lamego had misrepresented any results to

02:05    8    the board during that October 2013 meeting, Cercacor knew in

02:06    9    April.  They certainly knew in August 2014.  At least that's

02:06   10    consistent with the testimony and the evidence.

02:06   11            THE COURT:  Why?  Because they asked for the money

02:06   12    back?

02:06   13            MR. SHAW:  I'm sorry?

02:06   14            THE COURT:  Because they asked for the money back?

02:06   15            MR. SHAW:  Yes, of course.  I mean, when Sean

02:06   16    Merritt took over the project and conducted the analysis --

02:06   17    there's an unrebutted declaration from him, paragraphs 20 to

02:06   18    37, that he knew.  I think I have a quote here in paragraph

02:06   19    4:  "I determined as early as April or May 2014 that

02:06   20    noninvasive measurement of approximately 20 blood parameters

02:06   21    was not feasible."  That's from Sean Merritt.  He told Mr.

02:06   22    Kiani.  That's in paragraph 36.  Mr. Merritt's knowledge is

02:06   23    imputed to Cercacor.

02:06   24            Mr. Hammond admitted in cross-examination that he

02:06   25    knew in August 2014.  He said on page 59 I think of

02:07    1    March 13:

02:07    2        "Q. And you testified this occurred in

02:07    3    approximately August 2014; is that right?

02:07    4        "A. That was the board meeting, yes.

02:07    5        "Q. Okay. It's fair to say that at least at that

02:07    6    time Cercacor had reason to believe that the five licensed

02:07    7    parameters were not feasible, right?

02:07    8        "A. Right.

02:07    9        "Q. At that time they were questioned?

02:07    10       "A. Yes."

02:07    11       We contend that's when the statute of limitations

02:07    12   accrued, because that's when they had reason to believe that

02:07    13   Mr. Lamego's presentation to the board was inaccurate.

02:07    14       The next question that the Court posed was: What

02:07    15   impact, if any, does Chen's review of the slide deck have on

02:07    16   plaintiffs' ability to prove that Lamego knowingly acted

02:07    17   against Cercacor's interests in making the presentation?

02:07    18       Plaintiffs submit that it has a major impact on

02:07    19   plaintiffs' ability to prove that he acted knowingly against

02:08    20   Cercacor's interest. Chen and the entire team would be at

02:08    21   the presentation. They all signed off on it. Dr. Lamego

02:08    22   did not misrepresent anything. He and everyone else thought

02:08    23   the presentation was fine. He and his team were forthright.

02:08    24   There is unrefuted testimony from Merritt at pages 20 to 26,

02:08    25   testimony from Paul, 49 to 55, Lamego, 25 to 46, and even

02:08   1   Chen's testimony at trial from 3/16 at pages 120 to 122.

02:08   2           Mr. Re said the word "aspirational" was not found

02:08   3   anywhere in any documents.  But there was a word that --

02:08   4           THE COURT:  Certainly, wasn't that the gist of Dr.

02:08   5   Lamego's testimony with regard to the timelines and

02:08   6   predictions in the presentation?

02:08   7           MR. SHAW:  Right.  That's the gist of it, correct.

02:08   8   Yeah, I mean, they're aspirational.  But the word that was

02:08   9   found in his presentation to the board was "preliminary."

02:09  10   That was found on 15 different slides, all the slides that

02:09  11   they're now contending were somehow -- that he had

02:09  12   misrepresented the status of these as not being preliminary.

02:09  13           So think about it, preliminary, feasible,

02:09  14   possible.  These were testified to.  These were the facts.

02:09  15   We're not talking about validation.  We're not talking about

02:09  16   confirmation, substantiation, or clinically ready to go to

02:09  17   market.  We're talking about feasibility, preliminary,

02:09  18   possible.  These were the words that were used in the actual

02:09  19   presentation to the board.  And every single Cercacor

02:09  20   employee who had anything to do with it substantiated Dr.

02:09  21   Lamego's testimony.

02:09  22           The last question regarding the 50/50 data split,

02:09  23   Mr. Re said that Merritt's testimony in paragraph 30 was

02:10  24   hindsight and speculation.  But that's not necessarily

02:10  25   completely accurate, because if we look back at paragraphs

| | | |
|---|---|---|
| 02:10 | 1 | 27, 28, and 29, Mr. Merritt describes -- he lays the |
| 02:10 | 2 | foundation.  He says: "I took over the responsibilities for |
| 02:10 | 3 | leading the engineering team.  This isn't a one-man show. |
| 02:10 | 4 | This isn't Dr. Lamego doing something out there on his own |
| 02:10 | 5 | contrary to the company's interests.  This is a team effort. |
| 02:10 | 6 | These are sophisticated measurements and results and things |
| 02:10 | 7 | that need to be done by a team of engineers." |
| 02:10 | 8 | And Merritt took over that responsibility.  He |
| 02:10 | 9 | conducted the further analysis.  And from that analysis and |
| 02:10 | 10 | that foundation, he concluded information regarding the |
| 02:10 | 11 | 50/50 split.  So I'm taking that from what Mr. Re said. |
| 02:10 | 12 | With respect to the Court's first question, |
| 02:10 | 13 | though, is the 50/50 data split underlying Lamego's analyses |
| 02:11 | 14 | apparent from the slides?  It's not only apparent, but it is |
| 02:11 | 15 | explicit.  It's laid out there.  Exhibit 83 is the |
| 02:11 | 16 | presentation.  At Bates Nos. 113893 and 3894, it is there |
| 02:11 | 17 | for everyone to see, Mr. Kiani, Diab, the entire board. |
| 02:11 | 18 | It's all there. |
| 02:11 | 19 | At page 113901 through 3914, there's 14 pages, |
| 02:11 | 20 | where it says, 22 subjects, 48 sensors, and a pool of 356 |
| 02:11 | 21 | (blood sample, noninvasive sample), data pairs with 50 |
| 02:11 | 22 | percent randomly selected points, used for training and |
| 02:11 | 23 | 50 percent for tests."  This isn't something that was hidden |
| 02:11 | 24 | or not disclosed or not understood.  It was all there in |
| 02:12 | 25 | black and white and presented to the board.  That's called |

02:12  1    being forthright, forthcoming.  That's what happened.

02:12  2            Dr. Lamego further testified about it in paragraph

02:12  3    26.  Merritt testified that Diab would understand and have

02:12  4    been aware of this, as well at paragraph 30.

02:12  5            There was simply no testimony from the plaintiffs

02:12  6    using this method was known to cause errors or skew

02:12  7    feasibility results.  If Merritt went back as he did and

02:12  8    conducted further analysis and discovered this, he certainly

02:12  9    didn't conclude that Dr. Lamego did anything intentionally

02:12  10   wrong or to harm the company.  Dr. Lamego testified he

02:12  11   believed it was a valid method.  It was used for Pronto-7,

02:12  12   and the Rad-57 used identical methods.

02:12  13           So if there was an error with this method, then it

02:12  14   wasn't known.  It wasn't intentionally withheld or that he

02:12  15   tried to deceive anybody.  It was stated in the

02:12  16   presentation.

02:12  17           That's all I have, Your Honor.

02:13  18           THE COURT:  Okay.

02:13  19           MR. SHAW:  Thank you.

02:13  20           MR. RE:  We might have some agreement here.

02:13  21           THE COURT:  Mr. Re.

02:13  22           MR. RE:  The Merritt testimony that was objected

02:13  23   to by us was just paragraph 30, number one.  Number two,

02:13  24   there's nothing in Merritt about any wrongdoing.  Wrongdoing

02:13  25   was what the statute of limitations requires.  Why would

02:13    1    when Mr. Kiani said it wasn't until the Oxxiom he now

02:13    2    question the motives of Dr. Lamego?  It's not that they

02:13    3    needed to be substantively connected technology-wise, but it

02:13    4    was he saw disloyalty.  And that's what Joe Kiani testified.

02:13    5            What Mr. Shaw left out was the citation I gave to

02:13    6    his own client's direct testimony:  "I believe this was a

02:13    7    valid method because Cercacor's focus was on medical

02:13    8    products for home use."  We agree it was not apparent, and

02:13    9    he seemed to agree.

02:13   10            So was it apparent?  No.  It certainly wasn't

02:13   11    apparent that it would lead to errors.  And it sounded like

02:14   12    Mr. Shaw agreed that it wouldn't lead -- no one would know

02:14   13    that it would lead to error.  But he left out the admissions

02:14   14    of Dr. Lamego, that Dr. Lamego didn't believe in the

02:14   15    timeline.  But the preliminary data he keeps talking about,

02:14   16    he forgot that Dr. Lamego admitted to you that getting the

02:14   17    additional data could be done within the timeline.  So

02:14   18    talking about the preliminary, preliminary, it's all

02:14   19    preliminary, it didn't affect the schedule, because like Joe

02:14   20    Kiani testified, all the products require continual data

02:14   21    gathering.  That's normal.  That's to be expected.

02:14   22            Of course, there's only 22 samples.  Of course,

02:14   23    you get more data.  But Dr. Lamego admitted to the Court --

02:14   24    he admitted that the data would not slow down the project.

02:15   25            So, again, the arguments from the defendants leave

02:15    1    out some of the key admissions that were made by Dr. Lamego

02:15    2    in this trial.  And they leave out the fact that after this

02:15    3    presentation they got bonuses.  Everybody was happy with the

02:15    4    presentation.  It's true.  So the error, obviously not

02:15    5    apparent.  So they can't go both ways.

02:15    6            THE COURT:  Okay.  Let's move on to the trade

02:15    7    secrets.

02:15    8            Mr. Claassen.

02:15    9            MR. CLAASSEN:  Your Honor, as we move into these

02:15   10    trade secret questions, I notice there are some people in

02:15   11    the room who may not be covered by the Protective Order.

02:15   12            THE COURT:  Let me know when we get there.

02:15   13            MR. CLAASSEN:  Okay.

02:15   14            So the very first question is:  How do plaintiffs'

02:15   15    respond to defendants' various arguments that plaintiffs did

02:15   16    not possess some of the trade secrets because the

02:15   17    documentation on which plaintiffs rely show only bits and

02:15   18    pieces of certain trade secrets?  And you had an e.g., for

02:16   19    Trade Secret 1, 5, and 11.

02:16   20            And you heard from the witnesses at this trial

02:16   21    that many of these trade secrets, particularly 1, 5, and 11,

02:16   22    were the culmination of years of development work at Masimo

02:16   23    and Cercacor.  And Masimo relied on both documents and

02:16   24    testimony showing the entirety of each of those trade

02:16   25    secrets.

02:16    1          The question I think comes from the defendants'

02:16    2    closing brief at pages 18, 22, and 32, that there is no

02:16    3    requirement that a single document include the entirety of a

02:16    4    trade secret.  In fact, CUTSA itself defines a "trade

02:16    5    secret" as information.  There's not even a requirement that

02:16    6    the trade secret be in any document.  It can be within the

02:16    7    knowledge of a person, for example.  So there's certainly no

02:16    8    requirement that a trade secret be within a single document,

02:16    9    let alone several documents.

02:16   10          The closest case on point rejecting the theory

02:17   11    that a combination of information needs to be disclosed in a

02:17   12    single document comes from a Northern District case.  That's

02:17   13    UniRam Technology v. Taiwan Semiconductor.  And the cite for

02:17   14    that is 617 F.Supp 2d 938 at 941 (N.D. Cal. 2007).

02:17   15          Now, I can go into the specifics of each of those

02:17   16    three trade secrets if the Court would like.  I don't know

02:17   17    if that response is really what you were looking for or if

02:17   18    you wanted to know about the specifics of each trade secret.

02:17   19          THE COURT:  Well, you're saying take the bits and

02:17   20    pieces collectively, and they disclose the trade secrets.

02:17   21          MR. CLAASSEN:  Between the bits and pieces of --

02:17   22    in the documents and the testimony.  So you heard adequate

02:17   23    disclosure of the trade -- you heard testimony and multiple

02:17   24    documents showing adequate disclosure of each of the trade

02:17   25    secrets.  And I can go through each of those trade secrets

02:18   1    if it would be helpful to the Court, or I can just give you

02:18   2    citations if that would be helpful, or I could just move on

02:18   3    to the next question.

02:18   4               THE COURT:  Why don't you move on to the next

02:18   5    question.

02:18   6               MR. CLAASSEN:  Okay, I'll move on to the next

02:18   7    question.

02:18   8               Your next question was:  To prove existence of a

02:18   9    trade secret, do plaintiffs have to prove that the

02:18   10   information remains a trade secret (e.g., For Trade Secret

02:18   11   5, plaintiffs admit that upon releasing the Radius PPG, the

02:18   12   secret strategy relating to creating a wireless pulse

02:18   13   oximeter became public)?

02:18   14               So the simple answer to this question is, no, and

02:18   15   that's because the statute itself controls.  If you go to

02:18   16   CUTSA at 3426.1(B), it begins with the definition "at the

02:18   17   time of disclosure or use."  So the trade secret is

02:18   18   evaluated as of the time of the disclosure or use, not as of

02:18   19   the time of, for example, the trial that we had.  There is a

02:19   20   case on point on that issue as well.  It's Group One, Ltd.,

02:19   21   v. Hallmark Cards, Inc., and that's 254 F.3d 1041.  That's a

02:19   22   Federal Circuit case in 2001.

02:19   23               Your next question was:  For any former trade

02:19   24   secret information that plaintiffs themselves made public,

02:19   25   how is harm measured during the period of time beginning at

02:19  1    misappropriation and ending when the trade secret owner
02:19  2    elects to make it public?
02:19  3             Generally, the response not specific to this case
02:19  4    is that it could be a head start.  That again is addressed
02:19  5    directly in CUTSA itself at 3426.2(a).  And that
02:19  6    contemplates that an injunction can extend beyond the
02:19  7    secrecy to eliminate the commercial advantage or benefit
02:19  8    from the misappropriation.  The focus here is on how the
02:20  9    defendant was unjustly enriched.  In this case, Dr. Lamego
02:20  10   retained the benefit of the head start over legitimate
02:20  11   competitors, so any relief or harm from this trade secret
02:20  12   becoming public could still extend beyond the trade secret
02:20  13   becoming public.
02:20  14            There's a Ninth Circuit case on point on that
02:20  15   issue, and that is Winston Research Corp. v. Minnesota
02:20  16   Mining and Manufacturing, and the cite is 350 F.2d 134, and
02:20  17   that's at 141 to 143 (Ninth Circuit 1965).  In that case,
02:20  18   after a public disclosure of a trade secret, the Court found
02:20  19   it appropriate to issue an injunction for the time period in
02:20  20   which competitors would require -- or the time period
02:21  21   competitors would require after the disclosure in order to
02:21  22   develop the trade secret.
02:21  23            The other harms and remedies that we would be
02:21  24   seeking with respect to that trade secret that's now become
02:21  25   public is the declaration of willful and malicious

02:21  1   misappropriation.  That was in our Conclusions of Law,

02:21  2   Paragraph 128(c).  And then you could also consider it with

02:21  3   respect to attorneys' fees, and that was paragraph 129 of

02:21  4   our Conclusions of Law.

02:21  5          I'll move on to your next question with respect

02:21  6   to -- this really is a question for the defendants:  Do

02:21  7   defendants contend that if an employee uses a former

02:21  8   employer's trade secret from memory, that is insufficient to

02:21  9   constitute misappropriation?

02:21  10         Again, we dealt with cases on this.  It's in our

02:21  11  Conclusions of Law, Paragraph 39.  I won't belittle the

02:21  12  point, but that's where you can find the pieces.

02:22  13         THE COURT:  If you've seen how you do the magic

02:22  14  trick, you don't need to write it down.

02:22  15         MR. CLAASSEN:  You don't need to write it down.

02:22  16  That's exactly right.  Once you know the magic trick, you

02:22  17  know the magic trick, especially once you've known the magic

02:22  18  trick for 12 years.

02:22  19         Moving on to your next question on Trade Secret 1,

02:22  20  your question was:  If the Court finds Trade Secret 1 was

02:22  21  implemented in Oxxiom only up to version 1.6.3, what remedy,

02:22  22  if any, is appropriate with respect to later Oxxiom

02:22  23  versions?

02:22  24         So the first remedy that would be appropriate

02:22  25  would be a declaration of willful and malicious

02:22  1   misappropriation, and we asked for that in Conclusions of

02:22  2   Law 128(c).

02:22  3          We would also think that an appropriate remedy

02:22  4   would be an injunction against rollback to that previous

02:22  5   version of code.  The reason that that's important is in

02:23  6   this case Dr. Lamego changed from Trade Secret 1 to Trade

02:23  7   Secret 12.  So it's defining that if he also misappropriated

02:23  8   Trade Secret 12, we would want to make sure that he doesn't

02:23  9   rollback to using Trade Secret 1.

02:23  10         Is that clear to Your Honor?

02:23  11         THE COURT:  I think so.

02:23  12         MR. CLAASSEN:  Okay.  But there's nothing to do on

02:23  13  the later versions of code with respect to Trade Secret 1 in

02:23  14  particular.

02:23  15         Your next question was for Trade Secret 5, and it

02:23  16  was:  Given the stated "success of the Radius PPG and

02:23  17  failure of others to offer a similar solution," wasn't the

02:23  18  value of Trade Secret 5 realized, and relatedly, how was

02:23  19  Masimo harmed?

02:23  20         So I covered this again just a few questions ago.

02:23  21  It's a very related question.  The focus here is on how Dr.

02:23  22  Lamego was unjustly enriched.  He retained the benefit of a

02:23  23  head start over what would otherwise be legitimate

02:24  24  competition.  So, again, if he had waited until the Radius

02:24  25  PPG was announced and shipping, how long would it take him

37

02:24　　1　to develop a similar product?

02:24　　2　　　　　What's notable here is how long would it take him

02:24　　3　to develop a product without misappropriating all the other

02:24　　4　trade secrets?  So you can't really look at Trade Secret 5

02:24　　5　in pure isolation, because there's not really evidence of

02:24　　6　how long it would take Dr. Lamego without misappropriating

02:24　　7　other trade secrets in this case.

02:24　　8　　　　　In fact, the only testimony you really heard about

02:24　　9　the length of development time was from Mr. Diab, and he

02:24　10　explained that he had projected that it would take

02:24　11　approximately ten man-years to develop a similar project.

02:24　12　But even his estimate was based upon knowing what Masimo

02:24　13　knew at that time.  So there's some long period of time it

02:24　14　would take a competitor.  And you also heard from Mr. Kiani

02:24　15　that even sitting here today the archrival competitors to

02:25　16　Masimo don't have a product.  That is in his declaration at

02:25　17　paragraphs 126 to 128.

02:25　18　　　　　So the injunction here, if you grant an

02:25　19　injunction, should extend for a reasonable period of time to

02:25　20　account for how long it would take someone to develop.  And

02:25　21　that's going to be a number of years, because the Radius PPG

02:25　22　was announced in 2019, and we're now here in 2022 without a

02:25　23　serious competitor.

02:25　24　　　　　THE COURT:  If it takes ten man-years to develop

02:25　25　the technology, how does the Court translate that into a

02:25    1    specific period?

02:25    2            MR. CLAASSEN:  Well, with respect to True

02:25    3    Wearables in particular, there is one man at True Wearables,

02:25    4    so the calculation could be fairly simple.

02:25    5            THE COURT:  Okay.

02:25    6            MR. CLAASSEN:  For another company, it would be

02:25    7    more difficult, but here you've got one person.

02:25    8            Moving on to your next question:  Trade Secret 8,

02:25    9    what is the value?  Here, the value -- there's a low bar for

02:26   10    value with respect to trade secrets.  You actually addressed

02:26   11    the cases directly on point in the Preliminary Injunction

02:26   12    Order, and those are cited in our Conclusions of Law No. 31.

02:26   13            The value here for Trade Secret 8 in particular

02:26   14    comes from Dr. McNames' testimony.  He testified that Trade

02:26   15    Secret 8 improves the determination of pulse rate.  That's

02:26   16    from McNames 124 and our Findings of Fact Nos. 227 and 484.

02:26   17    In response, True Wearables' experts offered no opinion

02:26   18    disputing the economic value.  We cited that in our briefing

02:26   19    as well.

02:26   20            Chen's testimony doesn't really change that

02:26   21    because he testified the code didn't work for SpHb.  That's

02:26   22    not the particular value that McNames was talking about.

02:26   23    SpHb is a much more complicated endeavor than measuring

02:27   24    pulse rate.

02:27   25            Also, True Wearables used Trade Secret 8, so there

02:27  1    is some inherent value in the trade secret all on its own.

02:27  2           And the other value to Masimo is in having a

02:27  3    statement that employees can't make determinations on their

02:27  4    own about what they're free to take.  So it's again

02:27  5    consistent with the theme of Dr. Lamego setting an example

02:27  6    for the rest of Masimo and Cercacor, particularly for those

02:27  7    engineers that he led.  He was the Chief Technology Officer.

02:27  8    Other employees will be looking to what he did and what

02:27  9    happens as a result.  So Masimo would request that you

02:27  10   carefully consider that in determining the value of Trade

02:27  11   Secret 8.

02:27  12          I'll move on to your next question, Trade Secret

02:27  13   9.  You asked:  Did Daft address whether the Oxxiom source

02:27  14   code or TW patent application implement this trade secret?

02:27  15   The answer is no.  He didn't comment on the Oxxiom source

02:28  16   code or True Wearables patent applications with respect to

02:28  17   the specific details of Trade Secret 9.  What he did instead

02:28  18   was rely on his model-based distinction.  And you have

02:28  19   another question on the model-based distinction.  I want to

02:28  20   save the discussion about the model-based distinction for

02:28  21   that.  But there is nothing specific as to Trade Secret 9 in

02:28  22   his analysis for either source code or the patent

02:28  23   applications.

02:28  24          Okay, we're making pretty good progress on these

02:28  25   questions.  The next question was on Trade Secret 11.  Now,

02:28  1    I want to make sure this is clear to the Court.  The

02:28  2    question was:  Did Daft (or another witness) analyze whether

02:28  3    Trade Secret 11 was present in the Oxxiom source code or

02:28  4    True Wearables patent applications?

02:28  5           The expert on behalf of the defendants who opined

02:28  6    on Trade Secret 11 was Dr. Goldstein.  Dr. Goldstein gave an

02:29  7    unsupported conclusion at paragraphs 52 and 53 of his

02:29  8    witness statement with no citation to any particular lines

02:29  9    of source code.  For the patent applications, Dr. Goldstein

02:29  10   did not compare them to the definition of Trade Secret 11.

02:29  11   What he did instead was redefine Trade Secret 11 based on

02:29  12   characterizing what McNames' opinion was on Trade Secret 11.

02:29  13   So he didn't do a direct comparison.  What he did was not a

02:29  14   direct comparison of Trade Secret 11 itself to either the

02:29  15   code or the patent applications.  He used McNames' analysis

02:29  16   as a kind of shortcut to try and characterize it and attack

02:29  17   the McNames' analysis with respect to the patent

02:30  18   application.

02:30  19          On Trade Secret 11, it's also notable that

02:30  20   Mr. Diab's testimony is unrebutted about his development of

02:30  21   Trade Secret 11.  And that's detailed in our Findings of

02:30  22   Fact No. 563.  You can also find it in Mr. Diab's notebook,

02:30  23   and that's JTX-69 at MASM0141101.  So that's Trade Secret

02:30  24   11.

02:30  25          Moving on to Trade Secret 12, you had the same

02:30    1    question with respect to Trade Secret 12.  Again, this is

02:30    2    Dr. Goldstein, and he had no meaningful analysis of source

02:30    3    code with respect to Trade Secret 12.  The only place where

02:30    4    it's addressed is in his paragraph 128.  And on the patent

02:30    5    applications, he repeated the same analysis he performed

02:31    6    with respect to the preliminary injunction.

02:31    7         He didn't directly address the patent

02:31    8    applications.  What he did was focus on comparing that trade

02:31    9    secret -- I'm going to refraining from calling it, just so

02:31   10    we can keep everybody here in the courtroom unless you

02:31   11    prefer otherwise.  He didn't focus on comparing Trade Secret

02:31   12    12 to -- or he did focus on comparing it to publications

02:31   13    that he contended made that trade secret generally known.

02:31   14         So the comparison he did -- or the analysis he did

02:31   15    was not specifically analyzing the patent applications from

02:31   16    True Wearables itself.  So the McNames analysis of source

02:31   17    code and applications is pretty much unrebutted with respect

02:31   18    to Trade Secret 12.

02:31   19         All right, on to your final question on the trade

02:31   20    secrets, which was:  If the Court concludes that plaintiffs'

02:31   21    approach of measuring certain empirical data is different

02:31   22    than defendants' approach of fitting pleth signal data to a

02:31   23    model, which, if any trade secret misappropriation claims

02:32   24    does this impact?

02:32   25         From the plaintiffs' point of view, there's no

02:32  1    impact on the use of trade secrets whatsoever.  That's

02:32  2    because the analysis itself was unhelpful with respect to

02:32  3    the specifics of any of the individual trade secrets.  What

02:32  4    happened here is there is an attempt to find kind of a

02:32  5    through line with respect to all of the trade secrets in

02:32  6    making a distinction.

02:32  7            But really what happened here is what's

02:32  8    actually -- that a party may not use another's trade secret

02:32  9    with what it considers its own independent improvements if

02:32  10   the products themselves or the modifications themselves are

02:32  11   the product or process or are substantially derived from

02:32  12   other trade secrets.  We cited cases for you, including

02:32  13   SkinMedica v. Histogen on that point.  So that's the legal

02:33  14   point.  You can find that at our Conclusions of Law No. 41.

02:33  15           Factually, I can go into why the analysis does not

02:33  16   distinguish any of the trade secrets.  But before I do that,

02:33  17   I'd ask that anyone here leave the court.

02:33  18           Would you like me to go through that analysis?

02:33  19           THE COURT:  Yes, please.

02:33  20           MR. CLAASSEN:  Dr. Lamego is I think okay to stay.

02:33  21   I don't know --

02:33  22           MR. GERGELY:  Actually, Dr. Lamego should leave.

02:33  23           MR. CLAASSEN:  It's up to you, because this will

02:33  24   be within the scope of what's been disclosed to Dr. Lamego

02:33  25   already.  I'm not going into details that are more than he's

02:33  1    already seen.  If Mrs. Lamego would like to leave, that's --
02:33  2    go ahead and leave.
02:33  3            MR. GERGELY:  I think they should both leave.
02:33  4    They haven't been here for the entire trial.
02:33  5            (Courtroom cleared)
02:33  6            (The following portion was under seal:)
03:21  7            (End of sealed portion)
03:21  8            THE COURT:  Now we'll move on to the patent
03:21  9    infringement claim.
03:21  10           Mr. Re.
03:21  11           MR. RE:  These are the more easy questions.  Did
03:21  12   Stone address blocking emitter light (what is claimed), as
03:21  13   opposed to blocking ambient light, with respect to
03:21  14   infringement or obviousness?  The issue of ambient light
03:21  15   really only came up on validity.  Dr. Stone admitted that
03:21  16   the prior art does not disclose blocking emitter light.
03:21  17   That's our Finding of Fact 739 and his testimony on March 22
03:22  18   on page 79.  He agreed that the references Larrabee, Agnes,
03:22  19   and Sweitzer all are not addressing emitter light.
03:22  20           Stone mentions that the prior art blocks ambient
03:22  21   light.  That's our Finding of Fact 747.  And he agreed
03:22  22   Sweitzer cannot block emitter light because the device is
03:22  23   off while the cover is on, and putting a cover on Sweitzer
03:22  24   actually activates it.  So the cover is off, and it only is
03:22  25   talking about ambient light.  So on the validity side, he

44

03:22  1    addressed it, but he conceded in our direction.

03:22  2         On the infringement side, he agreed with

03:22  3    Goldberg's test that the amount of light received by the

03:22  4    detector is not sufficient.  So on the infringement side,

03:23  5    this idea of blocking emitter light to prevent a false

03:23  6    reading was not addressed at all with regard to

03:23  7    infringement.  And you'll remember their theory on

03:23  8    infringement was if there's two rooms side-by-side, the

03:23  9    light goes to the sky, and that's it.

03:23  10        They did not address the idea of blocking emitter

03:23  11   light coming back to the detector, which might cause a false

03:23  12   reading.  And the false reading is only caused by the

03:23  13   reflection back with an AC component.  Mr. Kiani explained

03:23  14   that the invention would give the false reading if you have

03:23  15   an AC component when it's hanging on a bed, for example, and

03:23  16   it moves.

03:23  17        So Dr. Stone only addressed emitter light not even

03:23  18   leaving the device.  His demonstration on the stand was

03:23  19   completely misleading.  That was dealing with whether or not

03:23  20   you got a reading when it's on the finger.  But blocking

03:24  21   emitter light is when it's not on the patient.  So I think

03:24  22   that answers your question.

03:24  23        With regard to the instructional video, Dr. Stone

03:24  24   agreed that the TW instructional video for Oxxiom does show

03:24  25   activation before the removal of Tab 2.  That's set forth

03:24  1    with citations in our Finding of Fact, Paragraph 719, where

03:24  2    Stone agreed.  He said so when I asked him in the March 22

03:24  3    transcript, page 86, lines 3 through 6.

03:24  4              THE COURT:  Who's going to address this?  Mr.

03:24  5    Gergely?

03:24  6              MR. GERGELY:  Thank you, Your Honor.

03:24  7              Dr. Stone did address the issue of whether or not

03:24  8    the Oxxiom device has an alleged cover that blocks a portion

03:25  9    of the emitter light from reaching the detector.  He

03:25  10   actually had it in his declaration where he had Tab 2 on.

03:25  11   He turned the device on, and he actually showed that light

03:25  12   was trying to come out of the device.  It was hitting the

03:25  13   reflective cover, and it was scattering back towards the

03:25  14   detector.

03:25  15             It actually showed the opposite of what's claimed.

03:25  16   It's not blocking a portion of the light from the emitter

03:25  17   from reaching the detector.  It actually promotes the light

03:25  18   from the emitter to reach the detector because it reflects

03:25  19   it back.  That was the example I gave where he had a

03:25  20   reflective cover over the two rooms.  The light goes out.

03:25  21   It hits the alleged cover.  It comes back down, and it hits

03:25  22   the detector.  So it does the opposite of what's claimed.

03:26  23             With respect to the issue of obviousness, Dr.

03:26  24   Stone is assuming that plaintiffs' extremely broad

03:26  25   interpretation of what the claim language means would be

03:26    1    true in looking at the issue of obviousness.  If you assume

03:26    2    what they're saying is true with respect to alleged

03:26    3    infringement, then those elements are shown in the prior

03:26    4    art.

03:26    5            If you are recall, the Sweitzer device actually

03:26    6    looked somewhat similar to the Oxxiom device where it had

03:26    7    the emitter and the detector side by side, and it had an

03:26    8    opaque cover on it.  There was one embodiment where you

03:26    9    would peel the cover off, and that would activate the

03:27   10    device.  But there are also alternate embodiments where the

03:27   11    device could be activated with a battery or RF energy from

03:27   12    outside the device.  In that case, one of ordinary skill in

03:27   13    the art would know that if you're trying to prevent the

03:27   14    light from the emitter from reaching the detector, you'd

03:27   15    simply leave that cover on.  That's where the secondary

03:27   16    references come in, Larrabee and Agnes.

03:27   17            It's true that those covers in those devices serve

03:27   18    to block out ambient light.  However, the point is that it

03:27   19    was known to cover a device to protect it from accidental

03:27   20    triggering by light.  So that was known.  That's the

03:27   21    teaching that's being applied, not that you're taking that

03:28   22    cover wholesale and applying it to Sweitzer.

03:28   23            In Sweitzer, the opaque cover was known, and it

03:28   24    was known to cover the emitter and detector.  It was known

03:28   25    that that cover could be on when you're using, for example,

03:28    1    like a battery or an outside RF energy device.  So that's

03:28    2    the combination, and the combination is obvious.

03:28    3            With respect to the instructional video, there's

03:28    4    some important points there, the most important of which is

03:28    5    that the video was created before the patent issued.  So

03:28    6    that's not evidence of infringement because the patent --

03:28    7    you can only infringe a patent upon issuance.  This

03:28    8    instructional video predated the issuance of the patent.  In

03:29    9    fact, it may have even predated the application.  I'm not

03:29   10    sure on that, but I'm certain it predated the issuance, so

03:29   11    it's not evidence of infringement.

03:29   12            It was also labeled "Confidential," and it was

03:29   13    also a draft.  There's no evidence that the video was ever

03:29   14    made public.  Again, the significance of that is there's no

03:29   15    evidence that the public is out there using this particular

03:29   16    device and infringing configuration, i.e., leaving Tab 2 on

03:29   17    and turning the device on.  In fact, the instructions state

03:29   18    the opposite, that the device is activated after the removal

03:29   19    of Tab 2.

03:29   20            That's all I have on patent infringement, Your

03:29   21    Honor.

03:29   22            THE COURT:  Okay.  Thank you.

03:29   23            MR. GERGELY:  Oh, sorry, I have one other point.

03:29   24    Again, this is with respect to the issue of infringement.

03:30   25    Interestingly, Mr. Goldberg when he was trying to prove up

03:30  1   infringement was actually shining ambient light on the

03:30  2   device.  So his evidence of infringement didn't establish

03:30  3   that the cover was serving to prevent the light from the

03:30  4   emitter from hitting the detector.  He was showing the white

03:30  5   LED light on the device with Tab 2 on.

03:30  6          Again, that is not evidence of what the claim is.

03:30  7   If anything, it's an experiment with respect to ambient

03:30  8   light and I think plaintiffs have conceded that's just

03:30  9   irrelevant to the issue of infringement.  Thank you.

03:30  10          MR. RE:  On the evidentiary objections --

03:30  11          THE COURT:  I think what it's really calling for

03:30  12   is there are a couple of silver bullets out there.

03:31  13          MR. RE:  Yes.

03:31  14          THE COURT:  Okay.

03:31  15          MR. RE:  None that knocks a claim out altogether

03:31  16   for a defense.  But the ones that are significant -- and I

03:31  17   addressed one already today -- it's the opinion testimony

03:31  18   and argument that they're extracting from the Rockley

03:31  19   witnesses.  These witnesses, which they treat as objective

03:31  20   third parties -- Dalvi, Paul, and Merritt -- we had 701 Rule

03:31  21   26 objections on all three.  And we saw that one of your

03:31  22   questions today was derived from an argument from Merritt

03:31  23   where he gives opinion testimony in paragraph 30.

03:31  24          So of the objections that matter, it's the 701

03:31  25   Rule 26.  No disclosure of that opinion testimony from the

03:31  1    three Rockley witnesses, particularly Dr. Merritt.

03:31  2            THE COURT:  Mr. Gergely.

03:31  3            MR. GERGELY:  Your Honor, we would agree that

03:31  4    there's no silver bullet with respect to evidentiary

03:32  5    objections that would knock out a claim or a defense.

03:32  6    However, there were significant objections to Kiani,

03:32  7    McNames, and Goldberg's testimony, and we think that that

03:32  8    testimony would be significantly gutted.

03:32  9            With respect to the issue of the three

03:32  10   gentlemen -- Dalvi, Merritt, and Paul -- who testified, I

03:32  11   don't believe that they were in any different position than

03:32  12   Mr. Chen, and I think we posed an expert objection to Chen.

03:32  13   You know, these are highly skilled persons, and they can

03:32  14   testify as to facts that are within their knowledge.  That

03:32  15   may encompass what may seem like highly technical

03:32  16   expert-type areas, but it's just areas within their

03:33  17   knowledge.  So we don't think that these three witnesses are

03:33  18   in any different position than Mr. Chen.  Thank you.

03:33  19            MR. RE:  I must.  They were the ones trying to use

03:33  20   Mr. Chen as an expert.  We objected.  I think it was

03:33  21   Mr. Lateef that objected.  They put a patent in front of

03:33  22   Mr. Chen and made him opine on it, and he never had seen it

03:33  23   before in his life.  So I agree with Mr. Gergely.  They

03:33  24   should not use any of the fact witnesses for opinion

03:33  25   testimony.  And we certainly did not do that with Mr. Chen.

```
03:33    1    They did.
03:33    2              So I do think there was some stretching of some
03:33    3    witnesses, but where it was egregious, it was done by them,
03:33    4    not us.  And they did it most blatantly with Dr. Merritt,
03:33    5    Mr. Dalvi, and Mr. Paul.
03:33    6              Mr. Paul, by the way -- we did a statement from
03:33    7    Mr. Paul.  He wouldn't cooperate with us.  So our statement
03:33    8    from Mr. Paul was just out of his deposition.  That's all
03:33    9    they would do because he was represented by Apple.  And the
03:34   10    Apple lawyer who was here -- that witness would only
03:34   11    cooperate with them, and then they extracted these opinions
03:34   12    from these three Rockley people to make the kind of
03:34   13    arguments which we saw on page 44 of their brief.
03:34   14              MR. GERGELY:  Your Honor, may I respond?
03:34   15              THE COURT:  Sure.
03:34   16              MR. GERGELY:  Yes, I believe we did object to
03:34   17    Chen -- or actually, no.  I'm sorry.  The plaintiffs did
03:34   18    object to Chen, and Your Honor overruled them.  You said
03:34   19    that was within his knowledge.
03:34   20              I did want to add one other objection, which was
03:34   21    in plaintiffs' post-trial briefing, they tendered expert
03:34   22    reports from Kiani and Diab.  Those were not part of the
03:34   23    trial record, and we move to strike those.  There was no
03:34   24    opportunity to cross-examine those because that wasn't part
03:34   25    of their declarations.
```

03:34  1        I think what they were trying to do there is they

03:34  2  were offering those declarations to shore up the lack of

03:34  3  evidence with respect to trade secret value with respect to

03:35  4  certain trade secrets which are just not in the record, so

03:35  5  we move to strike those.

03:35  6        MR. RE:  Well, I agree on that.  That is, they

03:35  7  were not put in for the substantive evidence.  It was to

03:35  8  contrast and respond to their objections to Kiani and Diab.

03:35  9  Kiani and Diab did Rule 26 disclosures.  Their witnesses did

03:35  10  no disclosure.  We were just contrasting.  We were not

03:35  11  trying to augment the record with those.  We were just

03:35  12  contrasting the types of witnesses and why their objection

03:35  13  should be overruled because we did a Rule 26 disclosure.

03:35  14  Our Rule 26 objection should be sustained because they

03:35  15  didn't.  That was the only purpose of submitting those.

03:35  16        THE COURT:  I won't strike them, but they're only

03:35  17  going to be received for the limited purpose you've just

03:35  18  stated, not as a substantive effort going to any liability

03:35  19  issue.

03:35  20        MR. RE:  Correct.  Thank you, Your Honor.

03:35  21        THE COURT:  Okay, let's turn to remedies.  You've

03:35  22  touched on a number of these points briefly.

03:36  23        MR. JENSEN:  Yes, I think we have, Your Honor.

03:36  24  Thank you.

03:36  25        I think that your questions will elicit almost

03:36    1    everything I'd like to say.  I'd like to preface it with

03:36    2    just some general comments if the Court would indulge me.

03:36    3    That is, I think what's become apparent is that from the --

03:36    4    our waiver of legal remedies should have made it clear if it

03:36    5    didn't -- I think it made it clear that this case is not

03:36    6    about past harm.

03:36    7          So questions about the past harm to Masimo -- yes,

03:36    8    there is past harm, but any damages -- when we waived those,

03:36    9    that's because any damages even if they could be paid -- any

03:36   10    damages would dramatically belittle the value of these trade

03:36   11    secrets.  We didn't want there to be some idea that, okay,

03:36   12    some larger company decides to pay the damages, and they've

03:36   13    paid their debt.  Even the $14 million unjust enrichment

03:36   14    measure, which is still in -- you asked a question about

03:36   15    that, and I will address it -- would be no more than a fly

03:37   16    buzzing around the people who are interested in Masimo's

03:37   17    Rainbow technology.  It's just so insignificant compared to

03:37   18    the value of these trade secrets.

03:37   19          When we consider the remedies, I think that

03:37   20    Lamego's testimony and the witnesses that came to try to

03:37   21    defend him, and the common defense that the relief -- the

03:37   22    case is bigger than what is going on here.  I think that's

03:37   23    apparent.  So if relief becomes focused on trying to

03:37   24    segregate one specific piece or another, I think we'll lose

03:37   25    what we actually tried to show.

03:37  1          We had to select.  We didn't pursue all of the

03:37  2     trade secrets.  It's not because we didn't believe in them.

03:37  3     We've tried to be very conscientious with the Court's time

03:37  4     and tried to select those things that would show the nature

03:37  5     of the effect, the nature of the misappropriation, the

03:37  6     nature of the taking, the breaches of contract, the nature

03:37  7     of what was going on here.

03:37  8          We presented unrebutted evidence during the trial

03:37  9     that third parties want Masimo Rainbow.  We learned during

03:38  10    cross-examination of Sean Merritt that also the entire

03:38  11    Rainbow team that reported to Dr. Lamego has reassembled at

03:38  12    Rockley, who is trying to do those Rainbow parameters.

03:38  13         There is some -- there's a confidentiality issue

03:38  14    here, Your Honor, and it's Apple's.  I don't think I've seen

03:38  15    Apple's lawyers in the courtroom, so I'm just going to

03:38  16    identify it.  But Mr. McClenahan from our client is not

03:38  17    entitled to see these documents.  I think I can address them

03:38  18    without revealing their contents.

03:38  19         I would just direct the Court to Denby Sellers'

03:38  20    deposition at page 132, lines 5 through 12, and joint

03:38  21    Exhibit 3402, which talks about the perceptions and the

03:38  22    importance of some of these things, and I think it sheds

03:39  23    some light on the relief we're requesting.

03:39  24         We were presented unrebutted testimony that Apple

03:39  25    thought Masimo's technology was the platinum in noninvasive

03:39    1    monitoring, and that they had interest in purchasing

03:39    2    Cercacor, and that that information was conveyed to Dr.

03:39    3    Lamego.  We presented unrebutted testimony that the Rainbow

03:39    4    technology was kept secret because once the original patents

03:39    5    from Masimo's set were published, the whole industry became

03:39    6    geniuses.  That was through Mr. Kiani.  We've learned

03:39    7    through unrebutted testimony that, therefore, Masimo kept

03:39    8    all of this Rainbow technology secret.

03:39    9          When we learned for the first time during

03:39    10   cross-examination that this whole team has reassembled, I

03:39    11   think you can understand how important this case is in terms

03:39    12   of deterring future use and the remedies.

03:40    13         You asked a really important question I think,

03:40    14   which is, you know, where do you draw the line between what

03:40    15   someone can take with them and what they cannot?  The case

03:40    16   law provides some very good guidance, and that is the trade

03:40    17   secret statute itself.  If it's generally known, it's

03:40    18   something that the person can take with them.  If it's not

03:40    19   generally known, experience that is transferable is that

03:40    20   type of experience that they learn anywhere, not things that

03:40    21   are specific to that employer's way to compete.  Any

03:40    22   experience that is based on the proprietary or confidential

03:40    23   information is not something that they can go use.

03:40    24         There's actually a really good case on this.  We

03:40    25   actually cited to the Mattel case, and that's in our

03:40    1    Conclusion of Law 39.  That also cites to another case,

03:40    2    Greenly versus Cooper, which is at 77 Cal.App.3d at

03:41    3    pages 391 to 392.  That's a 1978 case.  I'll quote from that

03:41    4    case on those pages, and Mattel which we cited in our

03:41    5    Conclusions of Law at 39 was also relying upon this case.

03:41    6         It says:  "Some knowledge gained by an employee is

03:41    7    of such general character that equity will not restrict its

03:41    8    later use.  An employee has the right after cessation of

03:41    9    employment to use anything that's not the property of his

03:41   10    employer.  Trade and business secrets and confidential

03:41   11    information, not just the trade secrets, are the property of

03:41   12    the employer and cannot be used by the employee for his own

03:41   13    benefit."

03:41   14         So if it qualifies for a trade secret, there is no

03:41   15    defense to trade secret misappropriation that I'm supposed

03:41   16    to be able to take this stuff with me.  It also need not be

03:42   17    in writing.  There is a good case on this.  We've cited this

03:42   18    I believe, the Morlife case:  "To afford protection to the

03:42   19    employer, the information need not be in writing but may be

03:42   20    in the employee's memory."  That's the Morlife case, 56

03:42   21    Cal.App.4th 1514 at 1522 to 1523.  It can be in the

03:42   22    employee's memory.

03:42   23         Trade secrets may exist.  There's another case,

03:42   24    George versus Burdusis, 21 Cal.2d 153 at page 160.  It's a

03:42   25    1942 case, that trade secrets may exist in the employee's

03:42    1    memory without documentation.  It's at our Conclusion of Law

03:42    2    39, and our closing brief cites to that at page 14.  We

03:42    3    cited to the Mattel and Morlife decisions.

03:42    4            Under California law, an employee's knowledge

03:43    5    about the employer's proprietary process may be considered a

03:43    6    trade secret although such information is not in writing.

03:43    7    That's also repeated in the Mattel case, which is citing the

03:43    8    Greenly case that I just mentioned.

03:43    9            We also provided some additional flavor on this in

03:43   10    our Conclusions of Law Nos. 40 and 41 about even if it's

03:43   11    just a kernel.  The proof here as Mr. Claassen pointed out

03:43   12    with respect to the accused instrumentalities was not about

03:43   13    a kernel.  It was the same stuff.

03:43   14            The Court asked another question about whether

03:43   15    Lamego has been effectively precluded from working in the

03:43   16    field during the litigation.  I'm not aware of any evidence

03:43   17    of that.  I am aware of evidence to the contrary.  In fact,

03:43   18    the evidence showed he's been very, very busy in the field.

03:44   19    He has been running True Wearables, which he did for almost

03:44   20    four years before the case and continues to run.  That's in

03:44   21    our Finding of Fact 331.  And that's in the Lamego witness

03:44   22    statement at paragraph 16 and at 33 and 34.

03:44   23            Since the lawsuit, he updated the software to move

03:44   24    Trade Secret 12 from not being used in the product and only

03:44   25    being in the patent application to being in the product

03:44   1    itself by substituting out one of the other trade secrets.

03:44   2    He announced Gleo in February 2020 -- he did say that the

03:44   3    lawsuit prevented him from having enough money to do the

03:44   4    glucose project.  He obtained FDA clearance for Oxxiom in

03:44   5    June of 2020 during this lawsuit.  That's at JTX-3174.

03:44   6            He's been very active in patent prosecution.

03:44   7    Isadora Lamego provided evidence of that, and we've cited

03:45   8    that in Conclusions of Law 102 and 103.

03:45   9            There's no evidence that I'm aware of that he

03:45   10   tried to find a job and was turned down due to the

03:45   11   litigation.  And he refused the assistance from Apple that

03:45   12   had been offered to him to help him find a new job.  That

03:45   13   was in the March 17 transcript at pages 185 to 186.

03:45   14           And we provided unrebutted testimony from Tony

03:45   15   Leng about how sought after the background of Dr. Lamego

03:45   16   would be in electrical engineering, a vast field in very

03:45   17   high demand.  The evidence showed that he -- not only that

03:45   18   he was active in it, but I think the evidence showed that he

03:45   19   was hoping his activities would harm Masimo.

03:45   20           He talked about if he had the resources and the

03:45   21   money, I'd build something that would not compete with

03:45   22   Masimo but would remove Masimo from the map in terms of a

03:46   23   pulse oximeter product.  And that's in our Conclusion of Law

03:46   24   at 73 where that citation comes from.

03:46   25           We also presented evidence that when he e-mailed

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:46  1    his Ph.D. advisor, Bernie Widrow, he talked about how

03:46  2    priceless it was what he thought his product was doing to

03:46  3    the competition.  That's in our Conclusion of Law at 73 and

03:46  4    references Joint Exhibit No. 51.

03:46  5         The Court asked:  If the Court converts the

03:46  6    present preliminary injunction to a permanent injunction, is

03:46  7    there still a need to impose a lifetime or even a more

03:46  8    limited ban on Lamego practicing in the field?  I think

03:46  9    that's what my original comments went to, but I think the

03:46  10   evidence shows us why.  First off, the easy piece of this is

03:46  11   Trade Secret 12 is only one of many things that are

03:46  12   involved, and the preliminary injunction only dealt with the

03:46  13   disclosure of that in a patent application.  As we showed at

03:47  14   trial, that has since been moved into the product.  So

03:47  15   simply converting that to a permanent injunction doesn't

03:47  16   even deal with the subsequent use of it in the product.

03:47  17        I think that what happened at the trial is

03:47  18   revealing of why an injunction in the field is justified and

03:47  19   would be supportable.  As Mr. Re explained, he was proud of

03:47  20   taking the documents.  He started taking them in 2009.

03:47  21   There was no litigation against any employees that he

03:47  22   identified at any point.

03:47  23        He believed Trade Secret 12 was a trade secret at

03:47  24   Cercacor.  He labeled it a trade secret at True Wearables,

03:47  25   and that's in our Findings of Fact at paragraph 378.  And

03:47  1   there was an exhibit that showed his writing.  He then filed

03:47  2   a patent on it to claim exclusive rights on it.  That's in

03:47  3   the Conclusion of Law at paragraph 71.

03:48  4          The Court then found Masimo was likely to succeed

03:48  5   on the merits of showing it was a trade secret when the

03:48  6   Federal Circuit affirmed.  Yet Dr. Lamego is coming to the

03:48  7   Court asking the Court as I heard him that anything that's

03:48  8   in my mind is mine to use.

03:48  9          He stated after all of those findings that imagine

03:48  10  if it was a trade secret I'd really be in trouble.  We

03:48  11  referenced that at our Findings of Fact No. 634.  That's

03:48  12  after all of that process.  So he knew it was a trade secret

03:48  13  when he took it.  And his testimony was now the lawyers have

03:48  14  taught me about trade secrets, so I know it's not a trade

03:48  15  secret.

03:48  16         But, interestingly, in that testimony about the

03:48  17  lawyer's teaching him -- and that's on March 18.  In the

03:48  18  transcript at page 44, lines 19 to 24, he says:  "Yeah, for

03:48  19  instance, let me give you an example.  I knew these things

03:49  20  were confidential.  But now that I have been through three

03:49  21  years of litigation in trade secrets, I have a better

03:49  22  understanding, not as much as Honorable Selna knew, but I

03:49  23  kind of understand now what a trade secret is, right."

03:49  24         So he's saying, well, I think it's not a trade

03:49  25  secret now that I've been educated.  I certainly thought it

03:49    1    was when it wasn't.  And he still says:  "I knew these
03:49    2    things were confidential."
03:49    3        Lamego testified, as I mentioned, that he thinks
03:49    4    what is in his mind is his to use.  That's at our Findings
03:49    5    of Fact 366.  I'm actually pretty confident that's probably
03:49    6    not what the lawyers told him, but it's what he heard.
03:49    7    That's why some kind of injunction from practicing in this
03:49    8    field -- he has admitted he can't separate it.  He thinks
03:49    9    what's in his mind is his, and he can't separate it.  And if
03:49   10    he's not blocked from some amount of practicing in this
03:50   11    field -- he has shown I think through his testimony that he
03:50   12    can't make that division.
03:50   13        THE COURT:  Some amount of time being a limited
03:50   14    temporal restriction?
03:50   15        MR. JENSEN:  Say that again, Your Honor.
03:50   16        THE COURT:  Some amount of time being a limited
03:50   17    temporal restriction short of life?
03:50   18        MR. JENSEN:  Yes.  I mean, I think that it would
03:50   19    be supported for life given the testimony we have.  I also
03:50   20    am cognizant of the Circuit we're in and the things that we
03:50   21    face, Your Honor.  We obviously gave a lot of thought to
03:50   22    this when we drafted the damages but knew that wouldn't
03:50   23    provide the kind of relief we need, which is protection from
03:50   24    these trade secrets in the future.
03:50   25        So, yes, we had suggested six years in our brief.

03:50  1    There was some basis given for that as to why we

04:29  2    chose six years.  There was evidence.  It wasn't simply

03:50  3    speculation by Mohammed Diab of ten years.  That was in his

03:50  4    notebook, his projection.  They give estimates all the time.

03:50  5    You know, I think we could all agree that estimates of how

03:51  6    soon engineers do things are rarely done that quickly.

03:51  7    That was in his notebook.  That was cited to the Court.  It

03:51  8    was not something where Mohamed Diab came and gave his

03:51  9    opinion.

03:51  10          But there is a period of time that we think that --

03:51  11   you know, if you get past it, then maybe you have less of a

03:51  12   likelihood that these things -- but these Rainbow trade

03:51  13   secrets and the gathering -- I'll tell you it really

03:51  14   triggered us when in their brief they talked in a cryptic

03:51  15   way about a representation that there is an undisclosed

03:51  16   third party that has interest in these patents.  And that

03:51  17   goes to the issue of the patents.  But there's no statement

03:51  18   of who that is.

03:51  19          I'll get to that in a minute, but I think you can

03:51  20   understand the concern that Masimo would have seeing that

03:51  21   kind of a representation that is being made, that there is

03:51  22   somebody else, some third party, that is supposedly a

03:52  23   necessary party to this action that has some interest in

03:52  24   those.

03:52  25          The Monovis case, by the way, is very instructive

| | | |
|---|---|---|
| 03:52 | 1 | on this.  This is in our Conclusion of Law 114.  That case |
| 03:52 | 2 | actually talked about if you're unable to divorce knowledge |
| 03:52 | 3 | of the trade secrets, then actually permanently enjoining |
| 03:52 | 4 | the defendant from the competitive field because he |
| 03:52 | 5 | repeatedly interpreted his obligations in a begrudgingly |
| 03:52 | 6 | narrow sense -- that that was sufficient to do it.  That's a |
| 03:52 | 7 | New York case.  I understand that.  We had put some |
| 03:52 | 8 | information on that in our Conclusion of Law No. 114, but it |
| 03:52 | 9 | is not unprecedented. |
| 03:52 | 10 | When you combine that -- so when he gave that |
| 03:52 | 11 | testimony as well -- that's in our Finding of Fact Nos. 649 |
| 03:52 | 12 | and 765 where he talks about we're learning machines, and I |
| 03:52 | 13 | can't separate it from my head.  So our view is he is unable |
| 03:53 | 14 | to respect the trade secrets because he can't separate them |
| 03:53 | 15 | in his head. |
| 03:53 | 16 | THE COURT:  But at some point they'll become of |
| 03:53 | 17 | less commercial significance. |
| 03:53 | 18 | MR. JENSEN:  Some of them will.  As I mentioned, |
| 03:53 | 19 | as came out in the trial, Rainbow technology, which Masimo |
| 03:53 | 20 | decided to keep secret because of how the industry had |
| 03:53 | 21 | become geniuses and then we had all sorts of lawsuits about |
| 03:53 | 22 | the infringement of those patents, has not been solved by |
| 03:53 | 23 | the industry.  That testimony was unrebutted.  That |
| 03:53 | 24 | technology was released in 2006 or something like -- in that |
| 03:53 | 25 | timeframe, 2007, 2008, and we're in 2022, and the industry |

03:53    1    has not solved that technology.

03:53    2            So Masimo I think justifiably is very concerned

03:53    3    about the knowledge that is in his head with respect to that

03:53    4    technology, which nobody else has figured out.  I don't

03:54    5    think we can say that, you know, you could pick one or two.

03:54    6    We of course revealed Trade Secret 5 with the release of

03:54    7    Radius PPG.

03:54    8            THE COURT:  Right.

03:54    9            MR. JENSEN:  And even our largest competitors,

03:54   10    Medtronic, a very big company, hasn't released a product yet

03:54   11    as Mr. Kiani testified.  So I think some of them have a

03:54   12    longer life than others, but they are certainly all trade

03:54   13    secrets at this time.

03:54   14            The Court asked:  If the Court finds for

03:54   15    plaintiffs on any claim implicating the Oxxiom device, why

03:54   16    isn't the appropriate remedy that Oxxiom may not continue to

03:54   17    be used with any trade secret, as opposed to plaintiffs'

03:54   18    suggestion to transfer Oxxiom to plaintiffs when not all of

03:54   19    Oxxiom is alleged to be trade secret-protected?

03:54   20            First, I think what I've talked about addresses

03:54   21    that a little bit.  Trying to parse it I think would be bad

03:54   22    messaging, that you can take this stuff and then after the

03:55   23    fact just take that out.  But also there was unrebutted

03:55   24    testimony that Trade Secrets 5, 8, and 11 were foundational

03:55   25    to the Oxxiom and not using those would require a complete

03:55    1    redesign.  That was in Goldberg's witness statement,

03:55    2    paragraph 66, and our Finding of Fact 454 for Trade Secret

03:55    3    5.  It was in the McNames' witness statement, paragraph 208,

03:55    4    and our Finding of Fact 501 for Trade Secret 8.  And

03:55    5    McNames, paragraph 312 of his witness statement, and Finding

03:55    6    of Fact No. 577 for Trade Secret 11.  I am not aware of any

03:55    7    evidence rebutting that foundational testimony.

03:55    8           Like I mentioned -- and this is in Finding of Fact

03:55    9    135, and Diab, paragraph 176 -- it wasn't simply speculation

03:55   10    that it would take ten years.  This was his estimate in his

03:56   11    notebook in a contemporaneous document of what the Masimo

03:56   12    engineers thought it would take, ten man-years.

03:56   13           The Court asked a separate -- a little different

03:56   14    question about disgorgement based on the stock value.  I

03:56   15    think I sort of addressed that.  The remedies that we

03:56   16    briefed did not mention this, even though we put in evidence

03:56   17    in Pinsonneault, paragraphs 9 through 21, on the $14 million

03:56   18    stock value and some of the projections.

03:56   19           As I mentioned, we're concerned about preventing

03:56   20    future use.  And any amount of payment just doesn't reflect

03:56   21    the value of these trade secrets.  But our concern was

03:56   22    reignited with that statement, and it's at Docket 568.  It's

03:56   23    their reply at page 12 where there is a representation that

03:56   24    there's an undisclosed party with interest in the patents.

03:56   25           So we would propose that a more equitable remedy

03:57  1   -- and the beauty of equity is it allows you to craft what

03:57  2   makes sense, that should they sell these assets to somebody

03:57  3   else, Dr. Lamego should not be the recipient of that

03:57  4   benefit.  We provided evidence who we think would be

03:57  5   appropriate of the disgorgement, but we didn't brief that

03:57  6   because we just really didn't think that it accomplished the

03:57  7   goals that we're after, which is trying to prevent use of

03:57  8   this in the future.  But if he were to get that, that would

03:57  9   be a windfall of unjust enrichment.

03:57  10          THE COURT:  So would you want an equitable lien?

03:57  11          MR. JENSEN:  Well, something like that is what I

03:57  12  was thinking of.  This wasn't in our briefing, but as I

03:57  13  thought about it, it would be somehow if -- you know, if he

03:57  14  transferred them, the benefit of that would flow to Masimo,

03:57  15  not to him, because that would be unjust enrichment.  So

03:57  16  some kind of equitable lien I think would be the vehicle to

03:57  17  do that.

03:57  18          That really was ignited by -- you know, it made us

03:57  19  think about the issue of what if he just transfers them,

03:57  20  which is actually what happened in the Sotera case?  The

03:58  21  next thing we knew the largest semiconductor maker in the

03:58  22  world owned the asset.  Our concern is the same here.  That

03:58  23  is, that it gets into -- we know that there are some fairly

03:58  24  large companies very interested in this technology.

03:58  25          You asked a question -- I think these are very

03:58    1    short ones -- what evidence supports our request to compel

03:58    2    disgorgement before October 24, 2014?  We only put in the

03:58    3    $125,000 as a specific request, but we provided some

03:58    4    additional data of the salary paid.  I think what supports

03:58    5    that is that Lamego at trial testified that his relationship

03:58    6    with Kiani was not normal, and he started keeping things in

03:58    7    2009, something Kiani testified he was completely unaware

03:58    8    of.  And Kiani testified that Dr. Lamego didn't implement

03:59    9    the data loss software that Kiani asked him to implement

03:59   10    that Masimo had.  That was at Findings of Fact 665 to 667,

03:59   11    and it gives some cites to the Court.

03:59   12            Lamego testified that -- well, as a result of that

03:59   13    testimony, I think it shows he was acting in his own

03:59   14    interest before that.  But we didn't specifically make that

03:59   15    request.  We provided the Court with the information should

03:59   16    the Court feel that was appropriate, and that's the basis.

03:59   17    It was his testimony.

03:59   18            The Court asked:  If any trade secret

03:59   19    misappropriation is found, is ordering the relevant patent

03:59   20    applications to go abandoned, as opposed to transferring

03:59   21    them to plaintiffs, the appropriate remedy?  We're fine with

03:59   22    either as I think we made clear in our briefing.  Because

03:59   23    there is I think a lack of trust, we will abandon those.

03:59   24    But we're fine with them going abandoned, however that

04:00   25    happens.

04:00  1          We don't want the information in the public.  We
04:00  2   wouldn't plan to have any prosecution of those or try to
04:00  3   have any benefit to Masimo.  We would like them abandoned.
04:00  4   So either is fine from our perspective.
04:00  5          The Court asks:  If the Court finds
04:00  6   misappropriation of any trade secrets or confidential
04:00  7   information, does Lamego -- oh, this is I think a question
04:00  8   for Dr. Lamego's team.  But as Mr. Re pointed out, we do
04:00  9   know just based on the comparison of Exhibits 311 and 313
04:00  10  that the binder of documents is not all he took.  There is
04:00  11  no overlap in those, and his lawyer sent us a letter with
04:00  12  different documents.  So to us the order should be broader
04:00  13  than, for example, the specific documents, that he should
04:00  14  return all things that he took from us.
04:00  15         The Court asked:  If such relief is warranted, how
04:00  16  will the Court ensure compliance since the trade secrets
04:01  17  have been kept secret?  I think we can help the Court here
04:01  18  as well.  If the Court finds misappropriation -- Dr. Lamego
04:01  19  was actually given a redacted version which conveys quite a
04:01  20  bit of information.  I think given what he knows, there's
04:01  21  probably quite a bit of information which he understands,
04:01  22  and his testimony suggested that very strongly.  But we're
04:01  23  okay with their being a sealed portion that he has access to
04:01  24  to understand that.
04:01  25         So if the Court finds misappropriation, then we're

04:01    1    fine with their being a portion of the injunction

04:01    2    delineating that trade secret as we've defined it and that

04:01    3    being shown to Dr. Lamego.  We think the better approach is

04:01    4    that there's some ban on the field for a while.

04:01    5            I think that answered all the Court's questions

04:01    6    and everything I had to offer.

04:01    7            THE COURT:  Well, the take-away I derive is that

04:01    8    what you really want is injunctive relief limiting Dr.

04:02    9    Lamego's activities going forward.  Disgorgement is an

04:02    10   interesting concept, but it won't give you what you want.  I

04:02    11   would have to say that a financial analysis I think would

04:02    12   tear apart both disgorgement analyses, whether based on the

04:02    13   stock sales or the internal projections.  Even if you're

04:02    14   wedded to recover dollars as disgorgement, I just don't see

04:02    15   the evidentiary basis.

04:02    16           MR. JENSEN:  I think we're completely on the same

04:02    17   wavelength, Your Honor.  We believe the value of these trade

04:02    18   secrets -- well, we think the evidence showed the value of

04:02    19   these trade secrets is billions of dollars.  Masimo has

04:02    20   never licensed its technology -- and that was evidence in

04:02    21   the case -- and has never indicated a willingness to license

04:03    22   this technology.  You know, I think even the $14 million

04:03    23   belittles the value of these trade secrets.

04:03    24           THE COURT:  Thank you.

04:03    25           Mr. Gergely.

04:03    1          MR. JENSEN:  Oh, I should answer one more question
04:03    2    for you, Your Honor.  I missed one.
04:03    3          THE COURT:  Okay.
04:03    4          MR. JENSEN:  You asked a question:  Does any
04:03    5    previously filed document provide a synopsis of which patent
04:03    6    applications contain which alleged trade secrets?  There's a
04:03    7    nice table in our Conclusions of Law 102 and 103.  It gives
04:03    8    the patent application, the trade secret at issue, and the
04:03    9    cites to where we believe it's proven.  I actually have
04:03    10   copies if you'd like them.  They are in those 102 and 103.
04:03    11   They're tabulated there.
04:03    12         THE COURT:  Okay.  Thank you.
04:03    13         Mr. Gergely.
04:04    14         MR. GERGELY:  Your Honor, with respect to the
04:04    15   first question, it's been answered.  Without admitting any
04:04    16   liability, Dr. Lamego has no problem returning any documents
04:04    17   that he may have kept to protect himself.
04:04    18         With respect to whether a permanent injunction
04:04    19   against future use would be appropriate, Your Honor alluded
04:04    20   at some point to this information becomes -- it may become
04:04    21   of less commercial value.  It may become stale.  I think
04:04    22   that gets back to this issue of head start.  Again, we have
04:04    23   some competing evidence in the record.
04:04    24         Kiani and Diab developed their first device in six
04:04    25   or seven months.  There are some notes in Mr. Diab's

04:04  1    notebook from 1998 with respect to developing some future

04:04  2    device that might take ten years.  Notably, we have to

04:05  3    realize in 1998 the technology was a lot different.  I think

04:05  4    he was referring to developing some custom chips, some --

04:05  5    what's known as ASICs, application-specific integrated

04:05  6    circuits, which is a huge endeavor.

04:05  7            If you recall, Lamego developed his device with

04:05  8    off-the-shelf components.  So there's a big difference

04:05  9    between lead time in 1998 and developing the ASIC versus

04:05  10   2022 when there's all these off-the-shelf components that

04:05  11   are freely available.  So I don't think a permanent

04:05  12   injunction forever would be appropriate in this case.  I

04:05  13   think a short period based on some sort of reasonable head

04:05  14   start would be appropriate, if at all.

04:05  15           THE COURT:  What if we looked at Dr. Lamego's 2013

04:06  16   board presentation?  That would certainly support a head

04:06  17   start period of more than six to seven months.

04:06  18           MR. GERGELY:  I'm not sure I follow your point,

04:06  19   Your Honor.

04:06  20           THE COURT:  He made a presentation, right?

04:06  21           MR. GERGELY:  Correct.

04:06  22           THE COURT:  There's been a lot of discussion and

04:06  23   criticism of that presentation, but couldn't the Court turn

04:06  24   to that as a potential benchmark for a period of head start?

04:06  25   I mean, he had his projections for all these programs.

04:06    1              MR. GERGELY:  A different product, Your Honor.  I
04:06    2    think those -- if I recall, the last page of JTX-83 was
04:06    3    projecting out some potential deadlines for leasing products
04:06    4    to manufacturing, et cetera, and getting his CE mark.  I
04:06    5    believe that was on a glucose monitoring device, which is
04:06    6    not what the Oxxiom is.  So I think there might be an apples
04:06    7    and oranges situation.
04:06    8              THE COURT:  Okay.
04:06    9              MR. GERGELY:  With respect to ensuring compliance
04:07    10   with respect to any proposed injunction, you know, Dr.
04:07    11   Lamego has been put in kind of an untenable situation where
04:07    12   he really hasn't been exposed to any of the trade secrets
04:07    13   during the litigation.  He does need some sort of ability if
04:07    14   he were to be enjoined to design-around what he may be
04:07    15   prohibited from using, so what Mr. Jensen suggests may be
04:07    16   appropriate.
04:07    17             I'm a little bit concerned about exposing Dr.
04:07    18   Lamego to these alleged trade secrets yet again and having
04:07    19   them claim somehow that there might be some sort of future
04:08    20   liability.  I mean, maybe this is a hypothetical concern of
04:08    21   mine, but he does have to have some sort of ability to see
04:08    22   what he's prohibited from doing.  For example, if there's an
04:08    23   offending portion of code, he could remove that, and I think
04:08    24   he ought to be entitled to do that.  Clearly, that's sort of
04:08    25   played out in this case where, you know, Trade Secret 1 is

04:08  1   not in the current version of code.  So he does have the

04:08  2   ability to design-around.

04:08  3        So maybe Mr. Jensen's suggestion is good, but I

04:08  4   don't think a redacted version would be very useful.  The

04:08  5   redacted version of the trade secrets which I've seen in

04:08  6   this case is -- it's almost unusable.  You just can't

04:08  7   understand it, so it would have to be very specific.

04:08  8        THE COURT:  I don't know how you could effectively

04:08  9   manage that.  It would unquestionably be easier to

04:08 10   design-around a trade secret if you had chapter and verse of

04:09 11   exactly what the trade secret was, what it did, what code is

04:09 12   associated with it.  It seems to me that wouldn't make a lot

04:09 13   of sense.

04:09 14        MR. GERGELY:  I don't follow, Your Honor.

04:09 15        THE COURT:  You're indicating that Mr. Lamego has

04:09 16   to be on notice of what the trade secrets are so that he can

04:09 17   -- he's enjoined from violating them.  He knows what they

04:09 18   are.

04:09 19        MR. GERGELY:  Correct.

04:09 20        THE COURT:  Well, what are you suggesting that he

04:09 21   be given, if anything, so that he's on notice?

04:09 22        MR. GERGELY:  Well, I'm kind of thinking on the

04:09 23   fly about what Mr. Jensen said.  It would be a specific

04:09 24   order, if there were to be such an order, saying you may not

04:09 25   use these particular lines of code.  For example, if they

04:09  1    were to say, Trade Secret 12 -- we know that that is the two

04:09  2    alternate algorithms.  Where in its code is that algorithm

04:10  3    used?  I mean, we submit it's not.  It's not even there

04:10  4    because they say it's this framework.  I'm just giving that

04:10  5    as an example.

04:10  6            It's got to be something fairly specific where he

04:10  7    can say, okay, I will comply.  I will take that out of my

04:10  8    product and do something different.  You know, it's been

04:10  9    shown that he has the ability to do that, at least with

04:10  10   respect to Trade Secret 1, because he's not using it in the

04:10  11   current version of product.

04:10  12           THE COURT:  Okay.

04:10  13           MR. GERGELY:  With respect to the third question:

04:10  14   If the Court finds for plaintiffs on any claims implicating

04:10  15   the Oxxiom device, why isn't the appropriate remedy that

04:10  16   Oxxiom may not, for example, continue to be used with any

04:10  17   trade secret, as opposed to plaintiffs' suggestion to

04:10  18   transfer Oxxiom to plaintiffs?  I agree that would be

04:11  19   overbroad.

04:11  20           I think an injunction has to be narrow and

04:11  21   tailored, and he has to have the ability to use his product,

04:11  22   if possible, without any alleged trade secret.  So I think a

04:11  23   request that the device be transferred would be overbroad.

04:11  24   It doesn't sound like the plaintiffs are asking for that.

04:11  25           They are asking, however, that he not work in this

04:11   1   industry.  I'm not aware of any precedent which would

04:11   2   support such a request.  There's a pretty strong body of

04:11   3   case law in California on rejection of the inevitable

04:11   4   disclosure doctrine.  The courts will not enjoin someone

04:11   5   from working for a competitor based on a theory that they

04:12   6   might use some information.  I don't think California law

04:12   7   would support any kind of ban on him working in the

04:12   8   industry.  I haven't seen any case law cited in their

04:12   9   briefing that would support that.  That's just an overbroad

04:12  10   request.

04:12  11        I think what would be appropriate is if there is a

04:12  12   piece of offending code in his device, because that's how

04:12  13   his device works, that it be identified, and then he can try

04:12  14   to work around that and take it out and try to do something

04:12  15   different.

04:12  16        THE COURT:  So you're saying he doesn't need to

04:12  17   know what the trade secrets are, but he needs to know what

04:12  18   the Court finds to be trade secret embodiments so he can

04:12  19   design around those?

04:12  20        MR. GERGELY:  It would be helpful to have both.

04:12  21   Certainly if he knows what's in his product that he needs to

04:12  22   take out, that would be helpful, but knowing both pieces of

04:12  23   information would be helpful.

04:12  24        THE COURT:  Well, I have trouble giving him the

04:13  25   first piece.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

04:13   1               MR. GERGELY:  Hence your question.

04:13   2               THE COURT:  Right.

04:13   3               MR. GERGELY:  Thinking out loud, if the Court is

04:13   4   hesitant to give him access to that trade secret, I think it

04:13   5   would be fair, though, to tell him what he may not do, like

04:13   6   this portion of your code is infringing or misappropriating

04:13   7   this particular trade secret, so I'm not going to allow you

04:13   8   to use that anymore.  You have to find some different way to

04:13   9   deal with it.

04:13   10              THE COURT:  Okay.

04:13   11              MR. GERGELY:  Where is the appropriate place to

04:13   12  draw the line between experience and skills gained while

04:13   13  working at one employer that is transferable to the next job

04:13   14  versus relying on confidential information?  I think the

04:13   15  Hooked case that I cited dealt with that.

04:13   16              Has this litigation effectively precluded Lamego

04:14   17  from working in the field?  Well, we know he lost his Apple

04:14   18  job basically because they marginalized him, and --

04:14   19              THE COURT:  Well, he didn't like the job, but they

04:14   20  made the decision as to what responsibilities.

04:14   21              MR. GERGELY:  True, true, but that was in direct

04:14   22  response to a demand letter that they had gotten from the

04:14   23  plaintiffs.  He was brought in to be a high-level scientist

04:14   24  there, and he was assigned to writing algorithms, which

04:14   25  based on his level of experience and education was way below

04:14  1    him.  So he did experience some harm.

04:14  2              Also, I would note --

04:14  3              THE COURT:  I don't think I've seen a claim for

04:14  4    interference with contract.

04:14  5              MR. GERGELY:  No, no, there hasn't been, but it

04:14  6    happened, and there was evidence in the record.  It may not

04:15  7    rise to the level of interference, and it may not be

04:15  8    tortuous, but it happened.

04:15  9              What else happened in this case is the plaintiffs

04:15  10   took a confidential document and advocated to Magistrate

04:15  11   Early that it be made public -- that was the email that Dr.

04:15  12   Lamego wrote to Tim Cook -- and it was made part of the

04:15  13   public record.  Then part of that got published in a story

04:15  14   in the Orange County Business Journal.  To make matters

04:15  15   worse, Mr. Kiani then commented on it and actually used the

04:15  16   word "crazy" and said, "Apple would be crazy to hire Dr.

04:15  17   Lamego."

04:15  18             So their hands are not particularly clean on this

04:15  19   issue, and that did hurt Dr. Lamego.  I know that Mr. Leng

04:15  20   got up here and testified that Dr. Lamego is this highly

04:16  21   talented engineer, and he can go find a job.  But the fact

04:16  22   of the matter is he was trashed in the press.  He was

04:16  23   trashed by Mr. Kiani.  It was done deliberately.  It did

04:16  24   hurt him, and it's hurting his reputation.

04:16  25             I agree that this litigation has effectively

04:16   1    precluded Lamego from working in the field.  I mean, he's
04:16   2    worked on his own device.  He hasn't been able to sell it.
04:16   3    He hasn't been able to generate any commercial interest in
04:16   4    it in large part because people don't want to touch it while
04:16   5    there's litigation pending.
04:16   6              With respect to third parties that may be
04:16   7    interested in patents, what we were referring to is Dr.
04:16   8    Lamego's family and the fact that his wife, Tatiana, and his
04:16   9    two daughters were named inventors on those patent
04:16   10   applications.  So they do have a property interest in those
04:16   11   patent applications, and they are necessary parties.  So
04:16   12   that's the reference to third parties, not that there's some
04:16   13   other third party lurking out there that's interested in
04:17   14   these patent applications.  It's a reference to his family.
04:17   15             The issue of lifetime or limited ban, I think
04:17   16   we've addressed that.  There's no precedent for that under
04:17   17   California law.
04:17   18             With respect to the issue of disgorgement of
04:17   19   salary, this issue arose within the context of breach of
04:17   20   fiduciary duty.  But what I heard Mr. Jensen say was there
04:17   21   was evidence that Lamego was saving some documents to his
04:17   22   personal file, this paper copy of files that he took with
04:17   23   him as early as 2009, and that he refused to allegedly
04:17   24   implement some data loss software while he was at Cercacor.
04:17   25             I've got one major response to that.  That has

04:17    1    nothing to do with the alleged breach of fiduciary duty

04:17    2    claim, which dealt with his presentation to the board, not

04:18    3    whether or not he was acting as the IT manager at Cercacor.

04:18    4             By the way, they had there own IT person there,

04:18    5    and his name was Jonathan Rosario.  He could have done that.

04:18    6    To blame the lack of implementation of software on Dr.

04:18    7    Lamego I think is a stretch.  So, no, there is no evidence

04:18    8    to compel disgorgement of Lamego's salary before 10/24/14.

04:18    9             THE COURT:  Are you tacitly conceding that if I

04:18   10    found that there was a breach of fiduciary duty after that

04:18   11    point or at that point that the disgorgement would be

04:18   12    appropriate -- that disgorgement?

04:18   13             MR. GERGELY:  Am I tacitly conceding that?

04:18   14             THE COURT:  Yes.

04:18   15             MR. GERGELY:  I think if Your Honor were to find

04:18   16    that there was some sort of breach of fiduciary duty with

04:18   17    respect to the JTX-83 presentation --

04:19   18             THE COURT:  Right.

04:19   19             MR. GERGELY:  -- I think, Your Honor, you're well

04:19   20    within -- you have the ability to order a disgorgement.  We

04:19   21    don't think that the evidence rises to the level of him

04:19   22    acting against the company's interests and acting in his own

04:19   23    interests.  If anything, all the other engineers at Cercacor

04:19   24    signed off on this presentation.

04:19   25             What I heard from Mr. Re was -- he kept saying,

04:19  1    oh, Dr. Lamego believed in this presentation.  You know, he
04:19  2    believed in the calibration methods.  He believed in it.  He
04:19  3    believed in it.  You know, how could this be notice to
04:19  4    Masimo and Cercacor of the claim when Dr. Lamego himself
04:19  5    believed in it?
04:19  6            To me, that sounds like he had a good-faith basis
04:19  7    for his calibration method.  If anything, I mean that's what
04:19  8    this was.  If it rises to the level of mistake, could that
04:20  9    be negligence?  Maybe.  But the evidence is that this method
04:20  10   was used in other devices as well.
04:20  11           So this is just Dr. Lamego exercising his
04:20  12   good-faith judgment on the appropriate methodology.  That
04:20  13   does not rise to the level of him acting against the
04:20  14   interests of the company and acting in his personal
04:20  15   interest, which is what the breach of fiduciary duty of
04:20  16   loyalty means.
04:20  17           The last question was with respect to stock -- oh,
04:20  18   no, no, you had a couple more.  Stock evaluation, I think
04:20  19   that's fairly been abandoned.
04:20  20           The next question is with respect to patent
04:20  21   applications, whether they should be abandoned or
04:20  22   transferred to plaintiffs.  The case that they're relying on
04:20  23   is the Richardson case from the Federal Circuit, and I
04:20  24   believe that case requires a claim-by-claim analysis, that
04:20  25   what's actually in the patent application, what's claimed,

04:21    1    is a trade secret.

04:21    2            There was no evidence here that what was in those

04:21    3    patent applications and actually claimed in the actual legal

04:21    4    claims was a trade secret.  So that would be very overbroad

04:21    5    to order a transfer of those applications to the plaintiffs.

04:21    6            I think they've stated in their papers that they

04:21    7    don't have an intent to prosecute them.  Well, we all know

04:21    8    what intent may mean.  It may mean present intent.

04:21    9            THE COURT:  Well, the Court can always cure that

04:21    10    problem with a mandate in the injunction for them to

04:21    11    abandon.

04:21    12            MR. GERGELY:  I think if these assets were to be

04:21    13    transferred to the plaintiffs, that would unjustly enrich

04:21    14    them because there's other technology in there which is not

04:21    15    their alleged trade secrets.  Again, they haven't shown what

04:21    16    is actually being claimed legally in those applications is a

04:22    17    trade secret.  So I think the Richardson case is not on

04:22    18    point.

04:22    19            For the synopsis of which patent applications

04:22    20    contain which alleged trade secrets, I would have to go back

04:22    21    to Mr. Jensen's list that he mentioned.  I assume it's

04:22    22    accurate.  We have our own internal list here which is

04:22    23    fairly lengthy.  I don't think it's worth the Court's time

04:22    24    to put that into the record.  I'll review Mr. Jensen's list

04:22    25    and compare it against our list.  If there's discrepancies,

04:22    1    is it okay if I let the Court know?

04:22    2              THE COURT:  Yes.

04:22    3              MR. GERGELY:  Thank you.  Your Honor, I think

04:22    4    that's all I have.

04:22    5              THE COURT:  Okay.

04:22    6              Mr. Jensen.

04:22    7              MR. JENSEN:  Just a couple things that I think

04:22    8    might assist the Court.  I think that the argument we just

04:22    9    had and the interchange explains why trying to slice and

04:23   10    dice trade secrets is not a reasonable remedy that would

04:23   11    remedy the wrong.

04:23   12              To identify the trade secrets and say, just take

04:23   13    these out, will put us right back here again in my belief.

04:23   14    Using the trade secrets as a guide to design change I

04:23   15    believe would be a misappropriation in and of itself under

04:23   16    the SkinMedica case that we cited.  So if we give him here's

04:23   17    what you can't do, that just isn't appropriate for someone

04:23   18    who has had unfettered access to our trade secrets, and I

04:23   19    think the Court recognized that.

04:23   20              It shows why if we try to dice it up like that and

04:23   21    he just takes this out and takes that out and then

04:23   22    everything's okay, there's the trade secrets we didn't

04:23   23    pursue through trial, and, you know, there will be I suspect

04:23   24    more.  He testified he can't separate in his mind what he

04:24   25    learned, what was a trade secret at Masimo, from what he's

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

04:24  1    doing today.  That's exactly what the case we cited from

04:24  2    New York found made it appropriate.

04:24  3            As I mentioned, he had unfettered access to

04:24  4    everything.  In terms of the timeline, as I mentioned, we

04:24  5    released PPG in 2019.  It's 2022.  Major competitors still

04:24  6    don't have it.  We still think that the six-year period we

04:24  7    proposed has a basis in the facts that we've presented.  It

04:24  8    will be probably very unreasonable for a single person

04:24  9    to --

04:24  10           By the way, there is no evidence -- I'm not aware

04:24  11   of any -- that Mohamed Diab and Joe Kiani had a finished

04:24  12   product in six months.  That was not any evidence I saw in

04:24  13   this courtroom.  The finished products were in the timeline.

04:24  14   They were much later.  That was simply when they showed on

04:24  15   the computer screen we think we can make this work.

04:25  16           In terms of the breach of fiduciary duty that he

04:25  17   mentioned, he was talking about the belief.  But what he

04:25  18   admitted is that he didn't believe in the timeline that the

04:25  19   Court questioned him about.  He did not believe that

04:25  20   timeline.  He admitted it was not true and that the board

04:25  21   was entitled to rely upon that.

04:25  22           He asked for resources.  They were authorized.

04:25  23   They were given to him.  Nobody knew that he had prepared

04:25  24   and was already making an offer to Apple at that point.  It

04:25  25   would have been looked at very differently.  That was the

04:25   1   testimony from Mr. Kiani.

04:25   2           I could briefly address this issue about the

04:25   3   publication.  I would urge the Court to read Judge Early's

04:25   4   Order.  Masimo did not urge that to become public.  That

04:25   5   was Judge Early's request to the parties in the courtroom

04:25   6   at that time.  That was not something encouraged by

04:25   7   Masimo.

04:25   8           And Kiani's comment that Mr. Gergely raised in the

04:26   9   recross of Kiani at the very end of the trial was a comment

04:26   10  regarding Mr. Cook's reaction to that, and his surprise that

04:26   11  Mr. Cook would entertain such an offer because he wouldn't

04:26   12  entertain such an offer.  It wasn't a comment about

04:26   13  Mr. Lamego as I recall.  And he introduced that right at the

04:26   14  end.  I just think that I need to clarify that for the

04:26   15  record.

04:26   16          I think the slice and dice idea just doesn't

04:26   17  create the kind of relief to prevent the use of someone who

04:26   18  had this kind of unfettered access to technology that over

04:26   19  the last 15 years nobody has been able to do.

04:26   20          I have nothing further, Your Honor.

04:26   21          THE COURT:  Okay.  Thank you.

04:26   22          Mr. Gergely, I neglected to ask you one question.

04:26   23  I had raised the concept of an equitable lien on the

04:26   24  property, particularly the patent applications if the Court

04:26   25  doesn't order those transferred.  Nobody briefed that, but

84

| | | |
|---|---|---|
| 04:26 | 1 | do you have any thoughts on that? |
| 04:26 | 2 | MR. GERGELY:  It's been awhile since I've |
| 04:27 | 3 | researched equitable liens.  Would it be if they were sold |
| 04:27 | 4 | to a third party they would be -- |
| 04:27 | 5 | THE COURT:  Some kind of monetary lien. |
| 04:27 | 6 | MR. GERGELY:  I guess the million dollar question |
| 04:27 | 7 | is how much? |
| 04:27 | 8 | THE COURT:  Well, sure. |
| 04:27 | 9 | MR. GERGELY:  I would have to look at that. |
| 04:27 | 10 | THE COURT:  Okay. |
| 04:27 | 11 | MR. GERGELY:  I mean, the problem with equitable |
| 04:27 | 12 | liens -- my memory of those is that you do have to have |
| 04:27 | 13 | all of the parties who are affected by the order to be part |
| 04:27 | 14 | of the litigation.  The issue here is that those |
| 04:27 | 15 | applications I believe are owned by Dr. Lamego, his wife, |
| 04:27 | 16 | Tatiana, and his two daughters.  They're all owners.  So we |
| 04:27 | 17 | don't have all the parties in front of the court who have |
| 04:27 | 18 | ownership interests in those.  I'd have to research it, |
| 04:27 | 19 | but I don't think an equitable lien might be appropriate |
| 04:27 | 20 | here. |
| 04:27 | 21 | THE COURT:  Okay.  Let me come back to Mr. Jensen. |
| 04:28 | 22 | What do we do where family members are co-patentees? |
| 04:28 | 23 | MR. JENSEN:  Your Honor, I think that -- we've |
| 04:28 | 24 | addressed this in our closing brief at pages 46 to 47.  It's |
| 04:28 | 25 | why we thought this referred to someone other than the |

04:28    1    family.   There's assignments to True Wearables by the family

04:28    2    that are in the record, so they're not record owners of

04:28    3    these.   These patent applications were assigned, and we've

04:28    4    pointed that out in the evidence at 46 to 47.

04:28    5              THE COURT:   Okay.

04:28    6              MR. JENSEN:   I understand the issue raised, but I

04:28    7    believe that the evidence in the record shows that they were

04:28    8    assigned to True Wearables.

04:28    9              THE COURT:   Okay.

04:28   10              MR. JENSEN:   By the way, the Monovis case did do a

04:28   11    lifetime prevention.   I think that -- you know, this is a

04:28   12    different district.

04:28   13              THE COURT:   Okay.   Well, it's been a long

04:28   14    afternoon, but I think you accomplished my goals.   We've

04:28   15    been at this awhile, but I think your remarks have been as

04:28   16    net as possible and as specific as possible.   And I think

04:29   17    they'll be very helpful to us as we move forward to finalize

04:29   18    the Findings of Facts and Conclusions of Law.

04:29   19              Anything else for today?

04:29   20              MR. RE:   No, Your Honor.

04:29   21              MR. GERGELY:   No, Your Honor.

04:29   22              THE COURT:   Okay.   Thank you.   We are adjourned.

04:29   23              (Whereupon, the proceedings were concluded)

04:29   24                        *    *    *

04:29   25

86

04:29    1
04:29    2
04:29    3
04:29    4                          **CERTIFICATE**
04:29    5
04:29    6          I hereby certify that pursuant to Section 753,
04:29    7    Title 28, United States Code, the foregoing is a true and
04:29    8    correct transcript of the stenographically reported
04:29    9    proceedings held in the above-entitled matter and that the
04:29   10    transcript page format is in conformance with the
04:29   11    regulations of the Judicial Conference of the United States.
04:29   12
04:29   13    Date:  May 22, 2022
04:29   14
04:29   15
04:29                              /s/   Sharon A. Seffens  5/22/22
04:29   16                         _____
04:29                              SHARON A. SEFFENS, U.S. COURT REPORTER
04:29   17
        18
        19
        20
        21
        22
        23
        24
        25

MR. CLAASSEN: [10]  31/9 31/13 32/21 33/6
35/15 36/12 38/2 38/6 42/20 42/23
MR. FLETCHER: [4]  4/23 5/3 5/6 5/8
MR. GERGELY: [46]  3/13 13/3 13/22 14/16
14/19 15/2 15/7 15/10 15/13 15/17 16/7 17/10
18/18 18/20 42/22 43/3 45/6 47/23 49/3 50/14
50/16 69/14 70/18 70/21 71/1 71/9 72/14
72/19 72/22 73/13 74/20 75/1 75/3 75/11
75/21 76/5 78/13 78/15 78/19 80/12 81/3 84/2
84/6 84/9 84/11 85/21
MR. JENSEN: [13]  51/23 60/15 60/18 62/18
63/9 65/11 68/19 69/1 69/4 81/7 84/23 85/6
85/10
MR. RE: [24]  3/6 3/21 3/23 4/1 4/4 4/10 4/19
5/12 5/16 6/12 7/7 7/10 12/25 18/24 29/20
29/22 43/11 48/10 48/13 48/15 49/19 51/6
51/20 85/20
MR. SHAW: [5]  24/23 25/13 25/15 27/7 29/19
THE CLERK: [1]  3/2
THE COURT: [93]

## $

**$125,000 [1]**  66/3
**$14 [3]**  52/13 64/17 68/22
**$14 million [3]**  52/13 64/17 68/22

## /

**/s [1]**  86/15

## 0

**0404 [1]**  2/6

## 1

**1-1053 [1]**  1/20
**1.6.3 [1]**  35/21
**10/24/14 [1]**  78/8
**100 percent [1]**  22/4
**10017 [1]**  2/9
**102 [3]**  57/8 69/7 69/10
**103 [3]**  57/8 69/7 69/10
**1041 [1]**  33/21
**1053 [1]**  1/20
**1083 [1]**  23/23
**11 [14]**  31/19 31/21 39/25 40/3 40/6 40/10
40/11 40/12 40/14 40/19 40/21 40/24 63/24
64/6
**113893 [2]**  24/10 28/16
**113901 [1]**  28/19
**114 [2]**  62/1 62/8
**12 [14]**  35/18 36/7 36/8 40/25 41/1 41/3 41/12
41/18 53/20 56/24 58/11 58/23 64/23 73/1
**120 [1]**  27/1
**122 [2]**  8/9 27/1
**124 [1]**  38/16
**126 [1]**  37/17
**128 [4]**  35/2 36/2 37/17 41/4
**129 [1]**  35/3
**13 [1]**  26/1
**132 [1]**  53/20
**134 [1]**  34/16
**135 [1]**  64/9
**139 [1]**  19/9
**14 [5]**  7/17 8/10 28/19 56/2 78/8
**141 [2]**  19/9 34/17
**143 [1]**  34/17
**144 [1]**  19/25
**14th [1]**  2/5
**15 [2]**  27/10 83/19
**1514 [1]**  55/21
**1522 [1]**  55/21
**1523 [1]**  55/21
**153 [1]**  55/24
**16 [4]**  1/17 3/1 27/1 56/22
**160 [1]**  55/24
**1670 [2]**  2/13 2/16
**17 [1]**  57/13
**176 [1]**  64/9
**18 [1]**  7/17 32/2 59/17

**1801 [1]**  2/12
**189 [1]**  57/9
**186 [1]**  57/9
**19 [1]**  59/18
**1942 [1]**  55/25
**1965 [1]**  34/17
**1978 [1]**  55/3
**1998 [3]**  70/1 70/3 70/9
**1:32 [1]**  3/1

## 2

**20 [3]**  25/17 25/20 26/24
**2001 [1]**  33/22
**2006 [1]**  62/24
**2007 [2]**  32/14 62/25
**2008 [1]**  62/25
**2009 [6]**  8/3 8/6 9/20 58/20 66/7 77/23
**2013 [4]**  8/6 25/5 25/8 70/15
**2014 [11]**  8/8 19/6 19/10 19/17 19/19 22/13
25/9 25/19 25/25 26/3 66/2
**2015 [1]**  19/8
**2016 [1]**  10/1 25/2
**2019 [2]**  37/22 82/5
**2020 [2]**  57/2 57/5
**2021 [1]**  8/19
**2022 [7]**  1/17 3/1 37/22 62/25 70/10 82/5
86/13
**2040 [1]**  2/5
**205 [1]**  19/21
**208 [1]**  64/3
**21 [2]**  55/24 64/17
**212 [1]**  2/10
**22 [8]**  24/16 28/20 30/22 32/2 43/17 45/2
86/13 86/15
**223-6520 [1]**  2/10
**227 [1]**  38/16
**23C [1]**  2/9
**24 [2]**  59/18 66/2
**25 [1]**  26/25
**254 [1]**  33/21
**26 [9]**  22/3 23/5 26/24 29/3 48/21 48/25 51/9
51/13 51/14
**27 [1]**  28/1
**28 [2]**  28/1 86/7
**29 [1]**  28/1
**2d [1]**  32/14

## 3

**3/16 [1]**  27/1
**30 [8]**  6/9 21/21 22/4 22/14 27/23 29/4 29/23
48/23
**303 [2]**  2/13 2/16
**306 [3]**  24/4 24/5 24/7
**31 [2]**  6/23 38/12
**311 [5]**  9/22 10/3 10/6 12/7 67/9
**312 [1]**  64/5
**313 [5]**  10/2 10/3 10/4 12/8 67/9
**3174 [1]**  57/5
**318 [1]**  19/21
**32 [1]**  32/2
**33 [1]**  56/22
**3300 [1]**  2/12
**331 [1]**  56/21
**34 [1]**  56/22
**3402 [1]**  53/21
**3426.1 [1]**  33/16
**3426.2 [1]**  34/5
**3426.7 [1]**  12/16
**35 [1]**  19/13
**350 [1]**  34/16
**357-1670 [2]**  2/13 2/16
**36 [1]**  25/22
**366 [1]**  60/5
**37 [1]**  25/18
**378 [1]**  58/25
**3894 [1]**  28/16
**39 [4]**  35/11 55/1 55/5 56/2
**391 [1]**  55/3

**3914 [1]**  28/19
**392 [1]**  48/9

## 4

**40 [2]**  6/8 56/10
**41 [2]**  42/14 56/10
**411 [1]**  1/20
**44 [3]**  21/19 50/13 59/18
**454 [1]**  64/2
**46 [3]**  26/25 84/24 85/4
**47 [2]**  84/24 85/4
**48 [2]**  24/16 28/20
**484 [1]**  38/16
**49 [1]**  26/25
**4th [1]**  1/20

## 5

**5/22/22 [1]**  86/15
**50 [16]**  6/8 6/23 21/11 21/12 22/6 22/21 22/22
22/23 23/9 23/11 23/14 24/11 27/22 28/11
28/13 28/21
**50 percent [1]**  28/23
**50/50 [13]**  21/11 21/12 22/6 22/21 22/22 23/6
23/9 23/11 23/14 24/11 27/22 28/11 28/13
**501 [1]**  54/3
**51 [1]**  58/4
**52 [1]**  40/7
**53 [1]**  40/7
**55 [1]**  26/25
**56 [1]**  55/20
**563 [1]**  40/22
**568 [1]**  64/22
**57 [1]**  29/12
**577 [1]**  64/6
**59 [1]**  25/25

## 6

**611 [1]**  2/15
**612 [1]**  1/21
**617 [1]**  32/14
**634 [1]**  59/11
**649 [1]**  62/11
**6520 [1]**  2/10
**66 [1]**  64/2
**665 [1]**  66/10
**667 [1]**  66/10
**69 [1]**  40/23

## 7

**701 [2]**  48/20 48/24
**71 [1]**  59/3
**719 [1]**  45/1
**73 [2]**  57/24 58/3
**739 [1]**  43/17
**747 [1]**  43/21
**753 [1]**  86/6
**760-0404 [1]**  2/6
**765 [1]**  62/12
**767 [1]**  2/9
**77 [1]**  55/2
**79 [1]**  43/18
**790 [1]**  8/8
**797 [1]**  19/13

## 8

**80202 [1]**  2/13
**804-8655 [1]**  1/21
**808 [2]**  2/15 19/13
**813 [1]**  19/13
**83 [3]**  28/15 71/2 78/17
**86 [1]**  45/3
**8655 [1]**  1/21

## 9

**90017 [1]**  2/16
**92614 [1]**  2/5
**92701 [1]**  1/20
**938 [1]**  32/14
**941 [1]**  32/14

**9**
**949** [1] 2/6

**A**

**abandon** [2] 66/23 80/11
**abandoned** [5] 66/20 66/24 67/3 79/19 79/21
**ability** [10] 16/15 20/5 26/16 26/19 71/13 71/21 72/2 73/9 73/21 78/20
**able** [7] 6/13 12/8 14/2 55/16 77/2 77/3 83/19
**about** [64] 3/19 5/18 6/9 8/4 9/7 10/18 11/5 11/24 17/23 20/9 20/22 21/15 22/3 22/10 22/12 22/24 23/8 23/15 23/21 24/11 27/13 27/15 27/15 27/17 29/2 29/24 29/24 30/18 32/18 37/8 38/22 39/4 39/20 40/20 43/25 52/6 52/7 52/14 53/21 56/5 56/10 56/12 56/14 57/15 57/20 58/1 59/14 59/16 61/15 62/2 62/12 62/21 63/3 63/20 64/14 64/19 65/13 65/19 71/17 72/23 82/17 82/19 83/2 83/12
**above** [1] 86/9
**above-entitled** [1] 86/9
**AC** [2] 44/13 44/15
**accidental** [1] 46/19
**accomplished** [2] 65/6 85/14
**account** [1] 37/20
**accrued** [1] 26/12
**accurate** [2] 27/25 80/22
**accused** [1] 56/12
**acknowledge** [1] 8/20
**acknowledgment** [1] 8/13
**across** [1] 22/21
**acted** [3] 20/5 26/16 26/19
**acting** [6] 66/13 78/3 78/22 78/22 79/13 79/14
**action** [2] 19/16 61/23
**activate** [1] 46/9
**activated** [2] 46/11 47/18
**activates** [1] 43/24
**activation** [1] 44/25
**active** [2] 57/6 57/18
**activities** [2] 57/19 68/9
**actual** [2] 27/18 80/3
**actually** [28] 6/20 7/24 10/18 24/19 38/10 42/8 42/22 43/24 45/10 45/11 45/15 45/17 46/5 48/1 50/17 52/25 54/24 54/25 60/5 62/2 62/3 65/20 67/19 69/9 76/15 79/25 80/3 80/16
**add** [1] 50/20
**additional** [4] 10/6 30/17 56/9 66/4
**address** [10] 5/17 39/13 41/7 43/12 44/10 45/4 45/7 52/15 53/17 83/2
**addressed** [11] 24/19 34/4 38/10 41/4 44/1 44/6 44/17 48/17 64/15 77/16 84/24
**addresses** [1] 63/20
**addressing** [1] 43/19
**adequate** [2] 32/22 32/24
**adjourned** [1] 85/22
**admissions** [3] 8/23 30/13 31/1
**admit** [1] 33/11
**admitted** [16] 7/11 8/6 17/17 20/13 20/13 20/19 20/21 20/22 25/24 30/16 30/23 30/24 43/15 60/8 82/18 82/20
**admitting** [1] 69/15
**advantage** [1] 34/7
**advisor** [1] 58/1
**advocated** [1] 76/10
**affect** [3] 12/17 20/21 30/19
**affected** [1] 84/13
**affirmatively** [2] 20/10 23/3
**affirmed** [1] 59/6
**afford** [1] 55/18
**after** [14] 6/8 22/7 22/9 31/2 34/18 34/21 47/18 55/8 57/5 58/16 59/12 63/22 65/7 78/9
**afternoon** [6] 3/6 3/12 3/13 3/18 24/23 85/14
**afterwards** [1] 22/7
**again** [16] 17/11 30/25 34/4 35/10 36/20 36/24 39/4 41/1 47/14 47/24 48/6 60/15 69/22 71/18 80/15 81/13
**against** [11] 8/5 18/1 20/6 26/17 26/19 36/4 58/21 69/19 78/22 79/13 80/25
**Agnes** [2] 43/18 46/16

**ago** [1] 36/20
**agree** [9] 18/5 30/9 73/8 74/9 75/4 75/9 61/5 73/18 76/23
**agreed** [6] 30/12 43/18 43/21 44/2 44/24 45/2
**agreeing** [1] 7/23
**agreement** [11] 6/21 7/5 11/8 11/13 11/14 12/13 13/17 13/19 14/13 17/23 29/20
**agreements** [2] 13/15 14/23
**ahead** [1] 43/2
**al** [4] 1/9 1/11 3/3 3/4
**algorithm** [1] 73/2
**algorithms** [2] 73/2 75/24
**all** [54] 5/23 5/25 6/1 7/12 8/23 10/10 10/20 12/13 12/14 14/7 16/18 18/11 19/7 22/7 22/7 23/20 26/21 27/10 28/18 28/24 29/17 30/18 30/20 37/3 39/1 41/19 42/5 43/19 44/6 47/20 48/21 50/8 53/1 54/8 59/9 59/12 61/4 61/5 62/21 63/12 63/18 67/10 67/14 68/5 70/10 70/14 70/25 78/23 80/7 81/4 84/13 84/16 84/17
**allegation** [1] 4/10
**allege** [1] 4/7
**alleged** [10] 45/8 45/21 46/2 63/19 69/6 71/18 73/22 78/1 80/15 80/20
**allegedly** [1] 77/23
**allow** [1] 75/7
**allowable** [1] 17/19
**allowed** [1] 7/5
**allows** [2] 10/25 65/1
**alluded** [1] 69/19
**almost** [4] 13/18 51/25 56/19 72/6
**alone** [2] 6/3 32/9
**along** [1] 7/16
**already** [4] 42/25 43/1 48/17 82/24
**also** [30] 3/16 9/18 9/21 10/8 10/22 11/7 11/17 15/24 16/5 20/19 35/2 36/3 36/7 37/14 38/25 40/19 40/22 46/10 47/12 47/13 53/10 55/1 55/5 55/16 56/7 56/9 57/25 60/19 63/23 76/2
**alternate** [2] 46/10 73/2
**although** [1] 56/6
**altogether** [1] 48/15
**always** [1] 80/9
**am** [4] 56/17 60/20 64/6 78/13
**ambient** [7] 43/13 43/14 43/20 43/25 46/18 48/1 48/7
**ambiguous** [4] 18/5 24/4 24/11 24/18
**amount** [5] 14/4 43/3 60/10 60/13 60/16 64/20
**Ana** [1] 1/16 1/20 3/1
**analyses** [3] 21/13 28/13 68/12
**analysis** [19] 16/22 22/12 22/15 25/16 28/9 28/9 29/8 39/22 40/15 40/17 41/2 41/5 41/14 41/16 42/2 42/15 42/18 68/11 79/24
**analyze** [1] 40/2
**analyzing** [1] 41/15
**Angeles** [1] 2/16
**announced** [3] 36/25 37/22 57/2
**announcement** [1] 19/23
**another** [11] 9/17 10/2 20/3 20/17 38/6 39/19 40/2 52/24 55/1 55/23 56/14
**another's** [1] 42/8
**answer** [21] 5/21 7/13 7/18 7/19 7/25 8/10 8/20 9/1 9/12 9/12 15/11 15/16 19/6 20/7 21/13 21/17 23/13 24/17 33/14 39/15 69/1
**answered** [2] 68/5 69/15
**answering** [2] 6/17 8/15
**answers** [3] 8/17 18/11 44/22
**anticipated** [1] 9/15
**any** [66] 3/19 4/1 4/10 8/15 8/17 8/21 11/18 13/7 17/2 17/7 17/23 18/4 18/16 19/18 19/18 20/4 20/11 24/6 25/1 25/2 25/7 26/15 27/3 29/24 32/6 33/23 34/11 35/22 40/8 41/23 42/3 42/16 49/11 49/18 49/24 51/18 52/8 52/9 52/9 54/21 56/16 58/21 60/5 61/5 63/17 64/6 64/20 66/18 67/2 67/3 67/6 69/4 69/15 69/16 71/10 71/12 71/13 72/22 74/1 74/7 74/8 77/3 82/11 82/12 84/1
**anybody** [4] 20/17 21/4 22/19 29/15

**anymore** [1] 75/8
**anyone** [2] 40/18 42/13
**anything** [12] 6/22 7/6 26/22 27/20 29/9 48/7 55/9 59/7 72/21 78/23 79/7 85/19
**anywhere** [4] 10/5 21/2 27/3 54/20
**apart** [1] 68/12
**apparent** [12] 21/13 22/18 23/13 24/18 28/14 28/14 30/8 30/10 30/11 31/5 52/3 52/23
**apparently** [1] 22/25
**APPEARANCES** [2] 2/1 3/5
**Apple** [8] 4/12 50/9 50/10 53/24 57/11 75/17 76/16 82/24
**Apple's** [2] 53/14 53/15
**apples** [1] 71/6
**application** [8] 39/14 40/18 47/9 56/25 58/13 69/8 70/5 79/25
**application-specific** [1] 70/5
**applications** [22] 39/16 39/23 40/4 40/9 40/15 41/5 41/8 41/15 41/17 66/20 69/6 77/10 77/11 77/14 79/21 80/5 80/16 80/19 83/24 84/15 85/3
**applied** [1] 46/21
**applying** [1] 46/22
**appreciate** [1] 16/1
**approach** [3] 41/21 41/22 68/3
**appropriate** [20] 34/19 35/22 35/24 36/3 63/16 65/5 66/16 66/21 69/19 70/12 70/14 71/16 73/15 74/11 75/11 78/12 79/12 81/17 82/2 84/19
**approximately** [3] 35/20 26/3 37/11
**April** [2] 25/9 25/19
**archrival** [1] 37/15
**are** [53] 3/8 3/15 3/16 5/11 5/12 6/10 10/10 12/6 12/6 13/20 23/11 28/6 31/10 38/12 42/10 42/11 42/25 43/11 43/19 46/3 46/5 46/10 48/12 48/16 49/13 49/14 49/17 51/4 52/16 54/21 55/11 58/11 61/6 63/12 65/23 65/25 69/10 69/25 70/11 72/16 72/18 72/20 73/24 73/25 74/17 76/18 77/11 78/9 84/13 84/15 84/22 85/2 85/22
**area** [3] 5/23 5/24 6/20
**areas** [1] 5/23 5/25 49/16 49/16
**arguing** [1] 13/12
**argument** [12] 4/1 6/24 8/25 17/8 20/24 21/20 22/24 23/1 23/8 48/18 48/22 81/8
**arguments** [3] 30/25 31/15 50/13
**arose** [1] 77/19
**around** [6] 52/16 71/14 72/2 72/10 74/14 74/19
**art** [4] 43/16 43/20 46/4 46/13
**as** [75] 4/25 9/6 9/6 14/8 14/9 16/9 16/9 18/16 19/1 19/1 19/17 19/24 20/22 22/2 25/19 25/15 27/12 29/4 29/7 31/9 32/5 33/18 33/18 33/20 38/20 39/19 39/21 40/16 43/12 48/19 49/14 49/20 51/18 56/11 58/13 58/19 59/7 59/22 59/22 60/3 61/1 62/14 62/19 63/11 63/17 64/19 65/12 66/3 66/12 66/20 66/22 67/8 67/18 68/2 68/14 70/5 70/24 73/5 73/17 75/20 77/22 77/23 78/3 79/10 81/14 82/3 82/4 83/13 85/15 85/16 85/16 85/17
**ASIC** [1] 70/9
**ASICs** [1] 70/5
**ask** [3] 23/19 42/17 83/22
**asked** [27] 6/19 7/3 7/16 8/15 8/16 8/22 8/22 10/8 10/22 20/16 25/11 25/14 36/1 39/13 45/2 52/14 54/13 56/14 58/5 63/14 64/13 65/25 66/9 66/18 67/15 69/4 82/22
**asking** [3] 59/7 73/24 73/25
**asks** [2] 20/3 67/5
**aspirational** [5] 20/25 21/1 21/2 27/2 27/8
**asset** [1] 65/22
**assets** [2] 65/2 80/12
**assigned** [3] 75/24 85/3 85/8
**assignments** [1] 85/1
**assist** [1] 81/8
**assistance** [1] 57/11
**associated** [1] 72/12
**assume** [2] 46/1 80/21

**A**

assuming [1] 45/24
attachments [2] 10/10 12/7
attack [1] 40/16
attempt [1] 42/4
attended [1] 20/7
Attorney's [1] 13/8
attorneys' [1] 35/3
augment [1] 51/11
August [5] 19/6 19/10 25/9 25/25 26/3
August 2014 [1] 19/6 25/9 25/25 26/3
author [1] 24/9
authorized [1] 82/22
available [1] 70/11
Avenue [1] 2/9
aware [7] 29/4 56/16 56/17 57/9 64/6 74/1 82/10
away [1] 68/7
awhile [2] 84/2 85/15

**B**

back [18] 3/20 10/1 14/2 16/12 19/17 25/12 25/14 27/25 29/7 44/11 44/13 45/13 45/19 45/21 69/22 80/20 81/13 84/21
background [1] 57/15
bad [1] 63/21
ban [4] 58/8 68/4 74/7 77/15
bar [1] 38/9
based [13] 12/18 37/12 39/18 39/19 39/20 40/11 54/22 64/14 67/9 68/12 70/13 74/5 75/25
basically [4] 13/12 13/13 15/23 75/18
basis [6] 17/15 61/1 66/16 68/15 79/6 82/7
Bates [1] 28/16
battery [2] 46/11 47/1
be [132]
BEAR [1] 2/4
beauty [1] 65/1
became [2] 33/13 54/5
because [51] 4/8 5/18 9/4 10/6 10/25 11/3 11/8 15/11 16/14 16/24 17/3 20/13 21/17 22/1 24/7 25/11 25/14 26/12 27/25 30/7 30/19 31/16 33/15 37/5 37/21 38/21 42/2 42/23 43/22 45/18 47/6 50/9 50/24 51/13 51/14 52/9 53/2 54/4 62/4 62/14 62/20 65/6 65/15 66/22 73/4 73/10 74/12 75/18 77/4 80/14 83/11
become [4] 34/24 52/3 62/16 62/21 69/20 69/21 83/4
becomes [2] 52/23 69/20
becoming [2] 34/12 34/13
bed [1] 44/15
been [32] 11/3 13/10 17/16 20/1 29/4 42/24 43/4 56/15 56/18 56/19 57/6 57/12 58/14 59/20 59/25 62/22 67/17 69/15 70/22 71/11 71/12 73/8 76/5 77/2 77/3 79/19 82/25 83/19 84/2 85/13 85/15 85/15
before [11] 8/3 14/25 15/6 42/16 44/25 47/5 49/23 56/20 66/14 78/8
began [1] 9/20
begin [4] 5/11 5/12 19/5 19/14
beginning [1] 33/25
begins [1] 33/16
begrudgingly [1] 62/5
behalf [1] 40/5
being [16] 8/4 22/20 23/21 27/12 29/1 46/21 56/24 56/25 56/25 60/13 60/16 61/21 67/23 68/1 68/3 80/16
belief [2] 81/13 82/17
believe [5] 18/1 20/14 20/16 21/3 26/6 26/12 30/6 30/14 49/11 50/16 53/2 55/18 68/17 69/9 71/5 79/24 81/15 82/18 84/15 85/7
believed [10] 19/21 23/3 23/10 29/11 58/23 79/1 79/2 79/2 79/3 79/5
belittle [2] 35/11 52/10
belittles [1] 68/23
below [1] 75/25
benchmark [1] 70/24
benefit [7] 34/7 34/10 36/22 55/13 65/4 65/14 67/3

**Bernie** [1] 58/1
best [1] 6/3
better [2] 59/21 68/3
between [5] 12/7 32/21 54/14 70/9 75/12
beyond [6] 10/15 11/19 12/11 17/18 34/6 34/12
bias [1] 24/14
big [2] 63/10 70/8
bigger [1] 52/22
billions [1] 68/19
binder [2] 10/4 67/10
bit [4] 63/21 67/20 67/21 71/17
bits [3] 31/17 32/19 32/21
black [1] 28/25
blah [3] 6/25 6/25 6/25
blame [1] 78/6
blaming [1] 6/1
Blank [1] 11/24
blatantly [1] 50/4
block [2] 43/22 46/18
blocked [1] 60/10
blocking [5] 43/12 43/13 43/16 44/5 44/10 44/20 45/16
blocks [2] 43/20 45/8
blood [3] 24/14 25/20 28/21
board [21] 4/6 20/7 20/8 20/9 20/18 20/23 21/6 21/9 22/20 23/22 25/5 25/8 26/4 26/13 27/9 27/19 28/17 28/25 70/16 78/2 82/20
body [1] 74/2
bolster [1] 13/13
bonuses [1] 31/3
both [9] 11/11 14/16 14/16 31/5 31/23 43/3 68/12 74/20 74/22
Boulevard [1] 2/16
bragging [1] 9/13
breach [19] 55/17 55/19 59/17 59/18 10/23 12/22 14/4 14/11 15/5 17/12 19/3 20/2 77/19 78/1 78/10 78/16 79/15 82/16
breaches [1] 53/6
BRIAN [2] 2/4 3/8
brief [12] 8/13 8/17 8/25 21/19 21/19 32/2 50/13 56/2 60/25 61/14 65/5 84/24
briefed [3] 18/2 64/16 83/25
briefing [7] 17/20 25/1 38/18 50/21 65/12 66/22 74/9
briefly [2] 51/22 83/2
briefs [1] 8/24
broad [1] 45/24
broader [1] 67/12
brought [1] 75/23
build [1] 57/21
bullet [1] 49/4
bullets [1] 48/12
Burdusis [1] 55/24
business [3] 13/16 55/10 76/14
busy [1] 56/18
buzzing [1] 52/16

**C**

CA [3] 1/20 2/5 2/16
Cal [1] 32/14
Cal.2d [1] 55/24
Cal.4th [1] 19/13
Cal.App.3d [1] 55/2
Cal.App.4th [1] 55/21
calculation [1] 38/4
calibration [3] 24/12 79/2 79/7
CALIFORNIA [10] 1/5 1/16 2/12 3/1 17/21 18/1 56/4 74/3 74/6 77/17
call [1] 6/10
called [1] 28/25
calling [3] 3/2 41/9 48/11
calls [1] 9/9
came [7] 21/18 21/19 21/22 43/15 52/20 61/8 62/19
can [36] 13/22 14/18 16/21 18/7 18/15 18/24 21/6 32/6 32/15 32/25 33/1 34/6 35/12 40/22 41/10 42/14 42/15 47/7 49/13 53/17 54/11

54/15 54/18 54/23 55/21 61/19 63/5 63/22 76/6 76/7 77/13 79/8 79/20 82/15
can't [14] 10/5 21/1 21/7 31/5 37/4 39/3 60/8 60/9 60/12 62/13 62/14 72/6 81/17 81/24
cannot [3] 43/22 54/15 55/12
Cards [1] 33/21
care [1] 11/21
carefully [2] 12/20 39/10
case [64] 4/10 4/11 4/13 8/2 11/1 11/1 11/2 11/8 12/5 14/7 16/15 16/18 16/24 17/20 19/12 21/9 32/10 32/22 33/20 33/22 34/3 34/9 34/14 34/17 36/6 37/7 46/12 52/5 52/22 54/11 54/15 54/24 54/25 55/1 55/3 55/4 55/5 55/18 55/20 55/23 55/25 56/7 56/8 56/20 61/25 62/1 62/7 65/20 68/21 70/12 71/25 72/6 74/3 74/8 75/15 76/9 79/22 79/23 79/24 80/17 81/16 82/1 85/10
cases [3] 35/10 38/11 42/12
cause [7] 19/16 21/16 22/11 23/2 23/16 29/6 44/11
caused [1] 44/12
CE [1] 71/4
CENTRAL [1] 1/5
CEO [1] 11/10
Cercacor [21] 5/21 8/7 10/13 11/2 11/9 11/11 19/5 19/10 23/12 25/8 25/23 26/6 27/19 31/23 39/6 54/2 58/24 77/24 78/3 78/23 79/4
Cercacor's [4] 20/6 26/17 26/20 30/7
certain [3] 31/18 41/21 47/10 51/4
certainly [12] 13/23 14/1 25/9 27/4 29/8 30/10 32/7 49/25 59/25 63/12 70/16 74/21
CERTIFICATE [1] 86/4
CERTIFIED [1] 1/9
certify [1] 86/6
cessation [1] 55/8
cetera [2] 16/17 71/4
change [5] 5/1 38/20 81/14
changed [1] 36/6
chapter [1] 72/10
character [1] 55/7
characterize [1] 40/16
characterizing [1] 40/12
charge [1] 16/25
Chem [1] 25/6
Chem-5 [1] 25/6
Chen [13] 20/7 20/8 20/10 21/5 26/20 49/12 49/12 49/18 49/20 49/22 49/25 50/17 50/18
Chen's [4] 20/4 26/15 27/1 38/20
Chief [1] 39/7
chips [1] 70/4
choice [1] 24/8
chose [1] 61/2
CHRISTOPHER [1] 2/4
Circuit [6] 33/22 34/14 34/17 59/6 60/20 79/23
circuits [1] 70/6
citation [3] 30/5 40/8 57/24
citations [2] 33/2 45/1
cite [5] 17/20 21/20 24/3 32/13 34/16
cited [14] 17/20 38/12 38/18 42/12 54/25 55/4 55/17 56/3 57/7 61/7 74/8 75/15 81/16 82/1
cites [2] 24/5 55/1 56/2 66/11 69/9
citing [1] 56/7
CLAASEN [1] 2/4
Claassen [3] 3/9 31/8 56/11
claim [13] 43/9 45/25 48/6 48/15 49/5 59/2 63/15 71/19 76/3 78/2 79/4 79/24 79/24
claimed [6] 43/12 45/15 45/22 79/25 80/3 80/16
claims [3] 41/23 73/14 80/4
clarify [1] 83/14
clean [1] 76/18
clear [12] 9/22 10/14 10/19 12/12 22/22 23/20 24/15 36/10 40/1 52/4 52/5 66/22
clearance [1] 57/4
cleared [1] 43/5
clearly [5] 7/11 7/20 12/1 12/6 71/24
client [1] 53/16

**C**

client's [2] 23/10 30/6
clinically [1] 27/16
closest [1] 32/10
closing [5] 8/25 23/8 32/2 56/2 84/24
co [2] 2/13 84/22
co-patentees [1] 84/22
code [19] 36/5 36/13 38/21 39/14 39/16 39/22 40/3 40/9 40/15 41/3 41/17 71/23 72/1 72/11 72/25 73/2 74/12 75/6 86/7
cognizant [1] 60/20
collecting [1] 9/20
collectively [1] 32/20
combination [3] 32/11 47/2 47/2
combine [1] 62/10
come [6] 9/10 11/6 16/16 45/12 46/16 84/21
comes [6] 23/9 32/1 32/12 38/14 45/21 57/24
coming [1] 44/11 59/6
comment [4] 39/15 83/8 83/9 83/12
commented [1] 76/15
comments [3] 3/19 52/2 58/9
commercial [5] 13/16 34/7 62/17 69/21 77/3
common [1] 52/21
companies [1] 65/24
company [7] 22/8 23/24 29/10 38/6 52/12 63/10 79/14
company's [2] 28/5 78/22
compare [4] 40/10 80/25
compared [1] 52/17
comparing [3] 41/8 41/11 41/12
comparison [4] 40/13 40/14 41/14 67/9
compel [2] 12/11 66/1 78/8
compelled [1] 18/7
compete [2] 54/21 57/21
competes [2] 18/1 18/10
competing [1] 69/23
competition [2] 36/24 58/3
competitive [1] 62/4
competitor [3] 37/14 37/23 74/5
competitors [3] 34/11 34/20 34/21 37/15 63/9 82/5
complete [1] 63/25
completely [4] 27/25 44/19 66/7 68/16
compliance [3] 15/25 67/16 71/9
complicated [2] 21/11 38/23
comply [2] 14/23 73/7
component [2] 44/13 44/15
components [2] 70/8 70/10
computer [1] 82/15
conceded [2] 44/1 48/8
conceding [2] 78/9 78/13
concept [2] 68/10 83/23
concern [4] 61/20 64/21 65/22 71/20
concerned [3] 63/2 64/19 71/17
conclude [1] 29/9
concluded [3] 4/7 28/10 85/23
concludes [1] 41/20
conclusion [10] 8/9 19/25 40/7 55/1 56/1 57/23 58/3 59/3 62/1 62/8
conclusions [14] 4/14 8/14 19/9 35/1 35/4 35/11 36/1 38/12 42/14 55/5 56/10 57/8 69/7 85/18
conducted [3] 25/16 28/9 29/8
Conference [1] 86/11
confident [1] 60/5
confidential [19] 6/22 6/23 7/11 7/12 11/12 11/19 12/1 12/14 13/8 17/11 18/16 47/12 54/22 55/10 59/20 60/2 67/6 75/14 76/10
confidentiality [5] 7/5 12/13 14/13 17/22 53/13
configuration [1] 47/16
confirmation [1] 27/16
conformance [1] 86/10
connected [1] 30/3
conscience [1] 9/19
conscientious [1] 53/3
consider [1] 35/2 39/10 52/19
considered [1] 56/5
considers [1] 42/9

consistent [3] 13/20 25/10 39/5
constituent [1] 55/2
constitute [2] 13/17 13/19
contain [2] 69/6 80/20
contemplated [2] 13/17 13/19
contemplates [1] 34/6
contemporaneous [1] 64/11
contend [5] 5/20 5/22 25/1 26/11 35/7
contended [1] 41/13
contending [1] 27/11
contents [1] 53/18
context [1] 77/19
continual [1] 30/20
continue [2] 63/16 73/16
continued [2] 8/7 9/1
continues [1] 8/10 56/20
contract [9] 5/17 5/17 5/19 12/15 12/20 18/12 18/17 53/6 76/4
contracts [1] 12/16
contractual [1] 12/17
contrary [4] 21/1 23/9 28/5 56/17
contrast [1] 51/8
contrasting [2] 51/10 51/12
controls [1] 33/15
converting [1] 58/15
converts [1] 58/5
conveyed [1] 54/2
conveys [1] 67/19
Cook [3] 23/21 76/12 83/11
Cook's [1] 83/10
Cooper [1] 55/2
cooperate [2] 50/7 50/11
copies [1] 69/10
copy [1] 77/22
Corp [1] 34/15
corporation [3] 1/9 3/3 21/8
correct [10] 4/8 4/13 7/7 14/19 22/16 27/7 51/20 70/21 72/19 86/8
correction [3] 4/2 4/5 24/14
correlations [2] 22/16
could [20] 9/6 9/10 13/21 30/17 33/2 34/4 34/12 35/2 38/4 46/11 46/25 52/9 61/5 63/5 71/23 72/8 78/5 79/3 79/8 83/2
couldn't [4] 3/9 3/10 14/18 70/23
counsel [4] 2/1 3/5 3/11 17/8
County [1] 76/14
couple [3] 48/12 79/18 81/7
course [4] 25/15 30/22 30/22 63/6
court [54] 1/4 9/16 10/22 12/4 15/7 17/4 17/13 24/4 26/14 30/23 32/16 33/1 34/18 35/20 37/25 40/1 41/20 42/17 52/2 53/19 56/14 58/5 58/5 59/4 59/7 59/7 61/7 63/14 63/14 63/13 66/11 66/15 66/16 66/18 67/5 67/5 67/15 67/16 67/17 67/18 67/25 70/23 73/14 74/18 75/3 80/9 81/1 81/8 81/19 82/19 83/3 83/24 84/17 86/16
Court's [4] 28/12 53/3 68/5 80/23
Courthouse [1] 1/19
courtroom [3] 3/16 14/8 41/10 43/5 53/15 82/13 83/5
courts [1] 74/4
cover [19] 10/9 10/11 11/18 43/23 43/23 43/24 45/8 45/13 45/20 45/21 46/8 46/9 46/15 46/19 46/22 46/23 46/24 46/25 48/3
covered [2] 31/11 36/20
covers [1] 46/17
craft [1] 65/1
crazy [1] 76/16 76/16
create [1] 83/17
created [1] 47/5
creating [1] 33/12
credible [1] 12/8
critical [1] 4/16
criticism [1] 70/23
cross [5] 6/7 6/9 21/23 25/24 50/24 53/10 54/10
cross-examination [5] 6/7 6/9 25/24 53/10 54/10
cross-examine [1] 50/24

cross-examined [1] 21/23
crown [2] 58/6 67/21
cryptic [1] 61/14
CTO [1] 23/21
culmination [1] 31/22
culpa [1] 17/15
cure [1] 80/9
current [2] 72/1 73/11
custom [1] 70/4
CUTSA [18] 11/22 12/2 12/16 12/17 12/19 32/4 33/16 34/5

**D**

Daft [2] 39/13 40/2
Dalvi [3] 48/20 49/10 50/5
damages [5] 52/8 52/9 52/10 52/12 60/22
data [21] 20/20 20/21 21/11 21/12 22/20 22/21 22/22 23/14 27/22 28/13 28/21 30/15 30/17 30/20 30/23 30/24 41/21 41/22 66/4 66/9 77/24
Date [1] 86/13
daughters [2] 77/9 84/16
deadlines [1] 71/3
deal [4] 3/23 3/25 58/16 75/9
dealing [1] 14/20 44/19
dealt [4] 35/10 58/12 75/15 78/2
debt [1] 52/13
deceive [1] 29/15
decide [1] 62/20
decided [1] 62/20
decides [1] 52/12
decision [1] 75/20
decisions [1] 56/3
deck [2] 20/4 26/15
declaration [9] 11/12 11/15 12/3 17/11 25/17 34/25 35/25 37/16 45/10
declarations [2] 50/25 51/2
defend [1] 52/21
defendant [2] 34/9 62/4
defendants [11] 1/12 2/7 3/15 4/15 4/24 4/25 8/13 30/25 35/6 35/7 40/5
defendants' [3] 31/15 32/1 41/22
defense [4] 48/16 49/5 52/21 55/15
define [1] 16/1
defined [1] 68/2
defines [1] 32/4
defining [1] 36/7
definition [5] 11/23 12/2 12/14 33/16 40/10
deliberately [1] 76/23
delineating [1] 68/2
demand [2] 57/17 75/22
demonstrated [1] 22/15
demonstration [1] 44/18
Denby [1] 53/19
Denver [1] 2/13
Departure [1] 22/9
dependent [1] 16/5
deposition [2] 50/8 53/20
derive [1] 68/7
derived [2] 42/11 48/22
describes [2] 15/23 28/1
design [6] 24/13 71/14 72/2 72/10 74/19 81/14
design-around [3] 71/14 72/2 72/10
detail [1] 23/7
detailed [1] 40/21
details [2] 39/17 42/25
detector [11] 44/4 44/11 45/9 45/14 45/17 45/18 45/22 46/7 46/14 46/24 48/4
determination [1] 38/15
determinations [1] 39/3
determine [1] 16/17
determined [2] 22/16 25/19
determining [1] 39/10
deterring [1] 54/12
develop [6] 34/22 37/1 37/3 37/11 37/20 37/24
developed [2] 69/24 70/7
developing [3] 70/1 70/4 70/9

**D**

**development [3]** 31/22 37/9 40/20
**device [27]** 43/22 44/18 45/8 45/11 45/12 46/5 46/6 46/10 46/11 46/12 46/19 47/1 47/16 47/17 47/18 48/2 48/5 63/15 69/24 70/2 70/7 71/5 73/15 73/23 74/12 74/13 77/2
**devices [3]** 23/11 46/17 79/10
**Diab [11]** 28/17 29/3 37/9 50/22 51/8 51/9 61/3 61/8 64/9 69/24 82/11
**Diab's [3]** 40/20 40/22 69/25
**dice [3]** 81/10 81/20 83/16
**did [61]** 6/3 6/8 6/12 9/2 11/12 11/15 12/4 14/12 14/22 14/22 17/1 17/14 20/8 20/12 20/17 20/18 21/3 21/24 23/19 24/6 24/6 25/1 26/22 29/7 29/9 31/15 39/8 39/13 39/17 40/2 40/10 40/11 40/13 41/8 41/12 41/14 41/14 43/11 44/10 45/7 49/25 50/1 50/4 50/6 50/16 50/17 50/20 51/9 51/9 51/13 56/19 57/2 64/16 72/11 76/1 76/19 76/23 82/9 83/4 85/10
**didn't [34]** 3/23 6/2 6/22 8/5 10/9 13/7 13/23 16/18 17/2 20/14 20/15 21/24 23/9 29/14 30/19 38/21 39/15 40/13 41/7 41/11 48/2 51/15 52/5 52/11 53/1 53/2 65/5 65/6 66/8 66/14 75/19 81/22 82/18
**difference [1]** 70/8
**different [13]** 4/13 27/10 41/21 49/11 49/18 64/13 67/12 70/3 71/1 73/8 74/15 75/8 85/12
**differently [1]** 82/25
**difficult [2]** 16/1 38/7
**digesting [1]** 4/24
**direct [11]** 6/23 19/18 23/5 23/7 23/10 24/20 30/6 40/13 40/14 53/19 75/5
**direction [1]** 44/1
**directly [3]** 34/5 38/11 41/7
**disclose [4]** 4/16 13/7 32/20 43/16
**disclosed [5]** 5/20 13/5 28/24 32/11 42/24
**disclosure [14]** 13/10 22/2 22/3 32/23 32/24 33/17 33/18 34/18 34/21 48/25 51/10 51/13 58/13 74/4
**disclosure of [1]** 32/23
**disclosures [1]** 51/9
**discovered [1]** 29/8
**discovery [1]** 16/10
**discrepancies [1]** 80/25
**discusses [1]** 22/6
**discussion [3]** 11/6 39/20 70/22
**disgorgement [11]** 64/14 65/5 66/2 68/9 68/12 68/14 77/18 78/8 78/11 78/12 78/20
**disloyalty [1]** 30/4
**disposal [1]** 51/2
**dispute [3]** 5/18 5/24 17/23
**disputes [1]** 15/24
**disputing [1]** 38/18
**disqualify [1]** 9/6
**distinction [4]** 39/18 39/19 39/20 42/6
**distinguish [1]** 42/16
**district [4]** 1/4 1/5 32/12 85/12
**dividing [1]** 5/13
**division [2]** 1/6 60/12
**divorce [1]** 62/2
**do [52]** 4/11 4/21 5/4 5/14 5/17 5/19 5/22 6/13 6/14 10/18 11/13 11/14 12/3 12/4 12/10 15/8 15/17 19/10 25/5 27/20 31/14 33/9 35/6 35/13 36/12 40/13 42/16 49/25 50/2 50/9 51/1 53/12 54/14 57/3 61/6 62/6 65/17 67/8 71/24 73/8 73/9 74/14 75/5 77/10 78/1 81/17 83/19 84/1 84/12 84/22 84/22 85/10
**Docket [1]** 64/22
**doctrine [1]** 74/4
**document [10]** 8/18 9/2 17/15 32/3 32/6 32/8 32/12 64/11 69/5 76/10
**documentation [3]** 17/25 31/17 56/1
**documents [43]** 7/24 8/2 8/6 9/3 9/14 9/20 9/21 9/24 10/2 10/4 10/5 10/6 10/7 10/16 10/21 11/13 11/16 12/5 12/6 12/8 13/21 13/22 13/25 14/3 14/6 15/19 16/9 16/17 17/11 17/16 18/4 27/3 31/23 32/9 32/22 32/24 53/17 58/20 67/10 67/12 67/13 69/16 77/21
**does [20]** 10/10 12/17 14/25 15/4 15/6 19/4

20/4 26/15 37/25 41/24 42/15 43/16 44/24 45/24 46/5 50/3 71/21 77/6 77/10 79/18 82/15
**does Lamego [1]** 36/7
**doesn't [8]** 36/8 38/20 58/15 64/20 73/24 74/16 83/16 83/25
**doing [4]** 28/4 58/2 71/22 82/1
**dollar [1]** 84/6
**dollars [2]** 68/14 68/19
**don't [46]** 4/1 4/23 4/25 5/18 9/16 9/21 10/15 10/20 13/16 13/18 13/22 13/24 16/24 16/25 17/14 17/20 17/23 18/7 18/15 19/1 19/2 32/16 33/4 35/14 35/15 37/16 42/21 49/11 49/17 53/14 63/4 67/1 68/14 70/11 72/4 72/8 72/14 74/6 76/3 77/4 78/21 80/7 80/23 82/6 84/17 84/19
**done [10]** 10/24 16/20 16/22 23/12 28/7 30/17 50/3 61/6 76/23 78/5
**down [6]** 7/9 30/24 35/14 35/15 45/21 57/10
**downgrade [1]** 9/10
**downloaded [1]** 16/17
**Dr [84]** 41/12 57/23 8/14 8/18 8/21 8/23 9/24 9/25 10/8 13/5 14/1 14/12 16/11 16/19 17/6 17/14 19/19 20/12 22/7 22/9 23/2 23/4 23/16 23/19 24/4 24/15 24/18 25/2 25/7 26/21 27/4 27/20 28/4 29/2 29/10 30/22 30/16 30/16 30/23 31/1 34/9 36/6 36/21 37/6 39/5 40/6 40/6 40/9 41/2 42/20 42/22 42/24 43/15 44/17 44/23 45/7 45/23 49/1 50/4 53/11 54/2 59/6 65/3 66/8 67/18 68/3 68/8 69/16 71/10 71/17 76/11 76/16 76/19 76/20 77/7 78/19 79/4 79/11 84/15
**Dr. [8]** 21/3 22/1 22/4 22/16 29/9 38/14 57/15 70/15
**Dr. Lamego [3]** 21/3 29/9 57/15
**Dr. Lamego's [1]** 70/15
**Dr. McNames' [1]** 38/14
**Dr. Merritt [3]** 22/1 22/4 22/16
**draft [1]** 47/13
**drafted [1]** 60/22
**dramatically [1]** 52/10
**draw [4]** 15/17 15/18 54/14 75/12
**due [2]** 22/20 57/10
**during [8]** 25/8 33/25 53/8 53/9 54/9 56/16 57/5 71/13
**duties [1]** 3/8
**duty [10]** 12/23 19/3 20/2 21/8 77/20 78/1 78/10 78/16 79/15 82/16

**E**

**e-mailed [1]** 57/25
**e.g [2]** 31/18 33/10
**each [6]** 24/14 31/24 32/15 32/18 32/24 32/25
**early [4]** 8/19 25/19 76/11 77/23
**Early's [2]** 83/3 83/5
**easier [2]** 21/18 72/9
**easy [2]** 43/11 58/10
**economic [1]** 38/18
**educated [1]** 59/25
**education [1]** 75/25
**effect [1]** 53/5
**effectively [4]** 56/15 72/8 75/16 76/25
**effort [2]** 28/5 51/18
**egregious [1]** 50/3
**either [6]** 4/8 23/24 39/22 40/14 66/22 67/4
**electrical [1]** 57/16
**electronic [2]** 14/6 14/9
**elects [1]** 34/2
**elements [1]** 46/3
**elicit [1]** 51/25
**eliminate [1]** 34/7
**else [6]** 26/22 61/22 63/4 65/3 76/9 85/19
**email [3]** 9/7 10/11 76/1
**emails [3]** 5/21 10/9 10/23
**embodiment [1]** 46/8
**embodiments [2]** 46/10 74/18
**emitter [15]** 43/12 43/16 43/19 43/22 44/5 44/10 44/17 44/21 45/9 45/16 45/18 46/7 46/14 46/24 48/4

**empirical [1]** 41/21
**employee [1]** 55/23 58/12
**employee's [4]** 55/20 55/22 55/25 56/4
**employees [6]** 8/5 18/25 39/3 39/8 58/21
**employer [4]** 55/10 55/12 55/19 75/13
**employer's [3]** 35/8 54/21 56/5
**employment [3]** 11/13 11/14 55/9
**encompass [1]** 49/15
**encouraged [1]** 83/6
**end [3]** 43/7 83/9 83/14
**endeavor [2]** 38/23 70/6
**ended [1]** 6/14
**ending [1]** 34/1
**Endo [1]** 19/12
**energy [2]** 46/11 47/1
**engineer [2]** 21/22 76/21
**engineering [2]** 28/3 57/16
**engineers [5]** 28/7 39/7 61/6 64/12 78/23
**enjoin [1]** 74/4
**enjoined [3]** 18/15 71/14 72/17
**enjoining [1]** 62/3
**enough [2]** 14/18 57/3
**enrich [1]** 80/13
**enriched [2]** 34/9 36/22
**enrichment [3]** 52/13 65/9 65/15
**ensure [1]** 67/16
**ensuring [1]** 71/9
**entertain [2]** 83/11 83/12
**entire [4]** 26/20 28/17 43/4 53/10
**entirety [2]** 31/24 32/3
**entitled [5]** 22/9 53/17 71/24 82/21 86/9
**equitable [7]** 64/25 65/10 65/16 83/23 84/3 84/11 84/19
**equity [2]** 55/7 65/1
**error [7]** 22/17 23/1 23/6 23/17 29/13 30/13 31/4
**errors [5]** 21/16 23/2 23/16 29/6 30/11
**especially [2]** 35/17
**essential [2]** 19/16
**establish [2]** 14/11 48/2
**estimate [2]** 37/12 64/10
**estimates [2]** 61/4 61/5
**et [6]** 1/9 1/11 3/3 3/16 16/17 71/4
**Ethicon [1]** 19/12
**evaluated [1]** 33/18
**evaluation [1]** 79/18
**even [18]** 12/1 23/14 26/25 32/5 37/12 37/15 44/17 47/9 52/9 52/13 56/10 58/7 58/16 63/9 64/16 68/13 68/22 73/3
**ever [2]** 8/13 47/13
**every [2]** 16/10 27/19
**everybody [2]** 31/3 41/10
**everyone [2]** 26/22 28/17
**everything [3]** 52/1 68/6 82/4
**everything's [1]** 81/22
**evidence [40]** 17/3 17/8 25/10 37/5 47/6 47/11 47/13 47/15 48/2 48/6 51/3 51/7 53/8 56/16 56/17 56/18 57/7 57/9 57/17 57/25 57/25 58/10 61/2 64/7 64/16 65/4 66/1 68/18 68/20 69/23 76/6 77/21 78/7 78/21 79/9 80/2 82/10 82/12 85/4 85/7
**evidentiary [3]** 48/10 49/4 68/15
**exactly [3]** 35/16 72/11 82/1
**examination [8]** 6/5 6/7 6/9 6/11 6/12 25/24 53/10 54/10
**examine [1]** 50/24
**examined [2]** 14/5 21/23
**example [14]** 6/4 11/8 32/7 33/19 39/5 44/15 45/19 46/25 59/19 67/13 71/22 72/25 73/5 73/16
**examples [1]** 6/16
**exclusive [1]** 59/2
**excuse [2]** 7/12 8/12 20/20
**excuses [4]** 6/1 7/1 8/4 8/12
**Executive [1]** 3/10
**exercising [1]** 79/11
**exhibit [9]** 9/22 10/2 23/23 24/4 24/5 24/7 28/15 53/21 58/4 59/5
**Exhibit 306 [3]** 24/4 24/5 24/7

**E**

**Exhibit 313 [1]** 10/2
**Exhibit 3402 [1]** 53/21
**Exhibit 83 [1]** 28/15
**exhibits [1]** 14/8 67/9
**exist [2]** 55/23 55/25
**existed [1]** 4/7
**existence [1]** 33/8
**expected [2]** 8/3 30/21
**experience [7]** 15/23 54/19 54/20 54/22 75/12 75/25 76/1
**experiment [1]** 48/7
**expert [10]** 9/9 16/16 16/16 22/1 22/2 40/5 49/12 49/16 49/20 50/21
**expert-type [1]** 49/16
**experts [1]** 38/17
**explain [1]** 10/25
**explained [4]** 19/24 37/10 44/13 58/19
**explaining [1]** 7/25
**explains [4]** 23/7 23/11 24/1 81/9
**explicit [2]** 12/17 28/15
**exposed [1]** 71/12
**exposing [1]** 71/17
**extend [4]** 12/11 34/6 34/12 37/19
**extends [1]** 18/5
**extent [3]** 9/21 10/15 10/20
**extracted [1]** 50/11
**extracting [1]** 48/18
**extremely [1]** 45/24
**Eyes [1]** 13/9

**F**

**F.2d [1]** 34/16
**F.3d [1]** 3/21
**F.Supp [1]** 32/14
**face [1]** 60/21
**fact [41]** 8/8 8/24 10/16 10/21 11/12 11/15 14/24 15/13 15/21 16/22 19/20 19/20 22/8 23/2 23/13 23/16 31/2 32/4 37/8 38/16 40/22 43/17 43/21 45/1 47/9 47/17 49/24 56/17 56/21 58/25 59/11 60/5 62/11 63/23 64/2 64/4 64/6 64/8 66/10 76/21 77/8
**facts [7]** 4/14 8/14 15/15 27/14 49/14 82/7 85/18
**Factually [1]** 42/15
**failed [1]** 4/16
**failure [2]** 9/17 36/17
**fair [5]** 13/15 14/1 16/13 26/5 75/5
**fairly [1]** 13/4 17/16 38/4 65/23 73/6 79/19 80/23
**faith [2]** 79/6 79/12
**false [4]** 44/5 44/11 44/12 44/14
**family [5]** 77/8 77/14 84/22 85/1 85/1
**favorable [1]** 9/25
**FDA [1]** 57/4
**fear [1]** 11/18
**feasibility [6]** 4/7 4/17 21/16 23/24 27/17 29/7
**feasible [5]** 23/25 24/1 25/21 26/7 27/13
**February [1]** 57/2
**February 2020 [1]** 57/2
**Federal [3]** 33/22 59/6 79/23
**feel [1]** 66/16
**fees [3]** 19/6 19/7 35/3
**fellow [1]** 21/9
**few [1]** 36/20
**fiduciary [10]** 12/22 19/3 20/2 21/7 77/20 78/1 78/10 78/16 79/15 82/16
**field [11]** 56/16 56/18 57/16 58/8 58/18 60/8 60/11 62/4 68/4 75/17 77/1
**figured [1]** 63/4
**file [1]** 77/22
**filed [2]** 59/1 69/5
**files [1]** 77/22
**final [1]** 41/19
**finalize [1]** 85/17
**financial [1]** 68/11
**find [11]** 12/4 21/21 35/12 40/22 42/4 42/14 57/10 57/12 75/8 76/21 78/15
**finding [12]** 11/15 17/13 17/14 43/17 43/21

45/1 56/21 62/1 64/2 64/4 64/5 64/8
**findings [11]** 8/6 8/11 43/20 9/5 9/20 38/16 40/20 43/24 59/3 61/11 60/4 66/10 85/18
**finds [8]** 10/22 35/20 63/14 67/5 67/18 67/25 73/14 74/18
**fine [8]** 5/15 18/3 24/20 26/23 66/21 66/24 67/4 68/1
**finger [1]** 44/20
**finished [2]** 82/11 82/13
**firm [1]** 16/25
**first [21]** 3/24 4/24 5/19 6/8 6/22 10/1 12/13 13/4 19/3 19/7 24/13 24/24 28/12 31/14 35/24 35/7 58/10 63/20 69/15 69/24 74/25
**fit [1]** 11/22
**fitting [1]** 41/22
**five [3]** 6/7 6/15 26/6
**flavor [1]** 56/9
**FLETCHER [3]** 2/11 3/15 4/22
**Floor [1]** 2/5
**flow [1]** 65/14
**fly [2]** 52/15 72/23
**focus [5]** 5/9 30/7 34/8 36/21 41/8 41/11 41/12
**focused [1]** 52/23
**folder [1]** 5/20 17/16
**follow [2]** 70/18 72/14
**following [1]** 43/6
**foregoing [1]** 86/7
**forensic [2]** 16/16 16/22
**forever [1]** 70/12
**forgot [1]** 30/16
**former [2]** 3/19 86/10
**forth [3]** 20/12 15 44/25
**forthcoming [2]** 6/17 29/1
**forthright [2]** 26/23 29/1
**forward [2]** 68/9 85/17
**found [4]** 27/2 27/9 27/10 34/18 59/4 66/19 78/10 82/2
**foundation [2]** 28/2 28/10
**foundational [2]** 63/24 64/7
**four [5]** 6/7 6/15 19/4 24/25 56/20
**four-year [2]** 19/4 24/25
**Fox [1]** 19/12
**framework [1]** 73/4
**free [2]** 12/4 39/4
**freely [2]** 6/6 70/11
**Friday [1]** 8/11
**front [5]** 8/19 17/21 19/12 49/21 84/17
**fulfilled [1]** 9/13
**full [2]** 10/5 14/8
**fully [1]** 4/16
**further [7]** 4/19 22/15 24/21 28/9 29/2 29/8 83/20
**future [7]** 54/12 60/24 64/20 65/8 69/19 70/1 71/19

**G**

**G2 [1]** 22/9
**gained [2]** 55/6 75/12
**gathering [2]** 30/21 61/13
**gave [15]** 7/12 7/18 8/4 8/18 8/21 8/23 21/24 23/22 24/5 30/5 40/6 45/19 60/21 61/8 62/10 62/10
**GEARY [2]** 2/11
**general [3]** 3/11 52/2 55/7
**generally [4]** 34/3 41/13 54/17 54/19
**generate [1]** 77/3
**geniuses [2]** 54/6 62/21
**gentlemen [1]** 49/10
**genuinely [1]** 5/18
**George [1]** 55/24
**GERGELY [11]** 2/8 3/14 4/22 13/2 45/5 49/2 49/23 68/25 69/13 83/8 83/22
**get [12]** 3/24 7/8 7/10 14/25 15/4 15/6 19/2 30/23 31/12 61/11 61/19 65/8
**gets [3]** 17/12 65/23 69/22
**getting [4]** 16/8 17/24 30/16 71/4
**gigabytes [1]** 14/9

**gist [2]** 27/4 27/7
**give [10]** 6/10 15/24 23/9 41/4 47/4 49/6 61/4 68/10 75/4 81/16
**given [9]** 14/5 16/21 36/16 60/19 61/1 67/19 67/20 72/21 82/23
**gives [4]** 8/12 48/23 66/11 69/7
**giving [3]** 9/3 73/4 74/24
**Gleo [1]** 57/2
**global [1]** 24/12
**glucose [2]** 57/4 71/5
**go [24]** 3/20 5/13 5/14 6/6 6/6 6/13 10/17 12/22 19/21 22/5 23/19 24/10 27/16 31/5 32/15 32/25 33/15 42/15 42/18 43/2 54/23 66/20 76/21 80/20
**goals [2]** 65/7 85/14
**goes [8]** 6/24 7/25 8/9 11/20 22/10 44/9 45/20 61/17
**going [20]** 4/13 5/11 5/12 5/13 8/11 15/12 19/21 21/17 37/21 41/9 42/25 45/4 51/17 51/18 52/22 53/7 53/15 66/24 68/9 75/7
**Goldberg [1]** 47/25
**Goldberg's [3]** 44/3 49/7 64/1
**Goldstein [4]** 40/6 40/6 40/9 41/2
**good [20]** 3/6 3/12 3/12 3/13 3/18 4/23 5/10 9/4 15/3 17/2 20/3 23/17 24/23 39/24 54/16 54/24 55/17 72/3 79/6 79/12
**good-faith [1]** 79/6 79/12
**got [8]** 9/14 31/3 38/7 44/20 73/6 76/13 76/20 77/25
**gotten [1]** 75/22
**GOULD [4]** 2/8 2/12 2/15 3/14
**grant [1]** 37/18
**great [1]** 10/24
**Greenly [2]** 55/2 56/8
**group [2]** 10/2 33/20
**guess [3]** 16/21 17/12 84/6
**guidance [1]** 54/16
**guide [1]** 81/14
**guilty [1]** 9/18
**gutted [1]** 49/8

**H**

**ha [2]** 9/5 9/5
**had [54]** 4/11 7/21 7/23 9/4 9/19 11/10 16/10 16/12 19/10 19/14 20/10 25/4 25/5 25/7 26/6 26/12 27/11 27/20 31/18 33/19 36/24 37/10 40/25 41/2 45/10 45/10 45/19 46/6 46/7 48/20 49/22 53/1 54/1 57/12 57/20 60/25 62/21 62/21 66/10 68/6 70/25 72/10 75/22 78/4 79/6 79/18 81/9 81/18 82/3 82/11 82/23 83/18 83/23
**half [2]** 24/12 24/13
**Hallmark [1]** 33/21
**Hammond [1]** 25/24
**hands [2]** 21/7 76/18
**hanging [1]** 44/15
**happened [11]** 16/14 20/9 24/1 29/1 42/4 42/7 58/17 65/20 76/6 76/8 76/9
**happens [2]** 39/9 66/25
**happy [1]** 31/3
**harm [8]** 29/10 33/25 34/11 52/6 52/7 52/8 57/19 76/1
**harmed [1]** 36/19
**harms [1]** 34/23
**has [37]** 10/6 14/11 17/14 19/15 21/7 21/13 22/12 26/18 45/8 53/11 54/16 56/5 56/15 56/19 58/14 60/8 60/11 61/16 61/23 62/22 63/1 63/4 67/23 68/19 68/21 69/16 71/11 72/15 73/9 73/20 73/21 75/16 76/25 81/18 82/7 83/19
**hasn't [5]** 63/10 71/12 76/5 77/2 77/3
**have [84]** 4/1 4/19 5/1 5/8 7/5 7/5 9/17 10/11 11/3 11/21 12/7 15/14 16/3 16/20 17/3 17/20 18/16 18/20 19/9 19/12 19/14 20/1 20/4 20/20 21/10 21/11 24/20 25/11 26/3 26/13 29/3 29/17 29/20 33/9 37/16 39/18 44/14 47/9 47/20 47/23 48/8 51/23 52/4 59/17 59/20 59/21 60/19 61/11 61/20 63/11 67/2 67/3 67/17 68/11 69/9 69/17 69/22 70/2 71/21

**H**

have... **[25]** 7/21 72/1 72/7 73/21 74/20
74/24 75/8 77/10 78/5 78/20 80/7 80/20 80/22
81/4 82/6 82/25 83/20 84/1 84/9 84/12 84/12
84/17 84/17 84/18 85/15
**haven't [3]** 43/4 74/8 80/15
**having [4]** 8/19 39/2 57/3 71/18
**he [276]**
**he'd [1]** 9/16
**he's [17]** 7/24 8/11 9/3 9/8 13/12 24/18 42/25
56/18 57/6 59/24 60/10 71/22 72/17 72/21
73/10 77/1 81/25
**head [11]** 18/6 34/4 34/10 36/23 62/13 62/15
63/3 69/22 70/13 70/16 70/24
**heading [1]** 24/10
**hear [2]** 11/5 12/24
**heard [12]** 4/21 5/4 19/17 31/20 32/22 32/23
37/8 37/14 59/7 60/6 77/20 78/25
**held [1]** 86/9
**help [5]** 10/11 15/8 15/16 57/12 67/17
**helpful [3]** 13/12 74/20 74/22 74/23 85/17
**Hence [1]** 75/1
**here [36]** 3/9 4/25 7/22 9/10 11/22 19/12
24/11 25/18 29/20 34/8 36/21 37/2 37/15
37/18 37/22 38/7 38/13 41/10 42/4 42/7
42/17 43/4 50/10 52/22 53/7 53/14 56/11
65/22 67/17 76/20 80/2 80/22 81/13 84/14
84/20
**here's [1]** 81/16
**hereby [1]** 86/6
**hesitant [1]** 75/4
**hidden [2]** 22/23 28/23
**high [2]** 57/17 75/23
**high-level [1]** 75/23
**highest [1]** 11/9
**highly [3]** 49/13 49/15 76/20
**him [39]** 6/3 6/3 6/6 6/6 6/7 6/13 6/14 6/19 7/5
7/13 21/23 22/2 25/17 36/25 37/2 45/2 49/22
52/21 57/3 57/12 57/12 59/7 59/17 60/6 65/15
66/9 74/7 74/24 75/4 75/5 75/18 76/1 76/24
77/23 78/21 79/13 81/16 82/19 82/23
**himself [5]** 13/21 13/23 15/22 69/17 79/4
**hindsight [3]** 22/7 22/19 27/24
**hire [1]** 76/16
**hiring [1]** 11/24
**his [97]**
**Histogen [1]** 42/13
**hits [2]** 45/21 45/21
**hitting [2]** 45/12 48/4
**Holland [3]** 9/23 9/24
**home [1]** 30/8
**Honestly [1]** 20/15
**Honor [36]** 3/6 3/13 3/21 4/23 5/3 5/6 13/3
18/11 24/23 29/17 31/9 36/10 45/6 47/21 49/3
50/14 50/18 51/20 51/23 53/14 60/15 60/21
68/17 69/2 69/14 69/19 70/19 71/1 72/14
78/15 78/19 81/3 83/20 84/23 85/20 85/21
**Honor's [1]** 15/2
**HONORABLE [2]** 1/8 59/22
**Hooked [1]** 75/15
**hope [1]** 19/2
**hoping [1]** 57/19
**hours [1]** 6/7
**how [30]** 5/21 10/10 11/24 14/25 15/4 15/5
21/15 23/11 23/15 31/14 33/25 34/8 35/13
36/18 36/21 36/25 37/2 37/6 37/20 37/25
54/11 57/15 58/1 61/5 62/20 67/15 72/8 74/12
79/3 84/7
**however [6]** 22/22 46/18 49/6 66/24 73/25
**huge [1]** 70/6
**hundred [4]** 14/3 14/20 15/21 18/18
**hundreds [1]** 14/8
**hurt [2]** 76/19 76/24
**hurting [1]** 76/24
**hypothesis [2]** 22/11 22/18
**hypothetical [1]** 71/20

**I**

**I'd [8]** 10/17 12/22 42/17 52/1 52/1 57/21

59/10 84/18
**I'll [10]** 28/3 39/21 39/12 59/3 61/4 62/12
80/24
**I'm [26]** 4/13 4/24 5/13 7/17 17/19 18/13
21/17 25/13 28/11 41/9 42/25 47/9 47/10
50/17 53/15 55/15 56/16 57/9 60/5 70/18
71/17 72/22 73/4 74/1 75/7 82/10
**I've [7]** 53/14 59/25 63/20 72/5 76/3 77/25
84/2
**i.e [1]** 47/16
**idea [4]** 44/5 44/10 52/11 83/16
**identical [1]** 29/12
**identified [2]** 58/22 74/13
**identify [2]** 53/16 81/12
**ignited [1]** 65/18
**imagine [2]** 24/10 59/9
**impact [6]** 12/20 20/4 26/15 26/18 41/24 42/1
**implement [4]** 39/14 66/8 66/9 77/24
**implementation [1]** 78/6
**implemented [1]** 35/21
**implicating [2]** 63/15 73/14
**importance [1]** 53/22
**important [8]** 11/7 11/8 11/11 36/5 47/4 47/4
54/11 54/13
**impose [1]** 58/7
**impossible [1]** 18/9
**improvements [1]** 42/9
**improves [1]** 38/15
**imputed [1]** 25/23
**inaccurate [1]** 26/13
**INC [3]** 1/11 3/3 33/21
**inclined [1]** 18/13
**include [1]** 32/3
**including [2]** 11/19 42/12
**independent [1]** 42/9
**indicated [1]** 68/21
**indicating [1]** 72/15
**individual [1]** 42/3
**indulge [1]** 74/3
**industry [6]** 54/5 62/20 62/23 62/25 74/1 74/8
**inevitable [1]** 74/3
**information [38]** 4/16 9/8 11/18 11/19 11/22
11/23 12/11 12/14 13/6 13/7 13/10 14/6 14/10
14/17 18/6 18/16 20/10 20/11 28/10 32/5
32/11 33/10 33/24 54/2 54/23 55/11 55/19
56/6 62/8 66/15 67/1 67/7 67/20 67/21 69/20
74/6 74/23 75/14
**infringe [1]** 47/7
**infringement [15]** 43/9 43/14 44/2 44/4 44/7
44/8 46/3 47/6 47/11 47/20 47/24 48/1 48/2
48/9 62/22
**infringing [2]** 47/16 75/6
**inherent [1]** 39/1
**injunction [23]** 4/13 4/24 5/13 17/17 17/19 18/13
34/19 36/4 37/18 37/19 38/11 41/6 58/6 58/6
58/12 58/15 58/18 60/7 68/1 69/18 70/12
71/10 73/20 80/10
**injunctive [1]** 68/8
**injured [1]** 19/15
**insignificant [1]** 52/17
**instance [1]** 59/19
**instead [2]** 39/17 40/11
**instructional [4]** 44/23 44/24 47/3 47/8
**instructions [1]** 47/17
**instructive [1]** 61/25
**instrumentalities [1]** 56/12
**insufficient [1]** 35/8
**integrated [1]** 70/5
**intent [3]** 80/7 80/8 80/8
**intentionally [2]** 29/9 29/14
**interchange [1]** 81/9
**interest [9]** 26/20 54/1 61/16 61/23 64/24
66/14 77/3 77/10 79/15
**interested [2]** 52/16 65/24 77/7 77/13
**interesting [1]** 68/10
**interestingly [2]** 47/25 59/16
**interests [7]** 20/6 26/17 28/5 78/22 78/23
79/14 84/18
**interference [2]** 76/4 76/7

**internal [2]** 68/13 80/22
**interpreted [1]** 62/5
**introduced [1]** 83/13
**invention [1]** 44/14
**inventors [1]** 77/9
**investigate [1]** 20/1
**involved [1]** 58/12
**irrelevant [2]** 21/6 48/9
**Irvine [1]** 2/5
**is [263]**
**Isadora [1]** 57/7
**isn't [6]** 28/3 28/4 28/23 63/16 73/15 81/17
**isolation [1]** 37/5
**issuance [3]** 47/7 47/8 47/10
**issue [37]** 5/1 5/14 8/9 10/22 13/1 14/7 14/10
16/5 16/7 16/8 17/12 17/24 18/2 22/3 33/20
34/15 34/19 43/14 45/7 45/23 46/1 47/24 48/9
49/9 51/19 53/13 61/17 65/19 69/8 69/22
76/19 77/15 77/18 77/19 83/2 84/14 85/6
**issue of [1]** 16/7
**issued [1]** 47/5
**issues [3]** 3/20 14/5 16/2
**it [240]**
**it's [101]**
**Item [1]** 3/2
**its [56]** 39/1 42/9 55/7 68/20 73/2
**itself [10]** 12/16 32/4 33/15 34/5 40/14 41/16
42/2 54/17 57/1 81/15

**J**

**JAMES [1]** 1/8
**January [2]** 8/8 25/2
**January 2014 [1]** 8/8
**January 2016 [1]** 25/2
**JENSEN [9]** 2/3 3/8 21/22 24/3 71/15 72/23
77/20 81/6 84/21
**Jensen's [3]** 72/3 80/21 80/24
**jewel [1]** 14/17
**jewels [1]** 14/20
**job [7]** 15/15 57/10 57/12 75/13 75/18 75/19
76/21
**Joe [6]** 9/9 19/24 23/23 30/4 30/19 82/11
**joint [2]** 53/20 58/4
**Jonathan [1]** 78/5
**JOSEPH [2]** 2/3 3/7
**Journal [1]** 76/14
**JTX [4]** 40/23 57/5 71/2 78/17
**JTX-3174 [1]** 57/5
**JTX-69 [1]** 40/23
**JTX-83 [2]** 71/2 78/17
**JUDGE [4]** 1/8 8/19 83/3 83/5
**judgment [1]** 79/12
**Judicial [1]** 86/11
**June [1]** 57/5
**June of [1]** 57/5
**jury [2]** 16/2 16/3
**just [46]** 4/1 6/10 10/9 10/11 10/14 10/19 17/7
17/8 21/1 24/8 29/23 33/1 33/2 36/20 41/9
48/8 49/16 50/8 51/4 51/10 51/11 51/17 52/2
52/17 53/15 53/19 55/11 56/8 56/11 63/23
64/20 65/6 65/19 67/9 68/14 72/6 73/4 74/9
79/11 81/7 81/8 81/12 81/17 81/21 83/14
83/16
**justifiably [1]** 63/2
**justified [1]** 58/18
**JVS [2]** 1/11 3/2

**K**

**keep [4]** 9/2 10/9 41/10 62/20
**keeping [1]** 66/6
**keeps [1]** 30/15
**kept [9]** 9/7 13/8 13/8 15/22 54/4 54/7 67/17
69/17 78/25
**kernel [1]** 56/11 56/13
**key [1]** 31/1
**Kiani [32]** 3/9 9/9 15/24 19/17 19/20 19/21
19/24 21/9 23/23 25/22 28/17 30/1 30/4 30/20
37/14 44/13 49/6 50/22 51/8 51/9 54/6 63/11

**K**

**Kiani...** [10] 66/6 66/7 66/8 66/9 69/24 76/15 76/23 82/11 83/1 83/9
**Kiani's** [1] 83/8
**kind** [15] 18/3 40/16 42/4 50/12 59/23 60/7 60/23 61/21 65/16 71/11 72/22 74/7 83/17 83/18 84/5
**knew** [14] 20/9 21/5 25/8 25/9 25/18 25/25 37/13 59/12 59/19 59/22 60/1 60/22 65/21 82/23
**KNOBBE** [2] 2/4 3/7
**knock** [1] 49/5
**knocks** [1] 48/15
**know** [50] 3/23 9/21 10/15 10/20 13/11 13/12 16/3 16/8 16/14 16/14 16/18 16/24 16/25 17/14 20/8 20/12 30/12 31/12 32/16 32/18 35/16 35/17 42/21 46/13 49/13 54/14 59/14 61/5 61/11 63/5 65/13 65/18 65/23 67/9 68/22 71/10 71/25 72/8 73/1 73/8 74/17 74/17 75/17 76/19 79/1 79/3 80/7 81/1 81/23 85/11
**knowing** [2] 37/12 74/22
**knowingly** [3] 20/5 26/16 26/19
**knowledge** [9] 25/22 32/7 49/14 49/17 50/19 55/6 56/4 62/2 63/3
**known** [15] 21/15 23/2 23/15 29/6 29/14 35/17 41/13 46/19 46/20 46/23 46/24 46/24 54/17 54/19 70/5
**knows** [3] 67/20 72/17 74/21
**KRISTEN** [1] 2/11

**L**

**labeled** [1] 47/12 58/24
**lack** [5] 14/21 15/24 51/2 66/23 78/6
**laid** [2] 12/20 28/15
**Lamego** [95]
**Lamego's** [12] 21/12 22/9 26/13 27/5 27/21 28/13 52/20 67/8 68/9 70/15 77/8 78/8
**language** [2] 4/14 45/25
**large** [2] 65/24 77/4
**larger** [1] 52/12
**largest** [2] 63/9 65/21
**Larrabee** [2] 43/18 46/16
**last** [4] 27/22 71/2 79/17 83/19
**Lateef** [1] 49/21
**later** [6] 4/6 7/3 35/22 36/13 55/8 82/14
**law** [36] 4/15 8/9 8/14 11/3 11/21 12/17 12/19 17/21 18/1 18/10 19/9 19/25 35/1 35/4 35/11 36/2 38/12 42/14 54/16 55/1 55/5 56/1 56/4 56/10 57/8 57/23 58/3 59/3 62/1 62/8 69/7 74/3 74/6 74/8 77/17 85/18
**lawsuit** [1] 56/23 57/3 57/5
**lawsuits** [1] 62/21
**lawyer** [3] 9/24 50/10 67/11
**lawyer's** [1] 59/17
**lawyers** [3] 53/15 59/13 60/6
**lays** [1] 28/1
**lead** [6] 3/22 22/25 30/11 30/12 30/13 70/9
**leading** [2] 19/11 28/3
**leads** [1] 7/3
**learn** [1] 54/20
**learned** [4] 53/9 54/6 54/9 81/25
**learning** [1] 62/12
**leasing** [1] 71/3
**least** [4] 6/15 25/9 26/5 73/9
**leave** [9] 23/23 30/25 31/2 42/17 42/22 43/1 43/2 43/3 46/15
**leaving** [2] 44/18 47/16
**led** [2] 39/7 48/5
**left** [4] 10/23 22/8 30/5 30/13
**legal** [3] 42/13 52/4 80/3
**legally** [1] 80/16
**legitimate** [2] 34/10 36/23
**Leng** [2] 57/15 76/19
**length** [1] 37/9
**lengthy** [1] 80/23
**less** [3] 61/11 62/17 69/21
**let** [10] 6/6 6/6 6/13 6/14 23/25 31/12 32/9 59/19 81/1 84/21
**let's** [4] 3/25 12/24 31/6 51/21

**letter** [4] 9/23 10/1 67/11 75/22
**level** [6] 21/10 21/14 44/23 75/15 76/5 76/6
**liability** [3] 51/18 69/16 71/20
**license** [2] 19/7 68/21
**licensed** [2] 26/6 68/20
**licensing** [1] 19/6
**lien** [5] 65/10 65/16 83/23 84/5 84/19
**liens** [2] 84/3 84/12
**life** [4] 49/23 60/17 60/19 63/12
**lifetime** [3] 58/7 77/15 85/11
**light** [27] 43/12 43/13 43/14 43/16 43/19 43/21 43/22 43/25 44/3 44/5 44/9 44/11 44/17 44/21 45/9 45/15 45/17 45/20 46/14 46/18 46/20 48/1 48/3 48/5 48/8 53/23
**light from** [1] 45/16
**like** [24] 10/17 11/23 12/22 13/18 17/15 30/11 30/19 32/16 42/18 43/1 47/1 49/15 52/1 52/1 62/24 64/8 65/11 67/3 69/10 73/24 75/5 75/19 79/6 81/20
**liked** [1] 9/14
**likelihood** [1] 61/12
**likely** [4] 22/11 22/17 22/18 59/4
**limitations** [8] 19/4 19/5 19/11 19/14 19/20 24/25 26/11 29/25
**limited** [5] 51/17 58/8 60/13 60/16 77/15
**limiting** [1] 68/8
**line** [7] 7/9 7/18 15/17 18/3 42/5 54/14 75/12
**line 4** [1] 7/18
**lines** [6] 21/19 40/8 45/3 53/20 59/18 72/25
**list** [4] 80/21 80/22 80/24 80/25
**litigation** [16] 8/2 8/3 9/5 9/14 9/19 13/9 13/13 56/16 57/11 58/21 59/21 71/13 75/16 76/25 77/5 84/14
**litigious** [1] 8/5
**little** [5] 21/10 21/18 63/21 64/13 71/17
**LLP** [1] 2/4
**logical** [1] 6/2
**long** [7] 19/1 36/25 37/2 37/6 37/13 37/20 85/13
**longer** [1] 63/12
**look** [6] 9/22 10/1 15/14 27/25 37/4 84/9
**looked** [3] 46/6 70/15 82/25
**looking** [3] 12/17 39/8 46/1
**Los** [1] 2/16
**lose** [1] 52/2
**loss** [2] 66/9 77/24
**lost** [1] 75/17
**lot** [5] 11/22 60/21 70/3 70/22 72/12
**loud** [1] 75/3
**low** [1] 38/9
**lower** [1] 21/8
**loyalty** [1] 79/16
**Ltd** [1] 33/20
**lurking** [1] 77/13

**M**

**machines** [1] 62/12
**made** [25] 4/10 5/20 7/1 8/1 8/18 13/5 13/11 13/12 13/13 23/8 31/1 33/24 41/13 47/14 49/22 52/4 52/5 61/21 65/18 66/22 70/20 75/20 76/11 76/12 82/2
**magic** [4] 35/13 35/16 35/17 35/17
**Magistrate** [1] 76/10
**mailed** [1] 57/25
**Main** [1] 2/5
**major** [2] 26/18 77/25 82/5
**make** [16] 6/1 6/2 9/22 10/9 10/19 13/23 34/2 36/8 39/3 40/1 50/12 60/12 66/14 72/12 76/14 82/15
**maker** [1] 65/21
**makes** [3] 17/13 17/13 65/2
**making** [6] 6/2 20/6 26/17 39/24 42/6 82/24
**malicious** [2] 34/25 35/25
**man** [5] 28/3 37/11 37/24 38/3 64/12
**man-years** [2] 37/11 37/24 64/12
**manage** [1] 72/9
**manager** [1] 78/3
**mandate** [1] 80/10

**manufacturing** [2] 34/16 71/4
**many** [4] 9/8 43/10 71/2 71/16
**map** [1] 57/22
**Marcelo** [1] 3/16
**March** [7] 7/17 19/8 26/1 43/17 45/2 57/13 59/17
**March 13** [1] 26/1
**March 17** [1] 57/13
**March 18** [2] 7/17 59/17
**March 2015** [1] 19/8
**March 22** [2] 43/17 45/2
**marginalized** [1] 75/18
**mark** [3] 9/23 9/24 71/4
**marked** [1] 7/12
**market** [1] 27/17
**marshal** [1] 15/15
**MARTENS** [2] 2/4 3/7
**MASIMO** [37] 1/9 3/3 8/4 10/12 11/2 11/11 18/25 19/6 23/12 24/10 31/22 31/23 36/19 37/12 37/16 39/2 39/6 39/9 52/7 53/9 54/7 57/19 57/22 57/22 59/4 61/20 62/19 63/2 64/11 65/14 66/10 67/3 68/19 79/4 81/25 83/4 83/7
**Masimo but** [1] 57/22
**Masimo's** [4] 10/1 52/16 53/25 54/5
**MASM0141101** [1] 40/23
**Mattel** [4] 54/25 55/4 56/3 56/7
**matter** [4] 18/17 48/24 76/22 86/9
**matters** [1] 76/14
**may** [36] 1/17 3/1 11/22 12/1 16/2 16/19 16/19 17/22 17/25 18/6 25/15 28/14 42/8 47/9 49/15 49/15 50/14 55/19 55/23 55/25 56/5 63/16 69/17 69/20 69/21 71/7 71/14 71/15 72/24 73/16 75/5 76/6 76/7 77/6 80/8 80/8 86/13
**May 2014** [1] 25/19
**maybe** [6] 14/3 15/21 61/11 71/20 72/3 79/9
**McClenahan** [2] 3/11 53/16
**McNames** [5] 38/16 38/22 41/16 49/7 64/5
**McNames'** [5] 38/14 40/12 40/15 40/17 64/3
**me** [22] 3/7 3/15 9/6 9/9 9/9 9/10 10/25 15/8 15/16 17/21 19/12 23/25 24/3 31/12 42/18 52/2 55/16 59/14 59/19 72/12 79/6 84/21
**mea** [1] 17/15
**mean** [16] 14/4 14/7 14/9 17/13 18/3 25/15 27/8 60/18 70/25 71/20 73/3 77/1 79/7 80/8 80/8 84/11
**meaningful** [1] 41/2
**means** [2] 45/25 79/16
**measure** [1] 52/14
**measured** [2] 14/14 33/25
**measurement** [1] 25/20
**measurements** [1] 28/6
**measuring** [2] 38/23 41/21
**mechanism** [1] 13/18
**medical** [1] 30/7
**Medtronic** [1] 63/10
**meeting** [3] 20/9 25/8 26/4
**meetings** [1] 20/8
**member** [1] 10/12
**members** [2] 21/9 84/22
**memory** [6] 17/21 35/8 55/20 55/22 56/1 84/12
**mention** [2] 8/17 64/16
**mentioned** [9] 56/8 60/3 62/18 64/8 64/19 80/21 82/3 82/4 82/17
**mentions** [1] 43/20
**MERCHANT** [4] 2/8 2/12 2/15 3/14
**merely** [1] 20/24
**merits** [1] 59/5
**Merritt** [23] 21/21 21/21 22/1 22/4 22/16 24/6 24/6 24/7 25/16 25/21 26/24 28/1 28/9 29/3 29/7 29/22 29/24 48/20 48/22 49/1 49/10 50/4 53/10
**Merritt's** [2] 25/22 27/23
**message** [1] 18/24
**messaging** [1] 63/22
**method** [10] 21/15 23/2 23/6 23/15 29/6 29/11 29/13 30/7 79/7 79/9
**methodology** [2] 23/4 79/12

O

**M**

**methods** [2] 29/12 79/2
**might** [10] 19/25 23/19 29/20 44/11 70/2 71/6 71/19 74/6 81/8 84/19
**million** [4] 52/13 64/17 68/22 84/6
**mind** [4] 59/8 60/4 60/9 81/24
**mine** [2] 59/8 71/21
**Mining** [1] 34/16
**Minnesota** [1] 34/15
**minute** [1] 61/19
**minutes** [2] 6/8 6/9
**misappropriated** [1] 36/7
**misappropriating** [3] 37/3 37/6 75/6
**misappropriation** [14] 12/18 34/1 34/8 35/1 35/9 36/1 41/23 53/5 55/15 66/19 67/6 67/18 67/25 81/15
**miscellaneous** [1] 15/22
**misleading** [1] 44/19
**mismatch** [1] 12/7
**misrepresent** [2] 9/11 26/22
**misrepresented** [2] 25/7 27/12
**missed** [1] 69/2
**mistake** [1] 79/8
**model** [4] 39/18 39/19 39/20 41/23
**model-based** [3] 39/18 39/19 39/20
**modifications** [1] 42/10
**Mohamed** [2] 61/8 82/11
**Mohammed** [1] 61/3
**MONDAY** [1] 3/1
**monetary** [1] 84/5
**money** [5] 11/25 25/11 25/14 57/3 57/21
**monitoring** [2] 54/1 71/5
**Monovis** [2] 61/25 85/10
**months** [3] 69/25 70/17 82/12
**more** [23] 6/12 7/1 11/5 12/5 12/6 12/6 19/10 20/20 21/10 21/14 24/15 30/23 38/7 38/23 42/25 43/11 52/15 58/7 64/25 69/1 70/17 79/18 81/24
**Morlife** [3] 55/18 55/20 56/3
**morning** [1] 4/23
**most** [2] 47/4 50/4
**motion** [3] 3/24 4/20 5/5
**motives** [1] 30/2
**move** [13] 18/23 31/6 31/9 33/2 33/4 33/6 35/5 39/12 43/8 50/23 51/5 56/23 85/17
**moved** [1] 58/4
**moves** [1] 44/16
**Moving** [3] 35/19 38/8 40/25
**Mr** [29] 3/9 4/21 4/22 13/2 15/24 19/17 24/22 25/21 28/17 31/8 37/14 44/13 45/4 49/2 49/23 49/25 54/6 63/11 68/25 69/13 76/15 76/23 80/21 81/6 83/1 83/8 83/22 84/21
**Mr.** [49] 3/22 5/11 13/12 16/8 16/12 17/5 21/22 24/3 25/22 25/24 26/13 27/2 27/23 28/1 28/11 29/21 30/1 30/5 30/12 40/20 40/22 43/10 47/25 49/12 49/18 49/20 49/21 49/22 50/5 50/5 50/6 50/7 50/8 53/16 56/11 58/19 67/8 69/25 71/15 72/3 72/15 72/23 76/19 77/20 78/25 80/24 83/10 83/11 83/13
**Mr. Chen** [4] 49/12 49/18 49/20 49/22
**Mr. Claassen** [1] 56/11
**Mr. Cook** [1] 83/11
**Mr. Cook's** [1] 83/10
**Mr. Dalvi** [1] 50/5
**Mr. Diab's** [3] 40/20 40/22 69/25
**Mr. Goldberg** [1] 47/25
**Mr. Hammond** [1] 25/24
**Mr. Jensen** [5] 21/22 24/3 71/15 72/3 77/20
**Mr. Jensen's** [2] 72/3 80/24
**Mr. Kiani** [1] 30/1
**Mr. Lamego** [2] 72/15 83/13
**Mr. Lamego's** [1] 26/13
**Mr. Lateef** [1] 49/21
**Mr. Leng** [1] 76/19
**Mr. McClenahan** [1] 53/16
**Mr. Merritt** [1] 28/1
**Mr. Merritt's** [1] 25/22
**Mr. Paul** [4] 50/5 50/6 50/7 50/8
**Mr. Re** [13] 3/22 5/11 13/12 16/8 16/12 17/5 27/2 27/23 28/1 29/21 43/10 58/19 67/8
**Mrmusch** [25] 3/22 5/25
**Mr. Shaw** [2] 4/22 49/25 84/21
**Mrs** [1] 43/1
**much** [13] 9/6 10/9 11/25 14/25 15/4 15/6 21/14 24/15 38/23 41/17 59/22 82/14 84/7
**multiple** [1] 32/23
**must** [5] 16/9 16/13 17/5 19/14 49/19
**my** [12] 3/8 9/11 16/21 17/1 17/21 58/9 59/8 62/13 73/7 81/13 84/12 85/14

**N**

**N.D** [1] 32/14
**name** [1] 78/5
**named** [1] 77/9
**narrow** [3] 13/5 62/6 73/20
**nature** [5] 6/25 53/4 53/5 53/6 53/6
**near** [1] 10/5
**nebulous** [1] 18/5
**necessarily** [1] 27/24
**necessary** [2] 61/23 77/11
**need** [20] 28/7 35/14 35/15 55/16 55/19 58/7 60/23 71/13 74/16 83/14
**needed** [1] 30/3
**needs** [5] 11/17 14/5 32/11 74/17 74/21
**nefarious** [1] 19/18
**neglected** [1] 83/22
**negligence** [1] 79/9
**net** [1] 85/16
**never** [7] 4/10 8/20 9/2 20/7 49/22 68/20 68/21
**new** [5] 2/9 20/20 57/12 62/7 82/2
**next** [20] 10/17 12/10 18/23 20/2 21/10 26/14 33/3 33/4 33/6 33/8 33/23 35/5 35/19 36/15 38/8 39/12 39/25 65/21 75/13 79/20
**nice** [1] 69/7
**night** [1] 23/21
**Ninth** [2] 34/14 34/17
**no** [71] 4/7 5/6 6/16 6/16 6/16 6/16 6/19 7/19 8/17 10/3 10/7 13/10 14/20 14/21 18/20 19/6 19/18 20/10 20/15 20/18 22/22 22/25 23/1 23/13 23/16 24/17 25/4 29/5 30/10 30/12 32/2 32/7 33/14 38/12 38/17 39/15 40/8 40/22 41/2 41/25 42/14 47/13 47/14 48/25 49/4 50/17 50/23 51/10 52/15 55/14 57/9 58/21 59/11 61/17 62/8 69/16 71/16 76/6 76/5 77/16 78/7 78/7 79/18 79/18 80/2 82/10 85/20 85/21
**No.** [1] 58/4
**No. 51** [1] 58/4
**nobody** [4] 63/4 82/23 83/19 83/25
**non** [3] 11/4 18/1 18/10
**non-competes** [2] 18/1 18/10
**non-patented** [1] 11/4
**noncompetitive** [1] 19/22
**none** [5] 3/21 8/23 20/7 24/17 48/15
**noninvasive** [3] 25/20 28/21 53/25
**Nonsensical** [1] 10/13
**normal** [2] 30/21 66/6
**Northern** [1] 32/12
**Nos** [4] 28/16 38/16 56/10 62/11
**not** [160]
**notable** [1] 37/2 40/19
**Notably** [1] 70/2
**note** [1] 76/2
**notebook** [5] 40/22 61/4 61/7 64/11 70/1
**notebooks** [1] 14/8
**notes** [1] 69/25
**nothing** [10] 4/11 14/19 20/9 20/25 24/20 29/24 36/12 39/21 78/1 83/20
**notice** [5] 6/5 31/10 72/16 72/21 79/3
**now** [22] 6/24 7/13 8/11 9/3 9/4 9/8 9/16 10/17 12/10 12/22 24/4 27/11 30/1 32/15 34/24 37/22 39/25 43/8 59/13 59/20 59/23 59/25
**number** [6] 18/8 18/9 29/23 29/23 37/21 51/22
**NY** [1] 2/9

**O**

**oath** [1] 16/11
**object** [6] 10/18 10/20 13/25 21/24 50/16 50/18
**objected** [5] 21/25 22/2 29/22 49/20 49/21
**objection** [5] 18/21 49/12 50/20 51/12 51/14
**objectionable** [1] 21/25
**objections** [6] 48/10 48/21 48/24 49/5 49/6 51/8
**objective** [1] 48/19
**obligations** [2] 13/21 62/5
**obtained** [1] 57/4
**obvious** [1] 47/2
**obviously** [6] 11/1 11/10 21/6 21/18 31/4 60/21
**obviousness** [3] 43/14 45/23 46/1
**occur** [1] 16/18
**occurred** [4] 16/24 17/1 22/17 26/2
**October** [3] 25/5 25/8 66/2
**October 2013** [1] 25/5
**October 24** [1] 66/2
**off** [9] 3/22 26/21 43/23 43/24 46/9 58/10 70/8 70/10 78/24
**offend** [1] 17/25
**offending** [2] 71/23 74/12
**offer** [5] 36/17 68/6 82/24 83/11 83/12
**offered** [2] 38/17 57/12
**offering** [1] 51/2
**officer** [3] 11/9 21/6 39/7
**oh** [8] 12/25 17/5 24/3 47/23 67/7 69/1 79/1 79/17
**okay** [43] 4/3 4/9 4/18 5/2 5/7 5/10 13/1 16/6 17/9 18/19 18/22 18/24 19/1 26/5 29/18 31/6 31/13 33/6 36/12 38/5 39/24 42/20 47/22 48/14 51/21 52/11 67/23 69/3 69/12 71/8 73/7 73/12 75/10 81/5 81/22 83/21 84/10 84/21 85/5 85/9 85/13 85/22
**OLSON** [1] 2/4
**once** [3] 35/16 35/17 54/4
**one** [41] 4/2 5/14 5/23 5/24 6/3 6/20 7/7 8/11 11/11 11/20 13/14 14/5 15/3 16/2 18/8 19/18 20/3 21/13 21/20 24/19 28/3 29/23 30/12 33/20 38/3 38/7 46/8 46/12 47/23 48/17 48/21 50/20 52/24 57/1 58/11 63/5 69/1 69/2 75/13 77/25 83/22
**one-man** [1] 28/3
**ones** [3] 48/16 49/19 66/1
**only** [28] 7/23 8/12 9/12 9/17 12/7 13/9 14/2 24/18 24/19 28/14 30/22 31/17 35/21 37/8 41/3 43/15 43/24 44/12 44/17 47/7 50/10 51/15 51/16 56/24 57/17 58/11 58/12 66/2
**opaque** [2] 46/8 46/23
**open** [1] 6/14
**open-ended** [1] 6/14
**opine** [1] 49/22
**opined** [1] 40/5
**opinion** [8] 22/5 38/17 40/12 48/17 48/23 48/25 49/24 61/9
**opinions** [1] 50/11
**opportunity** [1] 50/24
**opposed** [4] 43/13 63/17 66/20 73/17
**opposite** [4] 23/16 45/15 45/22 47/18
**optimistic** [1] 24/2
**Orange** [1] 76/14
**oranges** [1] 71/7
**order** [14] 14/11 19/13 21/17 31/11 34/21 38/12 67/12 72/24 72/24 78/20 80/5 83/4 83/25 84/13
**ordering** [2] 10/23 66/19
**ordinary** [1] 46/12
**original** [2] 54/4 58/9
**other** [27] 5/8 5/25 6/1 7/7 8/4 8/18 8/19 16/9 16/13 17/6 17/24 23/11 24/13 34/23 37/3 37/7 39/2 39/8 42/12 47/23 50/20 57/1 77/13 78/23 79/10 80/14 84/25
**others** [2] 36/17 63/12
**otherwise** [5] 5/4 36/23 41/11
**ought** [1] 71/24
**our** [49] 6/1 17/20 19/9 35/1 35/4 35/10 38/12

# Q

**our...** **[42]** 38/16 38/18 40/21 42/14 43/17
43/21 44/1 45/1 50/7 51/14 52/4 53/16 54/25
55/4 56/1 56/2 56/10 56/21 57/23 58/3 58/25
59/11 60/4 60/25 62/1 62/8 62/11 62/13 63/9
64/2 64/4 64/21 65/12 65/22 66/1 66/22 67/4
69/7 80/22 80/25 81/18 84/24

**out [39]** 3/24 4/2 4/14 5/13 7/14 7/21 12/20
17/6 28/4 28/15 30/5 30/13 31/1 31/2 45/12
45/20 46/18 47/15 48/12 48/15 49/5 50/8
56/11 57/1 62/19 63/4 63/23 67/8 71/3 71/25
73/7 74/14 74/22 75/3 77/13 81/13 81/21
81/21 85/4

**outside [1]** 46/12 47/1
**over [9]** 14/2 16/12 25/16 28/2 28/8 34/10
36/23 45/20 83/18
**overbroad [4]** 73/19 73/23 74/9 80/4
**overlap [3]** 10/3 10/7 67/11
**overly [1]** 24/2
**overruled [2]** 50/18 51/13
**own [12]** 23/10 28/4 30/6 39/1 39/4 42/9
55/12 66/13 77/2 78/4 78/22 80/22
**owned [2]** 65/22 84/15
**owner [1]** 34/1
**owners [2]** 84/16 85/2
**ownership [1]** 84/18
**oximeter [2]** 33/13 57/23
**Oxxiom [22]** 19/24 25/3 25/4 30/1 35/21
35/22 39/13 39/15 40/3 44/24 45/8 46/6 57/4
63/15 63/16 63/18 63/19 63/25 71/6 73/15
73/16 73/18

# P

**P.C [1]** 3/14
**P.M [1]** 3/1
**page [20]** 4/4 4/5 7/17 8/10 21/9 22/10 24/4
24/7 25/25 28/19 43/18 45/3 50/13 53/20
55/24 56/2 59/18 64/23 71/2 86/10
**page 12 [1]** 64/23
**page 132 [1]** 53/20
**page 14 [1]** 7/17 8/10 56/2
**page 160 [1]** 55/24
**page 44 [1]** 50/13 59/18
**page 59 [1]** 25/25
**page 7 [3]** 4/4 4/5 22/10
**page 79 [1]** 43/18
**page 86 [1]** 45/3
**pages [14]** 14/3 14/17 14/21 15/21 18/18
20/17 26/24 27/1 28/19 32/2 55/3 55/4 57/13
84/24
**pages 120 [1]** 27/1
**pages 391 [1]** 55/3
**pages 46 [1]** 84/24
**paid [3]** 52/9 52/13 66/4
**pairs [1]** 28/21
**panel [1]** 25/6
**paper [1]** 77/22
**papers [1]** 80/6
**paragraph [25]** 4/6 12/15 21/21 22/4 22/14
23/5 25/18 25/22 27/23 29/2 29/4 29/23 35/2
35/3 35/11 41/4 45/17 48/23 56/22 58/25 59/3
64/2 64/3 64/5 64/9
**paragraphs [8]** 6/23 22/10 22/12 25/17 27/25
37/17 40/7 64/17
**parameters [3]** 25/20 26/7 53/12
**parse [1]** 63/21
**part [9]** 9/8 22/5 23/1 50/22 50/24 76/12 76/13
77/4 84/13
**participate [1]** 21/5
**particular [11]** 13/24 24/5 24/7 36/14 38/3
38/13 38/22 40/8 47/15 72/25 75/7
**particularly [6]** 11/4 31/21 39/6 49/1 76/18
83/24
**parties [8]** 48/20 53/9 77/6 77/11 77/12 83/5
84/13 84/17
**partners [1]** 3/8
**party [8]** 16/16 42/8 61/16 61/22 61/23 64/24
77/13 84/4
**past [4]** 52/6 52/7 52/8 61/11

**patent [33]** 39/14 39/16 39/22 40/4 40/9 40/15
40/19 41/6 41/10 43/8 46/5 47/4 47/6 47/8
47/8 47/22 47/23 48/5 48/13 55/7 56/13 56/20
69/5 69/8 77/9 77/11 77/14 79/20 79/25 80/3
80/19 83/24 85/3
**patented [1]** 11/4
**patentees [1]** 84/22
**patents [6]** 54/4 61/16 61/17 62/22 64/24 77/7
**patient [2]** 24/12 44/21
**Paul [7]** 26/25 48/20 49/10 50/5 50/6 50/7
50/8
**pay [1]** 52/12
**payment [1]** 64/20
**PC [3]** 2/8 2/12 2/15
**peel [1]** 46/9
**pending [1]** 77/5
**people [5]** 6/1 31/10 50/12 52/16 77/4
**percent [3]** 22/4 28/22 28/23
**perceptions [1]** 53/21
**perform [1]** 14/12
**performance [2]** 14/22 15/20
**performed [1]** 41/5
**period [11]** 33/25 34/19 34/20 37/13 37/19
38/1 61/10 70/3 70/17 70/24 82/6
**permanent [4]** 58/6 58/15 69/18 70/11
**permanently [1]** 62/3
**person [5]** 32/7 38/7 54/18 78/4 82/8
**personal [2]** 77/22 79/14
**personnel [1]** 11/23
**persons [1]** 49/13
**perspective [1]** 67/4
**PETER [2]** 2/8 3/13
**Ph.D [1]** 58/1
**phase [1]** 11/6
**physical [1]** 13/25
**pick [1]** 63/5
**picked [1]** 23/25
**piece [4]** 52/24 58/10 74/12 74/25
**pieces [5]** 31/18 32/20 32/21 35/12 74/22
**Pinsonneault [1]** 64/17
**place [2]** 41/3 75/11
**plaintiff [2]** 14/11 19/14
**plaintiffs [26]** 1/10 2/2 3/7 4/7 5/19 16/10
26/18 29/5 31/15 31/17 33/9 33/11 33/24 48/8
50/17 63/15 63/18 66/21 73/14 73/18 73/24
75/23 76/9 79/22 80/5 80/13
**plaintiffs' [12]** 20/5 24/25 25/3 26/16 26/19
31/14 41/20 41/25 45/24 50/21 63/17 73/17
**plan [1]** 67/2
**platinum [1]** 53/25
**played [1]** 71/25
**please [2]** 3/5 42/19
**pleth [1]** 41/22
**point [21]** 4/2 15/2 17/17 32/10 33/20 34/14
35/12 38/11 41/25 42/13 42/14 46/18 47/23
58/22 62/16 69/20 70/18 78/11 78/11 80/18
82/24
**pointed [1]** 24/16 56/11 67/8 85/4
**points [3]** 28/22 47/4 51/22
**pool [1]** 28/20
**population [1]** 24/12
**portion [8]** 43/6 43/7 45/8 45/16 67/23 68/1
71/23 75/6
**posed [2]** 26/14 49/12
**position [4]** 13/14 25/4 49/11 49/18
**possess [1]** 31/16
**possible [5]** 27/14 27/18 73/22 85/16 85/16
**possibly [1]** 16/23
**post [1]** 50/21
**post-trial [1]** 50/21
**potential [2]** 70/24 71/3
**PPG [6]** 33/11 36/16 36/25 37/21 63/7 82/5
**practicing [3]** 58/8 60/7 60/10
**precedent [1]** 74/1 77/16
**precluded [3]** 56/15 75/16 77/1
**predated [3]** 47/8 47/9 47/10
**predictions [1]** 27/6
**preemption [1]** 12/19
**preface [1]** 52/1

**prefer [2]** 6/10 41/11
**preferred [7]** 27/12 27/17 27/18 27/19 27/20
30/15 30/18 30/18 30/19 38/11 41/6 58/6
58/12
**prepare [2]** 8/2 8/7
**prepared [1]** 82/23
**preponderance [1]** 10/15
**present [3]** 40/3 58/6 80/8
**presentation [27]** 20/6 20/11 20/23 22/20
22/23 23/4 23/22 24/9 25/5 26/13 26/17 26/21
26/23 27/6 27/9 27/19 28/16 29/16 31/3 31/4
70/16 70/20 70/23 78/2 78/17 78/24 79/1
**presented [6]** 28/25 53/8 53/24 54/3 57/25
82/7
**President [1]** 3/11
**PRESIDING [1]** 1/8
**press [1]** 76/22
**pretty [5]** 10/14 39/24 41/17 60/5 74/2
**prevent [5]** 44/5 46/13 48/3 65/7 83/17
**prevented [1]** 57/3
**preventing [1]** 64/19
**prevention [1]** 85/11
**previous [1]** 36/4
**previously [1]** 69/5
**priceless [1]** 58/2
**primary [1]** 22/17
**printed [5]** 7/14 7/21 16/17
**prior [4]** 22/15 43/16 43/20 46/3
**probably [11]** 10/20 14/9 14/16 16/4 16/23
16/23 17/1 17/2 60/5 67/21 82/8
**problem [3]** 69/16 80/10 84/11
**proceedings [3]** 1/15 85/23 86/9
**process [3]** 42/11 56/5 59/12
**produce [1]** 9/2
**produced [3]** 9/4 12/15 13/9
**product [18]** 16/25 37/1 37/3 37/16 42/11
56/24 56/25 57/23 58/2 58/14 58/16 63/10
71/1 73/8 73/11 73/21 74/21 82/12
**products [5]** 30/8 30/20 42/10 71/3 82/13
**programs [1]** 11/25 70/25
**progress [1]** 39/24
**prohibited [2]** 71/15 71/22
**project [5]** 22/9 25/16 30/24 37/11 57/4
**projected [1]** 37/10
**projecting [1]** 71/3
**projection [1]** 61/4
**projections [3]** 64/18 68/13 70/25
**promised [2]** 23/22 23/23
**promotes [1]** 45/17
**Pronto [1]** 29/11
**Pronto-7 [1]** 29/11
**proof [1]** 56/11
**proofreading [1]** 24/8
**property [4]** 55/9 55/11 77/10 83/24
**propose [1]** 64/25
**proposed [3]** 3/20 71/10 82/7
**proprietary [3]** 54/22 56/5
**prosecute [1]** 80/7
**prosecution [2]** 57/6 67/2
**protect [7]** 7/15 11/4 13/21 13/23 15/22 46/19
69/17
**protectable [1]** 17/22
**protected [1]** 63/19
**protection [4]** 6/21 13/18 55/18 60/23
**Protective [1]** 31/11
**protects [1]** 12/14
**proud [1]** 58/19
**prove [7]** 14/12 20/5 26/16 26/19 33/8 33/9
47/25
**proven [3]** 23/24 23/24 69/9
**provide [2]** 60/23 69/5
**provided [6]** 56/9 57/7 57/14 65/4 66/3 66/15
**provides [1]** 54/16
**public [15]** 8/18 13/7 33/13 33/24 34/2 34/12
34/13 34/18 34/25 47/14 47/15 67/1 76/11
76/13 83/4
**publication [1]** 83/3
**publications [1]** 41/12
**published [2]** 54/5 76/13

**P**

pulse [4] 33/12 38/15 38/24 57/23
purchasing [1] 54/1
pure [2] 17/7 37/5
purportedly [1] 10/4
purpose [4] 7/24 8/1 51/15 51/17
pursuant [1] 86/6
pursue [2] 53/1 81/23
put [8] 49/21 51/7 62/7 64/16 66/2 71/11
80/24 81/13
putting [1] 43/23

**Q**

qualifications [2] 9/11 15/23
qualifies [1] 55/14
question [68] 5/12 5/19 6/19 7/3 7/10 7/19
8/22 8/22 9/12 10/17 10/24 12/10 13/4 13/5
13/24 15/10 15/13 15/16 19/3 20/2 21/10
21/14 21/18 21/25 23/9 24/7 24/24 26/14
27/22 28/12 30/2 31/14 32/1 33/3 33/5 33/7
33/8 33/14 33/23 35/5 35/6 35/19 36/25 36/15
36/21 38/8 39/12 39/19 39/25 40/2 41/1 41/19
44/22 52/14 54/13 56/14 64/14 65/25 68/8 68/7
69/1 69/4 69/15 73/13 75/1 79/17 79/20 83/22
84/6
questioned [2] 26/9 82/19
questions [17] 6/13 6/18 7/8 7/16 8/15 10/8
11/20 18/12 21/12 31/10 36/20 39/25 43/11
48/22 51/25 52/7 68/5
quickly [1] 61/6
quite [2] 67/19 67/21
quote [6] 13/14 18/7 19/14 20/15 25/18 55/3
quote/unquote [1] 18/7

**R**

Rad [1] 29/12
Rad-57 [1] 29/12
Radius [5] 33/11 36/16 36/24 37/21 63/7
Rainbow [9] 11/5 52/17 53/9 53/11 53/12
54/3 54/8 61/12 62/19
raised [3] 83/8 83/23 85/6
raises [1] 21/25
randomly [2] 22/21 28/22
rarely [1] 61/6
rate [2] 38/15 38/24
RE [16] 2/3 3/7 3/22 5/11 13/12 16/8 16/12
17/5 27/2 27/23 28/11 29/21 43/10 58/19 67/8
78/25
reach [1] 45/18
reaching [3] 45/9 45/17 46/14
reaction [1] 83/10
read [6] 6/14 7/13 24/8 83/3
reading [7] 7/17 13/15 44/6 44/12 44/12
44/14 44/20
ready [2] 14/1 27/16
real [1] 7/21
realize [1] 70/3
realized [2] 19/25 36/18
really [22] 5/24 14/4 15/22 22/24 24/9 32/17
35/6 37/4 37/5 37/8 38/20 42/7 43/15 48/11
54/13 54/24 59/10 61/13 65/6 65/18 68/8
71/12
reason [7] 7/14 9/3 19/15 25/1 26/6 26/12
36/5
reasonable [5] 3/21 20/22 37/19 70/13 81/10
reassembled [2] 53/11 54/10
rebutting [1] 64/7
recall [4] 46/5 70/7 71/2 83/13
received [2] 44/3 51/17
recipient [1] 65/3
recognized [1] 81/19
record [18] 10/14 15/9 17/8 20/25 21/1 23/20
24/3 50/23 51/4 51/11 69/23 76/6 76/13 80/24
83/15 85/2 85/2 85/7
recover [1] 68/14
recross [1] 83/9
redacted [3] 67/19 72/4 72/5
redefine [1] 40/11
redesign [1] 64/1

refer [1] 24/6
reference [3] 16/1 17/14 73/4
referenced [1] 11/1
references [3] 43/18 46/16 58/4
referred [3] 8/24 10/10 84/25
referring [2] 70/4 77/7
reflect [1] 64/20
reflection [1] 44/13
reflective [2] 45/13 45/20
reflects [1] 45/18
refraining [1] 41/9
refused [2] 57/11 77/23
regard [4] 4/11 27/5 44/6 44/23
regarding [4] 10/24 27/22 28/10 83/10
regret [1] 3/9
regulations [1] 86/11
reignited [1] 64/22
rejecting [1] 32/10
rejection [1] 74/3
related [1] 36/21
relatedly [1] 36/18
relating [1] 33/12
relation [1] 25/4
relationship [1] 66/5
release [2] 25/4 63/6
released [4] 25/3 62/24 63/10 82/5
releasing [1] 33/11
relevant [1] 66/19
relied [1] 31/23
relief [8] 34/11 52/21 52/23 53/23 60/23 67/15
68/8 83/17
rely [4] 20/23 31/17 39/18 82/21
relying [3] 55/5 75/14 79/22
remains [1] 33/10
remarks [1] 85/15
remedies [8] 12/18 12/21 34/23 51/21 52/4
52/19 54/12 64/15
remedy [12] 10/24 11/6 17/10 35/21 35/24
36/3 63/16 64/25 66/21 73/15 81/10 81/11
remember [1] 44/7
removal [2] 44/25 47/18
remove [2] 57/22 71/23
repeated [2] 41/5 56/7
repeatedly [1] 62/5
reply [1] 64/23
reported [3] 11/10 53/11 86/8
REPORTER [1] 86/16
REPORTER'S [1] 1/15
reports [1] 50/22
representation [3] 61/15 61/21 64/23
represented [1] 50/9
representing [1] 3/14
reputation [2] 9/7 76/24
request [9] 14/1 39/9 66/1 66/3 66/15 73/23
74/2 74/10 83/5
requesting [1] 53/23
require [4] 30/20 34/20 34/21 63/25
requirement [3] 32/3 32/5 32/8
requires [2] 29/25 79/24
research [2] 34/15 84/18
researched [1] 84/3
resources [2] 57/20 82/22
respect [48] 13/4 13/11 14/4 16/7 17/10 18/12
24/24 28/12 34/24 35/3 35/5 35/22 36/13 38/2
38/10 39/16 40/17 41/1 41/3 41/6 41/17 42/2
42/5 43/13 45/23 46/2 47/3 47/24 49/2 49/4
49/9 51/3 51/3 56/12 62/14 63/3 69/14 69/18
70/1 71/9 71/10 73/10 73/13 77/6 77/18 78/17
79/17 79/20
respond [3] 31/15 50/14 51/8
responded [1] 10/11
responding [1] 9/25
response [7] 8/21 12/9 32/17 34/3 38/17
75/22 77/25
responsibilities [2] 28/2 75/20
responsibility [1] 28/8
rest [1] 39/6
restrict [1] 55/7
restriction [2] 60/14 60/17

result [2] 39/9 66/12
results [18] 9/22 9/25 25/7 26/6
retained [2] 34/10 36/22
retrospective [1] 22/12
return [8] 9/17 10/23 12/11 13/25 18/4 18/8
18/16 67/14
returned [1] 19/5 19/8 19/8
returning [2] 10/19 69/16
revealed [1] 63/6
revealing [2] 53/18 58/18
reverse [1] 21/17
review [3] 20/4 26/15 80/24
RF [2] 46/11 47/1
Richardson [2] 79/23 80/17
right [20] 4/14 7/15 12/25 16/4 18/18 18/19
26/3 26/7 26/8 27/7 35/16 41/19 55/8 59/23
63/8 70/20 75/2 78/18 81/13 83/13
rights [2] 12/10 59/2
rise [3] 12/1 76/7 79/13
rises [2] 78/21 79/8
Rockley [5] 21/21 48/18 49/1 50/12 53/12
rollback [2] 36/4 36/9
room [1] 31/11
rooms [2] 44/8 45/20
Rosario [1] 78/5
RPR [1] 1/19
Rule [6] 22/3 48/20 48/25 51/9 51/13 51/14
run [3] 19/5 24/14 56/20
running [1] 56/19
RYAN [2] 2/11 3/15

**S**

SACV [2] 1/11 3/2
SACV-18-02001-JVS [2] 1/11 3/2
said [17] 6/22 9/1 9/5 20/8 20/14 20/18 23/16
24/7 25/25 27/2 27/23 28/11 30/1 45/2 50/18
72/23 76/16
salary [1] 11/24 66/4 77/19 78/8
sales [1] 68/13
same [6] 7/16 40/25 41/5 56/13 65/22 68/16
sample [2] 28/21 28/21
samples [2] 24/14 30/22
Santa [3] 1/16 1/20 3/1
save [1] 39/20
saving [1] 77/21
saw [6] 5/25 14/7 30/4 48/21 50/13 82/12
say [21] 4/15 4/17 6/16 6/20 14/16 15/10
15/19 16/2 16/23 17/18 26/5 52/1 57/2 60/15
63/5 68/11 73/1 73/4 73/7 77/20 81/12
saying [9] 13/20 15/5 17/15 32/19 46/2 59/24
72/24 74/16 78/25
says [8] 22/14 23/5 24/11 28/2 28/20 55/6
59/18 60/1
scattering [1] 45/13
schedule [1] 30/19
scientist [2] 9/10 75/23
scope [3] 13/24 14/6 42/24
SCOTT [2] 2/14 3/15
screen [1] 82/15
seal [2] 8/19 43/6
sealed [2] 43/7 67/23
Sean [8] 21/21 21/21 24/5 24/6 24/7 25/15
25/21 53/10
second [3] 4/6 21/14 23/1
secondary [1] 46/15
secrecy [1] 34/7
secret [112]
secret-protected [1] 63/19
secrets [60] 7/4 11/19 11/21 12/12 17/19
17/22 31/7 31/16 31/18 31/21 31/25 32/16
32/20 32/25 32/25 37/4 37/7 38/10 41/20 42/1
42/3 42/5 42/12 42/16 51/4 52/11 52/18 53/2
55/10 55/11 55/23 55/25 57/1 59/14 59/21
60/24 61/13 62/3 62/14 63/13 63/24 64/21
67/6 67/16 68/18 68/19 68/23 69/6 71/12
71/18 72/5 72/16 74/17 80/15 80/20 81/10
81/12 81/14 81/18 81/22
section [3] 12/16 22/8 86/6
see [6] 9/6 10/2 28/17 53/17 68/14 71/21

**S**

seeing [1] 61/20
seeking [1] 34/24
seem [1] 49/15
seemed [1] 30/9
seems [2] 3/21 72/12
seen [8] 17/3 35/13 43/1 49/22 53/14 72/5 74/8 76/3
SEFFENS [3] 1/19 86/15 86/16
segregate [1] 52/24
select [2] 53/1 53/4
selected [1] 28/22
selection [1] 9/23
self [1] 13/18
self-protection [1] 13/18
sell [2] 65/2 77/2
Sellers' [1] 53/19
SELNA [2] 1/8 59/22
semiconductor [2] 32/13 65/21
senior [1] 10/12
sense [6] 6/2 10/9 20/3 62/6 65/2 72/13
sensors [2] 24/16 28/20
sent [2] 18/25 67/11
sentence [2] 4/5 4/6
separate [7] 12/25 60/8 60/9 62/13 62/14 64/13 81/24
serious [1] 37/23
serve [1] 46/17
serving [1] 48/3
set [4] 12/15 22/21 44/25 54/5
setting [1] 39/5
seven [2] 69/25 70/17
several [3] 22/10 22/12 32/9
sharing [1] 3/7
SHARON [3] 1/19 86/15 86/16
SHAW [5] 2/14 3/15 24/22 30/5 30/12
sheds [1] 53/22
shelf [2] 70/8 70/10
shining [1] 48/1
shipping [1] 36/25
shore [1] 51/2
short [3] 60/17 66/1 70/13
shortcut [1] 40/16
should [17] 4/15 4/17 11/18 37/19 42/22 43/3 49/24 51/13 51/14 52/4 65/2 65/3 66/15 67/12 67/13 69/1 79/21
shouldn't [1] 10/19
show [6] 23/25 28/3 31/17 44/24 52/25 53/4
showed [9] 45/11 45/15 56/18 57/17 57/18 58/13 59/1 68/18 82/14
showing [6] 14/21 21/7 31/24 32/24 48/4 59/5
shown [5] 46/3 60/11 68/3 73/9 80/15
shows [7] 7/20 10/12 24/10 58/10 66/13 81/20 85/7
side [7] 43/25 44/2 44/4 44/8 44/8 46/7 46/7
sign [1] 17/14
signal [1] 41/22
signed [2] 26/21 78/24
significance [6] 10/25 11/1 14/15 16/5 47/14 62/17
significant [7] 4/4 9/18 11/2 21/14 22/24 48/16 49/6
significantly [1] 49/8
silver [2] 48/12 49/4
similar [5] 36/17 37/1 37/11 46/6
simple [2] 33/14 38/4
simply [6] 29/5 46/15 58/15 61/2 64/9 82/14
since [8] 8/3 8/6 9/7 9/19 56/23 58/14 67/16 84/2
single [6] 8/20 27/19 32/3 32/8 32/12 82/8
sit [1] 4/25
sitting [1] 37/15
situation [2] 71/7 71/11
six [7] 6/15 60/25 61/2 69/24 70/17 82/6 82/12
six-year [1] 82/6
skew [1] 21/16 29/6
skill [1] 46/12
skilled [1] 49/13

skills [1] 75/12
skim [1] 81/19
sky [1] 44/9
slice [1] 81/9 83/16
slide [2] 20/4 26/15
slides [4] 21/13 27/10 27/10 28/14
slow [1] 30/24
so [126]
software [4] 56/23 66/9 77/24 78/6
sold [1] 84/3
solution [1] 36/17
solved [2] 62/22 63/1
some [68] 6/2 8/4 9/23 10/8 10/25 11/4 11/25 13/15 13/17 16/9 16/13 17/6 17/14 21/24 29/20 31/1 31/10 31/16 37/13 39/1 47/4 50/2 50/2 52/2 52/11 52/12 53/13 53/22 53/23 54/16 55/6 56/9 60/7 60/10 60/13 60/16 61/1 61/22 61/23 62/7 62/16 62/18 63/11 64/18 65/16 65/23 66/3 66/11 68/4 69/20 69/23 69/25 70/1 70/4 70/4 70/13 71/3 71/13 71/19 71/21 74/6 75/8 76/1 77/12 77/21 77/24 78/16 84/5
Some of [1] 11/25
somebody [2] 61/22 65/2
somehow [3] 27/11 65/13 71/19
someone [6] 37/20 54/15 74/4 81/17 83/17 84/25
something [15] 19/22 21/7 28/4 28/23 54/18 54/23 57/21 61/8 62/24 65/11 66/7 73/6 73/8 74/14 83/6
somewhat [1] 46/6
soon [1] 61/6
sophisticated [1] 28/6
sorry [3] 25/13 47/23 50/17
sort [9] 17/14 18/5 64/15 70/13 71/13 71/19 71/21 71/24 78/16
sorts [2] 6/1 62/21
Sotera [4] 8/5 16/15 16/22 65/20
sought [1] 57/15
sound [1] 73/24
sounded [1] 30/11
sounds [1] 79/6
source [7] 39/13 39/15 39/22 40/3 40/9 41/2 41/16
SOUTHERN [1] 1/6
speaks [1] 19/19
specific [13] 34/3 38/1 39/17 39/21 52/24 54/21 66/3 67/13 70/5 72/7 73/6 85/16
specifically [4] 7/13 8/9 41/15 66/14
specifics [4] 4/11 32/15 32/18 42/3
speculate [2] 16/21 17/5
speculating [2] 16/9 16/12
speculation [4] 17/7 27/24 61/3 64/9
speculative [1] 22/5
spent [1] 11/25
SpHb [2] 38/21 38/23
split [13] 21/11 21/12 22/6 22/21 22/22 23/6 23/9 23/11 23/14 24/11 27/22 28/11 28/13
stale [1] 69/21
stand [1] 44/18
start [1] 5/16 8/5 9/20 17/24 34/4 34/10 36/23 69/22 70/14 70/17 70/24
started [2] 58/20 66/6
starting [1] 7/18
state [1] 47/17
stated [5] 29/15 36/16 51/18 59/9 80/6
statement [19] 6/24 8/20 22/6 22/6 23/5 23/7 24/5 24/15 24/20 39/3 40/8 50/6 50/7 56/22 61/17 64/1 64/3 64/5 64/22
statements [1] 24/19
STATES [4] 1/4 1/19 86/7 86/11
status [1] 27/12
statute [12] 12/12 12/20 19/4 19/4 19/11 19/13 19/19 24/25 26/11 29/25 33/15 54/17
stay [1] 42/20
stead [1] 3/10
stenographically [1] 86/8
STEPHEN [1] 2/3
Steve [1] 3/8

still [8] 18/16 22/18 34/12 52/14 58/7 60/1 82/5
stipulate [1] 18/4
stock [5] 64/14 64/18 68/13 79/17 79/18
stole [1] 9/4
Stone [8] 43/12 43/15 43/20 44/17 44/23 45/2 45/7 45/24
stopped [2] 6/7
story [1] 76/13
strategy [1] 33/12
Street [3] 1/20 2/5 2/12
stretch [1] 78/7
stretching [1] 50/2
strike [5] 3/24 4/20 50/23 51/5 51/16
strong [1] 74/2
strongly [1] 67/22
stuff [7] 15/22 16/13 17/6 18/20 55/16 56/13 63/22
subject [2] 4/12 7/17
subjects [2] 24/16 28/20
submit [2] 26/18 73/3
submitted [1] 8/8
submitting [1] 51/15
subsequent [1] 58/16
subset [1] 10/3
substantial [7] 14/21 15/1 15/5 15/6 15/20 15/25 19/1
substantially [3] 14/12 14/23 42/11
substantiated [1] 27/20
substantiation [1] 27/16
substantive [2] 51/7 51/18
substantively [1] 30/3
substituting [1] 57/1
succeed [1] 59/4
succeeded [1] 8/1
success [1] 36/16
such [6] 6/4 55/7 56/6 67/15 72/24 74/2 83/11 83/12
sufficient [2] 44/4 62/6
suggest [1] 22/25
suggested [2] 60/25 67/22
suggesting [1] 72/20
suggestion [3] 63/18 72/3 73/17
suggests [2] 20/25 71/15
Suite [4] 1/20 2/9 2/12 2/15
support [4] 70/16 74/2 74/7 74/9
supportable [1] 58/19
supported [2] 17/7 60/19
supports [2] 66/1 66/4
supposed [1] 55/15
supposedly [1] 61/22
sure [7] 17/19 36/8 40/1 47/10 50/15 70/18 84/8
surprise [1] 83/10
suspect [4] 17/1 19/15 25/2 81/23
suspected [2] 19/18 22/11
suspicion [1] 17/2
sustained [1] 51/14
Sweitzer [5] 43/19 43/22 43/23 46/5 46/2 46/23
synopsis [2] 69/5 80/19

**T**

Tab [5] 44/25 45/10 47/16 47/19 48/5
Tab 2 [4] 45/10 47/16 47/19 48/5
table [1] 69/7
tabulated [1] 69/11
tacitly [2] 78/9 78/13
tailored [1] 73/21
Taiwan [1] 32/13
take [32] 4/13 6/22 11/12 11/15 12/4 13/21 13/22 14/25 15/4 15/6 19/1 32/19 36/25 37/2 37/6 37/10 37/14 37/20 39/4 54/15 54/18 55/16 63/22 63/23 64/10 64/12 68/7 70/2 73/7 74/14 74/22 81/12
take-away [1] 68/7
taken [6] 7/6 10/6 10/16 10/21 16/10 20/20
takes [1] 11/21 37/24 81/21 81/21
taking [8] 4/12 7/24 8/6 28/11 46/21 53/6

**T**
taking... [2]  58/20 58/20
talented [1]  76/21
talked [6]  11/24 57/20 58/1 61/14 62/2 63/20
 30/18 38/22 43/25 82/17
talks [2]  53/21 62/12
Tatiana [3]  3/16 77/8 84/16
taught [1]  59/14
teaching [2]  46/21 59/17
team [9]  10/13 26/20 26/23 28/3 28/5 28/7
 53/11 54/10 67/8
tear [1]  68/12
technical [4]  6/25 11/9 12/2 49/15
technology [20]  11/4 11/5 30/3 32/13 37/25
 39/7 52/17 53/25 54/4 54/8 62/19 62/24 63/1
 63/4 65/24 68/20 68/22 70/3 80/14 83/18
technology-wise [1]  30/3
tell [6]  20/15 20/17 20/18 21/4 61/13 75/5
temporal [2]  60/14 60/17
ten [5]  37/11 37/24 61/3 64/10 64/12 70/2
tendered [1]  50/21
terms [5]  18/14 54/11 57/22 82/4 82/16
test [2]  22/21 44/3
testified [6]  6/6 13/8 16/11 19/20 20/10
 21/22 23/3 26/2 27/14 29/2 29/3 29/10 30/4
 30/20 38/14 38/21 49/10 60/3 63/11 66/5 66/7
 66/8 66/12 76/20 81/24
testified that [1]  66/12
testify [1]  49/14
testifying [1]  8/15
testimony [48]  8/21 21/2 21/15 21/24 21/25
 23/10 23/15 25/10 26/24 26/25 27/1 27/5
 27/21 27/23 29/5 29/22 30/6 31/24 32/22
 32/23 37/8 38/14 38/20 40/20 43/17 48/17
 48/23 48/25 49/7 49/8 49/25 52/20 53/24 54/3
 54/7 57/14 59/13 59/16 60/11 60/19 62/1
 62/23 63/24 64/7 66/13 66/17 67/22 83/1
testing [2]  19/10 24/13
tests [1]  28/23
than [15]  8/18 8/20 12/5 24/15 38/23 41/22
 42/25 49/11 49/18 52/15 52/22 63/12 67/13
 70/17 84/25
Thank [16]  5/3 13/3 18/22 24/23 29/19 45/6
 47/22 48/9 49/18 51/20 51/24 68/24 69/12
 81/3 83/21 85/22
thanking [1]  9/9
thanks [1]  9/8
that [604]
that's [100]
their [32]  8/13 8/14 8/17 8/24 8/24 8/25 11/4
 16/11 20/24 21/19 21/19 23/10 39/5 44/7
 49/14 49/16 50/13 50/25 51/8 51/9 51/12
 52/13 53/18 61/14 64/23 67/23 68/1 69/24
 74/8 76/18 80/6 80/15
them [30]  7/15 9/4 10/18 11/2 13/23 19/16
 40/10 50/3 50/11 50/18 51/16 53/2 53/17
 54/15 54/18 58/20 62/14 62/18 63/11 65/14
 65/19 66/21 66/24 67/3 69/10 71/19 72/17
 80/7 80/10 80/14
theme [1]  39/5
themselves [3]  33/24 42/10 42/10
then [22]  6/8 6/24 9/7 15/20 20/16 22/10
 23/22 29/13 35/2 46/3 50/11 59/1 59/4 61/11
 62/3 62/21 63/22 67/25 74/13 76/13 76/15
 81/21
theory [3]  32/10 44/7 74/5
there [89]
there's [49]  6/15 8/17 10/3 10/6 11/12 13/9
 14/9 14/20 14/21 17/23 23/1 25/17 28/19
 29/24 30/22 32/7 34/14 36/12 37/5 37/13
 38/9 41/25 44/8 47/3 47/13 47/14 49/4 53/13
 54/24 55/23 57/9 61/17 64/24 67/20 68/4 69/6
 70/8 70/10 70/22 71/22 74/2 77/5 77/12 77/16
 80/14 80/25 81/22 85/1
therefore [1]  54/7
these [46]  7/11 7/14 7/21 8/1 9/3 11/16 27/12
 27/14 27/14 27/18 28/6 31/9 31/21 39/24
 43/11 48/19 49/13 49/17 50/11 50/12 51/22

52/10 52/18 53/17 53/22 59/19 60/1 60/24
 65/25 67/8 67/21 69/7 69/12 72/14 73/23
 68/19 68/23 80/7
they [80]  6/20 6/21 6/24 6/25 7/11 8/20 9/2
 10/18 10/19 11/3 17/10 17/18 17/18 19/8
 21/20 22/1 22/25 23/8 25/1 25/1 25/9 25/11
 25/14 26/9 26/12 26/21 30/2 31/2 31/3 31/5
 32/20 43/3 43/4 44/10 48/19 49/11 49/13
 49/19 49/21 49/23 50/1 50/4 50/9 50/11 50/21
 51/1 51/1 51/6 51/14 52/9 54/1 54/15 54/20
 54/23 61/4 61/14 63/12 65/2 69/10 72/17
 72/25 73/4 73/25 74/5 75/18 75/19 75/22
 77/10 77/11 78/4 79/21 80/6 80/15 82/14
 82/14 82/22 82/23 84/3 84/4 84/7
they'll [2]  62/16 85/17
they're [11]  7/4 27/8 27/11 39/4 46/2 48/18
 51/16 69/11 79/22 84/16 85/2
they've [2]  52/12 60/6
thing [3]  9/4 21/20 65/21
things [16]  4/12 5/8 6/2 28/6 53/4 53/22 54/20
 58/11 59/19 60/2 60/20 61/6 61/12 66/6 67/14
 81/7
think [147]
think defendants [1]  4/24
thinking [4]  9/19 65/12 72/22 75/3
thinks [3]  9/6 60/3 60/8
third [2]  2/9 4/5 16/16 48/20 53/9 61/16
 61/22 73/13 77/6 77/12 77/13 84/4
third-party [1]  16/16
this [154]
those [45]  6/16 8/23 13/25 14/23 15/19 16/2
 18/4 31/24 32/15 32/25 38/12 39/6 46/3 46/17
 46/17 50/22 50/23 50/24 51/2 51/5 51/11
 51/15 52/8 53/4 53/12 55/4 59/9 61/24 62/22
 63/25 66/23 67/2 67/11 69/10 71/2 74/19 77/9
 77/10 80/2 80/5 80/16 83/25 84/12 84/14
 84/18
though [4]  12/1 28/13 64/16 75/5
thought [12]  9/25 20/19 23/17 24/20 26/22
 53/25 58/2 59/25 60/21 64/12 65/13 84/25
thoughts [2]  3/19 84/1
thousands [1]  18/25
three [8]  14/17 32/16 48/21 49/1 49/9 49/17
 52/12 59/20
through [19]  5/13 8/7 11/3 19/9 20/16 21/20
 23/20 28/19 32/25 42/5 42/18 45/3 53/20 54/6
 54/7 59/20 60/11 74/17 81/23
throughout [1]  5/25
tight [1]  6/12
Tim [2]  23/21 76/12
time [26]  5/14 22/19 23/4 23/17 26/6 26/9
 33/17 33/18 33/19 33/25 34/19 34/20 37/9
 37/13 37/13 37/19 53/3 54/9 60/13 60/16 61/4
 61/10 63/13 70/9 80/23 83/6
timeframe [1]  62/25
timeline [12]  20/14 20/16 20/21 20/23 20/24
 21/3 30/15 30/17 42/4 82/13 82/18 82/20
timelines [1]  27/5
times [1]  6/15
Title [1]  86/7
today [10]  3/8 3/15 3/16 4/25 5/9 37/15 48/17
 48/22 82/1 85/19
told [3]  19/23 25/21 60/6
Tom [2]  3/11 11/24
Tony [1]  57/14
too [2]  7/10 7/16
took [14]  5/21 7/14 10/4 17/6 17/11 17/16
 25/16 28/2 28/8 59/13 67/10 67/14 76/10
 77/22
tool [1]  16/10
topic [1]  18/23
tortuous [1]  76/8
touch [1]  77/4
touched [1]  51/22
tough [1]  15/10
towards [1]  45/13
trade [168]
training [2]  22/22 28/22

transcript [11]  1/9 1/15 6/15 7/17 8/11 20/17
 45/3 57/23 86/9 86/9 86/10
transfer [1]  63/18 73/18 80/5
transferable [2]  54/19 75/13
transferred [5]  65/14 73/23 79/22 80/13
 83/25
transferring [1]  66/20
transfers [1]  65/19
translate [1]  37/25
trashed [2]  76/22 76/23
treat [1]  48/19
trial [18]  5/25 16/2 20/12 22/3 27/1 31/2 31/20
 33/19 43/4 50/21 50/23 53/8 58/14 58/17
 62/19 66/5 81/23 83/9
trick [4]  35/14 35/16 35/17 35/18
tried [10]  13/10 6/14 6/20 9/5 22/1 29/15 52/25
 53/3 53/4 57/10
triggered [1]  61/14
triggering [1]  46/20
trouble [3]  7/22 59/10 74/24
true [22]  1/11 3/3 25/3 31/4 38/2 38/3 38/17
 38/25 39/16 40/4 41/16 46/1 46/2 46/17 56/19
 58/24 75/21 75/22 82/20 85/1 85/8 86/7
trust [1]  66/23
truth [1]  20/15
try [7]  9/10 40/16 52/20 67/2 74/13 74/17
 81/20
trying [12]  11/3 45/12 46/13 47/25 49/19 51/1
 51/11 52/23 53/12 63/21 65/7 81/9
turn [4]  14/2 17/2 51/21 70/23
turned [3]  14/2 45/11 57/10
turning [1]  47/17
TW [2]  39/14 44/24
two [12]  12/15 18/9 20/17 21/11 24/13 29/23
 44/8 45/20 63/5 73/1 77/9 84/16
type [6]  13/15 13/17 19/15 19/19 49/16 54/20
types [1]  51/12

**U**
U.S [1]  86/16
unable [2]  62/2 62/13
unaware [1]  66/7
unclear [1]  23/14
uncontested [1]  13/6
under [11]  6/21 8/19 12/2 12/14 16/11 17/21
 17/22 43/6 56/4 77/16 81/15
underlying [2]  21/12 28/13
understand [8]  29/3 54/11 59/23 61/20 62/7
 67/24 72/7 85/6
understanding [1]  59/22
understands [1]  67/21
understood [1]  28/24
undisclosed [2]  61/15 64/24
unfettered [3]  81/18 82/3 83/18
unhelpful [1]  42/2
UniRam [1]  32/13
UNITED [4]  1/4 1/19 86/7 86/11
unjust [3]  52/13 65/9 65/15
unjustly [1]  34/9 36/22 80/13
unless [1]  41/10
unprecedented [1]  62/9
unquestionably [1]  72/9
unquote [1]  18/7
unreasonable [1]  82/8
unrebutted [10]  25/17 40/20 41/17 53/8 53/24
 54/3 54/7 57/14 62/23 63/23
unrefuted [1]  26/24
unrelated [1]  19/22
unsupported [1]  40/7
untenable [1]  71/11
until [6]  8/6 19/23 23/24 25/2 30/1 36/24
unusable [1]  72/6
up [10]  6/2 15/7 17/2 35/21 42/23 43/15 47/25
 51/22 76/20 81/20
updated [1]  56/23
upheld [1]  11/14
upon [12]  12/18 20/23 33/11 37/12 47/7 55/5
 82/21
upset [1]  23/21

**U**

urge [2]  83/3 83/4
us [12]  7/25 29/23 50/4 50/7 58/10 61/14
65/18 67/11 67/12 67/14 81/13 85/17
use [37]  5/20 7/2 8/1 9/13 9/13 9/14 9/15
11/18 13/5 13/11 13/12 13/13 13/16 13/23
22/1 30/8 33/17 33/18 42/1 42/8 49/19 49/24
54/12 54/23 55/8 55/9 58/16 59/8 60/4 64/20
65/7 69/19 72/25 73/21 74/6 75/8 83/17
used [16]  24/12 24/13 24/14 27/18 28/22
29/11 29/12 38/25 40/15 55/12 56/24 63/17
73/3 73/16 76/15 79/10
useful [1]  72/4
uses [1]  35/7
using [12]  18/15 21/15 23/2 23/15 29/6 36/9
46/25 47/15 63/25 71/15 73/10 81/14

**V**

valid [4]  23/6 23/17 29/11 30/7
validation [1]  27/15
validity [2]  43/15 43/25
value [20]  36/18 38/9 38/9 38/10 38/13 38/18
38/22 39/1 39/2 39/10 51/3 52/10 52/18 64/14
64/18 64/21 68/17 68/18 68/23 69/21
various [2]  11/25 31/15
vast [1]  57/16
vehicle [1]  65/16
verse [1]  72/10
version [7]  35/21 36/5 67/19 72/1 72/4 72/5
73/11
versions [2]  35/23 36/13
versus [5]  3/3 55/2 55/24 70/9 75/14
very [28]  3/12 5/10 7/20 11/2 11/7 11/11 20/3
31/14 36/21 53/3 54/16 56/18 56/18 57/6
57/16 61/25 63/2 63/10 65/24 65/25 67/22
72/4 72/7 80/4 82/8 82/25 83/9 85/17
Vice [1]  3/11
Vice-President [1]  3/11
video [6]  44/23 44/24 47/3 47/5 47/8 47/13
view [4]  6/1 15/9 41/25 62/13
violate [1]  18/9
violating [1]  72/17
violation [1]  11/13
volume [2]  14/14 16/5
volumes [1]  16/19
vs [1]  1/10

**W**

waited [1]  36/24
waived [1]  52/4
waiver [1]  52/4
want [25]  4/8 4/21 5/4 5/14 5/17 9/16 9/22
10/19 11/14 11/14 12/3 15/8 17/10 17/18 36/8
39/19 40/1 50/20 52/11 53/9 65/10 67/1 68/8
68/10 77/4
wanted [3]  3/23 4/1 32/18
wanting [1]  6/17
wants [1]  24/3
warranted [1]  67/15
was [237]
wash [1]  21/7
wasn't [17]  5/24 6/13 12/8 15/5 19/23 27/4
29/14 29/14 30/1 30/10 36/17 50/24 60/1 61/2
64/9 65/12 83/12
wavelength [1]  68/17
way [13]  3/24 5/14 8/12 12/13 50/6 54/21
61/15 61/25 75/8 75/25 78/4 82/10 85/10
ways [1]  31/5
we [156]
we'll [6]  5/13 5/16 7/8 7/10 43/8 52/24
we're [18]  5/13 14/19 27/15 27/15 27/17
37/22 39/24 53/23 60/20 62/12 62/25 64/19
65/7 66/21 66/24 67/22 67/25 68/16
we've [10]  53/3 54/6 55/17 57/7 68/2 77/16
82/7 84/23 85/3 85/14
WEARABLES [13]  1/11 3/3 25/3 38/3 38/3
38/25 39/10 40/4 41/16 56/19 58/24 85/1 85/8
Wearables' [1]  38/17
wedded [1]  68/14

well [41]  6/10 6/24 7/20 8/3 10/11 10/14 12/24
13/19 13/23 15/1 17/18 18/6 18/6 18/8 18/10
18/13 20/10 22/13 25/5 25/20 38/2 38/19 51/6
59/24 62/11 65/11 66/12 67/18 68/7 68/18
72/20 72/22 74/24 75/17 75/19 78/19 79/10
80/7 80/9 84/8 85/13
went [2]  29/7 58/9
were [56]  6/21 7/11 7/12 8/23 9/25 10/6 10/16
10/21 12/5 16/10 16/17 19/7 19/8 22/16 26/7
26/9 26/23 27/11 27/14 27/14 27/18 27/18
31/1 31/22 32/17 49/6 49/11 49/19 50/22 51/1
51/2 51/7 51/10 51/10 51/11 53/24 54/5 59/20
60/23 62/3 64/25 65/8 71/14 72/24 73/1 77/7 77/9
78/15 80/12 82/13 82/14 82/22 82/23 84/3
85/3 85/7 85/23
weren't [2]  6/20 6/25
West [1]  1/20
what [102]
what's [12]  22/24 37/2 42/7 42/24 45/15
45/22 52/3 60/9 70/5 74/21 79/25 79/25
whatsoever [1]  42/1
when [34]  4/6 6/16 7/13 11/5 19/5 19/7 25/2
25/6 26/11 26/12 30/1 31/12 34/1 44/15
44/20 44/21 45/2 46/25 47/25 52/8 52/19 54/9
57/25 59/5 59/13 60/1 60/22 61/14 62/10
62/10 63/18 70/10 79/4 82/14
where [34]  5/11 5/24 6/20 9/9 10/10 15/17
22/14 22/25 23/9 24/4 28/20 35/12 41/3 45/1
45/10 45/19 46/6 46/8 46/10 46/15 48/23 50/3
54/14 57/24 61/8 62/12 64/23 69/9 71/11
71/25 73/2 73/6 75/11 84/22
Whereupon [1]  85/23
whether [17]  7/4 12/18 13/5 13/11 14/5 15/18
18/5 20/11 39/13 40/2 44/19 45/7 56/14 68/12
69/18 78/3 79/21
which [46]  8/5 9/17 9/22 10/2 10/17 17/25
19/12 19/22 24/16 31/17 34/20 41/20 41/23
44/11 47/4 48/19 50/13 50/20 51/4 52/14
53/21 54/14 55/2 55/4 56/7 56/18 60/23 62/19
63/4 65/7 66/23 67/19 67/21 69/5 69/6 70/6
71/5 72/5 74/1 75/24 78/2 79/15 80/14 80/19
80/20 80/22
while [5]  43/23 68/4 75/12 77/4 77/24
white [2]  28/25 48/4
who [15]  21/6 21/22 27/20 31/11 40/5 49/10
50/10 52/16 53/12 61/18 65/4 81/18 83/17
84/13 84/17
Who's [1]  45/4
whole [3]  22/21 54/5 54/10
wholesale [1]  46/22
why [19]  7/19 19/19 23/19 24/1 24/11 25/11
29/25 33/4 42/15 51/12 58/10 58/16 60/7 61/1
63/15 73/15 81/9 81/20 84/25
Widrow [1]  58/1
wife [2]  77/8 84/15
will [7]  7/13 18/4 39/8 42/23 51/25 52/15
55/7 62/18 66/23 67/16 73/7 73/7 74/4 81/13
81/23 82/8
willful [2]  34/25 35/25
willing [1]  14/2
willingness [1]  68/21
Wilshire [1]  2/15
windfall [1]  65/9
Winston [1]  34/15
wireless [3]  16/15 16/22 33/12
wise [1]  30/3
withheld [2]  20/11 29/14
withhold [1]  20/13
within [10]  13/24 30/17 32/6 32/8 42/24 49/14
49/16 50/19 77/19 78/20
without [7]  37/3 37/6 37/22 53/18 56/1 69/15
73/22
witness [14]  6/17 6/23 7/11 22/5 22/6 23/5
23/7 40/2 40/8 50/10 56/21 64/1 64/3 64/5
witnesses [10]  31/20 48/19 48/19 49/1 49/17
49/24 50/3 51/9 51/12 52/20
won't [3]  35/11 51/16 68/10
word [6]  21/2 24/8 27/2 27/3 27/8 76/16
words [1]  27/18

work [8]  8/7 16/24 19/22 31/22 38/21 73/25
74/7 77/6
worked [1]  77/2
working [6]  56/15 74/5 74/7 75/13 75/17 77/1
works [1]  74/13
world [1]  65/22
world's [1]  9/9
worse [1]  76/15
worth [1]  80/23
worthy [1]  6/21
would [116]
wouldn't [9]  7/5 15/20 20/21 30/12 50/7 60/22
67/2 72/12 83/11
write [2]  35/14 35/15
writing [5]  55/17 55/19 56/6 59/1 75/24
written [1]  4/15
wrong [2]  29/10 81/11
wrongdoing [6]  19/15 19/18 20/1 25/2 29/24
29/24
wrote [2]  23/21 76/12

**Y**

Yeah [3]  18/20 27/8 59/18
year [3]  19/4 24/25 82/6
years [15]  9/15 31/22 35/18 37/11 37/21
37/24 56/20 59/21 60/25 61/2 61/3 64/10
64/12 70/2 83/19
yes [18]  3/25 5/22 7/9 7/10 7/19 12/12 25/15
26/4 26/10 42/19 48/13 50/16 51/23 52/7
60/18 60/25 78/14 81/2
yesterday [1]  7/20
yet [4]  15/13 59/6 63/10 71/18
York [3]  2/9 62/7 82/2
you [155]
you'd [2]  46/14 69/10
you'll [4]  6/5 10/2 11/5 44/7
you're [11]  15/5 16/4 32/19 46/13 46/21 46/25
62/2 68/13 72/15 74/16 78/19
you've [6]  6/19 35/13 35/17 38/7 51/17 51/21
your [63]  3/6 3/13 3/21 4/23 5/3 5/6 7/7 7/19
9/12 10/17 11/20 12/10 13/3 15/2 15/9 15/15
18/11 18/11 19/3 24/23 29/17 31/9 33/8 33/23
35/5 35/19 35/20 36/10 36/15 38/8 39/12
41/19 44/22 45/6 47/20 48/21 49/3 50/1 50/4
50/18 51/20 51/23 51/25 53/14 60/15 60/21
68/17 69/2 69/14 69/19 70/18 70/19 71/1
72/14 75/1 75/6 78/15 78/19 81/3 83/20 84/23
85/15 85/20 85/21
yourself [2]  7/15 23/19

**Z**

zero [1]  20/7